**Kenneth Burton LANG, Jr., Petitioner,**

v.

**Vince CULLEN,[1] Warden of California State Prison at San Quentin, Respondent.**

**Case No. CV 91–04061 MMM.**

United States District Court, C.D. California.

July 23, 2010.

1. Vince Cullen is substituted for his predecessor, Jeanne Woodford, as Warden of California State Prison at San Quentin, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure ("The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name.... The court may order substitution at any time"); *Deere v. Cullen,* 713 F.Supp.2d 1011, 1015–16, 2010 WL 1946914, *1 (C.D.Cal. May 11, 2010) (substituting Vince Cullen as Warden of California State Prison at San Quentin).

See also 782 P.2d 627.

930

Kenneth Burton Lang, Jr., Tamal, CA, pro se.

Gwen E. Freeman, Knapp Petersen and Clarke, Glendale, CA, Kerry R. Bensinger, Bensinger Ritt Tai and Thvedt, Pasadena, CA, for Petitioner.

David F. Glassman, Gary A. Lieberman, Office of Attorney General of California, Los Angeles, CA, for Respondent.

## DEATH PENALTY CASE

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS WITH RESPECT TO GUILT PHASE CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL AND *BRADY* AND *NAPUE* CLAIMS; FINDING COUNSEL'S PERFORMANCE WAS DEFICIENT AT THE PENALTY PHASE

MARGARET M. MORROW, District Judge.

Petitioner Kenneth Burton Lang, Jr., was convicted of robbery-murder in Santa Barbara, California in 1984, and after a short penalty phase, was sentenced to death. Petitioner's convictions and sentence were affirmed on direct appeal. His collateral claims for relief were rejected by the California Supreme Court without an evidentiary hearing or the issuance of an order to show cause. Petitioner presented his claims to the federal district court in a petition for a writ of habeas corpus that alleged ineffective assistance of counsel, prosecutorial misconduct, and instructional error. On September 11, 1998, Judge James Ideman denied the petition on all grounds. On September 5, 2000, the Ninth Circuit affirmed in part and reversed in part. The Ninth Circuit affirmed Judge Ideman's ruling on petitioner's claims of instructional error and his claim that statements made by the prosecutor misled the jury as to its role in the penalty phase. *Lang v. Woodford,* 230 F.3d 1367 (Table), 2000 WL 1256886, *1 (9th Cir. Sept. 5, 2000) (Unpub.Disp.), cert. denied, 532 U.S. 977, 121 S.Ct. 1614, 149 L.Ed.2d 478 (2001). The Ninth Circuit also affirmed Judge Ideman's denial of petitioner's request for discovery and an evidentiary hearing on the claim of abuse of prosecutorial discretion in electing to pursue the death penalty. *Id.* at *2. The Ninth Circuit held that Judge Ideman abused his discretion in denying petitioner an evidentiary hearing on his claim that counsel provided ineffective assistance during the penalty phase because he failed to investigate or present mitigation evidence, and during the guilt phase because he failed to investigate and present mental health evidence that could have corroborated petitioner's belief that he was in imminent danger at the time of the killing. *Id.* at *1. Finally, the Ninth Circuit concluded that Judge Ideman abused his discretion in failing to hold an evidentiary hearing to determine whether the prosecutor knowingly used coerced and false testimony or in the alternative failed, despite a lack of personal knowledge, to disclose the use of such testimony. *Id.* at *2.

On remand, the action was assigned to this court. The court set a schedule that provided time for discovery and a date for an evidentiary hearing. Approximately one month before the evidentiary hearing, the parties advised the court that they had agreed to present all evidence via declarations, depositions, and exhibits, and that neither wished to call live witnesses. Based on this representation, the court vacated the evidentiary hearing, and permitted the parties to proffer evidence

through direct testimony declarations, deposition excerpts that served as cross- and redirect examination of the witnesses, and documentary exhibits. The court heard oral argument on all issues except the issue of prejudice in the penalty phase on June 26, 2003.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Events of August 1983 and the Killing of Thurman Anderson

Thurman Anderson was shot and killed on August 18, 1983, approximately one mile from the Barrel Springs campground in the Los Padres National Forest. *People v. Lang*, 49 Cal.3d 991, 1002, 264 Cal. Rptr. 386, 782 P.2d 627 (1989). Anderson had left his home in Camarillo at 12:15 p.m. to go deer hunting. He told his wife he would return by August 21, 1983. The couple had visited the area the previous June and Anderson's wife had helped him prepare a map showing the route from the highway to the campground. According to his wife, Anderson was not in the habit of picking up hitchhikers. *Id.* at 1003, 264 Cal.Rptr. 386, 782 P.2d 627.

At approximately 8:45 p.m. on August 18, Anderson's motor home was stopped by a California Highway Patrol officer in Atascadero because the tail lights were not working. Petitioner, the driver and sole occupant of the vehicle, told the officer his name was Kenneth Burton Stevens. Petitioner said that he had no identification and that the motor home belonged to his stepfather. *Id.* Still driving the motor home, petitioner arrived at the Atascadero home of his friend Steve Schroff. Petitioner told Schroff that the motor home belonged to a hunter who had hired petitioner as a chauffeur. Petitioner said he wanted to "go out and party; just have a good time." Accompanied by Schroff's girlfriend, Terry Davis, petitioner and Schroff drove to a truck stop where Schroff arranged for petitioner to get $13 worth of gas and $87 cash with Anderson's credit card. Petitioner signed Anderson's name on the receipt. *Id.*

While in the motor home, Davis observed petitioner remove a rifle from its case and show it to Schroff. She also saw petitioner remove a handgun from under the seat. Pointing the gun at Schroff and Davis, petitioner said, "bang, bang," and laughed. After leaving Schroff and Davis at a motel, petitioner arrived at a restaurant at 10 a.m. and met an acquaintance named Mitchell Bass. With a woman Bass knew, Ines Tinker, petitioner and Bass purchased beer and drank and talked. Bass did not think that petitioner seemed despondent or depressed. *Id.* at 1003–04, 264 Cal.Rptr. 386, 782 P.2d 627. When Bass asked how petitioner had acquired the motor home, petitioner said that his boss allowed him to use it on weekends. Petitioner showed Bass a rifle and a handgun and pointed the handgun at Bass. *Id.* at 1004, 264 Cal.Rptr. 386, 782 P.2d 627.

Petitioner fell asleep and was awakened at approximately 6 a.m. by Bass. After driving Tinker and Bass home, petitioner drove back to the motel where he had left Schroff and Davis, and fell asleep in the motor home. He was awakened by Schroff at approximately 8 a.m. and drove Schroff and Davis to their respective places of employment. Later that day, petitioner told Schroff that he was going to fly to San Francisco and would leave the motor home at the airport. Petitioner gave to Schroff the rifle that had been in the motor home. Scroff thought petitioner was "a little jumpy" and that he frequently looked in the rearview mirror while driving. Petitioner used Anderson's credit card once again to purchase gasoline. *Id.*

Petitioner was arrested at the San Francisco airport at approximately 9 p.m. on August 19 after attempting to carry a bag

containing a loaded .32–caliber revolver through a security station equipped with an X-ray screening device. Petitioner said the bag belonged to his brother and he had not known its contents. Petitioner told agents his name was Thurman Anderson. Although he initially denied having identification, he eventually produced a wallet containing Anderson's credit card and driver's license extension.[2] *Id.* After being transported to a nearby police substation, petitioner gave a 1960 birth date and said he lived in Sonoma County. When a computer check of Anderson's birth date revealed a twenty-year disparity in birth dates, petitioner said he was Anderson's son. The bag in which the revolver was found also held an airplane ticket to Seattle, purchased by petitioner, and certain personal effects belonging to Anderson. *Id.*

On August 24, 1983, Santa Barbara police found Anderson's motor home in the parking lot of the San Luis Obispo airport. On August 26, 1983, police found Anderson's body. The body was face down, with Anderson's hands under his chest, in a grove of trees in a remote area; there was no human trail nearby.[3] The immediate area was searched, but no shell casings, weapons, wallet, or other personal effects were found. *Id.* at 1004–05, 264 Cal.Rptr. 386, 782 P.2d 627.

Anderson had been shot five times. One bullet entered the chest, traveled horizontally at a 45–degree angle to the body's left side, and penetrated the heart. Three bullets entered behind the left ear and another in the back. Although the precise sequence of the shots could not be determined, forensic experts deemed it likely that the shot to the chest occurred while Anderson was standing, causing a loss of consciousness within five to fifteen seconds. The experts concluded that the remaining shots were fired while Anderson was lying on the ground unconscious. *Id.* at 1005, 264 Cal.Rptr. 386, 782 P.2d 627. Bullets recovered from the body were consistent with bullets test-fired from the weapon in petitioner's possession, although the bullets were too deformed to permit positive identification. *Id.*

Petitioner testified at his criminal trial, and stated that after leaving Atascadero on Wednesday, August 17, 1983, he hitchhiked to Santa Monica looking for work. That same evening, he decided to return to Atascadero. Petitioner stated that, by noon the following day, he had hitchhiked to Santa Barbara in the rain. Petitioner accepted a ride from Anderson, who was driving the motor home. Anderson said he was going hunting for a few days and suggested that petitioner join him. *Id.* The men stopped at a store on Highway 154 where Anderson gave petitioner $100 to buy food and beer. Petitioner drank beer as Anderson drove to the Barrel Springs campground. *Id.* at 1006, 264 Cal. Rptr. 386, 782 P.2d 627.

By the time petitioner and Anderson arrived at the campground and set up camp, petitioner had consumed seven or eight beers. At Anderson's suggestion, they walked about a quarter of a mile to a water hole, intending to swim and bathe. On seeing how deep the water was, however, they returned to the campground and decided to go hunting. Anderson took his

---

**2.** Petitioner had discarded Anderson's license, which bore Anderson's photograph. *Id.*

**3.** An employee of the United States Forest Service testified that no one was at the Barrel Springs campground on Friday, August 19, 1983, but that the campground was about half full that weekend. The spot where Anderson's body was found was a better than average location in which to hunt deer, and was one to one and a half miles, or approximately 40 minutes' walk, from the campground. *Id.* at 1005, 264 Cal.Rptr. 386, 782 P.2d 627.

30.06 hunting rifle and strapped a knife on his belt. At Anderson's request, petitioner carried Anderson's binoculars and another hunting knife. Petitioner also carried his own loaded revolver. At petitioner's request, Anderson did not load his rifle, but carried ammunition in a cartridge case on his belt. *Id.*

After they had been hiking for approximately 45 minutes, Anderson said something about being afraid that he would catch a venereal disease; he also revealed that he had previously had sex with two men. As petitioner was looking through the binoculars, Anderson approached petitioner from behind and attempted to grab his leg and kiss him. Petitioner pushed Anderson away and yelled angrily at him. Anderson turned his back to petitioner and swung his rifle down from his shoulder. Petitioner could not see Anderson's hands and thought Anderson was loading the rifle. As Anderson slowly turned toward petitioner, petitioner pulled the revolver from his belt and fired. Although he emptied the gun, petitioner could not recall firing any but the first shot. *Id.*

Anderson was lying on the ground and appeared to be seriously injured. Petitioner testified that for his own safety, he took the rifle, knife, and cartridge case. He also took the motor home keys. Petitioner ran from the scene and returned to the campground. He left in the motor home. Driving recklessly, he hit a tree, damaging the rear part of the motor home, and breaking a tail light. Petitioner later discovered Anderson's wallet and watch in the motor home. *Id.*

Five days after being arrested in San Francisco on the weapons charge, petitioner spoke to officers investigating Anderson's disappearance. Initially, he told a series of lies, including that he had taken the motor home after he saw it outside a store with the motor running, and that he found the handgun in the motor home. Petitioner eventually confessed to shooting Anderson, describing the circumstances in a manner consistent with his trial testimony. He then led officers to the body. *Id.* at 1006–07, 264 Cal.Rptr. 386, 782 P.2d 627.

During cross-examination, petitioner was asked about his attitude toward gay men. He said that while he did not dislike gay men, he did not like it if a gay man tried to "play on" him. He denied frequenting an area in downtown Portland, Oregon called "The Camp," which was known as a pickup area for gay men, and seeing a man named Donnie Marshall there. Petitioner admitted prior felony convictions in Oregon for burglary, robbery, forgery, escape, and unauthorized use of a motor vehicle. *Id.* at 1007, 264 Cal.Rptr. 386, 782 P.2d 627.

Petitioner's trial counsel called mental health expert Dr. Rex Beaber, a clinical and forensic psychologist, who had interviewed petitioner and received a transcript of petitioner's statements to law enforcement officers shortly after his arrest. Dr. Beaber testified that Anderson's stated fear of venereal disease suggested he might belong to a subgroup of male homosexuals who had very few sexual contacts with men and an almost morbid preoccupation with venereal disease. According to Dr. Beaber, this subgroup's existence was not generally known. Dr. Beaber also testified that defendant's account of his actions following Anderson's death was consistent with a panic reaction that alternated with a fatalistic outlook causing petitioner to believe that he would inevitably be caught and that these were his last days as a free man. *Id.*

The prosecution called Donnie Marshall, a homosexual with a preference for younger men, who testified that he saw petitioner seven or eight times during the summer of 1983 in areas of downtown

Portland known as pickup spots for male homosexuals. Marshall said that petitioner was carrying a handgun when Marshall first met him. At a later meeting, Marshall agreed to let petitioner become his roommate. Marshall testified that he offered to orally copulate petitioner, and that petitioner did not seem in any way disturbed by the proposition. *Id.*

The prosecution also called Dr. Lee Coleman, a psychiatrist. Coleman testified that that opinions offered by psychiatrists and psychologists concerning disputed questions of facts, including an individual's state of mind, are unreliable. He found nothing significant or unusual in Anderson's statement regarding venereal disease. *Id.*

During the penalty phase, a stipulation concerning petitioner's prior convictions was read to the jury. It was also stipulated that petitioner's escape conviction was based on the fact that he walked away from a work detail outside the Oregon State Correctional Institution and that he had surrendered without resistance when confronted by a police officer near his hometown. A Santa Barbara County correctional officer testified as a defense witness that petitioner had not been involved in any disciplinary problems during the fourteen months he had been housed at the Santa Barbara County jail. *Id.* at 1007–08, 264 Cal.Rptr. 386, 782 P.2d 627.

**B. Procedural Background**

Petitioner was found guilty of first degree murder, and the jury found as a special circumstance that the murder had been committed during the perpetration of a robbery. CAL.PENAL CODE §§ 187, 190.2(a)(17)(i), 211. The jury further found that petitioner used a firearm in the commission of the offense. CAL.PENAL CODE §§ 1203.06, 12022.5. Petitioner was also convicted of possession of a concealable firearm by a convicted felon. CAL.PE-

NAL CODE § 12021. He was sentenced to death on December 5, 1984.

On direct appeal, the California Supreme Court set aside petitioner's conviction for possession of a concealable firearm, but otherwise affirmed the judgment. *Lang,* 49 Cal.3d at 1002, 264 Cal.Rptr. 386, 782 P.2d 627. Lang filed a petition for writ of habeas corpus on June 17, 1987, in the California Supreme Court. On October 12, 1989 the court denied both that petition and another that had been filed while the first petition was under submission.

Petitioner filed a federal habeas petition on April 26, 1993. On September 15, 1993, Judge Ideman found that a majority of petitioner's claims were unexhausted. As a result, on November 15, 1993, petitioner filed a third state habeas petition to exhaust the claims that Judge Ideman had deemed unexhausted, and to exhaust new claims he had discovered after filing his initial federal petition. On February 23, 1994, the California Supreme Court denied the petition.

On April 27, 1994 petitioner filed an amended federal petition. On May 26, 1994, respondent moved to dismiss the claims that the California Supreme Court found untimely because they should have been raised on direct appeal. Judge Ideman denied the motion to dismiss on July 11, 1994. On September 28, 1995, however, he vacated the July 11, 1994 order and granted respondent's motion. On August 26, 1996, Judge Ideman reconsidered his September 28, 1995 order, and concluded that the California's timeliness rule was not an adequate and independent state procedural rule that barred consideration of claims on federal habeas.

On July 28, 1994, petitioned filed a motion for an evidentiary hearing. Petitioner sought an evidentiary hearing on claims that were and were not the subject of the

California Supreme Court's timeliness decision. On December 13, 1995, Judge Ideman denied the motion in its entirety. A week prior to the issuance of that order, however, petitioner had filed an amended motion for an evidentiary hearing. Judge Ideman permitted the parties to submit additional briefing, and on September 11, 1996, denied the amended motion for evidentiary hearing in its entirety. Judge Ideman recognized, however, that the motion had been briefed at a time when the only viable claims remaining in the action were those that he had not dismissed in his September 28, 1995 order. Since Judge Ideman later reinstated the dismissed claims, he permitted petitioner to file a motion for evidentiary hearing on the reinstated claims. On March 11, 1998, Judge Ideman denied this further motion for evidentiary hearing. On September 1, 1998, Judge Ideman issued an order denying all claims in the petition for writ of habeas corpus. Ten days later, Judge Ideman retired from the bench.

On October 21, 1998, petitioner filed a motion for reconsideration of Judge Ideman's final judgment. The case was assigned to this court, which denied the motion on April 5, 1999, finding that petitioner had failed to present newly discovered evidence, to demonstrate that Judge Ideman committed clear error, to show that manifest injustice had resulted, or to show that there had been an intervening change in controlling law. On April 29, 1999, petitioner filed a notice of appeal as well as an application for a certificate of probable cause. On May 12, 1999, the court issued a certificate of probable cause.

On appeal, petitioner raised only certain issues: (1) whether he was entitled to an evidentiary hearing on his claim that trial counsel provided ineffective assistance by failing to undertake an investigation to develop mitigation evidence and failing to

introduce any meaningful mitigation evidence at the penalty phase; (2) whether he was entitled to an evidentiary hearing on his claim that trial counsel provided ineffective assistance at the guilt phase by failing to investigate and present readily available mental state evidence; (3) whether he was entitled to an evidentiary hearing on his claim that the prosecutor coerced a key witness to provide false testimony and/or failed to disclose the witness's prior inconsistent statements and the leniency the witness received in exchange for his testimony; (4) whether petitioner was entitled to discovery and an evidentiary hearing on his claim that the prosecutor's decision to charge petitioner with capital murder was influenced by the prosecutor's addiction to drugs and alcohol; (5) whether the giving of an instruction that the jury could find petitioner guilt of robbery based on a finding that he was in conscious possession of recently stolen property and had made false statements about how he obtained the property was an unconstitutional permissive-inference instruction; and (6) whether the giving of a instruction, which stated that the jury "shall impose" a death sentence if aggravating factors outweighed mitigating factors, combined with misleading prosecutorial argument, created an impermissibly conclusive presumption that a death sentence should be imposed, failed properly to instruct the jury that it was to use discretion in the weighing process, and did not advise the jury that sympathy could play a role in its determination.

On September 5, 2000, the Ninth Circuit affirmed in part and reversed in part Judge Ideman's ruling. The Ninth Circuit affirmed Judge Ideman's conclusion regarding the exercise of prosecutorial discretion and the jury instruction claims. It held, however, that Judge Ideman had abused his discretion in denying an evidentiary hearing on the two ineffective assis-

tance of counsel claims and the claim of witness coercion. The Ninth Circuit remanded for further proceedings.

On August 20, 2001, the court held a case management conference. After hearing from counsel, the court ordered that direct testimony be submitted in declaration form at least thirty days prior to the evidentiary hearing; the court's order also anticipated that cross-examination depositions would take place at least thirty days before the evidentiary hearing.[4] The court subsequently issued a minute order memorializing this schedule,[5] and setting an evidentiary hearing for February 26, 2002.[6] On October 5, 2001, petitioner filed a motion to continue the evidentiary hearing. The court granted this motion and rescheduled the evidentiary hearing for October 29, 2002.[7] On October 17, 2009, the court granted a stipulated request to continue the hearing to January 14, 2003.[8]

The parties subsequently advised the court that they had agreed to present all evidence via declarations, depositions, and exhibits. They stated that neither party would call live witnesses, and that depositions would suffice as cross-examination and redirect examination. Based on this representation, the court vacated the evidentiary hearing, and permitted the parties to adduce evidence through direct testimony declarations, deposition excerpts that constituted cross-examination and redirect examination of the witnesses, and documentary exhibits.[9] The court heard oral argument on June 26, 2003.

## II. DISCUSSION

### A. Evidentiary Objections

Prior to oral argument, both parties filed motions *in limine*, which have now been resolved by the court. Thereafter, the parties filed, quite literally, hundreds of evidentiary objections. Several of the objections ask that the court strike a witness's entire testimony. Objections that seek to strike all or a substantial portion of a witness' testimony are addressed in this section of the court's order. Most of the parties' evidentiary objections, however, are line-by-line objections to the relevance of a particular statement in a declaration, the fact that it is hearsay, the fact that the witness lacks personal knowledge of the fact to which he or she is testifying, or

---

4. Reporter's Transcript of Proceedings, Status Conference ("RT 8/20/01"), Docket No. 254 (Aug. 20, 2001) at 22:11–15 ("So we'll say that expert witness declarations [constituting] direct testimony must be provided within 30 days prior to trial with the expectation[ ] that the cross examination depositions will take place in the following 30 days [preceding] the evidentiary hearing"). The court initially proposed the expert testimony declarations be provided 45 days prior to the evidentiary hearing, but acceded petitioner's request that he have more time to prepare the direct testimony declarations. (*Id.* at 21:3–5.)

5. Minutes (Case Management Conference) ("Case Management Order"), Docket No. 251 (Aug. 20, 2001), ¶ 3 ("As respects [expert] witnesses, the parties shall serv[e] a declaration constituting the witness' direct testimony no later than thirty (30) days prior to the evidentiary hearing. The witness shall then

be cross-examined by deposition, and the relevant excerpts of the deposition testimony lodged no later than seven days prior to the evidentiary hearing. Further cross-examination may take place at the evidentiary hearing itself").

6. *Id.,* ¶ 1.

7. Order Granting Petitioner's Motion to Continue Evidentiary Hearing, Docket No. 275 (Jan. 2, 2002) at 3.

8. Stipulated Request and Order re: Continuance of Dates in Connection with Evidentiary Hearing, Docket No. 359 (Oct. 17, 2009).

9. Order re: Completion of Evidentiary Proceedings and Schedule ("3d Case Management Order"), Docket No. 396 (Jan. 10, 2003).

similar evidentiary concerns. To the extent the court relies on evidence to which a party has objected, it resolves the objection in this order. The court need not rule on the remainder of the evidentiary objections, however, because it need not consider the evidence in deciding the issues presented by the petition. *See Gonzales v. City of Martinez,* 638 F.Supp.2d 1147, 1149 n. 1 (N.D.Cal.2009) ("The Court addresses some of Defendants' evidentiary objections throughout this Order. However, the Court need not rule on the remainder of Defendants' evidentiary objections because the Court did not need to consider such evidence in order to resolve the motion for summary judgment").

### 1. Objections Based on Failure to Exhaust

Respondent contends that petitioner's failure to present the contents of his declaration and the declarations of Dr. Rex Beaber,[10] Dr. Barbara Cort Counter,[11] Dr. Jay M. Jackman,[12] Dr. David Lisak,[13] and Rickard Santwier,[14] to the state court violates *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). He also asserts that the declarations cast petitioner's claims in a significantly different light than they were presented in state court, and thus compel the conclusion that his claims are unexhausted.[15] Petitioner counters that he was diligent in presenting, and attempting to present, evidence supporting his claims in state court, and in requesting funds to do so. He notes that the state court denied his habeas petition

summarily, that he is indigent and that he was given no funds to conduct any investigation in state court. Petitioner also notes that, in ordering an evidentiary hearing, the Ninth Circuit implicitly directed the development of facts that were not in the record at the time it ruled.

This federal habeas petition that was filed prior to the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), so the provisions of the Act do not apply to the claims pleaded therein. *Lindh v. Murphy,* 521 U.S. 320, 332–33, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Duncan v. Ornoski,* 528 F.3d 1222, 1232–33 (9th Cir.2008). In *Tamayo–Reyes,* a pre-AEDPA case, the Supreme Court held that a petitioner is entitled to develop facts in a federal habeas proceeding "if he can show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure." *Tamayo–Reyes,* 504 U.S. at 12, 112 S.Ct. 1715. As the Ninth Circuit has recognized, however, "[t]he issue before the *Tamayo–Reyes* Court ... was not whether the district court was authorized to hold an evidentiary hearing, but whether the district court was *required* to order an evidentiary hearing under the circumstances at bar." *Seidel v. Merkle,* 146 F.3d 750, 754 (9th Cir.1998) (emphasis supplied). *Tamayo–Reyes* thus did not alter "the district court's broad authority to consider any evidence relevant to a federal habeas petitioner's claim." *Seidel,* 146 F.3d at 754

---

10. Evidentiary Objections to Declaration of Rex Beaber ("Beaber Obj."), Docket No. 368 (Nov. 5, 2002).

11. Evidentiary Objections to Declaration of Barbara Cort Counter ("Counter Obj."), Docket No. 369 (Nov. 5, 2002).

12. Evidentiary Objections to Declaration of Jay M. Jackman ("Jackman Obj."), Docket No. 374 (Nov. 5, 2002).

13. Evidentiary Objections to Declaration of David Lisak ("Lisak Obj."), Docket No. 371 (Nov. 5, 2002).

14. Evidentiary Objections to Declaration of Rickard Santwier ("Santwier Obj."), Docket No. 370 (Nov. 5, 2002).

15. Evidentiary Objections to Declaration of Kenneth Burton Lang, Jr. ("Lang Obj."), Docket No. 365 (Nov. 5, 2002).

(citing *Tamayo–Reyes*, 504 U.S. at 23, 112 S.Ct. 1715 (O'Connor, J., dissenting)).[16]

■ In the Ninth Circuit, "it is well-established that a federal district judge has 'the power, constrained only by [her] sound discretion, to receive evidence bearing upon the [habeas] applicant's constitutional claim.'" *Seidel*, 146 F.3d at 753 (quoting *Townsend*, 372 U.S. at 318, 83 S.Ct. 745).[17] "Contrary to what the State argues here, *Tamayo–Reyes* did not affect *Townsend's* holding with respect to the district court's broad authority to consider all evidence relevant to a federal habeas petitioner's claim." *Seidel*, 146 F.3d at 754. See also *Chacon v. Wood*, 36 F.3d 1459, 1465–66 (9th Cir.1994) ("In *Tamayo–Reyes*, the Supreme Court overruled *Townsend* in part. Specifically, it held

that a hearing is not mandatory under *Townsend's fifth* circumstance . . . unless the petitioner can show cause for failing to develop the material facts in state court and prejudice resulting therefrom" (emphasis original)). Consequently, in pre-AEDPA cases, notwithstanding the failure of a petitioner to offer a particular piece of evidence in the state courts, a district court has discretion to receive the evidence if it has granted an evidentiary hearing.[18] As noted, respondent also argues that admission of the declarations would render petitioner's claims unexhausted. Citing First Circuit law, He contends that the introduction of new factual allegations "render[s] a claim unexhausted if the [facts] cast a familiar claim 'in a significantly different light.'" [19] In the Ninth Circuit, however, "new factual allegations do

**16.** Although the court does not have before it a motion for an evidentiary hearing, as that issue was decided by the Ninth Circuit, the court finds informative the Supreme Court's recent decision in *Jefferson v. Upton*, —— U.S. ——, 130 S.Ct. 2217, 176 L.Ed.2d 1032 (2010) (per curiam). In *Jefferson*, in a case where a habeas petition was filed prior to the enactment of AEDPA, the Supreme Court held that the district court was required to distinguish between two situations. "[W]hen 'the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings' the district court 'ordinarily should . . . accept the facts as found' by the state-court judge." *Id.* at 2220–21 (quoting *Townsend v. Sain*, 372 U.S. 293, 318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)). On the other hand, "'if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding,' . . . the federal court 'must hold an evidentiary hearing' to resolve any facts that 'are in dispute.'" *Id.* at 2221 (quoting *Townsend*, 372 U.S. at 312, 83 S.Ct. 745). Petitioner did not receive any sort of hearing in state court on any of the three claims the Ninth Circuit remanded for evidentiary hearing. This fact is implicit in the Ninth Circuit's order of remand. There is, therefore, no set of factual findings made by a state court entitled to a presumption of correctness under *Jefferson* or the cases cited therein.

**17.** The Court in *Townsend* explained:

"[A] narrow view of the hearing power would totally subvert Congress' specific aim . . . of affording state prisoners a forum in the federal trial courts for the determination of claims of detention in violation of the Constitution. The language of Congress, the history of the writ, the decisions of this Court, all make clear that the power of inquiry on federal habeas corpus is plenary. Therefore, where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew." *Townsend*, 372 U.S. at 312, 83 S.Ct. 745.

**18.** Respondent's argument appears to be premised at least in part on an assumption that petitioner must show cause for his failure to develop facts in state court and prejudice resulting therefrom before he can adduce additional evidence in federal court. As noted, however, this is not the case, and the district court has discretion to receive evidence where it has granted an evidentiary hearing. Because the Ninth Circuit mandated an evidentiary hearing in this case, the court has discretion to receive petitioner's declaration and the expert declarations, notwithstanding petitioner's failure to present them to the California Supreme Court.

**19.** Lang Obj. at 1 (quoting *Domaingue v. Butterworth*, 641 F.2d 8, 12 (1st Cir.1981)).

not render a claim unexhausted unless they 'fundamentally alter the legal claim already considered by the state courts.'" *Chacon*, 36 F.3d at 1468 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 260, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)); see *Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999) ("We acknowledge that the precise factual predicate for Weaver's claim changed after the district court conducted its evidentiary hearing. However, new factual allegations do not render a claim unexhausted unless they fundamentally alter the legal claim already considered by the state courts. The facts adduced at the evidentiary hearing did not fundamentally alter Weaver's claim. The factual basis for the claim remained rooted in the same incident: the bailiff's contact with the jury after it sent out its note" (internal quotation marks and citations omitted)).

Petitioner has alleged that his trial counsel provided ineffective assistance during the penalty phase because he presented almost no mitigation evidence. He has also asserted that trial court was ineffective during the guilt phase because he failed properly to investigate and present evidence of petitioner's mental state when he shot and killed Thurman Anderson.

Petitioner's declaration details his difficult family and personal history, his recollection of the events of August 1983, and his recollection of interactions with trial counsel. Respondent cites no particular facts that had to be, but were not, presented to the state court to exhaust petitioner's ineffective assistance claims. Rather, respondent contends broadly that "[t]o the extent the [d]eclaration presents facts that *do not* transform the claim, but are nevertheless material to Petitioner's claim, presentation of those facts is forbidden under *Tamayo–Reyes*" because the declaration itself was not presented to the California Supreme Court.[20] Respondent does not contend that the introduction of the new facts detailed in petitioner's October 2, 2002 declaration "fundamentally alters" the claims petitioner presented to the state court. To the contrary, the facts set forth in the declaration remain rooted in the same claims petitioner raised in state court—that trial counsel failed properly to investigate and present a mental state defense in the guilt phase and that trial counsel failed properly to investigate and present a mitigation case in the penalty phase. Consequently, the court cannot accept respondent's assertion that the claims are unexhausted. Nor, as noted earlier, can it accept his suggestion that *Tamayo–Reyes* mandates that the district court not consider a fact unless that fact was presented to the state court, or unless he shows cause and prejudice. So long as petitioner was not granted an evidentiary hearing in state court, and so long as the fundamental nature of the claims presented to the state court has not changed, the court has discretion to consider new facts adduced in the context of the federal habeas proceeding.

As respects four of the expert declarations, respondent's evidentiary objections conclude with the following paragraph:

"Finally, Petitioner failed to present the contents of [the expert's] declaration in state court under 28 U.S.C. § 2254 and [it] therefore violates *Keeney v. Tamayo–Reyes[ ]*. If Petitioner presents facts that render his claim unexhausted, this Court would necessarily be precluded from providing Petitioner the relief he seeks; such facts are thus irrelevant to Petitioner's claim and inadmissible."[21]

---

20. Lang Obj. at 2 (emphasis supplied).

21. Jackman Obj. at 4–5; Lisak Obj. at 3–4; Santwier Obj. at 6–7; Counter Obj. at 6. Respondent's objections to Dr. Beaber's testimony state that the "Beaber [d]eclaration was not presented to the California Supreme Court. If the newly presented facts in the

As with his objections to petitioner's declaration, respondent makes no claim that the expert declarations fundamentally alter petitioner's claims. Nor does he identify any facts that cast petitioner's claims in a significantly different light. Rather, respondent relies on the fact that the contents of the declarations were not presented to the California Supreme Court and does not address whether they alter the nature of petitioner's claims.

In *Weaver*, 197 F.3d at 364, the Ninth Circuit noted that "[petitioner's] inability to fully explore what transpired during th[e] incident [underlying his claim] stemmed from the state courts' refusal to grant him an evidentiary hearing on the matter, rather than from any failure of diligence on his part." *Weaver*, 197 F.3d at 364. Judge Ideman previously ruled that petitioner's claims had been properly presented to the California Supreme Court. The basis for respondent's contrary argument now is that petitioner was required to present the precise factual contents of the expert declarations to the state court in order to exhaust his claims. Because petitioner did not receive an evidentiary hearing in state court, and a review of the expert declarations he has filed in this action confirms that they do not fundamentally alter the nature of petitioner's claims, respondent's objections to the declarations are overruled, and his request that they be stricken in their entirety is denied.

## 2. Objection to Family and Personal History as Irrelevant

### a. Petitioner's Declaration

Respondent next objects that, "to the extent [petitioner's] [d]eclaration alleges the existence of foregone background evidence that trial counsel, David Stanley, could have presented, it is irrelevant." [22] He contends the declaration is irrelevant because it does not address whether trial counsel "adequately investigated and was adequately prepared to present a case in mitigation," and does not discuss petitioner's communications with trial counsel.[23] Respondent also asserts that the background information in Lang's declaration is not relevant in assessing whether trial counsel was on notice of Lang's mental and emotional problems.[24] Petitioner concedes that the background evidence in the declaration is presented, in part, for the purpose of proving the prejudice prong of his claim that trial counsel rendered ineffective assistance during the penalty phase. He argues that

> "[t]he point of petitioner's [declaration] (and of the similar family member declarations) is to establish what David Stanley, trial counsel[,] could have learned in preparation for the 1984 trial had he but asked. This information could then have been provided to the mental health experts and/or be[en] presented at the penalty phase in mitigation. The declarations are submitted [to] show that Mr. Stanley's failure was real and had [an] enormous and wholly negative impact on petitioner's defense." [25]

[d]eclaration cast Petitioner's claims in a significantly different light, then consideration of these facts is precluded under the doctrine of the exhaustion." (Beaber Obj. at 2.) This tracks more closely the content of respondent's objections to petitioner's declaration.

**22.** Lang Obj. at 4.

**23.** *Id.*

**24.** *Id.* at 5.

**25.** Response to Objections to Lang Declaration at 3.

In its order remanding the case for an evidentiary hearing, the Ninth Circuit stated that "[t]here [were] ... questions of fact about what [evidence] Lang demanded trial counsel not present, whether trial counsel adequately investigated and was adequately prepared to present a case in mitigation, and whether trial counsel fully informed Lang of the importance of putting on mitigation evidence and the various types of mitigation evidence available." *Lang*, 2000 WL 1256886 at *1 (footnote omitted). The circuit court also noted that "there [were] questions of fact as to whether trial counsel was on notice of Lang's mental and emotional problems and, if so, whether trial counsel's failure to pursue and present mental health evidence [during the guilt phase] was unreasonable." *Id.*

Following remand, the court bifurcated the evidentiary hearing, so that trial counsel's allegedly deficient performance during the penalty phase could be addressed first, and the question of prejudice could be addressed, if necessary, thereafter.[26]

Although Lang's testimony concerning his family background is relevant to determine whether prejudice arose from trial counsel's failure to present mitigation evidence during the penalty phase, see *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir.2003) ("Evidence regarding social background and mental health is significant," because there is a " 'belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse,' " quoting *Boyde v. California*, 494 U.S. 370, 382, 110 S.Ct. 1190, 108 L.Ed.2d

316 (1990) (internal quotation marks and emphasis omitted)), its relevance in assessing deficient performance during that phase depends on whether petitioner shared the information with trial counsel.

■ The Supreme Court has recognized that a capital defense attorney has an "obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor (Terry Williams)*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citing 1 ABA Standards for Criminal Justice 4–4.1, commentary, p. 4–55 (2d ed.1980)). "However, counsel may also choose not to pursue a particular investigation if such a choice is reasonable." *Beardslee v. Woodford*, 358 F.3d 560, 570 (9th Cir.2004) (citing *Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments")). Deference to trial counsel's decision to forego further investigation turns on whether, given the investigation that was actually completed, counsel could "reasonably have chosen to eschew further mitigation research." *Beardslee*, 358 F.3d at 570; see also *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir.2001) ("Judicial deference to counsel is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments").

**26.** In a footnote, respondent suggests that "[t]he reasons for bifurcation apply equally to [p]etitioner's guilt-phase claim." (Beaber Obj. at 4 n. 2.) It is the court's order concerning that presentation of evidence that governs, however, rather than the rationale for the order. As a result, it is immaterial that the court might reasonably have chosen to bifurcate the presentation of evidence on both issues.

As noted, at the first stage of the bifurcated hearing on effective assistance during the penalty phase, petitioner's testimony concerning his background and life history is relevant in evaluating deficient performance *only if* the information was shared with trial counsel. Petitioner does not state in his declaration whether any of the background or life history information he presents was shared with trial counsel. Indeed, he suggests that the facts were not known to trial counsel since he describes them as information counsel "could have learned in preparation for the 1984 trial had he but asked." [27] What counsel "could have learned" is relevant only in assessing whether any ineffective assistance prejudiced petitioner during the penalty phase. At this stage of the bifurcated proceedings, the court need only determine whether counsel's investigation was adequate given the facts and circumstances known to him. See *Wiggins v. Smith*, 539 U.S. 510, 523–26, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (concluding that counsel's failure adequately to investigate prior to deciding not to introduce mitigation evidence constituted ineffective assistance, since the evidence in counsel's possession was suggestive of an abusive background and "counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless"). Consequently the court declines to consider the information in the penalty phase portion of this order.

The court, however, did not bifurcate the issue of ineffective assistance of counsel during the guilt phase. The Ninth Circuit identified three questions to be examined at the evidentiary hearing with respect to the guilt phase of petitioner's trial: (1) "whether trial counsel was on notice of Lang's mental and emotional problems"; (2) "if so, whether trial counsel's failure to pursue and present mental health evidence was unreasonable"; and (3) "whether the mental health evidence may have sufficiently corroborated Dr. B[ea]ber's and Lang's testimony to raise reasonable doubt as to whether the killing was actually motivated by a desire to rob or whether, instead, the killing was motivated by Lang's honest belief that his life was in imminent danger." *Lang*, 2000 WL 1256886 at *1. To the extent petitioner's testimony concerning his background and life history might be relevant to the first and second of these inquiries, the court reaches the same conclusion it did with respect to the issue of deficient performance during the penalty phase. In petitioner's declaration, he fails to state which portions, if any, of his life story and background he shared with trial counsel. Consequently, the declaration cannot be considered in evaluating whether trial counsel was on notice of petitioner's mental and emotional problems or whether trial counsel's failure to investigate and present mental health evidence, in light of what he knew, was unreasonable.

Information trial counsel failed to obtain from petitioner concerning his mental and emotional state is relevant to the question of prejudice during the guilt phase, however. The mental health evidence that trial counsel failed to uncover might have corroborated Dr. Beaber's and petitioner's trial testimony sufficiently to raise reasonable doubt as to whether the killing was motivated by petitioner's honest belief that his life was in imminent danger. As petitioner notes in his response to respondent's objection, the information in his declaration could "have been provided to the mental health experts to develop a mental state defense." The court, therefore, overrules respondent's

**27.** Response to Objections to Lang Declaration at 3. 19

general relevance objection to the admission of petitioner's life history and background information at the first stage of the bifurcated proceedings, finding that the information may be relevant to petitioner's guilt phase ineffective assistance claim. Additionally, petitioner's life history and background testimony will be admissible in the second phase of bifurcated proceedings concerning penalty phase ineffective assistance, since the testimony is unquestionably relevant in assessing whether trial counsel's failure to investigate and present mitigation evidence prejudiced petitioner.[28]

### b. Family Declarations

Respondent similarly contends that the declarations of petitioner's family members—"representing what trial counsel David Stanley theoretically could have presented regarding Petitioner's background [—] are irrelevant at this stage of the bifurcated proceeding"[29] because they do not address whether trial counsel "adequately investigated and was adequately prepared to present a case in mitigation."[30] Respondent asserts that during the first phase of the evidentiary hearing, the family declarations are relevant, at most, only in assessing the credibility of counsel's statement that he urged petitioner to allow him to present evidence of petitioner's background, and explained the importance of presenting such evidence to petitioner.[31]

Respondent also contends that the declarations of petitioner's family members are not relevant in evaluating whether trial counsel was on notice of petitioner's mental and emotional problems.[32] He maintains that whether counsel's penalty phase performance was deficient must be assessed based on the information trial counsel had in hand at the time of the trial in 1984 from petitioner, investigators' reports, and evaluations of petitioner by retained mental health experts, not on information that was unknown to trial counsel at that time.[33]

■ For the reasons stated with respect to petitioner's declaration concerning his personal and family history, the testimony of petitioner's family members, including those family members who were never contacted by trial counsel, will be relevant in determining whether petitioner was prejudiced by trial counsel's failure to present mitigation evidence. See *Douglas*, 316 F.3d at 1090. Much of the family background information contained in the family member declarations appears to be irrelevant at this stage of the bifurcated proceedings, however.

In evaluating trial counsel's performance during the penalty phase, the content of the mitigation evidence he could have presented through family members is relevant

---

**28.** Respondent also asserted multiple objections to each of 49 paragraphs of petitioner's declaration. As noted, the court will address these objections to the extent it relies on the evidence in the body of this order.

**29.** Evidentiary Objections to Direct Testimony Declarations of Petitioner's Family ("Family Obj.") at 4.

**30.** *Id.* at 5.

**31.** *Id.* The court understands respondent's concession to concern statements by family members as to whether the defense team contacted them, how much information they were asked to provide, and whether they were asked to testify or otherwise aid in petitioner's defense.

**32.** Although respondent's objection is addressed to the penalty phase, the same objection could be raised with respect to use of the testimony to evaluate deficient performance during the guilt phase. The court presumes that respondent did not assert such an objection because consideration of the issues of deficient performance during the guilt phase and prejudice resulting therefrom have not been bifurcated.

**33.** *Id.* at 5–6.

only to the extent that the defense team was aware of it. To the extent a family member was available to testify as a mitigation witness, but was not contacted by trial counsel or was not asked about his or her willingness to testify, the fact that the witness was not contacted or was not asked to testify, and any information actually communicated to the defense team are relevant in assessing whether trial counsel adequately prepared for the penalty phase of the trial.[34] The substance of the testimony that could have been presented had trial counsel interviewed the family members, or interviewed them in greater depth than he did, and that was not known to counsel in 1984, however, is relevant only to the prejudice prong of petitioner's penalty phase ineffective assistance claim. Indeed, petitioner concedes that he seeks to admit the family history declarations for the purpose of showing prejudice at penalty phase. He explains that

"[t]he point of the family member declarations is to establish what David Stan-

ley, trial defense counsel could have learned had he asked. If, in fact, there was no useful information to be learned, then Mr. Stanley's failure to conduct an investigation could well be said to have been without consequence. However, here the declarations amply illustrate that Mr. Stanley's failure was real and had an enormous impact on petitioner's defense." [35]

Because the family history set forth in the family member declarations is offered to show that trial counsel's deficient performance at the penalty phase prejudiced petitioner, to the extent the declarations contain information that was unknown to trial counsel or defense investigators at the time, they are not relevant during the first phase of the bifurcated proceedings, which concerns deficient performance only.[36]

In sum, for purposes of the first phase of the proceedings, the court will admit the family member declarations only to the extent they (1) describe the declarants' contact or lack of contact with Lang's trial

---

**34.** Respondent's objections to the admissibility of the family-member declarations recognize that the declarations are relevant "to the extent family members describe their contact or lack thereof with Mr. Stanley or his investigators," since this information tends to show "the steps that Mr. Stanley actually took to prepare for a possible penalty phase, and the mitigation evidence that Mr. Stanley then had in his possession." (See Obj. at 5).

**35.** Petitioner's Response to Respondent's Objections to Direct Testimony Declarations of Petitioner's Family Members ("Family Obj. Response") at 1–2.

**36.** As noted, the Ninth Circuit identified three questions to be examined at the evidentiary hearing regarding petitioner's guilt phase ineffective assistance claim: (1) "whether trial counsel was on notice of Lang's mental and emotional problems"; (2) "if so, whether trial counsel's failure to pursue and present mental health evidence was unreasonable"; and (3) "whether the mental health evidence m[ight] have sufficiently corroborated Dr. B[ea]ber's

and Lang's testimony to raise reasonable doubt as to whether the killing was actually motivated by a desire to rob or whether, instead, the killing was motivated by Lang's honest belief that his life was in imminent danger." *Lang*, 2000 WL 1256886 at *1. Information provided by Lang's family members concerning Lang's mental and emotional problems is relevant to the first and second of these inquiries only to the extent that the defense team knew the information prior to trial. Although information concerning petitioner's mental and emotional state *not* obtained from family members by the trial counsel and/or his investigators might be relevant to the third inquiry, petitioner does not rely on the family member declarations in arguing that further mental health evidence could have corroborated his and Dr. Beaber's testimony. Petitioner instead cites expert testimony furnished by Jackman, Lisak, Counter and Clardy in support of his position on the third of the guilt phase inquiries. Petitioner relies exclusively on his penalty phase claim in arguing that the family history testimony is admissible. (See Response at 1–2.)

defense team, or (2) describe matters conveyed to the defense team before or during trial. If any portion of a witness' proposed testimony is relevant and admissible because it addresses these subjects, the court will also admit background information showing the declarant's relationship to petitioner to place the balance of the admissible evidence in context. Applying this standard, the court finds that the family member direct testimony declarations are irrelevant during this phase of the proceedings, with the following exceptions:

- Petitioner's Direct Testimony Declaration of Phyllis C. Atwell (4/21/02), ¶ 67.[37]
- Petitioner's Direct Testimony Declaration of Phyllis Atwell (10/21/93), p. 1 (the first sentence to the extent that it indicates the declarant is the biological mother of petitioner), p. 10 (the sentence reading "I was never asked to testify at Ken's trial, but I would have if they had asked me").
- Respondent's Direct Testimony of Phyllis Atwell, in its entirety.
- Petitioner's Direct Testimony of Tamara Jean Dykes, ¶¶ 1, 58.
- Respondent's Direct Testimony of Tamara Dykes, final paragraph.[38]
- Petitioner's Direct Testimony of Kenneth Burton Lang, Sr., ¶ 1, 3, 5 (through the sentence, "The defense lawyer did not ask me for names of other people that could have been interviewed about Kenny and his life")
- Respondent's Direct Testimony of Kenneth Burton Lang, Sr., in its entirety.
- Petitioner's Direct Testimony of Tracy Christopher Lang, ¶¶ 1, 2, 23.
- Petitioner's Direct Testimony of Doris Rawson, ¶¶ 1, 16.
- Petitioner's Direct Testimony of Susan Mary Rosenthal, ¶¶ 1, 4.
- Respondent's Direct Testimony of Susie Rosenthal, in its entirety.
- Petitioner's Direct Testimony of Dyanne Van Zandt, ¶¶ 1, 4 (the sentence which reads, "I was never contacted by anyone that I can recall about Kenny's case until after he was on death row"), 5.

The declaration of petitioner's cousin, James Michael Lord, relates limited information concerning the family's history in paragraphs 3 and 4. Because there is no evidence that this information was communicated to trial counsel, it is relevant only to the prejudice prong of petitioner's penalty phase ineffective assistance claim, and is therefore admissible only in the second phase of the bifurcated proceedings. Respondent does not object to the remaining paragraphs of Lord's declaration, which concern information Lord gave law enforcement officers immediately following petitioner's arrest for murder. These portions of the declaration are submitted in support of petitioner's prosecutorial mis-

37. Although respondent has proffered evidence that Atwell was contacted, prior to trial, by an investigator working on petitioner's defense (see Respondent's Direct Testimony Declaration of Phyllis Atwell for Evidentiary Hearing), Atwell does not state what information she shared with the investigator. Accordingly, the court cannot determine whether the information contained in either of Atwell's direct testimony declarations was known to defense counsel prior to trial. The information is, therefore, inadmissible at this stage of the bifurcated proceedings.

38. This paragraph states: "An investigator talked with me before Ken's trial. I was willing to go to court and testify to what I have said in this statement and much more if asked." The declaration does not make clear, however, what information was conveyed to the investigator prior to trial nor whether the "investigator" referenced was one of petitioner's defense investigators. Without this information, the court cannot admit the contents of the declaration for the purpose of determining what was known by petitioner's trial counsel.

conduct claim and are relevant to that issue.

### 3. General Objections to the Testimony of Drs. Beaber, Schulte, and Ratner

■ Respondent asserts that Dr. Beaber's declaration is irrelevant in the first phase of the bifurcated proceeding. Dr. Beaber's testimony concerns petitioner's guilt phase ineffective assistance of counsel claim; as noted, the hearing on this claim was not bifurcated. Therefore, Dr. Beaber's testimony is admissible in this phase so long as it is relevant to either the deficient performance or prejudice prong of petitioner's guilt phase ineffective assistance claim and so long as it is otherwise admissible. Although respondent asserts that Dr. Beaber's testimony is relevant only to prejudice during the guilt phase,[39] Dr. Beaber's testimony concerning his qualifications to testify for the defense and his purported pro-prosecution bias is relevant in assessing whether trial counsel's performance was deficient during that phase as well. See *Skaggs v. Parker*, 235 F.3d 261, 270 (6th Cir.2000) (holding that defense counsel's decision to present, during the penalty phase, the testimony of an unqualified psychologist who had already provided damaging testimony at the guilt phase was *deficient* in that it "fell below an objective standard of reasonableness"); see also *Stevens v. McBride*, 489 F.3d 883, 896 (7th Cir.2007) (presenting expert testimony about which lawyers were "utterly in the dark" was a "complete failure of the duty to investigate with no professional justification"); *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir.2000) (holding, in a case in which an expert testified during the guilt phase regarding defendant's drug and alcohol abuse and his intoxication on the day of a murder, and opined on cross-examination that, although intoxicated, defendant acted purposefully and intentionally, and in which trial counsel conceded at a habeas evidentiary hearing that the expert had been retained to establish that defendant could not act purposely and intentionally because of intoxication and that he was "surprised" by the contrary testimony, that "counsel's failure to have questioned [expert] … prior trial in this regard is inexcusable. Defense counsel should have known [expert's] opinion on this ultimate issue and should have prepared accordingly").

Additionally, respondent's objection rests on an implicit assumption that because Dr. Beaber testified at the guilt phase, his testimony is not relevant in assessing petitioner's penalty phase claim. The Ninth Circuit recently considered the nature of ineffective assistance of counsel during the penalty phase:

> "[A] common shorthand for [this] claim is 'ineffective assistance during the penalty phase.' If taken literally, this shorthand is misleading. The question is whether a defendant's counsel was ineffective with respect to the penalty imposed, irrespective of when during the proceedings the counsel was ineffective. It is often the case that a counsel's ineffectiveness is manifested during the penalty phase, as the common shorthand suggests. For example, defense counsel may have failed to discover a witness who would have testified favorably during the penalty phase. But ineffectiveness is often manifested earlier. For example, defense counsel may have failed to discover impeaching evidence that could have been used against an unfavorable witness who testified during the guilt phase, and which would have portrayed the defendant in a light that

---

39. See Beaber Obj. at 3–4 (arguing that Dr. Beaber's testimony is not relevant in the first phase of the bifurcated proceedings).

would have assisted him at the penalty phase." *Libberton v. Ryan,* 583 F.3d 1147, 1166 (9th Cir.2009).

See also *Daniels v. Woodford,* 428 F.3d 1181, 1210 (9th Cir.2005) ("The combination of counsel's guilt and penalty phase deficiencies ... den[ied] Daniels effective representation and prejudiced the outcome of his penalty phase trial"); *Moore v. Johnson,* 194 F.3d 586, 619 (5th Cir.1999) ("[C]ounsel's deficient performance, including counsel's performance during the guilt phase of Moore's trial, prejudiced the outcome of the punishment phase of Moore's trial"). Under Ninth Circuit precedent, therefore, the court must consider whether trial counsel provided deficient performance during the guilt phase of the trial to determine whether petitioner received adequate representation as to the penalty received.

Respondent also objects to Dr. Beaber's testimony on the ground that it is not based on personal knowledge because Dr. Beaber testifies that "[he had] some memory of the case but [had] not reviewed any document to refresh [his] recollection and [did] not have specific memory of any conversation" with trial counsel.[40] A witness's "belief ..., without evidence supporting that belief, is no more than speculation or unfounded accusation.... To be cogniza-

ble ..., evidence must be competent." A witness must "show personal knowledge. It is not enough for a witness to tell all she knows; she must know all she tells." *Carmen v. San Francisco Unified School District,* 237 F.3d 1026, 1028 (9th Cir.2001). Dr. Beaber does not purport to testify to matters about which he lacks personal knowledge. For instance, Beaber does not testify to the substance of particular conversations with trial counsel. It appears that respondent's general objection is focused largely on Beaber's statement that

> "[i]f a defense attorney proposing to hire me was not aware of my pro-prosecution opinions and reputation, I would certainly advise that person of the above, and would have done so in 1984. I was always quite forthright in explaining to criminal defense counsel that I regarded it as below the standard of care for a defense counsel to primarily rely on my professional opinions in establishing a potential defense based on mental state."[41] Beaber clearly has personal knowledge of his own habits and practices. Moreover, Beaber's habit or custom makes it at least somewhat more likely that trial counsel was on notice of facts that should have caused him to investigate whether Beaber was an appropriate witness further.[42]

---

**40.** Declaration of Rex Beaber ("Beaber Decl."), Docket No. 315 (Oct. 7, 2002).

**41.** Beaber Decl., ¶ 10.

**42.** Respondent does not object to this evidence under Rule 406 of the Federal Rules of Evidence. Fed.R.Evid. 406 ("Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice"); *United States v. Ruiz-Lopez,* 234 F.3d 445, 448 (9th Cir.2000) ("Phillips candidly admitted that he did not recall arresting Ruiz-Lopez, but testified that it was

his general practice to watch a suspected illegal alien attempt to sneak across the border and then to approach the individual and determine his or her admissibility for immigration purposes. Such testimony of a habitual practice by reasonable inference is probative on the specific issue of the arrest of Ruiz-Lopez"); *McKenzie v. McCormick,* 27 F.3d 1415, 1421 (9th Cir.1994) ("Evidence that Judge Nelson would not engage in ex parte contact with attorneys regarding an ongoing case and that he regularly told time-consuming stories to attorneys was admissible to prove that Anderson had no opportunity to discuss sentencing-related matters with the judge during the 20 minutes or so not otherwise accounted for in the meeting").

Similarly, respondent objects to Dr. Schulte's testimony on the ground that he lacks personal knowledge. Schulte, a forensic psychologist who was briefly retained by trial counsel in 1984, states that he does not have a "specific recollection" as to whether he requested "all available background information" on petitioner, but believes he would have done so since it was his "invariable custom and practice to request all available background information on a client." [43] Based on the fact that Schulte cannot specifically recall this only aspect of his involvement in petitioner's case, respondent presumes that Schulte has no personal knowledge of the case at all, and so cannot testify: (1) that he was retained in August 1984; (2) that trial counsel did not tell him that some testing had already been conducted but did not share the results of that testing; (3) whether he was retained as an expert for the penalty phase; and (4) whether he was asked to provide opinions on mitigating factors. Although Schulte has admitted that he has no recollection regarding one matter, he does not state that he lacks recollection of the other subjects addressed in his declaration. The manner in which he testifies, moreover, indicates that he has first-hand knowledge of the facts. Respondent's lack of personal knowledge objections to Drs. Beaber's and Schulte's declarations are therefore overruled.

Respondent also objects to Schulte's testimony that had he received test results indicative of post traumatic stress disorder, gender confusion, depression or identity disorder, he would have recommended appropriate follow-up as speculative. Schulte states that he did not receive any

information beyond that gleaned from his initial consultation with petitioner, that he could have offered testimony in support of imperfect self-defense and voluntary intoxication defenses had he been asked to do so, and that had he been asked to evaluate the issue of imperfect self-defense, he would have conducted, or recommended that another expert conduct, an additional evaluation of petitioner. Finally, Schulte testifies that had he been asked to evaluate factors in mitigation, he would have testified that the "offense was committed while Mr. Lang was under the influence of extreme mental or emotional disturbance; and that at the time of the offense Mr. Lang's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law was impaired as a result of mental disease or defect and the effects of intoxication." [44]

Respondent similarly objects to two paragraphs in the declaration of Dr. Laurence Ratner as speculative. [45] Dr. Ratner examined petitioner in 1984 and states that had he had the information contained in Dr. Counter's report available, he would have found it significant and been able to provide Stanley with a more detailed diagnosis. [46] As members of the defense team who evaluated petitioner in 1984, Ratner and Schulte can offer testimony rationally based on their perceptions. FED.R.EVID. 701. They can testify accurately, based on their recollection and review of documents, concerning what testimony they would have offered had trial counsel provided certain information to them and called them as a witness. Such testimony is routinely admitted and considered in habe-

---

43. Schulte Decl. at ¶ 4.

44. Schulte Decl. at ¶ 8.

45. Evidentiary Objections to Direct Testimony of Dr. Laurence Ratner, Ph.D. ("Ratner Obj.") (Nov. 5, 2002).

46. Declaration of Laurence Ratner Ph.D. ("Ratner 9/20/02 Decl."), Docket No. 299 (Sept. 20, 2002), ¶¶ 5, 7.

as cases. See, e.g., *Stanley v. Schriro*, 598 F.3d 612, 619–21, 624–25 (9th Cir.2010) (considering multiple declarations of experts who examined the petitioner prior to his original trial in which the experts recounted what they "would have testified" to had they been provided additional information, and concluding, based on such testimony, that an evidentiary hearing regarding ineffective assistance of counsel during the sentencing phase was warranted); *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir.1999) (relying on evidence that doctors who examined petitioner before his trial, had they received additional evidence, would have testified differently during at the sentencing hearing); *Caro v. Calderon*, 165 F.3d 1223, 1226–27 (9th Cir. 1999) (relying on evidence concerning the fact to which an examining doctor would have testified had he known of defendant's exposure to neurotoxic chemicals); *Clabourne v. Lewis*, 64 F.3d 1373, 1385–86 (9th Cir.1995) (relying on evidence that a doctor who examined petitioner prior to trial, had he been given background materials, would have testified that petitioner had schizophrenia); *Hendricks v. Calderon*, 70 F.3d 1032, 1037–39, 1043 (9th Cir.1995) (relying on testimony by examining experts concerning the testimony they would have given had they had petitioner's social history in their possession, and concluding that, although the failure to provide the information to the experts did not rise to guilt phase ineffective assistance, it resulted in penalty phase ineffective assistance). Accordingly, respondent's speculation objections to Drs. Schulte's and Ratner's direct testimony declarations are overruled.

Accordingly, respondent's objections to the admission of the testimony of Drs. Beaber, Ratner, and Schulte regarding deficient performance are denied.[47]

### 4. General Objections to Expert Testimony

The direct testimony of psychologist Dr. Barbara Court Counter consists of a 249-page "psychosocial history," which she represents is based on her review of ten volumes of mental health documents related to petitioner, portions of the reporter's transcript of petitioner's 1984 trial, petitioner's amended petition for writ of habeas corpus prepared in 1994, and two interviews of petitioner conducted in 2002, which took a total of nine hours and 55 minutes.

Dr. Jay Jackman testifies, based in part on his review of other mental health professionals' reports, including the psychosocial history prepared by Counter, that it is his opinion petitioner suffers from various mental health disorders. Dr. Richard Lisak testifies regarding the effect of the trauma and abuse petitioner suffered. In preparing his declaration, Lisak reviewed trial transcripts, telephone interviews, and the declarations of other experts retained in this case. Rickard Santwier is petitioner's *Strickland* expert; he reviewed almost 2,500 pages of documents, including the 1984 trial transcripts, the California Supreme Court opinion, the petitions for writ of habeas corpus, the Ninth Circuit order, the declarations of petitioner's family members, trial counsel, witnesses, and the prosecutor in the 1984 trial, contemporaneous notes, correspondence, and other materials.

### a. Respondent's Objection That Counter's Declaration is not Admissible Under the California Evidence Code is Overruled

Respondent asserts that Counter's testimony would be inadmissible in state court

---

**47.** In addition to the general objections addressed in this section, respondent objects individually to six of the ten paragraphs in Beaber's declaration. As noted, the court will address these objections to the extent it relies on the paragraphs in the body of this order.

under California Evidence Code 352, because its probative value is substantially outweighed by the danger of undue prejudice, and California Evidence Code § 1200, which concerns hearsay. To the extent respondent suggests that the court is required to apply state evidentiary rules, respondent has not provided a proper basis for the exclusion of evidence in this proceeding. "Federal Rule of Evidence 1101(e) provides that the Federal Rules of Evidence apply to habeas corpus petitions filed in federal court under 28 U.S.C. § 2254." *McDowell v. Calderon*, 107 F.3d 1351, 1367 (9th Cir.1997), rev'd on other grounds, 130 F.3d 833 (9th Cir.1997) (en banc); see also *Spencer v. Georgia*, 500 U.S. 960, 961, 111 S.Ct. 2276, 114 L.Ed.2d 727 (1991) (mem.) (Kennedy, J., concurring in the denial of certiorari) ("State rules of evidence have no direct application in federal habeas courts"); *Amadeo v. Zant*, 486 U.S. 214, 227 n. 5, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988) (applying the Federal Rules of Evidence to determine the admissibility of evidence in a habeas proceeding).

■ Respondent may intend to suggest, however, that Counter's declaration is irrelevant because the opinions she offers would have been inadmissible at the 1984 trial under the California evidentiary rules. An expert witness testifying in a California proceeding, however, may rely on hearsay statements and may testify about a capital defendant's psychosocial history. See *In re Scott*, 29 Cal.4th 783, 823, 129 Cal. Rptr.2d 605, 61 P.3d 402 (2003) (noting that an expert witness "may base an opinion on reliable hearsay, including out-of-court declarations of other persons" (citation omitted)); *People v. Hughes*, 27 Cal.4th 287, 396, 116 Cal.Rptr.2d 401, 39 P.3d 432 (2002) ("Dr. White testified that

she had been asked by the defense to prepare a psychological history and background report concerning defendant. She described how defendant's chaotic and unstable family life affected his ability to cope, his sense of individuality, and his sense of self-esteem.... The witness reported that both parents had alcohol problems and all of the children had drug problems, but that as a general matter there was no ongoing violence in the family"); *In re Gay*, 19 Cal.4th 771, 816, 80 Cal.Rptr.2d 765, 968 P.2d 476 (1998) (noting that petitioner's 1983 trial included testimony from a psychologist who offered "evidence regarding the effect of family and childhood and social influences on petitioner's development, personality, and psychosocial history").

■ Respondent relies heavily on *People v. Rowland*, 4 Cal.4th 238, 14 Cal. Rptr.2d 377, 841 P.2d 897 (1992), for the proposition that a capital defendant's family history is material only to the extent it concerns the defendant himself. The *Rowland* court acknowledged, however, that the background of a defendant's family *may* impact or relate to the defendant himself. *Id.* at 278–79, 14 Cal.Rptr.2d 377, 841 P.2d 897 ("To be sure, the background of the defendant's family is material if, and to the extent that, it relates to the background of defendant himself"). Whether family background relates to the defendant himself is properly decided by the trier of fact. See *id.* at 279–80, 14 Cal.Rptr.2d 377, 841 P.2d 897 (holding that a prosecutor's argument that the jury should consider whether the family background related to the capital defendant was proper). Thus, *Rowland* does not provide a basis for excluding family background evidence that may relate in some way to petitioner. Counter's declaration, therefore, need not be excluded under *Rowland* because it relies on family background evidence.[48]

---

48. In addition to the general objections addressed in this section, respondent objects to several individual portions of Counter's testi-

mony. As noted, the court will address these

### b. Respondent's Objection that the Experts' Testimony is Inadmissible on Hearsay and Personal Knowledge Grounds

Respondent asserts that psychosocial history is not a proper subject of expert testimony under California law, but has not argued that Counter is not qualified as an expert in the field.[49] Similarly, respondent does not dispute that Jackman and Lisak are qualified mental health experts or that Santwier is a qualified *Strickland* expert.[50]

Finally, respondent does not object that the materials that form the basis for the experts' opinions are not of a type reasonably relied on by experts in their respective fields. Counter may properly rely on mental health records, court records and interviews with petitioner in forming her opinions. See *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir.1997) (fact that an expert's opinions were based on data collected by others was immaterial in determining the admissibility of the opinions); *Scott v. Ross,* 140 F.3d 1275, 1286 (9th Cir.1998) (expert could rely on certain pretrial testimony). She need not have personal knowledge of the events. For the same reason, the fact that Jackman, Lisak, and Santwier lack personal knowledge of the events described in the materials on which each relies does not provide a basis for exclusion. See FED. R.EVID. 602, 703, 803; *Southland Sod Farms,* 108 F.3d at 1142 *Rogers v. Raymark Indus., Inc.,* 922 F.2d 1426, 1430 (9th Cir.1991) (it is not required that the expert "be personally familiar with the facts or data of the particular case about which he is testifying; an expert opinion may be based on any type of evidence commonly used by experts in the field").

Counter does not attest to the truth of the facts referenced in the psychosocial history. Rather, she admits that her opinions are based on a review of ten volumes of mental health documents, the reporter's transcripts of petitioner's trial, the amended petition filed in this case and two interviews of petitioner. Her opinions are admissible, as the court does not consider her declaration for the truth of the matters asserted in the underlying documents and interviews on which she relied. Similarly, Jackman's, Lisak's, and Santwier's testimony is not hearsay because they do not attest to the truth of the materials on which they rely, but rather interpret those materials. It is settled that an expert can rely on extra-judicial statements in forming an opinion. See *Scott,* 140 F.3d at 1286 (stating that an expert could rely on newspaper articles, pretrial testimony, and conversations with colleagues).[51]

---

objections to the extent it relies on the information, in the body of this order.

49. Counter Obj. at 2–3.

50. As respects two paragraphs of Santwier's declaration, respondent asserts that Santwier does not identify specific sources supporting his testimony regarding the relevant standard of care for capital defense in 1984. (Santwier Obj. at 3.) Respondent did not, however, object to Santwier's qualifications as an expert on the topic. As of 1984, Santwier had handled numerous serious felony cases, including more than six capital cases. (Santwier Decl.,

¶¶ 3–4.) In the early 1980s Santwier was an instructor on capital litigation in the Los Angeles County Public Defenders' Office. (*Id.*) Santwier's qualifications provide a foundation for him to testify to the applicable standard of care in 1984.

51. To the extent respondent asserts that Jackman's conclusions "amount[ ] to speculation," he appears to take issue with the fact that Jackman offers opinions. Qualified experts, of course, are entitled to offer opinion testimony based on materials of a type reasonably relied on by experts in the particular field. FED.R.EVID. 703.

### c. Respondent's Objection that the Experts' Testimony is Inadmissible Under the Best Evidence Rule

█ For similar reasons, the court overrules respondent's objection to Counter's and Jackman's quotation of testimony given by witnesses at petitioner's trial, offered in declarations, or provided at depositions they did not attend; and to their description or quotation of out-of-court statements made in interviews, letters, reports, or other contexts under the best evidence rule. The best evidence rule requires that the original of a writing be used to prove the contents thereof. FED. R.EVID. 1002. Here, the underlying writings are quoted to show the basis for Jackman's and Counter's opinions; they are not offered to prove the contents of the writings. The best evidence rule has no application where evidence "submitted [is] not offered to prove 'the content of a writing.'" *Fireman's Fund Ins. Co. v. Stites,* 258 F.3d 1016, 1023 (9th Cir.2001). Counter may properly rely on the materials she consulted to lay a foundation for her opinion. To the extent respondent contends that Jackman or Counter has mischaracterized the underlying evidence summarized in their testimony, this is an issue that should have been addressed during cross-examination. Respondent's best evidence objection is therefore overruled.

█ Although not totally clear, it also appears that respondent objects to Counter's testimony on the basis that it is "partisan" and favors petitioner. An expert witness need not be impartial in order to testify. *United States v. Williams,* 81 F.3d 1434, 1441 (7th Cir.1996) (dicta). See also 4 J. Weinstein & M. Berger, WEINSTEIN'S FEDERAL EVIDENCE, § 702.06[8] (2d ed.2000) ("[t]here is no requirement under Rule 702 than an expert witness be unbiased. Few people are"). For this reason,

"'[a]n expert witness's bias goes to the weight, not the admissibility of the testimony, and should be brought out on cross-examination.'" *United States v. Kelley,* 6 F.Supp.2d 1168, 1183 (D.Kan.1998). See also *DiCarlo v. Keller Ladders, Inc.,* 211 F.3d 465, 468 (8th Cir.2000) (admitting an expert's testimony and allowing the opposing party to present evidence of bias on cross-examination). Consequently, this objection is overruled.

### d. Respondent's Objection that Santwier's Testimony is Based on Expert Declarations Created in 2002

Citing no authority, respondent contends that Santwier improperly relies on declarations created in 2002 to establish that trial counsel should have relied on such information at petitioner's 1984 trial. Respondent asserts that such "post hoc reasoning is entirely speculative." [52] While certain of the declarations Santwier has considered were created in 2002, his opinion is based on the fact that the information contained in the declarations was available at the time of the 1984 trial and could have been presented to the jury. The particular declarations on which respondent contends Santwier should not have relied are those executed by Counter, Jackman, Lisak, and Clardy. Respondent has not objected to the methodologies or qualifications of these witnesses and the court has found that their declarations are properly admitted. To the extent respondent contends that Counter, Jackman, Lisak and Clardy used 2002 standards and methodologies to reach their conclusions, he should have cross-examined them, presented contrary testimony from his experts, or objected that the witnesses' methodology was not reliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*

---

**52.** Santwier Obj. at 1.

509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Respondent also contends that Santwier attempts to "offer expert mental health evidence regarding Petitioner's actual state of mind at the time of the murder."[53] Santwier nowhere expresses an opinion on petitioner's mental state. Rather, he opines that the evidence offered by mental health experts "would have provided substantial evidence in support of Mr. Lang's testimony that he believed his life was in imminent danger."[54] Santwier's testimony fits easily within the traditional scope of testimony offered by a *Strickland* expert. Respondent has not objected to Santwier's qualifications as a *Strickland* expert. Consequently, his objections are overruled.

### e. Respondent's Objection that the Experts Have Testified to an Ultimate Issue in the Case

Respondent contends that Clardy's testimony as to how petitioner's reported alcohol consumption would have affected his mental state violates California Penal Code § 29, and therefore would not have been admissible at petitioner's trial.[55] Under California law, an expert may not testify "as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." CAL.PENAL CODE § 29.[56]

■ Although California law prohibits an expert from testifying that petitioner lacked the intent to commit the charged offense, that is not the nature of Clardy's testimony. Rather, Clardy offers an expert opinion concerning the effects of alcohol when it is consumed in the amounts described by petitioner. This sort of evidence is admissible in California. See *People v. Rangel*, 11 Cal.App.4th 291, 300, 14 Cal.Rptr.2d 529 (1992) (noting that an expert's testimony would have been admissible under Penal Code § 28 to the extent that it concerned "the effects of alcohol intake on appellant's actual mental state without reference to his capacity to form said mental state"); see also *People v. Welch*, 20 Cal.4th 701, 755, 85 Cal.Rptr.2d 203, 976 P.2d 754 (1999) ("Trial counsel competently argued to the jury that defendant's consumption of alcohol and drugs impaired his mental state and led to an impulsive killing that did not rise to the

**53.** *Id.*

**54.** Santwier Decl., ¶ 16.

**55.** Once again, the court construes respondent's argument to be that Clardy's testimony is not relevant in this proceeding under Rule 401 because it concerns matter that would not have been admissible at petitioner's trial under California law.

**56.** Similarly, in federal court, experts cannot testify "as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone." FED. R.EVID. 704(b). "However, Rule 704(b) allows expert testimony on a defendant's mental state so long as the expert does not draw the ultimate inference or conclusion for the jury." *United States v. Finley*, 301 F.3d 1000, 1015 (9th Cir.2002). "A prohibited 'opinion or inference' under Rule 704(b) is testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite *mens rea*." *United States v. Morales*, 108 F.3d 1031, 1037 (9th Cir.1997) (en banc). Rule 704(b) does not preclude testimony on a matter related to *mens rea* "if the jury might infer the necessary *mens rea* from such testimony, so long as the testimony as to the predicate matter does not necessarily imply the *mens rea* element." *Id.* at 1033. Since Clary's testimony does not *compel* the conclusion that Lang did not possess the requisite *mens rea* to commit first degree murder, Rule 704(b) does not bar its admission in this proceeding.

level of premeditation and deliberation necessary for first degree murder. He called the jury's attention to the evidence of defendant's intoxication, and to the expert testimony regarding the effects such intoxication would likely have on judgment and impulse control").

■ Here the ultimate issues were whether petitioner possessed the intent to rob and whether petitioner held an honest if unreasonable belief that his life was in imminent danger. Clardy's testimony is that petitioner's reported alcohol intake would have caused, *inter alia*, confusion and disorientation. Although an expert may not testify whether a defendant lacked the requisite mental state to commit a crime, he may testify to matters related to the mental state that bear on the issue of a defendant's intent. See *People v. Samayoa*, 15 Cal.4th 795, 837, 64 Cal.Rptr.2d 400, 938 P.2d 2 (1997) ("Neither the trial court, nor sections 28 and 29, barred defendant from presenting expert testimony relating to defendant's mental disorders at the time of the commission of the crimes, or a correlation of the evidence of the crimes to the experts' test results (short of an opinion that as a result of defendant's mental disorders he lacked the

capacity to form the intent to kill, or did not in fact have the intent to kill, when committing the crimes)"). Because the California courts would admit testimony such as Clardy's, respondent's objection must be overruled.[57]

Respondent next contends that, in paragraphs 7 and 58 of his declaration, Lisak opines regarding petitioner's mental state at the time of the offense.[58] Specifically, respondent asserts that Lisak's opinion that petitioner's account of the offense "is consistent with Mr. Lang's background of extensive trauma and our scientific understanding of its neurological impact" is inadmissible under California Penal Code § 29.[59]

Just as it permits an expert to testify regarding the effects of alcohol intoxication, California Penal Code § 29 permits an expert to opine that defendant's mental condition was consistent with the defense's interpretation of events surrounding the offense so long as he does not offer an opinion as to whether defendant lacked the requisite *mens rea*. See *Samayoa*, 15 Cal.4th at 837, 64 Cal.Rptr.2d 400, 938 P.2d 2; *People v. Nunn*, 50 Cal.App.4th 1357, 1365, 58 Cal.Rptr.2d 294 (1996) (holding that § 29 permits "the presentation of

**57.** Respondent also objects, in a single sentence, that "Clardy's opinion about Petitioner's mental state is . . . speculation." (Clardy Obj. at 3.) Clardy's opinion is based on the testimony and evidence in this case and the post-arrest statement of petitioner, which is material of a type reasonably relied upon by experts. See *Southland Sod Farms*, 108 F.3d at 1142. The opinions Clardy expresses are proper expert testimony, since experts may testify to the effects of alcohol consumption. See *United States v. Pino*, 606 F.2d 908, 919 (10th Cir.1979) (noting that "there are instances when, with a proper scientific basis, qualified expert testimony is admissible as to the effect of a given amount of alcohol on a defendant's mental capacity"); *Foy v. Dicks*, No. 92–6488, 1996 WL 204432, *1 (E.D.Pa. Apr. 23, 1996) (testimony concerning the effect plaintiff's alleged alcohol and cocaine use

had on his actions was admissible under *Daubert*, 509 U.S. 579, 113 S.Ct. 2786). Respondent has not objected that the effects of alcohol consumption is not a proper subject for expert testimony, that Clardy's methodology is unreliable, or that Clardy is not qualified. Consequently, respondent's speculation objection is overruled.

**58.** Lisak Obj. at 2–3.

**59.** *Id.* (citing *Jackson v. Calderon*, 211 F.3d 1148, 1158 (9th Cir.2000)) ("Jackson's counsel believed that section 29 applied to impairment by voluntary intoxication, and would prevent him from eliciting Dr. Mead's (or any other medical expert's) opinion that Jackson in fact had not premeditated. Counsel was not wrong in so concluding").

detailed expert testimony relevant to whether a defendant harbored a required mental state or intent at the time he acted"). In *Nunn*, the court held that

"it was permissible for [a defense expert] to opine that appellant, because of his history of psychological trauma, tended to overreact to stress and apprehension. It was permissible for him to testify [that] such condition could result in appellant acting impulsively under certain particular circumstances. [The expert] could have evaluated the psychological setting of appellant's claimed encounter [at the time of the offense] and could have offered an opinion concerning whether that encounter was the type that could result in an impulsive reaction from one with appellant's mental condition. What the doctor could not do ... was to conclude that appellant had acted impulsively, that is, without the intent to kill, that is, without express malice aforethought." *Id.*

The testimony offered by Lisak in this proceeding is precisely the type of testimony deemed admissible in *Nunn*.

Lisak does not discuss petitioner's intent at the time of the crime. Rather, he opines that petitioner's account of the shooting and of his beliefs preceding it "is consistent with Mr. Lang's background of extensive trauma and our scientific understanding of its neurodevelopmental impact." [60] Lisak does not state whether petitioner could have formed the requisite mental state for any of the crimes of which he was accused, but opines that someone with petitioner's extensive childhood exposure to repeated trauma perceives and reacts to threats differently, and is less able to control his reactions, than one without such background. [61]

Because Lisak neither states that petitioner lacked the requisite intent nor offers testimony compelling a conclusion that he lacked the requisite intent, Lisak's testimony is not prohibited by California Penal Code § 29. Respondent's objection is therefore overruled.

**f. Respondent's Objection to Dr. Jackman's Opinions Concerning the Quality of Trial Counsel's Work**

Respondent objects that various paragraphs of Jackman's declaration "purport to express expert opinions about the quality of trial counsel's work, about the reasonableness of trial counsel's actions, about what trial counsel should have done, or about what reasonable trial counsel would have done under certain circumstances." [62] Respondent asserts that Jackman is not qualified as an expert on the standard of care for criminal defense attorneys. Petitioner counters that Jackman "is qualified to opine ... whether the actions or omissions of petitioner's trial counsel, as to the mental state aspects of the case in the 1984 trial, were customary and appropriate within the attorney/mental health expert relationship." [63]

Jackman was retained to opine on five issues: (1) whether, at the guilt phase, mental health evidence was available that would have corroborated petitioner's defense that he had an honest belief his life was in imminent danger; (2) whether, at the guilt phase, trial counsel was on notice and/or should have been on notice of petitioner's mental and emotional problems; (3) whether, at the guilt phase, trial counsel's failure to present mental health evidence was unreasonable; (4) whether counsel adequately investigated mental health issues and was adequately prepared

60. Lisak Decl., ¶ 7.

61. *Id.*, ¶ 58.

62. Jackson Obj. at 3.

63. Jackson Response at 2.

to present a case, involving mental health experts, in mitigation; and (5) whether there was mental health evidence available that could have been presented and offered in mitigation.[64] Respondent does not dispute that Jackman, who has worked as a consultant in more than fifty homicide trials, is qualified as an expert to opine on the standard of care for mental health experts. Jackman has not established, however, that he is qualified to offer an opinion as to whether trial counsel's actions constituted ineffective assistance under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Consequently, the third and fourth questions described above do not appear to be within Jackman's expertise. Similarly, Jackman is not qualified to offer an opinion concerning the information about which trial counsel should have been on notice.[65] See *Klaczak v. Consolidated Medical Transport Inc.*, No. 96 C 6502, 2005 WL 1564981, *2 (N.D.Ill. May 26, 2005) ("The Court also ... excludes various purported expert testimony from Sparks and Nagorka as to what the Defendants purportedly knew or whether the Defendants intended to commit fraud. Such testimony is not helpful to the jury, as the jury is well positioned to make this type of assessment in the absence of a battle of expert testimony about what parties knew or did not know, or did or did not subjectively intend to do"). On the other hand, respondent has not objected to testimony that is based on Jackman's psychological expertise.[66]

Although the court admits Jackman's testimony to the extent that it expresses medical, psychological, or psychiatric opinions, it excludes Jackman's opinion that Stanley failed to perform reasonably as trial counsel or that his actions prejudiced the outcome at trial.[67] While Jackman is qualified as an expert on certain scientific issues, and those issues are relevant in assessing what conditions and symptoms *could* have been investigated, diagnosed, and presented, Jackman is not an expert on whether trial counsel *should* have investigated or presented such evidence.

### 5. Objections to the Admission of Presentence Reports

Deborah Bartley was a parole and probation officer for Clackamas County Community Corrections. Respondent has proffered Bartley's testimony regarding a 1980 presentence report she prepared concerning petitioner. He has also proffered a presentence hearing report prepared by Marith Levers, a deputy probation officer for the Santa Barbara County Probation Department who interviewed petitioner after the guilty verdict. Petitioner objects that both reports are hearsay.

 The reports are inadmissible, in their entirety, because they are hearsay.

---

64. Jackman Decl., ¶ 12.

65. To the extent Jackman purports to testify to the facts that trial counsel knew at the time, his testimony lacks foundation. To the extent he offers opinions as to what counsel should have known, his testimony concerns a topic that falls outside his qualifications and expertise.

66. Large portions of Jackman's testimony concern the evidence available at the time of petitioner's trial and the extent to which that evidence was indicative of certain psychological disorders. (Jackman Decl., ¶¶ 35–74.)

67. The testimony excluded includes the sections of Jackman's declaration in which he addresses whether trial counsel was on notice of the need to investigate mental health evidence further; trial counsel's unreasonable failure to present mental health evidence at the guilt phase; the fact that trial counsel's use and presentation of mental health evidence was prejudicial; and the adequacy of trial counsel's preparation and presentation of mental health evidence during the penalty phase. (*Id.*, ¶¶ 75–105.)

See generally FED.R.EVID. 801. Although statements petitioner made to the probation officer constitute party admissions that might be admitted under Rule 801(d)(2)(A), there is a second layer of hearsay because petitioner's statements are offered through Bartley's and Levers' presentence reports, which are themselves out-of-court statements. Respondent apparently seeks to have Bartley's report admitted as past recollection recorded, since Bartley states that she has no present recollection of preparing the report.[68] The hearsay exception for recorded recollection provides that "the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party." See FED. R.EVID. 803(5).

Respondent did not seek to "read the PSRs into the record," which, in the context of a hearing where evidence was presented via declarations and depositions, could have been accomplished by copying the relevant paragraphs of the report in Bartley's declaration or having them read by her at a deposition. Alternatively, perhaps it would have been sufficient for Bartley and Levers to incorporate the portions of the reports about which they had no present recollection by reference into their declarations. Respondent employed none of these approaches; instead, he submitted the presentence reports as exhibits. This is plainly not permitted by Rule 803(5).

Although Rule 803(8) authorizes the admission of certain public records for the truth of the matters asserted therein, it precludes admission where "the sources of information or other circumstances indicate lack of trustworthiness." The Ninth Circuit has noted that "presentence reports are generally inadmissible at trial to prove any of the hearsay reports they contain," that they "are not subject to

evidentiary standards" and that they "may also contain factual errors." *United States v. Kovac,* 367 F.3d 1116, 1120 (9th Cir. 2004). Respondent adduces no evidence that the presentence reports he offers are sufficiently trustworthy to be admitted under Rule 803(8). Nor does he identify any other evidentiary basis for admitting the documents, respond to petitioner's objection, or suggest any non-hearsay purpose for admitting the reports. The court therefore sustains petitioner's objection.

### 6. Objection to Admission of Crothers's Pretrial Testimony

Petitioner objects to respondent's submission of an excerpt from Daniel Crothers's testimony at a pretrial hearing in the underlying state court action as Crothers's direct testimony in this case. Petitioner contends that Crothers's testimony at the § 402 hearing, some of which was excluded at trial as unduly prejudicial, should be excluded in this proceeding in deference to the state court's decision.

At the 1984 trial, the trial judge permitted Crothers to testify regarding petitioner's prior statement that he would "waste any mother fucker that screws with me." The trial court excluded other statements petitioner purportedly made to Crothers—i.e., that homosexuals were easy marks for robbery and that petitioner would put a gun to the victim's head if the victim resisted—because it concluded the statements were not sufficiently probative of intent or plan. Although noting that the statements did "make a person suspicious" that there might have been an intent or plan, the court ultimately held that they were more prejudicial than probative.

A different analysis of prejudice applies in this proceeding. "While it is still possible for a Rule 403 type of error to unduly

68. See Bartley Decl., ¶ 3.

influence a judge, '[n]onjury trials present a much smaller danger of unfair prejudice than jury trials.'" *United States v. Nguyen,* D.C. No. CR F 06–0075 AWI, 2008 WL 540230, *9 (E.D.Cal. Feb. 25, 2008) (quoting *Carter v. Hewitt,* 617 F.2d 961, 972 n. 13 (3d Cir.1980)). See also *United States v. Caudle,* 48 F.3d 433, 435 (9th Cir.1995) ("[I]t would be most surprising if such potential prejudice had any significance in a bench trial"). Petitioner does not assert that the testimony is irrelevant, although respondent does not explain its relevance and has not cited the evidence in his brief. The testimony may be nominally probative in that it corroborates the 1984 testimony of Donnie Marshall. Thus, the court will admit the evidence in connection with its consideration of the prosecutorial misconduct claim.

### 7. Objection to Admission of Police Reports Under Public Record Exception

Petitioner next objects to the admission of a police report created by David Kell, a retired member of the Portland, Oregon police department. The report was written in January 1984, and records information regarding an interview that Kell and fellow officer James Bellah conducted of Donnie Marshall. Petitioner similarly objects to the admission of a police report created by Charles Watkins, an investigator with the Santa Barbara District Attorney's office. Watkins wrote the report in February 1984 concerning an interview he and Kell conducted of Marshall. Finally, petitioner objects to the admission of a police report created by Bruce Correll, who together with Scott, interviewed Marshall in July 1984.

■■■■■ "[D]istrict courts should admit such law-enforcement reports, if at all, only under the public-records exception contained in Federal Rule of Evidence 803(8)." *United States v. Pena–Gutierrez,* 222 F.3d 1080, 1086–87 (9th Cir.2000).

Rule 803(8)(B) permits the admission of "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel." FED.R.EVID. 803(8)(B). If the declarant was not under a "duty to report," the recorded statement must satisfy a separate hearsay exception. *Bemis v. Edwards,* 45 F.3d 1369, 1372 (9th Cir.1995). "It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted but that statements made by third persons under no business duty to report may not." *United States v. Pazsint,* 703 F.2d 420, 424 (9th Cir.1983). Applying these rules, to the extent the police reports record the out-of-court statements of Kell, Watkins, and Correll, they are admissible.

The reports contain hearsay statements by Marshall, however, which are inadmissible unless an exception to the hearsay rule applies or they are being offered for a non-hearsay purpose. Although they may be inconsistent with the testimony Marshall has given in this action, the prior statements were not made under oath and thus are not non-hearsay under Rule 801(d)(1)(A). See FED.R.EVID. 801(d)(1)(A) (prior statements of a witness that are "inconsistent with the declarant's testimony, and [that were] given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition" are not hearsay). Accordingly, Marshall's prior statements to Correll, Watkins, and Kell cannot be admitted to prove the truth of the matter asserted.

As will be seen, however, the truth of Marshall's statements is not relevant. The

only question that is relevant under the Ninth Circuit's remand order is whether any law enforcement officer coerced Marshall's testimony or otherwise knew it to be false. The reports are admissible, therefore, to the extent they are probative of what Marshall told law enforcement officials before he testified and whether any law enforcement officer was on notice that Marshall's testimony was false and/or coerced. The statements are admitted, therefore, for the limited purpose of showing what information Marshall gave law enforcement prior to trial. Subject to this restriction, petitioner's objection to the reports is overruled.

## B. Ineffective Assistance of Counsel During the Guilt Phase

### 1. Standard Governing Ineffective Assistance of Counsel During the Guilt Phase

In general, to prevail on an ineffective assistance of counsel claim, a petitioner must show (1) that his trial counsel's performance "fell below an objective standard of reasonableness" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See also *Cox v. Ayers,* 588 F.3d 1038, 1045–46 (9th Cir.2009) ("To prevail on a habeas claim of ineffective assistance of counsel, Petitioner must establish both (1) that counsel's performance was so deficient that it fell below an 'objective standard of reasonableness' and (2) that the deficient performance rendered the results of his trial unreliable or fundamentally un-

fair," quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052).[69]

■ To satisfy the first prong and prove that counsel's performance was deficient, petitioner must show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Ainsworth v. Woodford,* 268 F.3d 868, 873 (9th Cir.2001) (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052). In other words, "[t]o establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.' " *Wiggins,* 539 U.S. at 521, 123 S.Ct. 2527 (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052).

■ A district court's "scrutiny of counsel's performance is highly deferential, and [the court] 'must make every effort "to eliminate the distorting effects of hindsight." ' " *Jones v. Ryan,* 583 F.3d 626, 636 (9th Cir.2009) (quoting *Ainsworth,* 268 F.3d at 873, in turn quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). See also *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052 ("Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct"); *Cox,* 588 F.3d at 1046 ("In analyzing the performance of counsel, judicial scrutiny is deferential"); *Hendricks v. Calderon,* 70 F.3d 1032, 1040 (9th Cir.1995) ("What decision [counsel] may have made if he had more information at the time is exactly the sort of Monday-morning quarterbacking the contemporary assessment rule forbids. It

---

**69.** Courts apply *Strickland's* "ineffective assistance standard to cases where, as here, the trial occurred before *Strickland* was decided on May 14, 1984." *Pinholster v. Ayers,* 590 F.3d 651, 664 (9th Cir.2009) (en banc). See also *Burger v. Kemp,* 483 U.S. 776, 777, 107

S.Ct. 3114, 97 L.Ed.2d 638 (1987) (applying the *Strickland* standard in evaluating trial counsel's performance in a case where the habeas petitioner was convicted and sentenced to death on January 25, 1978, more than six years before *Strickland* was decided).

is meaningless, after more than a decade, for [counsel] now to claim that he would have done things differently if only he had more information. With more information, Benjamin Franklin might have invented television"). Thus, the reasonableness of counsel's performance is judged against "prevailing professional norms." *Pinholster*, 590 F.3d at 664 ("To be 'deficient,' counsel's trial performance must be objectively unreasonable 'under prevailing professional norms' and under 'all the circumstances' of the particular case," quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

 To avoid judging in hindsight, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[ ... and] defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)); *id.* at 690, 104 S.Ct. 2052 ("[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment"). See also *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir.2001) ("In determining whether the defendant received effective assistance of counsel, 'we will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight,' but rather, will defer to counsel's sound trial strategy," quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." *Strickland*, 466 U.S. at 681, 104 S.Ct. 2052. See also *Murtishaw*, 255 F.3d at 939 ("[Pe-

titioner] bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy").

 "'Even if [a] decision could be considered one of strategy, that [alone] does not render it immune from attack[, however]—it must be a *reasonable* strategy.'" *Cox*, 588 F.3d at 1046 (quoting *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir.1997) (emphasis original)). "[T]o be considered a constitutionally adequate strategic choice, the decision must have been made after counsel has conducted 'reasonable investigations or [made] a reasonable decision that makes particular investigations unnecessary.'" *Correll v. Ryan*, 539 F.3d 938, 947 (9th Cir.2008) (en banc) (quoting *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052). See *Cox*, 588 F.3d at 1046 ("A defense lawyer must make reasonable investigations in the course of representation.... Counsel's investigation must, at a minimum, permit informed decisions about how best to represent the client," citing *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir.1994)). See also *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir.2010) ("As an initial matter, we distinguish between two duties the parties conflate. On the one hand, counsel must investigate relevant defenses. One the other hand, counsel must reasonably select and present a defense. These are different duties. It is true that evaluation of the two duties overlaps: counsel will be hard pressed to satisfy the duty to select a defense when counsel fails to investigate the best defense. But counsel may fail to investigate a particular defense and still, luckily, present the best one. He may also properly investigate various defense but unreasonably select among the alternatives" (citations omitted)).

Consequently, it is incumbent upon the reviewing court to consider the reasonable-

ness of the investigation conducted by the attorney. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

The Ninth Circuit remanded this action with directions that the court review counsel's investigation and presentation of mental-state evidence to determine whether the mental-state evidence would have corroborated petitioner's assertion that he shot Thurman Anderson because he had an honest but unreasonable belief that his life was in imminent danger, and would have tended to negate a finding that he had a specific intent to rob Anderson prior to or during the shooting. To the extent the mental-state evidence would have had this effect, the failure to develop and present such evidence may be probative of deficient performance.

 Mental-state evidence is frequently scientific in nature and may be presented by experts. In *Richter v. Hickman,* 578 F.3d 944 (9th Cir.2009) (en banc), a decision the court finds instructive, the Ninth Circuit recently considered counsel's failure in a murder trial to retain a forensic serology expert.[70] It stated:

"Counsel's failure to consult any forensic expert constituted a threefold abrogation of his duty under *Strickland.* Counsel's first failing lay in his inadequate investigation *prior* to settling on a trial strategy; his second, in failing to conduct the necessary investigation before trial to determine what forensic evidence might be available for him to introduce or how expert testimony might support the theory he had chosen; and his third, in failing to consult experts who could assist *during* trial when the State, foreseeably, introduced damaging expert testimony regarding the blood evidence in the case." *Id.* at 954 (emphasis original).

The en banc panel "fault[ed] counsel for failing to conduct the requisite investigation about a critical issue in the case at the *first* stage—before settling on his defense strategy—and then for failing to rectify his deficient performance at any of the subsequent times he had the opportunity to do so." It noted that counsel "had three separate opportunities to consult with forensic experts" and that, had he done so at the first stage, "it would have been unnecessary to repeat his investigation at each subsequent stage." *Id.* at 954 n. 8 (emphasis original).

Employing the framework laid out in *Richter,* the court notes first that "*Strickland* obligates defense attorneys to make reasonable investigations before settling on a trial strategy or, at the least, to conduct sufficient inquiries to make an in-

---

**70.** On February 22, 2010, the Supreme Court granted a writ of certiorari in *Richter,* sub nom. *Harrington v. Richter,* —— U.S. ——, 130 S.Ct. 1506, 176 L.Ed.2d 108 (2010). Although California's petition for writ of certiorari requested that the Court determine whether the Ninth Circuit had misconstrued the Sixth Amendment by "elevating the value of expert-opinion testimony in a manner that would virtually always require defense counsel to produce such testimony," Petition for

Writ of Certiorari, No. 09–587, 2009 WL 3841844, *1 (Nov. 9, 2009), the Supreme Court granted certiorari only on the question whether "AEDPA deference appl[ies] to a state court's summary disposition of a claim, including a claim under *Strickland.*" *Harrington,* 130 S.Ct. at 1506–07. Because the court here reviews a pre-AEDPA petition, the Court's review of *Richter* will not affect the outcome of the present petition.

formed decision about whether further investigation is needed." *Id.* at 955. See also *Wiggins,* 539 U.S. at 525, 123 S.Ct. 2527 (holding that counsel must make an "informed choice" among possible defenses); *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Correll,* 539 F.3d at 948–49 ("An uninformed strategy is not a reasoned strategy," and "the traditional deference owed to the strategic judgments of counsel is not justified where there was not an adequate investigation 'supporting those judgments,' " quoting *Wiggins,* 539 U.S. at 521, 123 S.Ct. 2527);. *Jennings v. Woodford,* 290 F.3d 1006, 1014 (9th Cir. 2002) ("[A]ttorneys have considerable latitude to make strategic decisions about what investigations to conduct *once they have gathered sufficient evidence upon which to base their tactical choices* " (emphasis original));.[71] Investigations involving or necessitating the retention of experts do not differ materially from other investigations under *Strickland* in that, "[u]ntil a reasonable investigation is conducted, counsel is not in a position to make critical strategic decisions or settle on a trial strategy." *Richter,* 578 F.3d at 955.

■ "Counsel must conduct a pretrial investigation into the availability of independent, objective sources to support the part of his client's testimony that he knows or can reasonably expect will be challenged, and subsequently to present to the jury any evidence he finds that tends to show his client's innocence, tends to undermine the prosecution's case, or raises a reasonable doubt as to his client's guilt, unless he makes an informed, strategic decision that the risks of introducing such evidence outweigh its benefit to the defense." *Id.* at 956–57. See also *Duncan v. Ornoski,* 528 F.3d 1222, 1234 (9th Cir.2008) (stating that the Ninth Circuit "has repeatedly held that '[a] lawyer who fails adequately to investigate and introduce ... [evidence] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance,' " quoting *Hart v.*

71. Having conducted a reasonable initial investigation, however, trial counsel may reasonably decide to forego further investigation regarding one line of defense and instead focus on another, more viable, one. In *Williams v. Woodford,* 384 F.3d 567 (9th Cir. 2004), for example, a case that considered the standard of care applicable in a 1981 California trial, trial counsel consulted with three mental health experts before trial, none of whom produced reports supporting a mental-state defense. *Id.* at 610–11. In questioning following arrest, the defendant had stated that he was not present at either of the two robbery-shootings at issue. *Id.* at 611. Counsel therefore settled on an alibi defense; as a result, the court concluded that he "no longer had a duty to investigate a conflicting [and non-viable] mental-state defense." *Id.* See also *Bean v. Calderon,* 163 F.3d 1073,

1081–82 (9th Cir.1998) (counsel's reasonable choice of an alibi defense in a case where defendant's statements conflicted entirely with a diminished capacity defense terminated counsel's duty to investigate the diminished mental capacity defense); *Turk v. White,* 116 F.3d 1264, 1266–67 (9th Cir.1997) (defense counsel's reasonable selection of a self-defense theory obviated the need to investigate the conflicting defense of incompetency, citing *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 ("[T]he need for further investigation [of the other theory] may be considerably diminished or eliminated altogether")); *Correll v. Stewart,* 137 F.3d 1404, 1411 (9th Cir.1998) (defense counsel was not ineffective for failing to present psychiatric evidence that would have contradicted the primary defense theory of misidentification); *Fritchie v. McCarthy,* 664 F.2d 208, 215 (9th Cir.1981) (same).

*Gomez,* 174 F.3d 1067, 1070 (9th Cir.1999) (alterations original)); *Hendricks,* 70 F.3d at 1040 ("An attorney 'must ... provide factual support for [the] defense where such corroboration is available.' ... Failure to pursue such corroborating evidence with an adequate pretrial investigation may establish constitutionally deficient performance," quoting *United States v. Tucker,* 716 F.2d 576, 594 (9th Cir.1983)); cf. *Jones v. Wood,* 114 F.3d at 1013 (granting "an evidentiary hearing on the issues of [an] attorney's failure to investigate ... before trial and ... failure to test the evidence").

▆ The obligation to conduct this type of investigation can, and frequently does, require consulting an expert to determine if he or she can provide corroborating testimony or testimony that tends to refute the prosecution's evidence. Consulting an expert is particularly important where his or her testimony is the "only forensic evidence" that can reasonably support the defense theory. *Richter,* 578 F.3d at 957 ("The obligation to investigate only grows more imperative where the evidence at issue is the "only forensic evidence" that could reasonably support the defense theory"). See *Duncan,* 528 F.3d at 1236 ("[T]he central role that the potentially exculpatory blood evidence could have played in [the defendant's] defense increased [counsel's] duty to seek the assistance of an expert."). See also *Smith v. Mahoney,* 611 F.3d 978, 983–84 (9th Cir. 2010) (discussing the role of a "forensic psychiatrist" in evaluating defendant's capacity to appreciate the criminality of his conduct at the moment a crime was being committed); *Boyd v. City and County of San Francisco,* 576 F.3d 938, 942–43 (9th Cir.2009) (discussing the role of a "forensic psychiatrist" who concluded that a § 1983 plaintiff was attempting to commit "suicide by cop" when he fired on police officers); *Edwards v. Ayers,* 542 F.3d 759, 773 (9th Cir.2008) (discussing the role of a "forensic

psychiatrist" who gathered extensive historical information about a habeas petitioner and evaluated whether he suffered a mental illness to a definable level that might provide a defense to a shooting).

The Ninth Circuit has often deemed "defense counsel in a murder trial ... ineffective where there was some evidence of the defendant's mental illness in the record, but counsel failed to investigate it as a basis for a mental defense to first degree murder." *Daniels,* 428 F.3d at 1206 (applying the standard of care for trial counsel in a 1984 California trial). See also *Jennings,* 290 F.3d at 1014–16 (reviewing a 1984 California trial and holding that defendant was denied effective assistance of counsel because "trial counsel failed adequately to investigate and present considerable evidence regarding petitioner's psychological and family history that might have ... defeated the jury's finding of the requisite intent for first degree murder in the guilt phase,"); *Bloom v. Calderon,* 132 F.3d 1267, 1277 (9th Cir.1997) (reviewing a 1983 California trial and holding that "[t]he complete lack of effort by Bloom's trial counsel to obtain a psychiatric expert until days before trial, combined with counsel's failure to adequately prepare his expert and then present him as a trial witness, was constitutionally deficient performance").

▆ Where counsel has retained qualified mental health experts, however, " 'an attorney is entitled to rely on the opinions of [those] experts in deciding whether to pursue an insanity or diminished capacity defense.' " *Williams,* 384 F.3d at 610 (quoting *Hendricks,* 70 F.3d at 1038). See also *Harris v. Vasquez,* 949 F.2d 1497, 1525 (9th Cir.1990) ("It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts"). Consequently, the Ninth Circuit has held that a "defense counsel reasonably declined to

pursue a mental-state defense when two experts opined that the defendant was neither insane nor diminished in mental capacity, and a third expert could not reach a conclusion." *Morgan v. Bunnell,* 24 F.3d 49, 52 (9th Cir.1994) ("In light of these expert opinions, defense counsel reasonably declined to try these defenses"). See also *Hendricks,* 70 F.3d at 1038 (defense counsel was not deficient at the guilt phase for deciding not to present a mental-state defense when two mental health experts found no evidence that defendant was insane or diminished in mental capacity).[72] Similarly, "it is 'acceptable trial strategy to choose not to call psychiatrists to testify when they can be subjected to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion.'" *Williams,* 384 F.3d at 610 (quoting *Harris,* 949 F.2d at 1525).

▆▆▆▆ Evaluating the adequacy of an attorney's scientific or other expert investigation is a forensic exercise. The "reasonableness of counsel's performance must be evaluated from his perspective at the time of the trial, not in hindsight." *Caro v. Woodford,* 280 F.3d 1247, 1255 (9th Cir. 2002). Consequently, if a particular scientific method was not known or a mental condition had not been identified at the time trial counsel was conducting his investigation, "this fact would preclude a finding of deficient performance." *Id.* (determining whether the dangers of pesticides were known in 1980 and 1981 when counsel investigated and tried the case, and holding that sufficient literature and data were available at that time to conclude that defendant had brain damage resulting from exposure).

This is consistent with *Strickland's* directive that attorney performance be judged against professional norms prevailing at the time of trial. *Pinholster,* 590 F.3d at 669. As one "guide[ ] to determining what is reasonable," the *Strickland* Court referenced "[p]revailing norms of practice as reflected in American Bar Association standards." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. See also *Rompilla v. Beard,* 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) ("[W]e long have referred [to the ABA Standards] as 'guides to determining what is reasonable,'" quoting *Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527). In *Pinholster,* the Ninth Circuit, sitting en banc, considered whether certain language in *Bobby v. Van Hook,* —— U.S. ——, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) (per curiam), had called into question reliance on the ABA standards. In *Van Hook,* the Supreme Court noted that "[r]estatements of professional standards, we have recognized, can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." *Id.* at 16 (citing *Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant")). The Sixth Circuit had relied on the 2003 edition of the ABA Guidelines in determining the standard of care applicable to a defense counsel' performance in a 1985 trial. The Court found this to be in error. *Id.* at 17 ("Judging counsel's conduct in the 1980's on the basis of these 2003 Guidelines—

---

**72.** As discussed *infra* in addressing petitioner's penalty phase ineffective assistance claim, a substantially different standard applies to the investigation and presentation of mental-state defenses at the penalty phase. *Hen-*

*dricks* reflects this dichotomy; the Ninth Circuit there concluded that the investigation and presentation of mental-state evidence constituted ineffective assistance at the penalty phase, but not at the guilt phase.

without even pausing to consider whether they reflected the prevailing professional practice at the time of the trial—was error").

The Court also noted that the Sixth Circuit had "treated the ABA's 2003 Guidelines not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands with which all capital defense counsel 'must fully comply.'" *Id.* It cautioned, as *Strickland* had stressed, "that 'American Bar Association standards and the like' are 'only guides' to what reasonableness means, not its definition." *Id.* (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052). The Court then noted in a footnote:

"The narrow grounds for our opinion should not be regarded as accepting the legitimacy of a less categorical use of the Guidelines to evaluate post–2003 representation. For that to be proper, the Guidelines must reflect '[p]revailing norms of practice,' *Strickland,* 466 U.S. at 688[, 104 S.Ct. 2052], and 'standard practice,' *Wiggins[ ],* 539 U.S. [at] 524[, 123 S.Ct. 2527], and must not be so detailed that they would 'interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions,' *Strickland,* [466 U.S.] at 689[, 104 S.Ct. 2052]. We express no views on whether the 2003 Guidelines meet these criteria." *Id.* at 17 n. 1.

The Court thus reserved judgment as to whether a "less categorical use" of the then-extant ABA Guidelines was proper.

Subsequently, an en banc panel of the Ninth Circuit addressed this precise question in *Pinholster:*

"[T]he Court held that it is permissible to use a restatement of professional standards to help determine an attorney's obligation towards a client only when those standards 'describe the professional norms prevailing when the representation took place.' *Van Hook,* [130 S.Ct.] at 16. That is precisely what we do here. We refer to the 1982 edition of the ABA standards that were in effect at the time of Pinholster's 1984 trial. Moreover, in *Van Hook,* the Sixth Circuit erroneously stated that attorneys 'must fully comply' with the ABA guidelines. *Id.* (citing *Van Hook v. Anderson,* 560 F.3d 523, 526 (6th Cir. 2009)). Here we make clear, as the Supreme Court has, that such standards do not define reasonable representation, but rather are 'guides to determining what is reasonable.' *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052." *Id.* at 670.

The Ninth Circuit then held that defense counsel had provided deficient performance "under ... the prevailing norms of practice, as reflected in the ABA Standards in place at the time of his trial." *Id.* at 674.[73]

73. The dissenters in *Pinholster* vociferously disputed what they viewed as a categorical application of the then-extant ABA Guidelines:

"The opinion here illustrates just how far we've strayed from the Court's wise cautions in *Strickland.* Rather than looking to the standards of practice applicable in the community at the time trial was held, we have now adopted a national standard embodied in the ABA Guidelines, which are read rigidly to require a certain kind of investigation and a certain kind of mitigation defense (what is known as 'humaniz-

ing' the defendant) in every capital case. Contra *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. No attention is paid to whether these standards reflect the contemporary norms in the community. Rather, current notions of a proper mitigation defense are telescoped back across the decades and retroactively imposed on counsel who had no way of knowing that this is what was expected of them. Contra *id.* This is exactly what the Supreme Court summarily reversed the Sixth Circuit for doing in *Van Hook:* 'Judging counsel's conduct in the 1980s on the basis of [later ABA Guide-

The ABA Guidelines applicable at the time of petitioner's trial stated: "It is

lines]—without even pausing to consider whether they reflected the prevailing professional practice at the time of the trial—was,' the Court held, 'error.' *Van Hook*, 130 S.Ct. at 17. It's the same error the majority commits today. Moreover, at the time of Pinholster's trial, the ABA had no guidelines specifically applicable to capital cases (those didn't come about until 1989), and the guidelines pertaining to criminal cases were quite general. They certainly did not impose anything like the straightjacket the majority retroactively imposes on counsel today. The most relevant portion of the 1982 Guidelines consists of a single sentence buried in a paragraph of 'Commentary.' This sentence does no more than point out that various aspects of the defendant's background 'will be relevant' to an effective defense. That's a far cry from a commandment that lawyers leave no stone unturned when investigating the defendant's background." *Id.* at 693, 104 S.Ct. 2052 (Kozinski, C.J., dissenting). Judge Dozinski, jointed by Judges Rymer and Kleinfeld, urged that "[i]nstead of rehashing the ABA Guidelines, ... [the court] ask[ ] whether the investigation by [petitioner's] counsel comported with the standards for counsel in a capital case in California in the mid–1980s." *Id.* at 694. They looked to past Ninth Circuit precedent and California Supreme Court precedent, rather than the ABA Guidelines, to determine the standard of care in California in the mid–1980s. The dissent noted that Supreme Court precedent did not "establish the ABA as the final authority on how lawyers must conduct criminal trials, with the power to override contrary determinations by the state courts about the lawyers they admit to practice." *Id.* at 696, 104 S.Ct. 2052.

The court is mindful that the dissent does not represent circuit precedent, and moreover, that the dissenting judges may have felt constrained to defer to state court rulings on the standard of care because *Pinholster* was a post-AEDPA case. *Id.* at 688 ("When AEDPA governs, we are constrained by yet another measure of deference, one that we owe to the state courts which first examined and ruled on the issue. Deference in the IAC context is particularly appropriate because the state courts, and state supreme courts in particular, are most familiar with the type of inquiry we must undertake under *Strickland*"); *id.* at

702 ("'We'll never know [what may have happened if defense counsel's strategy had succeeded], of course, but the burden of proof, *Strickland's* presumption of competence and AEDPA deference each require us to presume that the lawyers did the smart thing, not the dumb one").

The majority in *Pinholster* emphasized that "it is permissible to use a restatement of professional standards to help determine an attorney's obligation towards a client only when those standards 'describe the professional norms prevailing when the representation took place.'" *Id.* at 670 (quoting *Van Hook*, 130 S.Ct. at 16). Both the majority and the dissent appear to agree, therefore, that a court must verify that the standards embodied in the ABA Guidelines represent the standard of care prevailing in the state and during the year in which the trial took place. The dissent looked to Ninth Circuit precedent, in particular the decision in *Hendricks*, 70 F.3d 1032, and concluded that the ABA Guidelines required more than *Hendricks*. *Pinholster*, 590 F.3d at 694. By contrast, the majority concluded that the ABA Guidelines represented the prevailing norm at the time and in the community where the representation took place. Considering all of the opinions in *Pinholster*, the court finds it appropriate to look to past Ninth Circuit and California precedent as well as to the ABA Guidelines in determining the standard of care applicable in capital cases in California in 1984.

On June 14, 2010, the Supreme Court granted a writ of certiorari in *Pinholster* sub nom. *Cullen v. Pinholster*, — U.S. —, 130 S.Ct. 3410, 177 L.Ed.2d 323, 2010 WL 887247, *1 (June 14, 2010). The court's review of the briefing on the petition for writ of certiorari reveals that each of the questions presented concerns the scope of review of the reasonableness of a state court's adjudication and factfinding under AEDPA. Because the present action involves a pre-AEDPA petition concerning a case in which the state court did not conduct an evidentiary hearing, and because the court views its holding here as consistent with both the majority and dissenting opinions in *Pinholster*, the court does not believe that the Supreme Court's review of *Pinholster* will affect the outcome in the present case.

the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.... The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1 (2d ed.1982 Supp.).

The Ninth Circuit has repeatedly relied on the ABA Guidelines in determining the standard of care governing investigation and presentation of a mental-state defense. See, e.g., Smith, 611 F.3d at 986–87 ("By 1982, the ABA had released criminal justice standards requiring a defense attorney to thoroughly investigate the circumstances of a case, even in the face of guilt statements by the defendant"); [74] Daniels v. Woodford, 428 F.3d 1181, 1202–03 (9th Cir.2005) (citing the 1982 ABA Guidelines as the standard of care during a 1983 California trial). In addition, as early as 1983, the Ninth Circuit held that "[p]retrial investigation and preparation are the keys to effective representation of counsel," noting that "[c]ourts have repeatedly stressed the importance of adequate consultation between attorney and client, the interviewing of important witnesses, and adequate investigation of potential defens-

es." Tucker, 716 F.2d at 581 (internal citation omitted).

Petitioner proffers Santwier's testimony to establish the standard of care for the defense of capital cases in 1983 in California. Santwier is a 1969 graduate of the University of San Diego Law School. In 1970, he went to work in the Los Angeles County Public Defenders' Office, and remained a Deputy Public Defender until March 1984. Between 1970 and 1976, Santwier tried approximately forty jury trials, including murder and manslaughter cases. He also briefed and argued one case in the California Supreme Court. Between 1976 and 1978, Santwier was a senior trial deputy, handling serious felonies, including death penalty cases. From 1978 to 1980, he served as the supervising deputy at the traffic court, following which he returned to handling serious felony cases, including the defense of numerous capital cases. Santwier also served as an instructor in the Public Defender's office-wide capital litigation training program. Between 1980 and 1983, Santwier represented more than six capital clients and numerous murder/manslaughter clients. From 1980 to 1984, he was second in the chain of command supervising 20–30 deputies handling felonies and misdemeanors. From 1984 to 1989, Santwier was in private practice, during which time he handled four capital cases. From 1989 to 2002, he was a sole practitioner, and tried at least four capital cases. In 1986, he co-authored a chapter in the C.E.B. Criminal Law Practice and Procedure treatise.[75]

**74.** In Smith, the Ninth Circuit held that counsel's investigation of a mental-state defense was deficient in light of two pieces of information in his possession. The defendant told trial counsel that he had used drugs over many years. Nonetheless, counsel did not investigate this history of drug use or defendant's drug use leading up to the murders. Defendant also spoke of his desire to be put to death. The court noted that "[t]hat desire, whether couched in reasoned argument or not, should have put the defense lawyer on notice that [the defendant] might have mental health problems." Smith v. Mahoney, 596

F.3d 1133, 1142–43 (9th Cir.2010). Because counsel possessed this information, but did not commission a psychiatric evaluation, or seek further information regarding defendant's educational, corrective, or mental health background, the court concluded that his failure to investigate constituted deficient performance. Id. at 1143. It did not grant the writ, however, because it concluded there had been no prejudice.

**75.** Declaration of Rickard Santwier ("Santwier Decl."), Docket No. 305 (Sept. 27, 2003), ¶¶ 1–9.

Santwier testifies that as early as 1978, there were seminars and publications available to defense attorneys and their investigators regarding the investigation, preparation, and presentation of a defense in capital cases, both at the guilt and penalty phases. Beginning in 1980, the "California Appellate Project" published a capital defense manual, made available exclusively to the criminal defense bar and updated annually. Santwier notes that in addition to these publications, the authors of the materials and members of various organizations were available to provide advice and support at the time of petitioner's trial.[76]

Santwier describes the standard of care regarding the presentation of a mental state defense in 1984 as follows:

"The standard[ ] of care in 1984 required counsel, aware of the existence of a mental state defense, to conduct a reasonable mental health investigation prior to trial. To do so, at a minimum, counsel was obligated to (a) obtain information about petitioner by conducting a reasonable and thorough background investigation through competent investigators, under his direction; (b) to consult with and engage appropriate experts; (c) to reasonably inform the experts regarding the purpose of their engagement in the context of the defenses being offered; (d) to inform the experts of relevant available information and to provide the experts with such information as would be sufficient to permit the experts to evaluate the case and form their opinions; (e) to discuss with the experts the information the expert would need; (f) to reasonably pursue leads developed by the experts; and (g) to present such findings and evidence to the jury supportive and corroborative of the defenses. Thereafter, when presenting mental health experts at trial, the standard of care in 1984 required counsel to reasonably ensure (a) that the expert called had the relevant reference question in mind and was adequately prepared to testify to such at trial; (b) that the expert was qualified to testify on the subject matter for which the expert was called; (c) that the evidence being offered actually assisted the defense's theories and (d) if, the prosecution called an expert, that defense counsel would be prepared to cross-examine the prosecution's expert. This is basic defense behavior that should be done in any case when an expert is considered and can help or hurt your case." [77]

On at least one occasion, the Ninth Circuit has held that a district court erred in rejecting the testimony of a *Strickland* expert who was properly qualified to testify regarding "the minimal steps that counsel was required to take in" the relevant year, and whose testimony was "consistent with [the Ninth Circuit's] established case law and that of the Supreme Court." *Hamilton v. Ayers*, 583 F.3d 1100, 1129 (9th Cir.2009). See also *Ainsworth v. Calderon*, 138 F.3d 787, 791 (9th Cir.1998) (concluding that the district court did not abuse its discretion in admitting the testimony of a *Strickland* expert); *Thompson v. Calderon*, 109 F.3d 1358, 1364 (9th Cir. 1997) (noting, without criticism, the district court's decision to allow petitioner and the State to call "attorney expert witnesses to support their arguments regarding ineffective assistance of counsel").

The Ninth Circuit has held that a district court "must analyze each of [petitioner's] claims separately to determine whether his counsel was deficient, but 'prejudice may result from the cumulative impact of multiple deficiencies.'" *Boyde v. Brown*, 404 F.3d 1159, 1175 (9th Cir.2005)

---

**76.** *Id.,* ¶ 10.

**77.** Santwier Decl., ¶¶ 24–25.

(quoting *Cooper v. Fitzharris,* 586 F.2d 1325, 1333 (9th Cir.1978) (en banc)). Consequently, the proper course with respect to both the guilt and penalty phases is to consider each of petitioner's claims of ineffective assistance of counsel separately for purposes of determining whether trial counsel's conduct fell below the appropriate standard of care, and then consider the areas of deficient performance cumulatively to determine whether they prejudiced petitioner.

## 2. Trial Counsel's Investigation and Presentation of Guilt Phase Mental–State Evidence

### a. David Stanley's and Peggy Torralva's Interviews with Petitioner

Petitioner was arrested at the San Francisco International Airport on August 20, 1983. On August 23, 1983, he was arraigned in San Mateo Municipal Court for possession of a firearm without a permit, carrying a loaded weapon in public, carrying a deadly weapon (nunchakus), and possession of marijuana. At his arraignment, petitioner requested counsel; later that day, an attorney from the San Mateo Public Defender's Office was appointed. On August 25, 1983, petitioner was interrogated outside the presence of counsel, and confessed to stealing Thurman Anderson's

motor home, which had been discovered at the San Luis Obispo Airport. After a short break in the interrogation, petitioner confessed to shooting Thurman Anderson. On August 26, 1983, petitioner was released to the custody of Detective Bruce Correll of the Santa Barbara Sheriff's Department. Correll accompanied petitioner via plane to Santa Barbara County. The San Mateo Public Defender's Office informed the Santa Barbara Public Defender's Office that petitioner was en route. Deputy Public Defender David Stanley was assigned to represent petitioner.[78]

When Correll and petitioner arrived at the Santa Maria station house, Correll continued to question petitioner. Petitioner agreed to help authorities locate Anderson's body, and led District Attorney Michael Scott and detectives to the body near the Barrel Springs Campground.[79] Petitioner returned to the station jail that night at 9:00 p.m. Stanley, who had been waiting at a nearby restaurant, was able to have a brief conversation with petitioner. Stanley's handwritten notes reflect that the meeting took place between 9:30 and 10:05 p.m. Peggy Torralva, an investigator in the Santa Barbara Public Defender's Office, was also present.[80] Petitioner gave Stanley and Torralva an overview of the incident, and reported that he had given the same account to detectives.[81] Petition-

---

**78.** Amended Petition for Writ of Habeas Corpus ("Petition"), Docket No. 75 (Apr. 27, 1994) at 24–28. Correll recalled that during the interrogation in which petitioner admitted shooting Anderson, petitioner said that Anderson had made a sexual advance toward him. Correll testified that petitioner described "in great detail" the events leading up to the murder while they were walking toward the body. Correll acknowledged that he convinced petitioner to lead authorities to the body by convincing him that Correll already knew where it was located. Correll believes petitioner did not realize that authorities did not know the location of the body until he led them to it. (Petitioner's Selected Deposition Excerpts: Bruce Correll ("Correll Depo."),

Docket No. 352 (Nov. 27, 2001), at 12:25, 13:1–3.)

**79.** Petition at 29–30.

**80.** Resp.'s Exh. 391 ("Stanley 8/26/83 Notes"), Docket No. 419 (Aug. 26, 1983).

**81.** Stanley's notes state that petitioner "[g]ave [an] overview to us." He did not, however, summarize the overview he received. (*Id.*) As the tape-recorded interview conducted the next day makes clear, petitioner had, by the time that interview took place, communicated to Stanley that he had been drinking beer prior to the shooting. This information could only have been communicated during the first meeting between Stanley and petitioner.

er also provided the names, addresses, and telephone numbers of his father and mother, as well as the name and address of his cousin, Jim Lord.[82]

On August 27, 1983, Stanley and Torralva interviewed petitioner again, and tape-recorded the exchange.[83] At this meeting, Stanley emphasized to petitioner the importance of relating to him and Torralva all the details of the case; Stanley noted that "some little trivial thing that might not seem like much now" could be very important.[84] Stanley asked petitioner to relate the events that had occurred between Thursday, August 18, 1983, when petitioner left Atascadero and hitchhiked to Santa Monica, and the date Anderson picked petitioner up.[85] Stanley and Torralva asked petitioner detailed questions in an attempt to identify the exact location of the store at which Anderson allegedly gave petitioner $100 so that petitioner could buy beer and food.[86] Stanley asked petitioner how much he had "had to drink" by "the time … the shooting happened"; petitioner responded that by that time, he had

drunk "seven or eight beers."[87] When Stanley asked for further details, i.e., whether petitioner had been drinking steadily from the time Anderson picked him up, petitioner reported feeling sick and asked if he could return to his cell for a few minutes. Stanley decided to end the interview for the day.[88] After the interview, Stanley asked a jailhouse employee to take petitioner to the clinic where petitioner was treated.[89]

On August 28, 1983, Torralva interviewed petitioner without Stanley present, and recorded the interview. Petitioner described the drive from the store to the campground and the process of setting up the campground with Anderson.[90] He noted that the walk from the campground to the site of the shooting had taken about an hour because he and Anderson had "stopped and looked around." He stated, however, that the district attorney whom he had led to the body had timed their brisk walk from the campground to the body at twenty-seven minutes.[91] Petitioner told Torralva that the district attorney

**82.** (*Id.*) Petitioner reported that Lord had no telephone.

**83.** As stated in the court's order on petitioner's motion *in limine*, the transcripts of the audio recordings have been excluded under the best evidence rule. Consequently, the court has reviewed and relies on the audio recordings of the interviews conducted on August 27, August 28, and August 30, 1983. (Pet.'s Exh. 140 (Recording of 8/27–28/1983 Interviews ("8/27/83 Interview" and "8/28/83 Interview"); Pet.'s Exh. 142 (Recording of 8/30/83 Interview ("8/30/83 Interview").) Where appropriate, the court has also consulted Stanley's handwritten notes of the August 27 and 30, 1983 interviews (Resp.'s Exh. 392 ("Stanley 8/27/83 Notes"), Docket No. 419 (Aug. 27, 1983); Resp.'s Exh. 393 ("Stanley 8/30/83 Notes"), Docket No. 419 (Aug. 30, 1983)), as well as the Investigation Report authored by Torralva, which includes brief summaries of the August 28 and August 30, 1983 interviews (Resp.'s Exh. 395 ("Torralva Report"), Docket No. 419 (Aug. 31, 1983).)

**84.** 8/27/83 Interview.

**85.** *Id.* Stanley and Torralva wanted to learn any possible detail regarding all of the individual drivers who gave Stanley a ride, perhaps in the hope of finding someone who could corroborate petitioner's account.

**86.** *Id.*

**87.** *Id.*

**88.** *Id.*

**89.** Stanley 8/27/83 Notes; Petition at 29. The nurse who treated petitioner on this occasion later sat on petitioner's jury. (*Id.*)

**90.** 8/28/83 Interview. Although the tape of the August 27, 1983 interview contains a statement by Torralva that she was taking notes, neither party submitted these notes for the court's review.

**91.** *Id.*

had asked him about his past record and had been "trying to get [petitioner] to say that the only reason [he] brought this guy [Anderson] up [t]here was to rob him and kill him and all this kind of stuff, you know. He was trying to tell me that was my reason behind it." [92] Torralva ended the interview after approximately a half hour, because she did not want to tire petitioner.[93]

Stanley and Torralva met with petitioner again on August 30, 1983. Stanley described in depth the nature of the murder, robbery, and weapon-possession charges that petitioner faced, the lesser included offenses to first degree murder, and the nature of the special circumstance of committing murder in the course of a robbery. Among the possible defense strategies discussed was the availability of voluntary manslaughter in "situations like where somebody is really drunk, you know, really under the influence of alcohol. . . ." Stanley noted, however, that "this is something that is not very popular with juries. You know, they don't really buy it. But the law says that if somebody is under the influence [ ] that they don't really form these mental states of premeditation. . . ." [94] Stanley also described the defense of an "actual or honest but unreasonable belief in the need to defend oneself." He told petitioner that a "jury [could] decide[ ] that they believe[d] [petitioner] when [he] [said] that [he was] afraid and

[he] really thought that [he] had to shoot in order to defend [him]self," but could conclude that his actions were not reasonable in that he "should have first said, throw the gun down." [95] Petitioner also detailed the entirety of his prior criminal record for Stanley.

During the August 30 interview, Stanley noted an earlier conversation in which petitioner had said that he "definitely" wanted to get in touch with his father. Stanley said he had attempted to contact petitioner's father. Because he believed petitioner's comment that he had a poor relationship with one of his stepmothers concerned petitioner's relationship with his mother, Stanley had not yet contacted petitioner's mother. When petitioner assured him that he and his mother had a good relationship, Stanley said: "Oh, you get along with your mother, okay. Good." [96] Petitioner also told Stanley that he had a good relationship with his grandmother, who had helped raise him following his parents' divorce. Stanley noted that personal information could be important:

"Okay. Good. That kind of stuff becomes real important to us later in the case, most of the time. If we can walk you, it doesn't matter, but we don't get that lucky very often to walk somebody completely, and if we don't, then the background information is going to be important to us." [97]

92. *Id.*

93. *Id.*

94. *Id.*

95. *Id.*

96. 8/30/83 Interview. The court assumes that the references to the prior conversation concern the August 26, 1983 interview, since the tape recordings of the August 27 and August 28, 1983 interviews do not reflect any discussion of this issue.

97. *Id.* Other than this comment, there appears to have been no other reference during this interview to the jury's role in balancing mitigating and aggravating factors. Indeed, in a declaration executed in 1998, Stanley said that he had "never told Mr. Lang that under the instructions given to the jury . . . a death sentence was conceded if no mitigating evidence was presented, because the aggravating evidence of the prior convictions automatically outweigh[s] the non-existent mitigating factors." (Declaration of David Stanley ("Stanley 9/11/98 Decl."), Docket No. 338 (Sept. 11, 1998), ¶ 2.)

Stanley asked petitioner if there were any coaches from school who could "put in a good word" for him; petitioner said that a "Mr. Hood" from Rex Putnam High School in Oregon might do so. Petitioner told Stanley that he believed Hood was still at Rex Putnam and that he had since become the principal.[98] Stanley's handwritten notes reflect that he telephoned petitioner's mother that evening. She was not home, but that he talked with petitioner's grandmother.[99]

It does not appear that trial counsel recorded any further interviews with petitioner. On October 5, 1983, petitioner wrote Stanley a twelve-page single-spaced letter.[100] The letter gave Stanley a detailed account of the events that had transpired between August 12, 1983, when petitioner hitchhiked from Portland, Oregon, to Atascadero, California, and August 16, 1983, when he left Atascadero to hitchhike to Santa Monica.[101] Petitioner said that while he was hitchhiking from Santa Monica on the evening of August 16, 1983, a driver sexually assaulted him, causing petitioner to flee the vehicle and hide in bushes on an off-ramp overnight. Petitioner said he got only a couple of hours' sleep.[102]

The letter stated that the next afternoon, Anderson picked petitioner up and invited him to have a beer in the vehicle. He told petitioner he had a wife and kids, which put petitioner at ease after his experience the night before. Anderson eventually invited petitioner to go camping with him.[103] The letter detailed petitioner's alcohol consumption, the fact that he was "walking a little heavy [because of the] alcohol," and felt that his "senses might have been a little screwed up." [104] Petitioner said that Anderson mentioned his fear of catching V.D. from petitioner, that he referenced prior same-sex sexual encounters, and that he touched and kissed petitioner. Petitioner said that Anderson looked "mad as hell" after petitioner pushed him away, and that "about a hundred things were going through [his] mind at this time." Petitioner related that he

"didn't [k]no[w] what to think[.] I was scared and mad and thinking a hundred things at the same time. I was thinking about turning and running but was thinking this guy could shoot me right in the back pretty easy. I just wasn't to[o]

---

98. *Id.*

99. Stanley 8/30/83 Notes.

100. Pet.'s Exh. 1, Vol. 5, Tab # 53 ("Lang 10/5/83 Letter") (Oct. 5, 1983).

101. *Id.* at 1–2.

102. *Id.* at 2–3. The letter related that the driver was

"looking at [petitioner] pretty funny so [petitioner] kept [his] hand on the door just in case [he] had to jump out quick. After a couple of miles his first question he asked me [was]['']how would you like to get your rocks off?['] I ask[ed] him what he was talking about. Then he started · talking about he wanted to get it on and other thing[s]. All this time he was sitting there playing with himself [and] all he had on was a pair of shorts [and] a couple of minutes later he turn[ed] on a[n] off ramp[.] [T]his was about 10 miles from Ventura[.] [A]s soon as he pulled over I had my hand on the door [and] he took his shorts off then started to grab for me[.] I couldn't get the door open right away so when he got his hand on me I back handed him and got the door open and started running. I found some bushes under the off ramp and hid there. I took my nunchaka sticks out of my bag and waited but didn't he[ar] him follow me. I stayed there the rest of the night[.] [I]t was about 1:00 A.M. when I ran from the van. I sle[pt] a couple of hours [and] woke up about 5:00 to 6:00 in the morning." (*Id.*)

103. *Id.* at 4.

104. *Id.* at 8.

sure if he would do it or not[.] [H]e wasn't saying a word the [w]hole time and I knew he was mad. I heard him slam down the bolt on his gun. My gun was in my front packet and the handle was under my belt[.] [W]ithout even thinking when I heard that bolt slam down I grabbed my gun out of my pocket. To tell you the truth I don't even remember grabbing for it and firing. I sure didn't stop and count how many times I was firing shots 1 thr[ough] 5. It really happened to fast[.]" [105]

The letter also described what transpired after petitioner left the scene of the crime; it recounted that petitioner felt sick from the alcohol he had consumed, and that he took the R.V. and left.[106]

### b. Defense Investigator Brian Conry

Torralva did not remain assigned to the case. On September 21, 1983, Stanley telephoned the Multnomah County, Oregon public defender's office seeking a recommendation for an Oregon-based investigator who could undertake a preliminary investigation.[107] An investigator in that office recommended Brian Conry, who had previously been an investigator for a public defender's office for approximately two years, before becoming an attorney and starting a private practice. Although Conry had begun practicing law, he continued to do investigative work.[108]

Stanley outlined the case for Conry and Conry expressed interest. An attorney in private practice in Oregon also recom-

mended Conry to Stanley. On September 29, 1983, Stanley offered Conry the job; he accepted and said he would need a letter confirming employment, a summary of the crime, and copies of all Oregon-based information in Stanley's position.[109] On September 30, 1983, Stanley sent Conry a letter stating:

> "The results of your work likely will be most useful at the penalty phase, if this case reaches that stage. In California, the defense presentation at the penalty phase of a possible death penalty case involves the creative presentation of any available evidence to show that the client has redeeming qualities and should not be put to death.

> With that purpose in mind, I would expect your work to be in two general areas. First, I would appreciate your contacting family members and following up on information they might provide in order to present a biographical sketch of Ken as a family member, as he interacted in his peer group of friends and associates, and as a student through the public school system. The other general area would be to explore his criminal history, including the relative level of severity of his Oregon crimes, any residual feelings toward him by crime partners, victims, or law enforcement personnel, and any reaction toward him from other inmates or the administration at O.S.C. I [Oregon State Correctional Institution].

---

105. *Id.* at 9–10.

106. *Id.* at 11–12.

107. Resp.'s Exh. 389 ("Stanley 9/21–29/83 Notes"), Docket No. 419 (Sept. 21–29, 1983).

108. Much of this factual description is more relevant to analysis of ineffective assistance during the penalty phase than to ineffective assistance during the guilt phase. In the in-

terest of providing a complete picture of the investigation conducted prior to the guilt phase, however, the court summarizes the information developed through that investigation fully at this point. The court will highlight those portions of the investigation that are relevant in analyzing ineffective assistance during the penalty phase in a later section of the order.

109. *Id.*

I will next give you a general overview of the evidence in the current case. I would ask that you would exercise caution as to how much of this information you reveal to Ken's family members, until we have a better feel for their attitudes toward Ken and also as to how they might react emotionally to the information. Also, as I mentioned on the telephone, I am hoping to travel to the Portland area within the next few weeks so that I can personally get acquainted [with] his closer family members." [110]

On October 19, 1983, Conry advised Stanley that he had contacted Carol Gruber, petitioner's grandmother; Phyllis Gruber, his birth mother; Ken Lang, Sr., his father; Tracy and Tony Lang, his half-brothers; Carol Dewey, his first stepmother; and Hilda Lang, his second stepmother. Conry provided the following summary in his letter:

"The Lang family feels inner conflict in their discussions about the defendant. The two witnesses I feel best about are the mother and the grandmother. They have the least amount of bad things to say about the defendant and are the warmest people to talk with.

If you want to use character evidence in the trial; that the defendant is a peaceable person and would not have been the first aggressor, this type of evidence is available. But, what would be the scope of cross-examination on this?

\* \* \*

Let me know if you have any other ideas on how to proceed; the way I see it, is I could proceed any number[ ] of ways, but it would be helpful to know where the most fruitful path lies via the guidance of the defendant. [Handwritten note:] This has now been resolved through conversations." [111]

Conry also sent Stanley memoranda of the interviews he had conducted. In his memorandum of the interview with Ken Lang, Sr., Conry reported that petitioner's father had said: " 'Ken is a thief; he has a disease this way; [but] I really believe that he is [not] capable of killing someone, he has never been a violent person.' . . . [Petitioner's father] said that his son 'didn't fight his way through school' and that his son was more of a 'stand-offish' person who wanted 'to be by himself.' [He] said that he never had a problem with his son as far as the use of violence." [112] Petitioner's father said that he and "his son . . . [had] had 'good and bad times' and that he wished that they had been closer. He said . . . he felt that if he [had been] closer to his son . . . he might have been able to help his son through some of his problems." [113] Conry continued:

"In regard to the charges against the defendant, [his father] said that he 'don't think he done it to start with.' He said that his son wouldn't kill anyone unless it was a matter of self defense and he said anyone would do that. I asked . . . why he felt that way and he said 'because he is not a violent person; he is an easy going person' and he is 'not a d[e]structive killer of any type of animal.' [Petitioner's father] said that [petitioner] is not the type of person who would take a [B.B.] gun and shoot some birds if

110. Pet.'s Exh. 49 ("Conry 9/30/1983 Letter") at DS0618.

111. Pet.'s Exh. 51 ("Conry 10/19/1983 Letter") (Oct. 19, 1983) at DB1494.

112. Pet.'s Exh. 52 ("Conry/Lang Sr. Memo.") (Oct. 7, 1983) at 1. See also Pet.'s Exh. 53 ("Conry/Lang, Sr. Notes") (Oct. 7, 1983) at 1

("The witness said that his son 'didn't fight his way through school' and that his son was more of a 'stand-offish' person who wanted 'to be by himself'. The witness said that he never had a problem with his son as far as the use of violence. . . . The witness said that his son is more 'a sneaky type kid' ").

113. Pet.'s Exh. 52 at 4.

they were around the front[ ]yard or wher[ ]ever. [He] also . recalled that when the defendant was about fourteen 'I knocked the crap out of him but he just stood there.' The [father] said that he had gra[bb]ed the defendant by the shoulders and 'bounced him off the wall.' [He] said that this was the only time that he showed any anger toward[ ] the defendant although he was angry at him at other times. [He] said that he didn't hit the defendant with his fists."[114]

Conry also reported that Lang, Sr. advised "that the defendant's real mother wanted to have 'nothing to do with him' i.e., with the defendant."[115] Conry asked petitioner's father whether "he felt his son had any emotional or mental problems"; petitioner's father replied: " 'I believe he does.' The [father] said that he was 'always blaming myself' and he cited 'the broken marriages' and he said that he felt these broken marriages 'has something to do with it'. . . . [He] said that his son 'never had [a] real [ ] chance' . . . [and] that the defendant's real mother never had any time for him."[116]

Hilda Lang, petitioner's second stepmother and Lang, Sr.'s wife in 1984, was present during the Lang, Sr. interview. Conry reported that when Lang, Sr. said "he blamed himself for the way the defendant was to an extent because of the broken marriages," he "also said that his wife would get on him about how he shouldn't feel sorry for the defendant." Conry reported that "to an extent I think he is under his wife's thumb."[117] He stated that Hilda Lang had "interjected some things [during his interview of Lang, Sr.] and [that he] asked her some sep[a]rate questions at those moments when [he] was not directing the questions to her husband. . . . [Hilda Lang] said [that] the defendant was a 'dreamer.' She said that he did good at [high school] his freshman year . . . and then 'all of a sudden [went] bananas[.]' [S]he said 'he wouldn't go to school—he would stay in the halls.' She said that he thought of himself as a 'hippie' and that he would hang out in the bus depot. She felt that his job hunting was non-existent. [Conry] asked her how she felt when she heard of the charges against the defendant and she said 'I couldn't believe it[.]' . . . [S]he said that they read all the newspaper stories about it and the stories change[d] a[ ] little bit each time. . . . [Conry] asked [Hilda] if she felt that the defendant had any mental problems and she said that she felt that he did. She said that she felt . . . he [was] 'depressed' and that he 'feels insecure.' She said that she [felt] he could use some psychiatric help."[118] Lang, Sr. recalled that after petitioner had been released following time in custody on an earlier sentence, "they [had given] him a room upstairs. [He reported] that his son [had] turned that room into 'a Halloween movie' . . . [with] 'everything in black' and . . . black curtains in the room. [He] said that his son wanted to paint the walls black but they wouldn't let him do it. . . . [H]e talked to his son about the situation and that the talk depressed him." (Id.)

Ballew later complained about unprofessional comments Conry included in his interview notes regarding Hilda Lang. She cited the following observation specifically:

"Mrs. Lang has a polished look to her—her hair is real neat and trim and she is short and she is cute enough. My impression of her is that she's at least using her cuteness to be a little queen.

---

114. *Id.* at 5.

115. *Id.* at 2.

116. *Id.* at 3.

117. Pet.'s Exh. 53 at DB0903.

118. Pet.'s Exh. 54 ("Conry/Hilda Lang Notes I") (Oct. 7, 1983) at DB0904.

I asked her the ultimate question as to whether she could say anything at the sentencing, you know, as far as the son being a killer or not and she just couldn't say anything, she says she would not know. A few times she had kind of an evil laugh and she would kind of start this nervous laugh that both she and her husband would share about the son being a liar and never really knowing what he was doing. I disliked her. This is the type of woman who I think would dominate men because of the way they look or whatever, and the woman is not a stunning beauty or anything but I do feel that she dominates her husband or at least he is very careful not get her upset or whatever. Sometimes I would ask questions and they would look at each other and they would kind of answer together and I'm sure the last thing he wanted to do was insult her and I'm sure that they talked about the interview in length after I left." [119]

Petitioner contends that Conry's interview of Hilda Lang and the way in which he memorialized it demonstrate the unprofessional nature of the investigation he conducted and suggests that he was inexperienced and did not provide adequate reports.

Conry also interviewed petitioner's first stepmother, Carol Dewey (nee Rosenthal). Dewey reported that petitioner was "not a 'violent person,'" that "'He ha[d] never, ever been violent.'" Dewey told Conry that petitioner "'soft spoken[,]' [and] ... that he never even acted like he was going to hit her. She said that she raised Lang from the time he was three to the time he was thirteen and he was 'spoiled rotten.' She said that he came back to her home one time and said [that that] 'was where he belonged.' This was approximately four to five years ago at Christmas time and he stayed two or three months. [Dewey] said that [petitioner's] grandmother [had] kicked him out. She said that she guessed 'he stole some things from her.'" [120] As respects "the way ... defendant was raised," Dewey said that she "'was very strict with him ... terrible.'... She said that she would pick him up and spank him on the bottom." [121] She also related that Lang, Sr. frequently drank heavily, "and then c[a]me back and [took] [petitioner] out of his bed in the middle of the night" and threatened to leave her.[122]

Petitioner's half-brother—Carol Dewey's son Tracy Lang—was present for at least part of this interview. "Tracy mentioned something about the defendant never getting anything his whole life and [Dewey] was down her son's throat in about a quarter of a second...." Conry summed up his impressions as follows: "It was just a real w[ei]rd interview, people were real tense and again I wasn't real thrilled. The basic line is that they don't know that much about Kenny's recent life and they seem more interested in jumping on each other th[a]n really communicating with me. I got out of there pretty quickly." [123]

Tracy Lang offered "his personal opinion ... that [petitioner] was not violent." When Conry asked how well Tracy Lang knew petitioner, he responded: "'[L]ike a

---

119. Pet.'s Exh. 55 ("Conry/Hilda Lang Notes II") (Oct. 7, 1983) at DB0905.

120. Pet.'s Exh. 57 ("Conry/Rosenthal Notes I") (Oct. 12, 1983) at DB0892.

121. *Id.* Given the description of Carol Dewey's abuse of petitioner by petitioner's half-siblings, this is a remarkable understatement.

122. *Id.* at DB0893.

123. Pet.'s Exh. 59 ("Conry/Rosenthal Notes II") (undated) at DB0894.

brother,' " and reported that when petitioner was not in prison, he saw him about once a week. Tracy Lang opined that petitioner " 'wouldn't keep on beating' some one until they were dead[,]' [—] he's not that kind of person[ ].... He said that he also knew of the defendant living in a 'Freight Liner' trailer at one time." [124] Conry reported that Tracy Lang said that if the defendant had committed a homicide, he "should be executed." He also said: " 'If he did it he deserves to die.' " [125] Tracy Lang later denied vociferously that he ever made this statement.[126]

Petitioner's other half-brother, Tony Lang, reported that petitioner "was peaceful and never hurt anybody.... [H]e is not violent, but he is 'sneaky.' [Tony Lang] said that [petitioner] wouldn't hurt anybody if he wanted something; he would

just steal it.... He [noted] that the defendant was real into himself and that he didn't think that his own shit stank. The witness said that the defendant was smart[,] ... [and that he] 'likes freedom—likes to get away with things.' " Tony Lang had "never talked with the defendant about getting into any fights or anything, [but noted that he] like[d] to fantasize about being 'super macho.' " [127]

Petitioner's mother gave Conry an account of Carol Dewey's mistreatment of her son. She "said that she had heard that Carol [Dewey] was 'terribly mean to Ken Lang, Jr.' She said that Carol ... used to knock Kenny around,' and 'be really [cruel].' ... She said that Carol ... told her that this was true." [128] Petitioner's mother blamed Dewey for keeping her and her son apart.[129] She said that

124. Pet.'s Exh. 60 ("Conry/Tracy Lang Notes I"), (Oct. 12, 1983) at DB0895. The reference to living in a Freight Liner appears to indicate that petitioner was homeless at one time, and slept in the beds of parked trucks. (Declaration of Tracy Christopher Lang ("Tracy Lang Decl."), Docket No. 342 (Apr. 15, 2002), ¶ 13 ("I also remember Kenny when he was a teenager having no place to live. He stayed for a while in the back of a semi trailer in Oregon City. He had problems with my father. Times were hard then and there [were] not many jobs around. My father was with Hilda when Kenny was homeless. Hilda always complained and gave my father a hard time about Kenny").) Supporting his opinion that petitioner was not violent, Tracy Lang also reported that "he never saw the defendant get angry[,] ... [and] that he had never been around the defendant when the defendant was in a fight. He [did say, however,] that he [had] hear[d] about the defendant beating up some guy...." (Conry/Tracy Lang Notes I at DB0895.)

125. *Id.*

126. Conry's notes continued:
"I don't know if you can tell by the way the report reads but I didn't feel the witness was real interested in helping or that he really cared. This kid was about 18 years old and one of the first things he said to me was that if the defendant did it then he should be fried.... [H]e has it down on the

defendant because the defendant is a bad boy. There was a lot of tension when I talked to him—just a lot of odd tension.... I didn't get the feeling that he gave a shit but that he was more interested in coming off cute when he talked to me." (Pet.'s Exh. 61 ("Conry/Tracy Lang Notes II") (Oct. 12, 1983) at DB0897.)

127. Pet.'s Exh. 62 ("Conry/Tony Lang Notes") (undated) at DB0890. Conry concluded, after leaving the house where Carol Dewey, Tracy Lang, and Tony Lang lived:
"I left here feeling real depressed. I didn't feel these witnesses [Carol Dewey, Tracy Lang, and Tony Lang] added anything. Again, I don't know if you can see the tone of my report, but I think these people were going along with the company line as perpetuated [by] Mr. Lang wherein[ ] the defendant is sneaky, thiefy, institutionalized, can't make it on the outside, etc., to the extent where their good will towards him has been poisoned." (Pet.'s Exhibit 63 ("Conry General Notes") (undated) at DB0891.)

128. Pet.'s Exh. 69 ("Conry/Cavitt Notes I") (Oct. 7, 1983), at DB0907.

129. *Id.* at DB0908 ("The witness said that it was 'Carol's idea not to let Kenny around me' ")

"when she first heard about the shooting, ... she didn't know what to do. She said that when the defense attorney from California told her about the situation, [she] 'couldn't say anything.' [Petitioner's mother] said that Kenny [had] 'never, ever been that way around [her][,]' ... that the defendant had never been cruel around her, and that he 'd[idn't] cuss in front of [her].' [She] said that he [was] 'always a gentlem[a]n, very nice.' " [130]

Conry asked petitioner's mother whether "the defendant was a peaceful or a violent person, and [she] said that ... the defendant was a peaceful person[,] ... 'very much' so. [Petitioner's mother] said that she care[d] about Kenny Jr. and that she ... [felt] ... he care[d] about her. [She] said that Kenny Jr. would hug and kiss her, and treat her well. She said that he was courteous, and that he wouldn't even cuss when he became angry. She [reported] that when he becomes angry '[h]e kind of clams up—won't say a word—like sits and pouts.' [Petitioner's mother] said that she [had] never heard about Kenny Jr. being in any fights and that she never saw anyone get physical with Kenny Jr. [ ][She] spoke of a time when her younger son 'tore into' Kenny Jr. and Kenny 'just held him.' [She] said that Kenny would not hit the younger son, but just kept the younger son from hitting him. The witness said that she asked Kenny Jr. why [he] hadn't hit her younger son back[,] and that Kenny [had] said 'what for mom, he's littler than me.' [She reported] that her younger son had come after the defendant with both of his fists 'just churning' and

that the defendant had held the younger son there, and didn't even get mad at the younger son." [131]

Petitioner's mother reported that "she doesn't like violence and that she [had] talk[ed] to the defendant about violence a little bit, although she never had to scold him about it, because he was always so nice. [She] said that Kenny Jr. responded to [her] talks about violence by saying "No mom, I'm not going to do it." [Petitioner's mother] said 'I love my sons[ ]' and again she said that she had no problems with Kenny. Of Kenny she said that 'He's a good person; not a violent person; kind to other people; he gives us things.' She said that he ha[d] given things to her son Bobby, i.e., clothing because he wants to. She said that he ha[d] done this with other people, too. . . . [A]sked ... if she would allow her son to live with her, ... [petitioner's mother] said 'absolutely, because him and I have gotten along great.' " [132]

Conry also interviewed petitioner's grandmother, Carol Gruber. Asked about the charges against petitioner, she said:

" 'I didn't believe it, I know the boy, he would never do anything like that, he's a gentle boy, a good boy, a happy boy.' [Petitioner's grandmother] said that when the defendant was in Salem, at the Oregon State Penitentiary, ... he 'wrote [her] often[ ]' ... 'beautiful letters about himself and what he planned doing when he got out.' She said that he looked to the future and that he wanted to get a job and get his life straightened out. [Petitioner's grandmother] said 'I don't

---

130. *Id.* at DB0909.

131. *Id.*

132. *Id.* Petitioner's mother stated that "she felt that at one time the defendant [had] a

drug problem, although she didn't really know ... the extent of it. . . ." She reported that petitioner had "at one time ... admitted the drug problem." (*Id.*) She noted, however, that "she didn[']t notice any mental problems in her observations of Ken Lang, Jr." (*Id.*)

understand how they think he could even think that he did this."[133]

Gruber recounted that

"she [had] had the defendant when he was younger[,] ... [and] that 'when he got mad, [he] would usually go off in a corner, or go to [her] room and cry, and then he would come back and tell [her] he was sorry, no matter what he did.'

＊　　＊　　＊

"[Conry] asked [petitioner's grandmother] when and if the defendant was released from prison, if she would allow him to live with her, and she said that she would. [She] said that the defen-

dant 'never causes trouble[']' and that she couldn't see how he could ever be charged with killing somebody. She said that this [was] the way everybody [felt] about him. [Petitioner's grandmother commented:] 'You can't make me believe this either.' She said that the defendant [had] 'never hurt anybody[,]' and ... that she had no recollection of ever discussing the topic of violence or fighting with [him].... She said that her opinion was that he was not mentally disturbed.... [When Conry] asked ... if she felt that the defendant care[d] about human life[,] [petitioner's grandmother] said that she [felt] he [did] care[ ] about human life."[134] Testifying

---

133. Pet.'s Exh. 71 ("Conry/Gruber Notes I") (Oct. 7, 1983), at DB0918.

134. *Id.* Conry reports that petitioner told his grandmother "all about his life and about 'his little daughter.' She said that he wanted to get a job and go back to California and 'make a home for his girl and daughter.'" (*Id.*) In handwritten notes of an interview Stanley conducted with petitioner on October 11, 1983, petitioner confirmed that he had a child who had been born in February or March 1983, while he was in prison. He said the child had been conceived when he walked off a work detail from OSCI and hitchhiked to Atascadero, California (Pet.'s Exh. 50 ("Stanley 10/ 10–11 /83 Notes") (Oct. 10–11, 1983) ("Δ does have a little girl: born 2/17 or 18/61 (mother): Sheri Weller; baby born about 2 or 3/83—doesn't know name or where born—broke up because Δ decided to turn self in.... They lived together in Atascadero about 9/82–10/82: Saint Ysabel St.... Pat [Martin] might know Sheri.... Sheri was from East Coast somewhere—Δ doesn't know where her family is. Never visited Δ at OSCI. Sheri lived at Jack London Motel in Portland off + on").
 In a subsequent description of petitioner's grandmother, Conry stated:
 "She is a very elderly person. She's short. She speaks real plainly when she says that, you know, he's a good boy and he'd never do anything like this. She's not going to give you any sophisticated terminology, [but] she will certainly give you the impression that she is sincere when she says that the defendant wouldn't shoot anybody. Apparently we can also use a community opin-

ion on that, that the defendant is not violent. The son was over there—Ken Sr.'s brother, and he was popping in with things like when the grandmother said he was a good boy in general and what not that *she really* didn't know that, because he'd been in prison, but ... she just kept on saying what she felt." (Pet.'s Exh. 72 ("Conry/Gruber Notes II"), at DB0920.)
 Conry also interviewed Sabrina Morrison, whom petitioner had dated for a period. Morrison stated that "she 'never saw [petitioner] get angry.'" (Petitioner's Exh. 64 ("Conry/Morrison Notes I") (Oct. 4, 1983), at DB0885.) Although she believed he was peaceable, she asserted that petitioner had stolen her car and she did not have a positive opinion of him for that reason. (*Id.*) Conry concluded: "[I]n a sentencing I don't think or see why we would want to put her on...." (Pet.'s Exh. 65 ("Morrison Notes II") (Oct. 1983) at DB0889.) Later, however, Conry sent a memorandum to Stanley stating: "I don't know if I would trust Senior on the stand, I wouldn't trust Hilda, so far I like the mother and the grandmother, and that is it, and now, maybe Sabrina." (Conry General Notes.)
 Conry interviewed James Michael Lord, petitioner's cousin and cellmate at OSCI. He stated that he had never known petitioner to get in fights, but described him as a "schemer" who had "a thing about guns." Lord said that "a lot of people should get the death penalty, but not Lang." When Conry asked if Lord "would let Lang live with [him] if Lang got out of prison, [Lord] said[,] ... 'Hell yeah,

in 2002 Stanley explained that he had asked Conry "mainly [to] talk with family members and I—my recollection is I outlined for my areas of interest, which included potential penalty phase issues. My mind-set at the time was that I wanted to get at least a preliminary snapshot of what was going on with family and associates in Oregon while we were waiting to get our own full-time investigator on the case, and so he was—in my mind he was kind of a stop-gap. You know, a temporary, go out and do this preliminary work for us—a concern about both guilt issues, mental state guilt issues, and potential penalty phase issues." [135]

Petitioner knew that an investigator was contacting his family members and did not object. [136] At his deposition, Stanley said that he thought Conry's investigation was "adequate," but he had "hoped for better." He noted that standing alone, Conry's investigation would not have been sufficient for the penalty phase investigation. [137] Dorothy Ballew, who took over from Conry as the defense investigator, was more blunt: in her opinion, Conry's "reports were unprofessional and unhelpful." [138]

### c. Defense Investigator Dorothy Ballew

In October 1983, Stanley met with Dorothy Ballew, who was assigned to conduct the remainder of the investigation. When asked to describe her assignment, Stanley stated that "it was kind of a fluid situation in terms of specific things that she under-

---

I would do everything I could for the guy.' [He] also that if he had money to fly down to California, he would fly down there now." (Pet.'s Exh. 74 ("Conry/Lord Notes I") (Oct. 24, 1983), at DB0925.) Conry reported that Lord had asked if he wanted to smoke marijuana with him before he left. "He is a confident little cat and he was pretty excited about helping Kenny Lang out. He really was. He was a lot more excited th[a]n the family members except for Mom and Grandma." (Pet.'s Exh. 75 ("Conry/Lord Notes II") (Oct. 29, 1983), at DB0928.)

Conry also interviewed Mitchell Bass, a friend of petitioner. Bass "said that when he first heard of the charges against Lang through the newspapers [it] shocked him and that he didn't believe any part of it. [He] said that ... he [could] honestly say that he [did] not believe what 'they say happened actually happened.' " (Pet.'s Exh. 76 ("Conry/Bass Notes I") (Oct. 26, 1983), at DB0921.) When Conry asked whether Bass felt "defendant valued human life[,][he] ... said[:] ... 'I don't think that he had any lack of respect for human life; he seemed to enjoy life no matter where he was; if anything, he had a high regard' for human life. [Bass] mentioned that even inside OSCI ... Lang would walk around [with] ... a genuine smile on his face. [He] said that Lang was not aggressive but that he would not let you hit him either. He

said that a lot of times he saw Lang just walk away from fights." (*Id.*)

135. Deposition of David Y. Stanley, Esq. ("Stanley Depo."), Docket No. 360 (Oct. 1, 2001) at 51:21–25, 52:1–9. See also *id.* at 213:2006 ("My idea of hiring Mr. Conry was to get a preliminary kind of investigation of Mr. Lang's background and family with the idea that ultimately we would have a full-time investigator who would do follow-up work").

136. *Id.* at 214:6–16.

137. *Id.* at 215:1–21.

138. Declaration of Dorothy Ballew ("2002 Ballew Decl."), Docket No. 326 (Oct. 11, 2002), ¶ 54. Ballew Depo. at 82:11–25 ("I did review these [reports] and the—there were synops[e]s of each of the different reports that he did that he makes comments about the individual that he interviewed. I think at that time it was based on those comments. I thought that for one thing the mother, ... he seems to dismiss, and I knew that was an important person in Ken's life. That was somebody that, although he didn't grow up with her, he had warm and fond memories of her, and I think that Brian Conry had really dismissed her and not gotten—talked to her at all. And then the—he just had, you know, some comments and his attitude in general about the people that he had spoken to").

took to do." [139] Ballew traveled to Oregon and re-interviewed most of the people with whom Conry had spoken, as well as others. [140] Stanley could not recall if he ever told Ballew that her interview memoranda might be used by mental health experts, nor could he recall if he advised either Conry or Ballew that the purpose of their investigation was to gather evidence for the penalty phase. [141]

As respects all phases of the trial, Ballew asserts that although she and Stanley "communicate[d] by telephone, [she] did not receive any direction from . . . Stanley [regarding] issues to investigate or examine." Ballew did "not recall any specific formal meetings with . . . Stanley prior to the trial nor did [she] receive any memorandum from [him] . . . regard[ing] [the] investigation." [142] Ballew described Stanley's representation of petitioner as "[u]nprofessional in terms of no structure and focus for the case and what we should do and what we should present and where we were going with any of the witnesses. Unprofessional in that sense. To tell you the truth, I don't know that he had a whole lot of experience with trial at that time himself." [143] Ballew maintains that a more experienced litigator would have had

"a game plan, more direction and maybe developing witnesses to present—I mean, first having an idea of—. . . I'm not so sure that enough time was spent with Ken Lang to really get an idea of what he needed for the case on Mr. Stanley's part or on my part. We didn't have the savvy at the time to know what to ask for or information to get that would send us in any direction. That's what I mean when I say he didn't have a whole of experience with trials. There was no plan, you know, one, two, three, ABC. This is what we want to bring to a jury. This is what we want to understand about Ken Lang, that sort of thing. There was just nothing like that." [144]

Ballew stated, however, that she never told Stanley she was not "getting enough direction" because she felt that she lacked the experience to know the level of di-

---

**139.** Stanley Depo. at 219:18–25, 220:1–7. 78

**140.** *Id.* at 220:23–25, 221:1–4.

**141.** *Id.* at 221:5–18. Similarly, Stanley could not recall if he had ever instructed Ballew to investigate the abuse petitioner suffered as a child, his trauma, depression, or homelessness. (*Id.* at 222:16–25, 223: 1 –11.)

**142.** 2002 Ballew Decl., ¶ 5.

**143.** Deposition of Dorothy M. Ballew ("Ballew Depo."), Docket No. 397 (Nov. 7, 2001), at 90:8–14.

**144.** Ballew Depo. at 135:23–24, 136:1–14. As evidence that Stanley lacked a cohesive trial strategy, Ballew offered the following anecdote:

"Ken Lang testified in this case. . . . And the decision to do that, to have him testify was a last minute, spur of the moment decision that David Stanley made. We took a break. We were sitting at counsel table. We took a break. We went into the jury room. He said to Ken that he thought that he needed to testify or talked to him about testifying. Within—I don't know how much time we took for the break, but by the end of the day, Ken was testifying. There was no preparation with him about how to testify to prepare him for cross-examination. There was none of that. . . . [H]e may have met with Mr. Lang on his own, but a lot of the times we were together I never saw him prepare Ken, and the reaction that Ken had in that jury room when he was told or talked to about testifying was something that you would not be able to miss. His reaction was she[e]r terror, confusion and physically sweating and not comprehending. He's not a real bright guy. He didn't comprehend what was going on, the magnitude of his testifying might have. I mean, it's a vivid memory that I have of him back in the jury room." (*Id.* at 137:16–25, 138:1–22.) Respondent filed a motion to exclude this testimony, which the court denied.

rection was needed.[145] Petitioner's case was the first death penalty action on which Ballew worked. Ballew stated:

"I was not searching for the dynamics of Mr. Lang's home life or other contributing factors to his behavior, as is my practice now. I believe the investigation was superficial and inadequate." [146]

Ballew met frequently with petitioner. In his 2002 deposition, Stanley noted that Ballew was frequently present during his meeting with petitioner, that when Ballew was not present, he never took a position that was inconsistent with the positions he had taken when Ballew was present, and that he always briefed Ballew on the substance of his meetings with petitioner.[147]

Ballew interviewed a number of petitioner's family members and produced memoranda regarding the interviews for Stanley.[148] Ballew's report of her interview with petitioner's father offered a picture of a father who was distant from his son and who deliberately ignored the apparent abuse of petitioner by his stepmother. Lang, Sr. related an instance in which petitioner begged his father to stay so the two could live together. "Ken Sr. said it was difficult for Ken, but he (Ken Sr.) felt they needed to live their own lives. Ken was 12 years old at the time." [149] He also related the sudden abandonment of petitioner by his birth mother.[150] Lang, Sr. acknowledged indirectly some responsibility for the way petitioner's life had developed. Ballew reported that petitioner's father

"said he used to blame himself for what happened to Ken. He rationalize[d] away his guilt by saying 'I had to live my life, and he had to live his'. He admit[ted] that he had marital problems with his first two wives, and that they argued in front of the kids. He feels that this consumed the time he could have given to Ken." [151]

---

145. *Id.* at 64:4–9 ("Q. So you didn't say to him 'I don't feel like I'm getting enough direction on this case. Can you please give me more direction?' Nothing of that nature? A. I really don't feel I had enough experience at the time to really do that"). See also *id.* at 66:10–15 ("Q. During the course of the Lang case did you ever complain to anybody or confide in anybody that you didn't feel you were getting enough direction on the case? A. I don't think I had enough sense to know it at the time").

146. 2002 Ballew Decl., ¶ 9.

147. Stanley 9/11/98 Decl., ¶ 3 ("When [Ballew] was not present, I did not take any position with Mr. Lang that was inconsistent with positions I took when Ms. Ballew was present. Further, Ms. Ballew and I discussed the case frequently, and I always shared with her the substance of my meetings with Mr. Lang when she was not present"); Ballew Depo. at 89:17–25, 90:1–3 ("He kept—I think he kept me up-to-date on everything that was going on in terms of, you know, court hearings or meetings with Ken. I mean, he—I think he kept me pretty much aware of what was going on. I think that we were pretty close in terms of, you know, caring about the client . . .").

148. All of Ballew's interview memoranda are undated.

149. Pet.'s Exh. 88 ("Ballew/Lang Sr. Notes"), at DB0564.

150. *Id.* at DB0566 ("Mr. Lang and Grandma Gruber told me that one evening, when Phyllis and Ken were still married, Phyllis brought Ken Jr. over to her house and left. Mrs. Gruber said that Ken 'was still a baby in a blanket.' She (Grandma Gruber) thought that Phyllis was just leaving Ken with her while she went out for the evening. Instead, when Ken[']s father came home he found a note from Phyllis saying she was leaving him for another man. Ken Sr. did not know where Phyllis was until two years later when she wrote him a letter saying she was married and living in Texas. Ken Sr. then went to a lawyer and filed for a divorce from Phyllis").

151. *Id.* at DB0568 (also stating that "he had never felt like Ken was a failure[, and that he did] not know what happened to Ken. He [said that he] 'wish[ed] [petitioner] could have

Petitioner's mother contradicted the picture provided by Conry and petitioner's father of her departure from the family. She said she left the family when petitioner was four or five years old, but that thereafter, petitioner occasionally ran away from the home he shared with his father and Carol Dewey and came to her house.[152] She also related that petitioner lived with her occasionally during his childhood, but that her husband kicked him out of the house for stealing empty Coca Cola bottles.[153] At one point, when Carol Dewey and Lang, Sr. were fighting, petitioner's mother "went to an attorney to try to get custody of Kenny. The attorney told her she would have to pay him $400[ ] down before he would work on the case.... [S]he did not have the money to do this so she did not go through with her plan to retain custody of Ken."[154] Petitioner's mother reported that Carol Dewey and Hilda Lang directed "only bitterness" toward petitioner.[155]

Ballew also interviewed Susie Rosenthal, petitioner's step-aunt and the sister of Carol Dewey. Susie Rosenthal told Ballew that petitioner's father "had molested her when she was about 10 years old. She also said that he [had] attempted to rape one of her sisters. She said that Ken Sr. [was] 'sick and a liar.' "[156] Susie Rosenthal also provided some insight regarding petitioner's attitude toward gay men. Ballew stated:

"Ken lived with Susie and her lesbian lover Tammy when he was released from the army. It was Ken who suggested I see Susie in regards to his attitude toward homosexuality. I asked Susie how Ken reacted to homosexual males that visited her home when Ken lived with her. At first she did not remember any male homosexuals coming to her house but after giving it a few days['] thought she said that there was one homosexual male named Brad that would come over every once in a while. She told me that whenever Brad came into their apartment Ken would get up and leave."[157]

Another relative of petitioner's, Cathy Helms, told Ballew that "all the kids" in the family "were into stealing" and that "no one [in the family] talks about that."[158]

gotten his life together' ' '). Ballew also interviewed Hilda Lang, petitioner's second step-mother, and noted:

"Hilda is the only person that says Ken is bright. She said that when he was in the 8th grade he made great grades and she felt he was 'really gonna make it.' She said shortly after she does not know what happened but everything change and he started going down hill." (Pet.'s Exh. 89 ("Ballew/Hilda Lang Notes"), at DB0969.)

152. Pet.'s Exh. 90 ("Ballew/Atwell Notes"), at DB0970 ("She said that Ken Jr. was not with her since he was 4 or 5 years old. She said that at one time Ken ran away from Carol[']s to his mother[']s. She said that Carol and Ken Sr. were fighting a lot at the time").

153. Id. ("At some point while Ken was living with his mother and Craig Atwell [Ken] took some [Coke bottles] and turned them in for cash. She said that at the time she and Craig Atwell had no money and they needed the bott[les] for food money. (The grandmother says that it is not true that they were poor at the time. She said that Craig was making [good] money at the time [Phyllis] is referring to)[.] After Ken took the [Coke bottles] Craig Atwell tol[d] him he could not stay in his house any longer[,] if he was going to steal from us. Craig said that right now the bottles might be a small issue but later it might be worse. Craig told Ken I'm not going to put up with it you'll have to find another place to stay").

154. Id. at DB0971–72.

155. Id.

156. Pet.'s Exh. 91 ("Ballew/Susie Rosenthal Notes"), at DB0590.

157. Ballew/Susie Rosenthal Notes at DB0590.

158. Petitioner's Exh. 92 ("Ballew/Helms Notes"), at DB0968. Although Ballew's notes imply that Helms is a relative of petitioner,

The court notes that Carol Dewey's and Ken Lang, Sr.'s third child, Tamara Jean Dykes (nee Lang), offered inconsistent testimony in her 1988 and 2002 declarations as to whether she was interviewed prior to petitioner's trial. In her 1988 declaration, Dykes stated that an investigator spoke with her before the 1984 trial.[159] In her 2002 declaration, she asserted that no defense investigator spoke with her.[160] Neither Conry's nor Ballew's notes reflect a conversation with Dykes. In a 1989 declaration, however, Stanley identified her as one of the witnesses he considered calling during the penalty phase.[161] Given that Stanley and Dykes recalled, in 1989 and 1988 respectively, that a defense investigator contacted Dykes, the court concludes that one of Conry or Ballew spoke with her, most probably while she was residing with Carol Dewey and Tony and Tracy

Lang. The court has no evidence, however, regarding the content of the interview.

Ballew testified that, based on the interviews she conducted, she knew in 1984 that the marriage of petitioner's biological parents was tumultuous and marked by arguments and separations, and that she communicated this fact to Stanley.[162] Ballew also knew that petitioner was unhappy in Carol Dewey's home and felt like an outsider; she also imparted this fact to Stanley.[163]

### d. Mental Health Experts Retained by Stanley

Stanley recalled that, after reviewing Conry's and Ballew's reports, he concluded that family members' "comments . . . indicat[ed] various kinds of possible mental health issues."[164] He also testified that after reviewing the information, he knew petitioner "had suffered emotional abuse."[165] Stanley expressed concern

they do not identify her relationship to petitioner. At her deposition, Ballew did not recall who Cathy Helms was. (Ballew Depo. at 112:19–23.)

159. Declaration of Tami Lang ("Dykes 1988 Decl."), Docket No. 346 (Dec. 13, 1988) at 2 ("An investigator talked with me before Ken's trial. I was willing to go to court and testify to what I have said in this statement and much more if asked").

160. Declaration of Tamara Jean Dykes ("Dykes 2002 Decl."), Docket No. 346 (Apr. 19, 2002), ¶ 58 ("No one ever talked to me before Little Kenny's trial. . . . [N]o one ever asked me to help Little Kenny of to be a witness for him").

161. Declaration of David Y. Stanley ("Stanley 1989 Decl."), attached as Exh. 288 to Stanley Depo. (Aug. 23, 1989). On February 10, 2003, respondent filed a request to submit the entire deposition transcripts of Stanley, Lang, and Donnie Marshall. (Request to Submit Entire Deposition Transcript of Kenneth B. Lang, Jr., Trial Counsel David Y. Stanley, and Donnie Marshall, Docket No. 420 (Feb. 10, 2003).) Petitioner filed a response on February 18, 2003 indicating his non-opposition.

(Response by Petitioner, Docket No. 425 (Feb. 18, 2003).) Because the court deems this request and response to be a stipulation to expand the record, the court deems the exhibits attached to the Stanley deposition and referenced therein to be part of the record.

162. Ballew Depo. at 112:23–25, 113:1–7 ("[Q.] On the first page, the last paragraph Mr. Stanley indicates that the marriage between Mr. Lang's biological parents was a highly tumultuous[] one marked by arguments and separations. [] Do you recall being aware of that in 1984? A. Yes. Q. And you would have imparted that to Mr. Stanley? A. Yes").

163. Id. at 112:8–19 ("Q. . . . Mr. Stanley speaks of Ken Lang, Sr[.]'s remarriage to Carol Rosenthal . . . , and that Lang, Jr. . . . . was generally unhappy in this home and felt himself to be an outsider. Was that information that you were aware of in 1984? A. Yes. Q. And would you have imparted that information to Mr. Stanley? A. Yes").

164. Stanley Depo. at 231:6–12.

165. Stanley Depo. at 232:10–13.

about conducting a psychiatric or psychological evaluation too early in the case, however, because petitioner was opposed to "having his head shrunk."[166] He explained:

"[U]ntil we had established a better rapport and I was able to explain to him how such an evaluation might relate to corroborating or buttressing his version of what happened, until we got to that point I don't think he saw that there was any need for such an evaluation and just because of his personal predilections he would have preferred not to have done it."[167]

Ultimately, Stanley prevailed on petitioner to meet with mental health experts for the purpose of establishing a defense at the guilt phase; Stanley could not recall, however, if he informed petitioner that the experts would be used for the penalty phase as well.[168]

In mid–1984, Stanley retained Lawrence Ratner, Ph.D., a licensed clinical psychologist.[169] In 1984, Dr. Ratner "was regularly consulted as an expert by the Santa Barbara Public Defender's Office" and had "evaluated numerous defendants charged with murder in cases involving mental state issues."[170] Ratner could not recall being asked specifically to evaluate whether petitioner's shooting of Anderson was a panic response, the result of posttraumatic stress disorder ("PTSD"), or based on an actual but unreasonable belief that his life was in danger.[171] This is confirmed by the introduction to his July 9, 1984 report memorializing his findings, in which Dr. Ratner wrote that "Mr. Stanley wanted to know Ken's emotional makeup, his intellectual level, and if there were any gender confusion problems present." He identified this as the "referral question."[172] At his 2002 deposition, Stanley stated that he had a "moderately clear [recollection] that at th[e] point [Ratner was retained] we were focusing on guilt phase, and I don't remember asking anything about—you know, give us some—some input in terms of potential penalty phase."[173]

---

166. *Id.* at 235:23–25.

167. *Id.* at 236:5–15.

168. *Id.* at 237:12–15.

169. Declaration of Laurence Ratner Ph.D. ("Ratner 9/20/02 Decl."), Docket No. 299 (Sept. 20, 2002), ¶ 2. Ratner in his 2002 testimony stated: "I do not have a complete recollection of this case after so many years, but I have reviewed my report which has refreshed my recollection, and it was my general understanding that this evaluation was performed for the purpose of determining Mr. Lang's emotional make up, his intellectual level, and if there were gender confusion problems present." (*Id.*)

170. Declaration of Laurence Ratner Ph.D. ("Ratner 9/23/02 Decl."), Docket No. 303 (Sept. 27, 2002), ¶ 2.

171. Ratner 9/20/02 Decl., ¶ 3 ("I do not recall Mr. Stanley telling me that my evaluation was directed to providing support for Mr. Lang's susceptibility to panic because of post traumatic stress disorder, depression or any other mental condition or deficit. Nor do I recall Mr. Stanley telling me that he was trying to support voluntary manslaughter or 'imperfect' self defense, or that Mr. Lang had an actual but unreasonable belief that his life was in danger when he shot the victim in this case. Reading my report, I do not believe that these were the reference questions").

172. Ratner 9/20/02 Decl., Exh. 40 ("Ratner Report"), at 1. See also Ratner 9/23/02 Decl., ¶ 3 ("Mr. Stanley asked me to determine Mr. Lang's emotional makeup, his intellectual level, and whether there were any issues of gender confusion and in particular concerns about homosexuality").

173. Stanley Depo. at 62:3–6. Had Stanley asked Ratner to evaluate whether petitioner's shooting of Anderson was a panic response, the result of posttraumatic stress disorder ("PTSD"), or based on an actual but unreasonable belief that his life was in danger, the expert's input would have been relevant in both the guilt and the penalty phases.

Although Dr. Ratner could not recall "exactly" what he said to Stanley, he noted it was his "usual custom and practice to request from the defense attorney all available materials relative to the client's mental health, including background information about the client's family history, his relationship with his family, investigative reports, [and] social and biographical information."[174] Dr. Ratner stated that he was not given any information regarding petitioner's alcohol intoxication, abandonment and physical abuse by his parents and stepparents, or his experiences in the days leading up to the murder.[175]

Dr. Ratner interviewed petitioner for one-half hour on July 2, 1984 and two hours on July 3, 1984.[176] He "took a mental status, a psychosocial history, and performed a psychological test battery consisting of the WAIS–R, Rorschach, MMPI, Carlson Psychological Survey, Draw A Person, and Bender Gestalt."[177] On July

**174.** Ratner 9/20/02 Decl., ¶ 4 ("I have no reason to believe I did not follow that custom and practice in this case"). Aside from this information, Dr. Ratner does not recall requesting any follow-up information. (Deposition of Lawrence S. Ratner Ph.D. ("Ratner Depo."), Docket No. 407 (Feb. 5, 2003) at 15:1–2 ("I don't remember [if I asked for additional information] but I don't think I did"); *id.* at 20:23–25, 21:1–5 ("Q. [][D]o you recall at any time advising anyone representing Lang that—that—that you could not come to a reliable or thorough conclusion without additional information? ... A. You know, I don't remember. But looking back at my relationship with the Public Defender's Office, I was basically there to screen cases to see if there was some angle or hook that we could use, and that was my purpose. Information might—this wasn't an N.G.I. hearing; it wasn't a competency hearing. It was just simply to feel out what was going on for some angle we could use, and that's where I left it"). At his 2002 deposition, Stanley could not recall what referral question he posed to Dr. Ratner or what, if any, materials or facts he gave him. (Stanley Depo. at 241:17–25, 242:1–25, 243:1–25, 244:1–25, 245:1–25, 246:1–5.)

**175.** Ratner 9/20/02 Decl., ¶¶ 5–6.

**176.** Ratner Report at 1.

**177.** *Id.* Dr. Ratner's "psychosocial history" was four pages long and included a brief family, educational, and sexual history, as well as details regarding Anderson's murder. (*Id.* at 2–5.) At his 2003 deposition, Dr. Ratner explained his understanding of a psychosocial history:

"Psychosocial history is their—how their background affects the current predicament that they're in, whether it be emotion problems or legal problems that they're in. We look at—you see how old they are. And all these—all these points create [a] hypothesis. ... You look at education. Education tells me if the person is—has been successful in life, or they—they're a school dropout, or they're retarded, so education is important to me. ... I look at their marriage, if they've been single, or married, or never married, and if they are married, have they had multiple relationships or one relationship, and has it been good or bad. All of these things dovetail back into the overall picture. The—we look at criminal history; drug history; you need to know [whether] these [have] been problems, so that if you have someone that's depressed, for example, is the depression related to family problems, drug problems; you need to know that for causation purposes. Have they been—medical problems are important. If a person has had—is complaining of depression and, say, they have a thyroid problem, diabetes, what have you, all those could make someone really depressed." (Ratner Depo. at 26:13–25, 27:1–20.)

Ratner noted that his understanding of a psychosocial history "has never changed. It's always the—looking at the mental status and trying to connect that, the presentation, to what's going on in their life, in terms of education, family, legal problems, drug problems, what have you, and then moving on to the test and then dovetailing into ... [trails off]." (Ratner Depo. at 28:7–25, 29:1–5.)

Dr. Ratner was also asked the "purpose [of] providing a psychosocial history when you're consulting, as of 1984, in a—in a murder case." He responded:

"To see if things led up to, you know, here's somebody that is accused of murder, has there been a history of criminal conduct on this person's part. If so, are you dealing with an antisocial personality who was just

9, 1984, Dr. Ratner sent Stanley a letter stating:

"After interviewing and testing Ken, I feel that the victim at the time of the crime mistook Ken's passive, polite ways as an indication that he had homosexual tendencies. I further feel that the victim did not realize that he was dealing with someone who has both gender confusion and insecurity about being masculine.

In addition, all his life Ken has attempted to mark these sensitive areas and taken steps to protect himself from homosexual attack.

This, no doubt, was particularly true in the prison setting, in which he was able to survive.

Another factor that is important to remember in Ken's case is that [he] does have a borderline level of intellectual functioning, particularly in word power, mathematical computation, and common-sense reasoning.

In other words, hypothetically, in a situation where someone was trying to seduce him, he would be a little slow in understanding what was going on because of his borderline level of intellectual functioning. Obviously, when he realized what was happening in his intoxicated state, he overreacted." [178]

Dr. Ratner attached a report that provided some social background. It "emphasized that [petitioner] got along well with his father until he was about 13. At that time he began having problems with his second stepmother [Hilda Lang], and the relationship between him and his father broke down." [179] The report also stated that at some point in his childhood petitioner became homeless and began living in a makeshift cabin or treehouse he built in the woods, supporting himself by shoplifting. Ratner stated that petitioner first had sexual intercourse when he was eight or nine years old because he was forced or pressured to do so by three female teenage cousins. [180]

Dr. Ratner also provided the results of the battery of psychological tests he conducted. He noted that an elevated score for

"Psychopathic Deviancy [on the MMPI] indicates that an individual has asocial and anti-social tendencies. This can include lying, stealing, promiscuity, and a general disregard for social rules and conventions. Individuals with this particular profile have assaultive thoughts, acting out behavior, and are described as being hostile and irritable. They are moreover seen as being unable to conform to society's standard, and are further described as egocentric, narcissistic and impulsive.

The moderate elevation of the scale score for Paranoia suggests that he is

committing one more crime. Is this a crime out of—crime [that] doesn't make sense. Then why doesn't it make sense? Why did this person do it out of the blue? And is there anything contributing in the background that could have caused it, like were they abused themselves, or did they witness crimes in the past themselves? So it's—it's to see if there is any—what—any causation of what is being charged for. Whatever they've been charged with, is there something that led up to that?" (Ratner Depo. at 33:25, 34:1–16.) Dr. Ratner testified that a psychosocial history is generally "20 pages" long, and based on

"the subject's version, may be some medical—medical records or legal records attached to it, and that's it. There's never any collateral interview with family or anything. It's just strictly some doctor reports, lawyers, police reports, some—and then the actual intake." (Ratner Depo. at 49:21–25, 50:1–11.)

178. Ratner 9/20/02 Decl., Exh. 39 ("Ratner Letter").

179. Ratner Report at 3.

180. *Id.* at 3–4.

guarded, self-centered, highly sensitive and underachieving.

\* \* \*

When seen in combination, an individual with elevated scale scores for Psychopathic Deviancy and Paranoia would be diagnosed as having a passive-dependent personality."[181]

Based on these findings, Dr. Ratner diagnosed petitioner as "having a personality disorder of a sociopathic type, [with] ... a disregard for social rules and conventions. He is also seen as being hostile, irritable, rebellious and underachieving. He has definite problems with impulse control, and is possibly somewhat narcissistic,"[182] as well as "having a passive-aggressive personality."[183]

Dr. Ratner "did not request any additional background information from ... Stanley, nor did [he] recommend further testing or other experts to ... Stanley."[184] Ratner did not purport "to arrive at a diagnosis, per se, but to arrive at a specific angle that [Stanley] could use to get the sentence reduced in some way."[185] Stanley never contacted Dr. Ratner after receiving his report.[186]

181. Ratner Report at 5–6. Dr. Ratner performed the MMPI test, Bender Gestalt test, WAIS–R test, Carlson Psychological Survey, Draw a Person test, and Rorschach test. *Id.* at 5–10. In his 2003 deposition, Dr. Ratner explained the purpose of these various tests. (Ratner Depo. at 8:12–25, 9:1–23 ("[W]e were looking for certain angles, so to speak, to help [Lang's] case. You want to know if—their I.Q., their intellectual level.... [T]here's an issue if they're mentally retarded [whether] they can form an intent to murder.... No. 2, you want to know if they have a mental illness. So you do a mental status to see if there's any voices, depression, anxiety, and then if you have the time you try to do an MMPI, Minnesota Multi–Phasic Personality Inventory, to determine if there's any underlying emotional problems, personality problems, that could have, again, prevented them from forming intent at the time of the murder. Also, you do projective tests, like the Rorschach, to see ... if there is some underlying mental illness present.... If someone has brain damage, the—they have problems with impulse control; they have problems with anger and so forth; so you want to screen for that. That's picked up by the WAIS–R, [] from the Wexler Inventory Scale, and that's also picked up in the Rorschach, and it can be picked up ... with the Draw A Person or Bender").)

182. Ratner Report at 9–10.

183. *Id.* at 10. See also Ratner 9/23/02 Decl., ¶ 11 ("In summary, I found that Mr. Lang had a sociopathic personality disorder, and a disregard for social rules and conventions. In contemporary terms, I found him to have an antisocial personality disorder. He did not appear to have a disorder of thought or mood, nor was he seen as suffering from low self-esteem. I saw nothing in my test results of from my interview from which I could conclude that Mr. Lang had organic brain damage").

184. Ratner 9/23/02 Decl., ¶ 12.

185. Ratner Depo. at 74:25, 75:1–5. See also *id.* at 79:4–7 ("In Mr. Lang's case, I was simply stating what I felt was going on. I wasn't trying to give a DSM–3 diagnosis, just trying to—to try to give Mr. Stanley some ammunition in preparing a defense").

186. *Id.* at 90:9–19 ("Q. Were you ever contacted after you sent your report? A. No. Q. Did Mr. Stanley ever talk to you about your report? A. No"). Stanley stated that among the reasons he did not use Dr. Ratner as a witness or an expert was that "some red flags went up with me in Dr. Ratner's results in terms of the diagnosis of psychopathic personality, which I did not personally see in Mr. Lang, but if he had testified and that had come out, I saw that as a potential bombshell if we got to a penalty phase because those are the people who jurors are most concerned about not ever getting out and, you know, being in free society again. So that was—I'm sure would have entered into my concern not to have that kind of testimony." (Stanley Depo. at 73:4–25, 74:1–18. See also *id.* at 87:16–24 ("At kind of a gut level I guess, how—my sense of penalty juries is that you do not want to portray a defendant as some-

Following his receipt of Dr. Ratner's report, in early August 1984, Stanley retained Dr. Jerome L. Schulte, who in 1984 was a licensed psychiatrist specializing in the field of forensic psychiatry.[187] Dr. Schulte was retained "to provide a general evaluation of [petitioner's] mental status."[188]

In a 2002 declaration, Dr. Schulte stated that in 1984 it was his "invariable custom and practice to request all available background information on a client." He said he had "no reason to believe [that he] did not request all such information in this case, and [that he] believe[d] that [he] would have done so, although the passage of time prevent[ed] [him] from having a specific recollection."[189] Dr. Schulte did not, however, "receive any information other than the information gleaned from [his] initial consultation with Mr. Lang himself."[190] In particular, Stanley did not give Dr. Schulte Dr. Ratner's report or letter, and Schulte assumed that he was the only mental health expert who had been retained.[191] Stanley did not advise Dr. Schulte that he was exploring defenses of voluntary intoxication or an honest but unreasonable fear of imminent danger.[192] Although Dr. Schulte was aware of the mitigation factors that are relevant under California law, moreover, he was not asked to address the penalty phase.[193]

---

body who is frightening to a jury. You know, they—they have objective guidelines, but they're human beings, and I think when you start talking about a sociopath and a psychopath, you start conjuring images of the Charlie Mansons of the world, and I think it's just a very dangerous image to portray to a penalty jury").

187. Declaration of Jerome Schulte ("Schulte Decl."), Docket No. 316 (Oct. 7, 2002), ¶ 1.

188. *Id.,* ¶ 2.

189. *Id.,* ¶ 4.

190. *Id.,* ¶ 5.

191. *Id.,* ¶ 3 ("I specifically requested that psychological testing be conducted. Mr. Stanley did not inform me that some testing had already been performed, nor did he provide me with the results of any testing").

192. *Id.,* ¶¶ 6–7 ("Had I been advised that the defenses were voluntary intoxication and imperfect self-defense (which I understand to be the honest but unreasonable fear of imminent danger), and if I had [ ] been asked to address the significance of Mr. Lang's intoxication as it related to these defenses, I would have and could have provided testimony that would support a finding that Mr. Lang was intoxicated and that such intoxication could be taken into account to determine if Mr. Lang had the specific intent necessary for felony murder or whether the shooting occurred, as Mr. Lang described, as the result of a quarrel. Similarly, intoxication would support the defense theory that Mr. Lang shot Mr. Anderson with an honest belief that it was necessary to protect himself, even if such belief was unreasonable by objective standards. [¶] Had I been asked to evaluate the defense of imperfect self-defense, and if I had been asked to address the significance or Mr. Lang's mental state as it related to this defense, I would have conducted, or recommended that another expert conduct additional evaluation of Mr. Lang.... These are all areas I would have wanted to explore had I been given the reference question of whether Mr. Lang had any mental condition which could support the defense of imperfect self-defense").

193. *Id.,* ¶ 8 ("I was aware at the time of the factors which could be considered in mitigation at the death penalty phase of the trial. It was not my understanding that I was being retained as an expert for the penalty phase. Had I been asked to evaluate the factors in mitigation I would have and could have testified that the offense was committed while Mr[.] Lang was under the influence of extreme mental or emotional disturbance; and that at the time of the offense Mr[.] Lang's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law was impaired as a result of mental disease or defect and the effects of intoxication").

On August 10, 1984, Dr. Schulte sent Stanley a report containing his preliminary conclusions. Dr. Schulte insists that the report was "preliminary ..., identifying certain issues which [he] believed required further development." [194] The preliminary report was just over two pages long; in it, Dr. Schulte concluded that petitioner was not

"a dedicated criminal. Rather, this man has some interesting facets of a success neurosis as well as of a depressed person who does not feel entitled to have success and had to subvert any success and seemingly arrange to be punished. Diagnostically, the most important fact might be whether psychological testing might support a finding of anaclitic depression (of psychotic proportions on an unconscious level) as well as the obvious character[o]logical problems.

\* \* \*

This man's case history and overall picture would be one that lead to the impression in earlier years that many character disorders were people [sic] with basic severe depressions that needed to act out their depressions to avoid the intense pain of their depressions." [195]

The report includes certain statements by petitioner, e.g., (1) " 'I felt more guilty about taking his stuff and van than for the killing' " and (2) " 'I don't remember pulling the trigger that many times—I can't remember the shots. I thought to myself he could get a shot off.' " [196]

After Dr. Schulte sent his report to Stanley on August 10, 1984, Stanley did not contact Schulte again regarding the case.[197] Stanley's "concern with Dr. Schulte was the potential impeachment with his professional problems"; this is a reference to the fact that Dr. Schulte had been disciplined by California regulatory authorities.[198] Stanley subsequently retained Dr. Rex Beaber, who in 1984 was a licensed clinical psychologist specializing in forensic and clinical psychology.[199] Stanley testified that the case was "already in jury selection" when he first consulted Dr. Beaber.[200] At his 2002 deposition, Stanley recalls his reason for retaining Beaber and allowing him to testify at trial:

"I thought Rex Beaber brought a different kind of perspective because of his own background and the fact that he was a lawyer—and I don't think a prac-

194. *Id.,* ¶ 3.

195. Schulte Decl., Exh. 38 ("Schulte Report") at 2–3. Dr. Schulte also concluded that petitioner had "lifelong feelings of being lonely," that he had a "consistent pattern" of "seem[ing] to arrange to get caught," and a non-violent personality characterized by a "more passive dependent personality structure." (*Id.* at 2.)

196. Schulte Report at 2.

197. *Id.,* ¶ 9 ("However, I was not asked to render these opinions and Mr[.] Stanley did not contact me again in reference to this case after I had provided my report of August 10, 1984").

198. Stanley Depo. at 256:17–19. Stanley testified that he had not performed any background check on Dr. Schulte prior to retain-

ing him. (*Id.* at 238:19–23 ("Q. Do you recall if at the time you hired Dr. Schulte that you had conducted a background search to determine if he had any disciplinary problems? A. I—I don't recall, and I do not recall when we learned that apparently he did").

199. Declaration of Rex Beaber ("Beaber Decl."), Docket No. 315 (Oct. 7, 2002), ¶ 1. Although the declaration references an attached curriculum vitae, the exhibit was not attached to the declaration provided the court.

200. Stanley Depo. at 257:21–25 ("It is true that we were already in jury selection when we actually had the consultation and [Dr. Beaber] actually interviewed Mr. Lang as best I recall").

ticing lawyer, but he had gone to law school—and his personal qualities. When I met him, I thought he would be an effective witness just because of his kind of charisma." [201]

Beaber's 2002 declaration stated that he had "some memory of the case but [had] not reviewed any documents to refresh [his] recollection and [that he did] not have specific memory of any conversations [he had] had with Mr. Stanley." [202] Dr. Beaber's short declaration states:

"At the time of my retention, and indeed throughout my career, I have been principally retained by the prosecution to testify on behalf of the State and against mental state defenses in criminal trials. It is my sincere professional opinion, in general, [that] the threshold standard for diagnosing various mental health conditions should be quite high. I am aware that there are now, and were in 1984, other psychiatrists and psychologists who are much more inclined to render opinions helpful to the defense as to the mental state of their clients.

\* \* \*

I have occasionally been retained by a member of the defense bar. Often, this retention is more for the purpose of creating a conflict of interest which would then prevent the prosecution from using me as a[n] expert witness in that case. My pro-prosecution bias was, and is, well known in the legal community. I believe, in the context of mental state defenses, most mental health testing is useless and I have testified in accordance with that opinion.

In light of my well known pro-prosecution views regarding mental state defenses, I would consider it disastrous and foolish for defense counsel to retain me as the *only* expert witness to establish a mental health or mental state defense, given my deeply held and often expressed pro-prosecution opinions. This would be especially true where the defense was being provided by the Public Defenders Office, where funds were limited. Indeed, it was my regular practice to warn defense counsel who were considering retaining me that they should not rely solely on my views for the purposes of preparing a defense. If a defense attorney proposing to hire me was not aware of my pro-prosecution opinions and reputation, I would certainly advise that person of the above, and would have done so in 1984. I was always quite forthright in explaining to criminal defense counsel that I regarded it as below the standard of care for a defense counsel to primarily rely on my professional opinions in establishing a potential defense based on mental state." [203]

---

201. Stanley Depo. at 73:4–25, 74:1–18. Stanley also testified, however, that he did not "specifically recall [investigating Beaber's background] except [his] general recollection [was] that [Beaber's] background was that he had done some consulting with, I think, law enforcement agencies and had testified for the prosecution, and of course that's—in terms of credibility, that's useful to call him as a defense witness." (Stanley Depo. at 84:12–19.)

202. Beaber Decl., ¶ 2.

203. *Id.*, ¶¶ 3, 5–8. Stanley reviewed Dr. Beaber's declaration, and in his own 2002 declaration, stated: "Had Dr. Beaber made such a remarkable statement to me I am confident I would remember it, and I do not recall that he made any such statement to me." (Declaration of David Y. Stanley ("Stanley 10/8/02 Decl."), Docket No. 338 (Oct. 8, 2002) at 3.

Respondent objects that the first of the paragraphs in Beaber's declaration is "vague to the point of meaninglessness and, thus, irrelevance." (Beaber Obj. at 5.) The paragraph is not vague, as Dr. Beaber knows that as of 1984, he had been retained principally by the prosecution. He is also competent to offer the opinion that at that time, his opinions were more pro-prosecution than those of his colleagues. Respondent also asserts a hearsay objection. (*Id.*) Because this paragraph contains no out-of-court statements of-

Dr. Beaber reviewed three sources of data in preparing to testify. First, he interviewed petitioner on September 22, 1984 for two and a half hours. Second, he reviewed a transcription of the interview conducted by Detective Correll. Third, Dr. Beaber considered "a few comments or representations" made by Stanley and Ballew.[204] It does not appear that Dr. Beaber ever supplied a report memorializing his

findings based on the September 22, 1984 interview.

Dr. Beaber testified at trial that Anderson's expressed concern about venereal disease was one voiced frequently by a unique subset of gay men who are secretive about their sexual activity with other men, and who have had relatively little same-sex sexual contact.[205] Dr. Beaber also testified that petitioner's actions fol-

---

fered for the truth of the matter asserted, this objection is overruled. Respondent objects to the second paragraph in Beaber's declaration as hearsay. Dr. Beaber clearly understood the reasons for his retention in various criminal cases; the statement communicates nothing more than his understanding, and is not offered or admitted for the truth of the matter asserted, but to show that Dr. Beaber believes his role in certain cases was to create a conflict of interest. This makes it more likely Beaber would have warned Stanley not to rely exclusively on his testimony. Respondent also objects that the third paragraph in Beaber's declaration is hearsay. Dr. Beaber knows his own reputation in the legal community. Moreover, Rule 803(21) of the Federal Rules of Evidence creates a specific exception to the hearsay rule for statements regarding the "[r]eputation of a person's character among associates or in the community." Respondent objects vaguely on relevance grounds to the statement that "in the context of mental state defenses, most mental health testing is useless and I have testified in accordance with that opinion." This testimony is relevant because it provides background for the opinion Dr. Beaber rendered in petitioner's case; it is also material is assessing whether it was reasonable for trial counsel to call Dr. Beaber as a witness. Consequently, respondent's objections are overruled. Many of the objections, moreover, go to the weight rather than the admissibility of the testimony, and would have been a proper subject for cross-examination had respondent chosen to examine Dr. Beaber.

204. Pet.'s Exh. 1, Vols. II–IV, Tabs 5–10, Reporter's Transcript ("Trial Transcript") (Sept. 14, 1984–Oct. 27, 1984), at 2001:5–28, 2074:16–28.

205. *Id.* at 2002:17–28. Dr. Beaber testified that he was qualified to render such an opinion because he had interviewed hundreds of gay men over the years as a clinical psychologist and knew the sorts of statements they made to potential male sexual partners, and because he had interviewed a number of men who had been approached by closeted gay men. (*Id.* at 2003:8–28, 2004:1–7, 2075:2–27.) The purpose of offering this opinion was to show that what closeted gay men said regularly when soliciting male sexual partners was a unique fact and one that it was highly unlikely petitioner would have invented after the crime. (*Id.* at 2040:2–12. See *id.* at 2084:27–28, 2085:1–12 ("The psychological significance of that utterance is that there is, indeed, a subgroup of homosexuals, homosexuals who have not quite come to terms with their homosexuality, sometimes referred to colloquially as closet homosexuals, who have very few homosexual contacts and have, oh, almost morbid preoccupation with venereal disease.... So that his descriptions of the utterances of the victim are quire consistent with a known pattern of concerns in a small subgroup of homosexuals").) Dr. Beaber testified that it was possible that petitioner could have learned about this unique preoccupation and way of expressing that preoccupation elsewhere, but the testimony was designed to raise the inference in the jury that it was unlikely that petitioner would have learned of this sort of utterance except from Anderson. On cross-examination, Scott attempted to get Dr. Beaber to admit that a sexually inexperienced heterosexual male would make a similar comment, and Dr. Beaber responded that the more appropriate comparison would be to an "ordinary" gay man. He stated that "an ordinary homosexual [ ] can show and often does show a remarkable disregard to a very real risk [of contracting venereal diseases]." (*Id.* at 2110:3–6.)

lowing the shooting were consistent with a person who was experiencing a "fairly intense panic."[206] In other words, such a reaction was "more consistent with a person in a panicked flight or fight state as compared to, for example, a person who is having engaged in a more calculated cold-blooded killing."[207] Similarly, as respects petitioner's action in emptying his gun, Dr. Beaber testified that "blindly using more force than ... would seem necessary ... [ ] has to do with the issue of passion arousal and panic."[208] Dr. Beaber, howev-

206. *Id.* at 2004:15–24. Dr. Beaber found it significant that after the shooting petitioner became "even more terrified. Maybe he already was [terrified] or maybe had a continuation of this, of this state of terror that arose from the situation. And instead of following what, from his point of view, would be a rational course of action, which is to trace back his trail along a particular cowpath to the point where the recreational vehicle was parked, he kind of ran wildly over hills where there were not particular trails. And, in fact, he indicated that his running from the scene, his fleeing from the scene was so devoid of rational thought that he actually kind of got himself lost in that process. He attempted to run back to the R.V. as the crow would fly, so to speak, as opposed to a rational way. Another piece of behavior that suggested a panic state of mind was that he indicated to me that he had a recollection of grabbing for his gun and he had a recollection of the initial act of pulling the trigger. He then reports that he has a kind of blank spot in his mind, to use the term loosely, a kind of amnesia, and has no memory of anything until the time that he hears the gun, which he has in his hand, clicking, pulling the trigger and that click that you hear when there are no shells to discharge. And this clicking, if you will, and, again, I am speaking somewhat colloquially, brought him to. This description, which some psychologists will call a description of disassociation, is a description that you get very commonly in circumstances in homicides and other violent crimes where the crime is committed under the effects of an intense arousal, panic, passion." (*Id.* at 2086:6–28, 2087:1–14.) Dr. Beaber also found petitioner's fatalistic attitude during the days following the shooting, which led ultimately to his attempt to board a plane with a loaded gun in his carry-on luggage, consistent with a panic state. Dr. Beaber recalled meeting with many criminal defendants in the hours following their heat-of-passion crimes, and said they had said "the same words that [petitioner] said to [Dr. Beaber], that I kind of don't remember anything and then I heard the clicking of the gun in my hand, the click of the gun. So that parallel in the wording and construction of that moment is just remarkably consistent with these crimes of intense passion that I have become involved with." (*Id.* at 2091:7–17.) On cross-examination, Scott challenged Dr. Beaber to identify literature discussing this type of panic reaction. Dr. Beaber responded: "[This could] [p]robably [be found in] a number of places. All the literature—the old literature on situation adjustment reactions that discusses how people respond in various depressant or anxious ways to various unpleasant life circumstances. Certainly the concept of panic as a response to circumstances is discussed in detail[ ] [in the context of] post-traumatic stress disorders, and of course, there [is a] gigantic [amount of] literature on anxiety panic response that is a part of the literature on ... stress [reactions], in general. Both literature on the physiology of panic and ... literature on the phenomenon of panic and then there's a social psychology including anxiety for experiment purposes in laboratories. Any number of places and different kinds of places in psychological literature where panic is discussed. Ordinarily, everyday people don't need an expert to tell them that terrifying circumstances produce a terrified state of mind. Most people having lived a few years appreciate that as an evident fact." (*Id.* at 2113 at 1–18.)

207. *Id.* at 2005:3–10.

208. *Id.* at 2008:3–6. See *id.* at 2008:7–21 ("Crimes that are committed in circumstances of intense arousal, fear, panic, are commonly associated with unloading the whole gun or executing a number of stab wounds in the case of knife attacks, that are extraordinarily large and unrelated to stopping somebody; it is reflective more of crimes of passion as opposed to circumstances where a person executes a more premeditated killing or a killing for some non-impassioned purpose like a robbery"); *id.* at 2092:5–13 ("It is commonly cited in the literature that crimes of passion involve remarkable overkill, and

er, did not diagnose petitioner with a panic disorder or any other condition included in the DSM–III. Rather, he testified that petitioner was in a "panic state," not that he suffered a "panic disorder."[209]

Dr. Beaber told the jury that over an eight year period, he had been retained as a prosecution witness in 90% of cases he had handled; he said that in the remaining 10%, he was retained by defense counsel to prevent prosecution from hiring him and did not testify.[210] Stanley also elicited on direct examination that Dr. Beaber believed that a "reasonable person could argue that psychology is—psychology and psychologists are the most inept, most unskillful, and that psychology is the most inexact of the sciences. Psychologists do the best that they can, but the nature of the human mind is such that to make exact inferences about its qualities is remarkably difficult and so psychology in general has to be taken with a considerable grain of salt, and unfortunately psychologists almost as a matter of principle disagree with each other so that getting two psycholo-

gists to agree about something is just remarkable. Psychology has barely advanced from being an art to a science, just barely."[211]

At no point in the investigation did Stanley pursue further information regarding, or retention of an expert concerning, petitioner's alcohol consumption, his resultant blood alcohol level, or the effect alcohol may have had on petitioner's senses. Stanley testified in his 2002 deposition that had he sought and received forensic testimony supporting an argument that petitioner's blood alcohol was high enough to impair his judgment and cause him to misperceive events and circumstances, it would have been consistent with the presentation of imperfect self-defense and with an argument that petitioner had an honest but unreasonable belief that his life was in imminent danger.[212] Stanley also testified in 2002 that had he engaged an expert who concluded that petitioner's "level of intoxication [had] been sufficiently high to have affected his perceptions and judgments at

[there is] some data indicating that 50 percent—[in] 50 percent of homicides with elements of passion, there is amnesia for even more than the firing of the weapon").

209. *Id.* at 2010:22–27 ("In panic there are two uses in psychiatry; one is the DSM–3 criteria for panic disorder. Two, and my testimony is that the defendant suffers no panic disorder as it is described in the diagnostic and statistical manual. Rather, he suffers—he was in a panic state which is not a mental disorder"). Dr. Beaber testified at a preliminary hearing that "[t]he defendant reported ... having a recollection of having pulled the trigger. Then he reports being amnesic until such time as the clicks of his gun kind of jarred him to an awareness that he had emptied his gun. Very common that people who subjectively tell you they are panicked will described eclipses in their full consciousness with a—I don't want to use a word improperly, but once th[ey] act—I want to say automatically, but they act with remarkably little thought").

210. *Id.* at 2094:4–12.

211. *Id.* at 2094:17–28, 2095:1–4.

212. Stanley Depo. at 270:6–25, 271:1–5 ("Q.... In the course of the trial or prior to trial, did you engage a forensic analyst to calculate Mr. Lang's blood alcohol levels? A. I certainly don't recall that we did, and I have no reason to think that we did. Actually, I would have been able to pretty well do—[have] done that myself. Q. Did you have any tactical or strategic reason not to hire an analyst to run these blood alcohol calculations? A. No. Q. Did you engage a forensic alcohol expert to discuss the impact of intoxication on a person's judgment and perceptions? A. No. Q. If you had such forensic testimony that would offer support that Mr. Lang's blood alcohol was high enough to impair his judgment and cause him to misperceive events and circumstances, would that have been consistent with the presentation of an imperfect self-defense.... [A.] Yes").

the time of the incident," he would have considered presenting such testimony.[213]

### 3. Whether Trial Counsel's Performance Was Deficient with Respect to Investigation and Presentation of Mental–State Evidence at the Guilt Phase

Petitioner argues that a failure properly to investigate his background and to present the facts trial counsel knew or would have known based on a proper investigation to mental health experts led to a failure to diagnose petitioner with post-traumatic stress disorder ("PTSD"), identity disorder, and dysthymic disorder.[214] Had petitioner been diagnosed with one or all of these disorders, he argues, the jury might have been more likely to believe that petitioner was motivated at the time of the shooting by an honest if unreasonable belief that his life was in imminent danger. Petitioner also argues that trial counsel failed adequately to investigate and present evidence of his alcohol consumption and intoxication, which could also have contributed to an honest but unreasonable belief that his life was in danger. Because they involve substantially different analytic questions, the court considers separately petitioner's contentions regarding mental-health disorders and evidence of alcohol intoxication.[215]

---

213. *Id.* at 277:2–10 ("Q.... If you had engaged a forensic expert regarding intoxication who would have concluded that ... Mr. Lang's level of intoxication [was] sufficiently high to have affected his perceptions and judgments at the time of the incident with Mr. Anderson, would you have presented that information in support of your defense of imperfect self-defense and voluntary intoxication? ... [A.] [E]ssentially the same answer [to the prior question to which Stanley answered 'I certainly would have considered presenting it'].").

214. Trial Brief ("Pet.'s Trial Brief"), Docket No. 441 (Apr. 14, 2003), at 3–14.

215. Petitioner's trial brief does not assert that petitioner suffered from a neurological or neurodevelopmental disorder. Dr. Lisak testified as to the neurological or neurodevelopmental impacts of petitioner's troubled social history. On cross-examination, Dr. Lisak was forced to admit that his testimony was not based on the state of neurological science in 1984, but in the decades thereafter. Testifying in 2003, Dr. Lisak stated that his testimony was based on science that had developed from 1988 until 2003. (Excerpts from Deposition of David Lisak for Evidentiary Hearing ("Lisak Depo."), Docket No. 406 (Feb. 5, 2003), at 8:7–20 ("Q. Your references in your declaration to our understanding of neurobiology do not refer to the level of understanding that was extant in 1984, correct? A. No. I mean, my description of the impact, the neurobiological impact of trauma is a summary, sort of a synopsis of what we understand, and as such it's a cumulative synopsis which would include a lot of research and data that has emerged in the last 15–10, 15 years. Q. You did not intend in writing your declaration to restrict yourself to the state of the art, as it were, as it existed in 1984, correct? A. That's correct").) Dr. Lisak also conceded that the bulk of his direct testimony had been based on the state of science after 1993. (*Id.* at 9:14–24 ("Most of the real advances of the neurobiology of trauma have—well, I guess it would be safer to say that they coalesce in the last ten years"); *id.* at 10:11–20 ("[I]n this particular field I think most people would agree there has been this kind of critical mass coalescing that has occurred in the last ten years").)

The court presumes that petitioner retained Dr. Lisak to identify possible mental-state evidence that could have been presented at trial based on neurological or neurodevelopmental disorders, but abandoned the argument when it became apparent that Dr. Lisak could not provide testimony based on the state of the science in 1984. See *Caro*, 280 F.3d at 1256 ("The State also contends that we cannot find deficient performance because the medical community was not yet aware of the effects of neurotoxicants on one's neurological system at the time of Caro's trial. If true, this fact would preclude a finding of deficient performance because the reasonableness of counsel's performance must be evaluated from his perspective at the time of the trial, not in hindsight").

### a. Mental Health Disorders

Petitioner first asserts that, had counsel conducted an adequate investigation and provided the information developed by that investigation to mental health experts, they would have diagnosed a mental disorder. Determining the validity of this claim requires that the court answer several distinct analytical questions: (1) whether the factual investigation Stanley conducted with the assistance of Torralva, Conry, and Ballew, was insufficient and constituted deficient performance because Stanley did not collect the contents of the twelve binders of mental health evidence presented in this proceeding, including a 249–page psychosocial history, and provide it to mental health experts; (2) whether Stanley performed deficiently by not giving all of the factual background and statements by petitioner that he possessed to the three mental health experts; (3) whether Stanley failed adequately to prepare the mental health experts by posing a proper referral question and offering guidance regarding the nature of possible mental-state defenses; (4) whether Stanley's investigation of mental health issues in consultation with Drs. Ratner, Schulte, and Beaber constituted deficient performance or whether he was entitled to rely on the reports Drs. Ratner and Schulte provided and conclude that further investigation of petitioner's mental health would not be fruitful; and (5) whether Stanley rendered deficient performance by calling Dr. Beaber as a witness.

### (1) Trial Counsel's Witness Investigation

■ "*Strickland* obligates defense attorneys to make reasonable investigations *before* settling on a trial strategy or, at the least, to conduct sufficient inquiries to make an informed decision about whether further investigation is needed." *Richter*, 578 F.3d at 955 (emphasis original). See also *Wiggins*, 539 U.S. at 525, 123 S.Ct.

2527 (holding counsel must make an "informed choice" among possible defenses); *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Jennings*, 290 F.3d at 1014 ("[A]ttorneys have considerable latitude to make strategic decisions about what investigations to conduct *once they have gathered sufficient evidence upon which to base their tactical choices*" (emphasis in original)).

■ "Until a reasonable investigation is conducted, counsel is not in a position to make critical strategic decisions or settle on a trial strategy," *Richter*, 578 F.3d at 955, including a decision whether or not to present evidence of defendant's mental state at the time of the crime. This is because "[a]n uninformed strategy is not a reasoned strategy," *Correll*, 539 F.3d at 949, and "the traditional deference owed to the strategic judgments of counsel is not justified where there was not an adequate investigation 'supporting those judgments,'" *id.* at 948–49 (quoting *Wiggins*, 539 U.S. at 521, 123 S.Ct. 2527). As the *Richter* court noted:

"Counsel is obligated to conduct a reasonable investigation in order to present the most persuasive case that he can. Counsel must conduct a pretrial investigation into the availability of independent, objective sources to support the part of his client's testimony that he knows or can reasonably expect will be challenged, and subsequently to present to the jury any evidence he finds that tends to show his client's innocence, tends to undermine the prosecution's

case, or raises a reasonable doubt as to his client's guilt, unless he makes an informed, strategic decision that the risks of introducing such evidence outweigh its benefit to the defense." *Richter*, 578 F.3d at 956–57.

See also *Hendricks*, 70 F.3d at 1040 ("An attorney 'must provide factual support for the defense where such corroboration is available.' ... Failure to pursue such corroborating evidence with an adequate pretrial investigation may establish constitutionally deficient performance," quoting *Tucker*, 716 F.2d at 594); *Jones*, 114 F.3d at 1013 (granting "an evidentiary hearing on the issues of his attorney's failure to investigate ... before trial and his lawyer's failure to test the evidence").

In some circumstances, corroboration may take the form of eyewitness testimony or character witnesses. In other cases, it may take the form of expert testimony. Here, petitioner alleges that an explanation of his mental state at the time of the crime, including any then-present mental health conditions and alcohol intoxication, might have supported and corroborated his account of the crime. The Ninth Circuit "has repeatedly held that 'a lawyer who fails adequately to investigate and introduce evidence that demonstrates his client's factual innocence, or that raises

sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance.' " *Duncan*, 528 F.3d at 1234 (9th Cir.2008) (quoting *Hart*, 174 F.3d at 1070).[216]

For reasons that will be more fully discussed in the section of this order that deals with counsel's performance during the penalty phase, Conry's and Ballew's investigation was flawed. In particular, it appears that Conry did not prepare a report regarding his interview of Tamara Lang and did not interview petitioner's aunt, Susie Rosenthal, although he knew that petitioner had lived with her for at least a year. Additionally, although there were indications that petitioner had suffered physical abuse and been homeless at times during his childhood, Conry's notes do not reflect an effort to elicit detailed information regarding these circumstances from the family members with whom he spoke. Ballew recognized that Conry's investigation was not thorough.[217] Nonetheless, as outlined *infra*, she did not immediately attempt to reinterview witnesses or supplement Conry's investigation. Rather, she waited nine months before going to Oregon to begin interviews. Ballew, moreover, did not reinterview all of the members of petitioner's family. Although Conry's notes suggested that Carol Dewey

**216.** See also *Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir.2002) (holding that counsel's failure to investigate evidence that defendant's brother was the shooter constituted deficient performance); *Lord v. Wood*, 184 F.3d 1083, 1095–96 (9th Cir.1999) (holding that counsel's failure to call key witnesses whose testimony undermined the prosecutor's case constituted deficient performance); *Hart v. Gomez*, 174 F.3d at 1070 (holding that counsel's failure to review key documents corroborating a defense witness's testimony constituted deficient performance); *Sanders*, 21 F.3d at 1457 (holding that counsel's failure to investigate evidence that someone else was the killer constituted deficient performance). "The failure to investigate is especially egregious when a defense attorney fails to

consider potentially exculpatory evidence." *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002); see also *Harris v. Wood*, 64 F.3d 1432, 1435–37 (9th Cir.1995) (holding that counsel's failure to retain an investigator and interview many of the individuals identified in the police reports was deficient performance).

**217.** The tone and editorial comments in Conry's reports are troubling as well, a fact that Ballew also noted. Cf. *Wellons v. Hall*, —— U.S. ——, 130 S.Ct. 727, 728, —— L.Ed.2d —— (2010) (per curiam) ("From beginning to end, judicial proceedings conducted for the purpose of deciding whether a defendant shall be put to death must be conducted with dignity and respect").

had shown some willingness to acknowledge her physical abuse of petitioner, for example, there is no indication that Ballew attempted to reinterview Dewey or her children, Tracy, Tony and Tamara.

Whatever the limitations of the investigation, however, based on the interviews Conry and Ballew conducted, and petitioner's written and oral statements to him, Stanley clearly knew many of the salient details contained in the psychosocial history compiled by Dr. Barbara Cort Counter in this proceeding. At the core of the parties' dispute regarding the adequacy of Stanley's mental health investigation is whether trial counsel was required to engage an expert to produce a psychosocial history like that prepared by Dr. Counter. The Ninth Circuit resolved a similar dispute in *Hamilton*. There, the petitioner argued that trial counsel performed deficiently by failing to retain a mitigation expert,[218] and failing to prepare a " 'social history' report." *Hamilton*, 583 F.3d at 1130. The Ninth Circuit declined to decide whether such steps were standard practice in death penalty defense in California in 1982 because it concluded that counsel's "deficient performance ... did not result from ... failure to hire a specialized investigator. Rather, it resulted from counsel's failure to pursue obvious leads provided by the people he did interview, to review relevant documents that were in his possession, and to present to the jury the mitigating evidence of which he was aware, among the other errors."

*Id.* As respects the preparation of a social history, the court stated that it did not "need [to] decide whether standard capital practice ... in 1982 included preparing a 'social history' report per se" because "[i]t [was] undisputed that counsel was required to obtain the type of available information that a social history report would contain, such as family and social background and mental health, which [petitioner]'s counsel failed to do." *Id.*

*Hamilton* concerned counsel's performance during the penalty phase rather than the guilt phase. As in *Hamilton*, however, petitioner has not demonstrated that the standard of care in California in 1984 required counsel to commission the preparation of a written psychosocial history or compile the voluminous evidentiary record provided by Dr. Counter.[219] The testimony of petitioner's *Strickland* expert is not to the contrary. Santwier's argument that a more complete psychosocial history should have been prepared appears to focus on the need for such a history at the penalty phase. Santwier states that "Stanley failed to conduct a reasonably adequate pretrial mental health investigation."[220] He then asserts: "As will be discussed with respect to the penalty phase investigation and preparation, had trial counsel conducted a reasonably adequate penalty phase investigation, which should have been completed before the start of the trial, the failures with respect to the guilt phase mental health preparation most likely would not have occurred."[221] Santwier

218. A "mitigation expert" is "someone specially trained in investigating and presenting mitigating evidence at the penalty phase of a capital trial." *Hamilton*, 583 F.3d at 1130.

219. By way of example, the documents Dr. Counter collected include close to 400 pages of health records for a half-sister of petitioner's who died in 1966. There is no indication that petitioner ever met or knew of his half-sister, who was institutionalized permanently before petitioner's birth for severe neurologi-

cal disorders. Petitioner never visited the institution where the sister was housed. Indeed, although she died in 1966 on her thirteenth birthday, her mother did not learn of her death until an investigator for petitioner's case informed her of that fact in 1986. (Counter Decl. at 23–25; Exh. 6, Vol. 5, Exhs. 1–2, MH1362–1727.)

220. Santwier Decl., ¶ 26.

221. *Id.*

does not independently outline the "failures" of investigation respecting guilt phase mental health preparation to which he refers. The court takes Santwier's comments to mean that he believes it was deficient performance not to commission the preparation of an extensive psychosocial history for use in the penalty phase. Santwier does not appear to opine that it was deficient performance to fail to obtain such a history at the guilt phase, however. Rather, it appears that he believes petitioner would have benefitted at the guilt phase had the extensive investigation he believes was required for the penalty phase been completed before trial began. In other words, Santwier asserts that petitioner can succeed on his guilt phase ineffective assistance claim by demonstrating deficient performance at the penalty phase and prejudice at the guilt phase, without showing deficient performance at the guilt phase. The court has not identified any decision that has adopted such an approach.

Indeed, the Ninth Circuit has distinguished between the level of investigation required for the guilt phase and the level of investigation required for the penalty phase. In *Hendricks*, it held that the pretrial investigation counsel had conducted in the case constituted deficient performance at the penalty phase but not at the guilt phase. At no point did the court suggest that there could be a finding of deficient performance or prejudice at the guilt phase based on a flawed mental health investigation that affected the penalty phase. The court thus follows *Hamilton* and evaluates counsel's performance at the guilt phase by asking whether he collected the information that would have been included in a social history report, such as family and social background and mental health information.

In addition to reviewing the adequacy of the investigation counsel undertook, the court must also review the reasonableness of counsel's conclusion that further investigation was unnecessary. "While a lawyer is under a duty to make reasonable investigations, a lawyer may make a reasonable decision that particular investigations are unnecessary." *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir.1998). As the Supreme Court in *Strickland* stated:

> "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

"Thus, as long as a reasonable investigation was conducted, a reviewing court should defer to counsel's strategic choices." *Cox*, 588 F.3d at 1049.

The Supreme Court has held that counsel need not undertake exhaustive witness investigation. The question is not "what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n. 38, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). Mindful of this admonition, the court cannot find that Stanley's investigation of petitioner's background was insufficient at the guilt phase. It may have been prudent or appropriate for the defense team to have done more. Indeed, the court finds it puzzling, given obvious indications that Conry's investigation was incomplete, that

Ballew and/or Stanley did not reinterview each of the witnesses with whom Conry had spoken, especially Carol Dewey and Tracy and Tony Lang.[222] Nonetheless, the defense team discovered the outlines of petitioner's tumultuous upbringing, the abuse he suffered, the fact that petitioner had been sexually assaulted as a prepubescent boy, and the fact that petitioner was homeless for much of his childhood. Petitioner too provided information regarding his background, penning a twelve-page handwritten letter to Stanley and telling Dr. Ratner that he had been forced into a sexual act when he was seven or eight years old. Given that petitioner provided significant information regarding his background, and that petitioner's mother gave Ballew information regarding the tumultuous and abusive nature of his upbringing under Carol Dewey's care, it was not constitutionally unreasonable to rely on these sources instead of reinterviewing Carol Dewey and her children.

### (2) Trial Counsel's Preparation of Expert Witnesses

### i. Failure to Provide Background Information

Petitioner also faults Stanley for failing to give the three mental health profession-als he retained—Drs. Ratner, Schulte, and Beaber—any significant portion of the background information provided by petitioner and collected by defense investigators. A similar question was presented in *Hendricks*. There, trial counsel hired a psychiatrist and a psychologist, each of whom interviewed the defendant and concluded that he was not insane and suffered no diminished capacity that might support a mental-state defense. *Hendricks*, 70 F.3d at 1037. The petitioner argued "that by 1981 [in California] it was the recognized duty of defense counsel in capital cases to obtain social history evidence relevant to a client's mental condition where there was an indication of mental disturbance and to provide such evidence to an expert in order for the client's condition to be properly evaluated." *Id.* at 1038. As is the case here, the petitioner did not argue "that examination by two mental health experts was per se inadequate. Rather, Hendricks argue[d] that trial counsel had a duty to provide the experts with his client's family social history, even absent any request from the experts." *Id.*[223]

222. Tracy Lang has denied ever telling Conry that he wanted to see his half-brother executed and stated that Conry never identified himself as being a member of the defense team. (Declaration of Tracy Christopher Lang ("Tracy Lang Decl."), Docket No. 342 (Apr. 15, 2002), ¶ 2 ("I first heard about Kenny's arrest in this case from my father. I recall a man came out and talked to us after Kenny was arrested. I did not know whether he was for or against Kenny. I later heard that he said that I though Kenny should 'fry' if he did it. I never said any such thing. Kenny is my brother and I would never want him to be executed. No one has ever explained the process to me that Kenny went through. I never knew that there were two parts to his trial, a guilt trial and a penalty trial. I was never told that I could be a witness and testify for him. I was never told that it was a possibility. I was never asked to testify for him. If I had been asked, at any time, I would have testified on my brother's be-

half").) It is conceivable that Tracy Lang may simply have altered his view as to the punishment petitioner should receive between 1983, when he was seventeen or eighteen years old, and 2002, when he was thirty-six or thirty-seven years old. Whether or not Conry accurately reported Tracy Lang's statements, however, nothing in the record suggests that Stanley had reason to disbelieve the information Conry reported. Stated differently, nothing in the record suggests that it should have been evident that Conry had lied or mischaracterized the witnesses' statements.

223. The district court in *Hendricks* chronicled Hendricks' extensive personal history of traumatic events: the death of Hendricks' mother during childbirth; the fact that Hendricks' entire family blamed him for his mother's death throughout his childhood; the fact that he was raised by his grandmother in a small two-room house in Alabama together with sixteen other family members; the fact that

The *Hendricks* court concluded that "[n]either reason nor the existing authority would lead one to conclude that an attorney in 198[1] had such an affirmative constitutional duty." *Id.* (citing *Bloom v. Vasquez*, 840 F.Supp. 1362, 1370 (C.D.Cal. 1993) (reviewing a 1983 California trial, and concluding that "[i]n the absence of a specific request, an attorney is not responsible for gathering background material that might be helpful to a psychiatrist evaluating his client")). The court emphasized that, while hindsight taught that prudent counsel should enlarge the scope of information investigated and provided to experts in capital cases, "hindsight [was] a weak standard for fixing constitutional minima." *Id.* It stated:

"To now impose a duty on attorneys to acquire sufficient background material on which an expert can base reliable psychiatric conclusions, independent of any request for information from an expert, would defeat the whole aim of having experts participate in the investigation. An integral part of an expert's specialized skill at analyzing information is an understanding of what information is relevant to reaching a conclusion. Experts are valuable to an attorney's investigation, then, not only because they have special abilities to process the information gathered by the attorney, but because they also are able to guide the attorney's efforts toward collecting relevant evidence. To require an attorney, without interdisciplinary guidance, to provide a psychiatric expert with all information necessary to reach a mental health diagnosis demands that an attorney already be possessed of the skill and knowledge of the expert. Hendricks' [and Lang's] own psychiatric expert, Dr. Lisak, conceded that a psychological report reflects what the expert thinks is important. If an attorney has the burden of reviewing the trustworthiness of a qualified expert's conclusion before the attorney is entitled to make decisions based on that conclusion, the role of the expert becomes superfluous." *Id.* at 1038–39.

See also *Wallace*, 184 F.3d at 1117 ("Even though the psychologists lacked important information about Hendricks's drug problems and hard childhood, we held that counsel's failure to investigate and relay this information was not deficient because the psychologists had not asked for it," citing *Hendricks*, 70 F.3d at 1038); *Riel v. Ayers*, No. CIV S–01–0507 LKK KJM, 2008 WL 1734786, *10 (E.D.Cal. Apr. 14, 2008) ("At the guilt phase, counsel does not have an obligation to provide retained mental health experts with background materials absent a specific request by the expert," citing *Hendricks*, 70 F.3d at 1038–39).

Hendricks was regularly beaten with a frying pan and a switch; the fact that Hendricks' grandmother forced him to drink kerosene regularly; the fact that Hendricks at age ten was forced to live in a brothel that his father ran; the fact that Hendricks' bed was used by prostitutes and their customers and that Hendricks was sexually abused multiple times while living in this brothel; the fact that Hendricks developed a sexual relationship with his stepmother during his teen years; the fact that Hendricks had been raped by a stranger after being kicked out of the brothel by his father; the fact that Hendricks attempted suicide; and the fact that Hendricks had a son at eighteen who died of a rare skin disease and Hendricks then developed a serious heroin addiction. Trial counsel did not relate these facts to the mental health experts, but advised them vaguely that there was a "history of mental illness and substance abuse on both sides of Hendricks's family." *Hendricks v. Calderon*, 864 F.Supp. 929, 936 (N.D.Cal. 1994). Nonetheless, both the district court and the Ninth Circuit concluded that counsel's failure to relate information regarding Hendricks' life to the experts did not constitute deficient performance at the guilt phase.

In *Jennings*, trial counsel retained a psychiatrist, who conducted a "preliminary" interview lasting only two hours that was not intended to rule out potential mental defenses. *Jennings*, 290 F.3d at 1013. Despite strong indications that defendant had been using methamphetamine and reports that he was schizophrenic and had attempted suicide, new counsel who had substituted into the case decided to pursue an alibi defense and conducted no further investigation regarding a mental-state defense. *Id.* at 1013–14. The respondent in *Jennings* cited *Hendricks* for the proposition that once trial counsel has had his client examined by a mental health expert, he has no duty to investigate a mental-state defense further if he chooses to pursue an inconsistent alibi defense. The Ninth Circuit concluded that *Hendricks* did not apply because the standard of care in California respecting choices between a mental-state defense and an alibi defense had changed between 1981 and 1983. Specifically, in 1983, the California Supreme Court decided *People v. Mozingo*, 34 Cal.3d 926, 196 Cal.Rptr. 212, 671 P.2d 363 (1983), which held that "a possible conflict between a diminished capacity and an alibi defense would not excuse counsel's failure initially to *investigate* the potential strengths of a 'mental defense' vis-a-vis an uncorroborated alibi defense." *Id.* at 934, 196 Cal.Rptr. 212, 671 P.2d 363 (emphasis original).[224] The Ninth Circuit held that *Mozingo* set the standard for conducting a mental-state investigation before choosing to pursue a different defense.

Both *Jennings* and *Mozingo* concerned the performance of a trial counsel who did not properly investigate a mental-state defense by retaining and utilizing mental health experts. In *Jennings*, prior counsel engaged a psychiatrist only to conduct a brief preliminary interview of the defendant and counsel elected to have no further testing or evaluation done. Counsel in *Mozingo* did not engage a mental health expert at all. As support for its decision that counsel's performance was deficient, the *Jennings* court cited *Bloom*, another post-*Mozingo* California decision. *Bloom* had cited *Hendricks* for the proposition "that counsel does not have a duty 'to acquire sufficient background material on which an expert can base reliable psychiatric conclusions, independent of any request for information from an expert.'" *Bloom*, 132 F.3d at 1277 (quoting *Hendricks*, 70 F.3d at 1038). It noted, however, that in Bloom's case, a mental health expert had requested, and trial counsel had not provided, the necessary background information. The Ninth Circuit concluded that "when the defense's only expert requests relevant information which is readily available, counsel inexplicably does not even attempt to provide it, and counsel then presents the expert's flawed testimony at trial, counsel's performance is deficient." *Id.* at 1278.

The Ninth Circuit applied both *Bloom* and *Jennings* in *Raley*. The *Raley* court emphasized that trial counsel's performance was not deficient under *Bloom* and *Jennings* because counsel "retained not one, but three, mental health experts, each of whom interviewed Petitioner and provided a report in advance of trial." *Raley*, 470 F.3d at 801. Raley countered that trial counsel could not rely on the experts' reports because he had "failed to provide them with enough information about [p]etitioner's childhood to support an informed

---

**224.** In *Jennings*, the prosecutor had raised *Mozingo* with the trial judge and expressed concern that defense counsel had not properly investigated defendant's medical records and that such failure might provide grounds for appeal. In open court, defense counsel falsely stated that he had discharged that duty. *Jennings*, 290 F.3d at 1016.

expert opinion." *Id.* The Ninth Circuit disagreed:

> "It is undisputed that [trial counsel] gave the three experts basic background information about Petitioner. [The mental health experts] testified in depositions that they knew that [p]etitioner had been abused by his mother, and there is no evidence that either doctor requested additional life history information. The experts interviewed [p]etitioner and thus had an opportunity to question him directly about his childhood. Additionally, during the habeas proceeding both doctors were given an exhaustive report regarding [p]etitioner's history. Neither said that the additional information would have changed his expert opinion significantly." *Id.*

In combination, *Hendricks, Jennings, Bloom,* and *Raley* stand for the proposition that where there is a possibility that a viable mental-state defense exists, counsel has a duty to retain an expert or experts to investigate that defense more than preliminarily, and to provide all information requested by the experts during the course of their evaluation. Counsel is entitled to rely on the experts' assessment as to the information they require, however; he need not himself determine what information is necessary to reach a mental health diagnosis and provide it *sua sponte.*

██ Here, Stanley retained three mental health experts to evaluate whether petitioner had a viable mental-state defense. The question is whether he provided the experts with all the information they requested to perform their assessment. On the present record, the court cannot determine the answer to this question. Stanley says it was his custom to give experts basic information and to respond to any requests for additional information they made.[225] In petitioner's case, Stanley also ensured that the experts had access to petitioner. All three interviewed petitioner, and he provided significant information to them. Indeed, Dr. Ratner commented in his report that petitioner "cooperated completely ... during the interview and did his best to answer all questions honestly and completely."[226] Dr. Ratner asserts that it was his "usual custom and practice to request from the defense attorney all available materials relative to the client's mental health, including background information about the client's family history, his relationship with his family, investigative reports, [and] social and biographical information."[227] In an apparent contradiction, however, he notes that his "interviews and testing were adequate at that time to address all of the issues identified by Mr. Stanley, [that he] complied with the generally accepted standards and practices for such an evaluation," and that he "did not request any additional background information."[228] Like Dr. Ratner, Dr. Schulte states that it was his "invariable custom and practice to request all available background information on a client."[229] Dr. Beaber simply does not address what information he received or requested. None of the mental health experts alleges that he requested any particular information that Stanley did not provide. Dr. Schulte and Dr. Ratner, in fact, concede that they did not request additional information.

In short, nothing in the record indicates what information was provided to the mental health experts nor what information was requested. Stanley recalls that the "normal process" would have been to pro-

---

225. Stanley Depo. at 74:21–25, 75:1–3.

226. Ratner Report at 2.

227. Ratner 9/20/02 Decl., ¶ 4.

228. Ratner 9/23/02 Decl., ¶¶ 4, 12.

229. Schulte Decl., ¶ 4.

vide Dr. Ratner with pertinent police reports and a copy of the statement petitioner gave to Detective Correll.[230] Although he cannot recall whether Dr. Ratner requested further information, Stanley states that had Ratner done so, he would have provided it.[231] Although Dr. Schulte states that it was his normal practice to request all available information on a client, in 2002, he stated that "it [was] clear" from reading his 1984 report that he "did not receive any information" other than the facts he gleaned from his interview with petitioner.[232] Stanley, moreover, does not recall that Dr. Schulte requested further information.[233] Stanley similarly does not recall that Dr. Beaber requested further information,[234] and Dr. Beaber's 2002 testimony makes no reference to such a request.

Given the factual record presented, petitioner has not met his burden of showing that Stanley rendered deficient performance by failing to provide relevant information to the mental health experts. Dr. Ratner has testified inconsistently that it was his usual custom and practice to request all information but that he requested no information, relied exclusively on his interviews and testing of petitioner, and in doing so, satisfied applicable professional standards.[235] Although Dr. Schulte notes that it was his "invariable" practice to request all background information, he contends that, having received no informa-

tion whatsoever, he did not request additional information, and made no reference to the dearth of information he received in his report. This account is not plausible. Either Dr. Schulte received background information from Stanley, which, in the absence of a request for additional information by Dr. Schulte, Stanley justifiably deemed sufficient, or Dr. Schulte did not ask that he be given all background information available. For his part, Dr. Beaber does not assert that he requested information that was not provided.

Under then-prevailing legal norms, Stanley was not required to turn over every piece of information in his possession absent a request by the experts. Rather, Stanley's role was to comply with information requests made by the mental health experts. Dr. Beaber and Dr. Ratner concede they were not denied any background information they requested. Dr. Schulte's testimony is, for the reasons stated, not plausible. Consequently, the court cannot find that Stanley's performance was deficient because he failed to provide necessary information to the mental health experts he retained.[236]

### ii. Failure to Formulate a Proper Referral Question

Petitioner next argues, without citing authority regarding the pertinent legal standard in 1984, that Stanley was required to formulate a more specific referral question to Drs. Ratner and Schulte.[237]

230. Stanley Depo. at 74:21–25, 75:1–3.

231. *Id.* at 77:1–4.

232. Schulte 9/23/02 Decl., ¶ 5.

233. *Id.* at 89:19–25.

234. *Id.* at 90:12–17.

235. Petitioner does not appear to dispute that this constitutes an inconsistency in Dr. Ratner's testimony. (Pet.'s Brief at 28 ("Al-

though he signed a declaration for respondent stating that he did not request background information from Mr. Stanley, Dr. Ratner does not explain why he failed to follow his usual custom and practice in this case").

236. The court finds alternatively below that to the extent Stanley performed deficiently by failing to provide necessary information to the mental health experts, petitioner was not prejudiced by his deficient performance in the guilt phase.

237. Pet.'s Trial Brief at 29–31.

The court finds informative the Ninth Circuit's decision in *Silva v. Woodford,* 279 F.3d 825 (9th Cir.2002), which reviewed an analogous question in the context of a 1982 California trial.

Trial counsel in *Silva* did not conduct any background investigation, in large measure because the defendant indicated that he did not want such an investigation conducted and threatened to disrupt the trial if trial counsel acted contrary to his wishes.[238] *Id.* at 829. Counsel hired a psychiatrist to evaluate the defendant, but "provided no information or direction on the type of evaluation to be performed." The psychiatrist described the resulting evaluation as "suboptimal"; he interviewed defendant for 45 minutes by telephone, but defendant was "unwilling to speak candidly because he believed the phone used for the interview was being monitored by prison authorities." *Id.* at 829–30. Among the facts that were not provided to the psychiatrist was "such basic information [as the fact] that Silva faced the death penalty and needed to be evaluated for purposes of defending against a first-degree murder charge." *Id.* at 837.

The district court concluded that trial counsel was not deficient in the investigation and preparation of potential psychiatric defenses at either the guilt or penalty phases. It noted that counsel had "consulted [a psychiatrist], received an unfavorable opinion from him with respect to the availability of psychiatric defenses, and relied on that conclusion in deciding to focus his energies elsewhere." It also noted that the psychiatrist had concluded there was no evidence of incompetency or mental disorder. *Id.* The circuit court noted that trial counsel's "negligence in failing to advise [the psychiatrist] that the prosecutor was seeking the death penalty or that [defendant] needed to be evaluated for penalty phase purposes closed off an entire source of information about potential mitigating evidence." As a result, it held that counsel's performance was deficient at the penalty phase. As respects the guilt phase, however, the Ninth Circuit held that because trial counsel "engaged and consulted" an expert, "received an unfavorable opinion ... with respect to the availability of psychiatric defenses, and reasonably relied on that conclusion to focus his energies elsewhere," there was no deficient performance. *Id.* at 851. It concluded that counsel had "obtain[ed] sufficient information from [the expert] about the viability of mental defenses during the guilt phase to make an informed decision about trial strategy. Put another way," the court stated, "given that mental de-

---

**238.** Silva disputed that he did not want a background investigation conducted. The court noted that, although trial counsel stated that Silva did not want him to contact family members and friends, counsel "apparently took Silva's alleged directive as grounds to forego all inquiry into his past. [He] also never obtained or examined available records that might have alerted him to Silva's mental health history, incarceration record, history of drug usage, and family background." *Id.* at 829. Indeed, the court noted that although Silva apparently did not want his parents *called* as witnesses, counsel interpreted this as a direction that he not *contact* them. *Id.* at 839. The court also noted that counsel's explanation "fail[ed] to distinguish between contacting Silva's parents and contacting other family members and friends, or investigating other aspects of Silva's past such as his psychiatric history, criminal and incarceration records, and drug usage. Indeed, other evidence that might have been useful in constructing a mental state defense, such as Silva's federal presentencing report, prior psychiatric evaluations, incarceration records, and drug usage history, were readily available and did not ... require contacting Silva's family or friends from back home. Even taking [counsel's] words at face value, then, there are subtle but highly significant discrepancies as to precisely what instructions Silva gave him." *Id.*

fenses to charges of premeditated murder are rarely successful during the guilt phase, it was not unreasonable for [trial counsel] to forego such a trial strategy in light of the evaluation he received." *Id.*

*Silva* appears to be the only case that addresses an attorney's duty to explain to a mental health expert his or her expected role in a particular case, and the legal defenses that counsel wishes to have investigated. As in *Hendricks*, the *Silva* court found that counsel's investigation was inadequate at the penalty phase, but sufficient at the guilt phase. One could thus rationally conclude that *Silva* applied a lower standard of care at the guilt phase and followed *Hendricks* in evaluating the penalty phase. While this interpretation is plausible, *Silva* does not cite *Hendricks* to justify its conclusion that counsel performed deficiently at the penalty phase but not at the guilt phase. Nor does the opinion articulate, in the manner *Hendricks* did, the different purposes for which evidence of mental problems may be presented at the guilt and penalty phases, justifying the use of "differing legal standards." Compare *Hendricks*, 70 F.3d at 1043 ("Evidence of mental problems may be offered to show mitigating factors in the penalty phase, even though it is insufficient to establish a legal defense to conviction in the guilt phase"). Rather, *Silva* focused on the fact that counsel's failure to advise the expert that there would be a death penalty phase of the trial "closed off an entire source of information" because it prevented the expert from even considering mitigation issues. Conversely, as respects the guilt phase, the court concluded that trial counsel had not "closed off" an area of inquiry because he "had [the expert] examine [the defendant] for competency," the expert examined the defendant

for mental disorders and found none, and the expert provided an opinion "with respect to the availability of psychiatric defenses." *Silva*, 279 F.3d at 837.

The court therefore concludes that under *Silva*, the question is whether Stanley's lack of guidance or poor guidance to the experts closed off entire source of evidence in support of petitioner's defense. At the outset, the court notes a consideration it deems implicit in *Silva*. Mental health experts who testify regularly in criminal trials do not enter each new investigation with a blank slate of knowledge concerning available legal defenses. With respect to common or traditional mental state defenses, it is possible that no guidance is constitutionally required. Indeed, Dr. Ratner testified that in 1984 his primary employment was as an expert for the public defender's offices in Santa Maria and San Luis Obispo, California. He stated that for each case in which he was retained, he would evaluate the defendant's intellectual level to determine competence and then evaluate for any mental illnesses that would have "prevented [the defendant] from forming intent at the time of the murder."[239]

Stanley's chosen mental-state defense was not a traditional or common one. In 1985, one California appellate court noted the defense of an honest but unreasonable belief that one must kill in self-defense as "seldom recognized and rarely applied." *People v. Ogen*, 168 Cal.App.3d 611, 622, 215 Cal.Rptr. 16 (1985). Indeed, the defense pursued by Stanley was so rarely applied that until the California Supreme Court decided *People v. Flannel*, 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1 (1979), in 1979, there was significant doubt as to whether the defense was available in California. See *People v. Jacobs*, 230 Cal.

---

**239.** Ratner Depo. at 8:12–25, 9:1–7. It is notable that this latter defense, that the defendant had a mental illness that would have deprived him of the capacity to form any specific intent to murder, that was at issue in *Silva*. *Silva*, 279 F.3d at 850–51.

App.3d 1337, 1344, 281 Cal.Rptr. 733 (1991) ("*Flannel* did not change the existing law by its holding. It merely iterated what had always been the law in California, though seldom recognized and rarely applied"); *People v. McGreen*, 107 Cal. App.3d 504, 528, 166 Cal.Rptr. 360 (1980) ("The Supreme Court [in *Flannel*] concluded that although that unreasonable belief doctrine was an extant legal doctrine, it was unique, seldom applicable, and had never been given full substantive discussion by courts").

■ Given that the defense pursued by Stanley was not a common one likely to be known to mental health experts who regularly supported criminal defense investigations and testified at criminal trials, his failure to inform the experts that he had identified the unreasonable belief doctrine as a possible defense constituted deficient performance because Stanley's failure so to advise the experts closed off investigation into mental conditions or illnesses supporting the defense. This is confirmed by Dr. Schulte, who states that he would have

conducted an additional evaluation of petitioner had he known Stanley contemplated presentation of such a defense.[240] The court therefore concludes that Stanley provided deficient performance by failing to provide sufficient guidance to the mental health experts.

### (3) Trial Counsel's Presentation of Dr. Beaber

The court next considers whether Stanley was reasonable in calling only Dr. Beaber to testify at trial. Stanley's decision not to call Dr. Ratner was based on the fact that Dr. Ratner did not reach a diagnosis that would have supported a mental-state defense, and that having him testify would have opened the door to examination on Dr. Ratner's diagnosis of antisocial personality disorder. Given trial counsel's reasonable strategic choice to avoid such testimony, the court concludes that the decision not to call Dr. Ratner was not deficient performance. Dr. Schulte, moreover, provided no diagnosis that would have supported a mental-state defense,

---

**240.** As early as August 28, 1983, Stanley identified an "actual or honest but unreasonable belief in the need to defend oneself" as a potential defense in the case. (8/28/1983 Interview.) Dr. Ratner testified, however, that he did not believe Stanley ever mentioned the defense to him. (Ratner 9/20/02 Decl., ¶ 2 ("Nor do I recall Mr. Stanley telling me that he was trying to support voluntary manslaughter or 'imperfect' self defense, or that Mr. Lang had an actual but unreasonable belief that his life was in danger when he shot the victim in this case. Reading my report, I do not believe that these were the reference questions").) Dr. Schulte similarly testified that Stanley never referenced this defense. (Schulte Decl., ¶ 7 ("Had I been asked to evaluate the defense of imperfect self-defense, and if I had been asked to address the significance or Mr. Lang's mental state as it related to this defense, I would have conducted, or recommended that another expert conduct additional evaluation of Mr. Lang. I have reviewed Dr. Barbara Cort Counter's declaration to some extent. These are all areas I

would have wanted to explore had I been given the reference question of whether Mr. Lang had any mental condition which could support the defense of imperfect self-defense").) Dr. Beaber was not deposed in this case. His testimony at petitioner's trial did not address petitioner's state of mind at the time of the killing, however. Rather, as summarized by the California Supreme Court, Dr. Beaber "testified that Anderson's stated fear of venereal disease, as related by defendant, suggested he might belong to a subgroup of male *homosexuals* having very few sexual contacts with men and an almost morbid preoccupation with venereal disease. According to Beaber, this subgroup's existence is not generally known. Beaber further testified that defendant's account of his actions following Anderson's death was consistent with a panic reaction alternating with a fatalistic outlook in which defendant believed he would inevitably be caught and these were his last days as a free man." *Lang*, 49 Cal.3d at 1007, 264 Cal.Rptr. 386, 782 P.2d 627.

and had certain ethical lapses that would have resulted in his impeachment on cross-examination.[241] Once again, this appears to have been a reasonable strategic choice. Perhaps for this reason, petitioner's argument appears to center less on Stanley's failure to call Dr. Ratner or Dr. Schulte than on his decision to call Dr. Beaber, who was known for his pro-prosecution bias.[242]

 Dr. Beaber was selected by petitioner specifically *because* of his pro-prosecution bias. Dr. Beaber's statement that he was unlikely ever to provide testimony favorable to a criminal defendant is belied by the fact that he did provide favorable testimony in this case.[243] Stanley notes that particularly in a small town such as Santa Maria in 1984, jurors may have been skeptical of mental health professionals; thus, presenting a witness who traditionally testified against criminal defendants and against a finding of diminished capacity or insanity would have bolstered the witness's credibility in their eyes.[244] Moreover, Stanley describes Dr. Beaber as particularly charismatic and persuasive.[245] Be-

241. Stanley Depo. at 256:17–19 ("The only concern with Dr. Schulte was the potential impeachment with his professional problems, but I had no reason to doubt his competence").

242. Petitioner also argues that Dr. Beaber's testimony that petitioner suffered from some form of panic response at the moment of the shooting could have been bolstered had Dr. Beaber known the facts contained in Dr. Counter's psychosocial history. Dr. Beaber's testimony in this proceeding does not support this assertion, however. Indeed, as addressed in the court's prejudice analysis, *infra*, neither the experts petitioner retained in this action nor at the original trial support this assertion.

243. Stanley 10/8/02 Decl. at 2 ("Those concerns seem valid in the typical case in which Dr. Beaber describes himself as far less likely than many other mental health professionals to provide an opinion and proposed testimony which would be helpful to the defense. Those concerns had no application in Mr. Lang's case because Dr. Beaber, after examining Mr. Lang, was prepared to offer testimony favorable to the defense on the relatively-limited issue on which I strategically intended to have him testify. Indeed, Dr. Beaber's recall of this case is obviously, and understandably given the passage of time and likely busy professional life he has led since, limited given his statement on page 3 that the likelihood he would testify favorably in a specific case on a mental health defense is 'extremely remote,' when in fact he gave such favorable testimony in this case. Further, the fact [that] his favorable testimony was in the context of the pro-prosecution bias to which he refers at

some length in his declaration served, in my opinion, to bolster his credibility as a witness and to provide added persuasive force to the content of his testimony. Moreover, since he was prepared to testify favorably for the defense, there would have been no reason for him to give his usual admonition to counsel, described above, and I do not believe he ever suggested I would be foolish, or it would be disastrous, for me to rely upon him as a defense witness").

244. Stanley Depo. at 84:12–19 ("I don't specifically recall [investigating Beaber's background] except my general recollection is that his background was that he had done some consulting with, I think, law enforcement agencies and had testified for the prosecution, and of course that's—in terms of credibility, that's useful to call him as a defense witness. It's the converse of the problem with somebody like Dr. Ratner who usually testified for the defense").

245. Stanley Depo. at 73:4–25, 74:1–18 ("[I]n my experience there can be limited utility to the testimony of mental state professionals, that they often are viewed with scepticism by juries, and my experience and that of others in Santa Maria was that was particularly true in Santa Maria and that they tend to be self-canceling. Because if you have at least a traditional mental state expert testify for the defense in a trial [the prosecution would present a rebuttal witness] who in those days often testified that mental state professionals are no better than anybody else at evaluating people and their mental states, so that they would kind of cancel. And so Dr. Ratner

cause Stanley has explained that he decided to call Dr. Beaber not despite, but because, he was known to testify for the prosecution in most cases, and because that strategic choice was supported by reasonable investigation, the court is required to defer to the choice.

### b. Alcohol Consumption and Intoxication

As noted, the failure to present evidence of petitioner's alcohol consumption and intoxication differs from the failure to present evidence of petitioner's mental disorders. Unlike his investigation of mental disorders petitioner may have had, Stanley conducted no investigation regarding petitioner's alcohol consumption, his resultant blood alcohol level, or the effect on petitioner's perception of events. Stanley testified in his 2002 deposition that the decision not to investigate or present evidence of petitioner's alcohol consumption and intoxication was not the result of a tactical or strategic choice. Indeed, he stated that had forensic testimony indicated that petitioner's blood alcohol was high enough to impair his judgment and cause him to mis-

perceive events and circumstances, it would have supported an argument that the killing was the result of imperfect self-defense or an honest but unreasonable belief that petitioner's life was in imminent danger.[246] Stanley also testified in 2002 that had he engaged such an expert and had the expert concluded that petitioner's "level of intoxication [was] sufficiently high to have affected his perceptions and judgments at the time of the incident," he would have considered presenting such evidence at trial.[247]

In the Ninth Circuit's recent en banc decision in *Richter*, the court emphasized that, at least where trial counsel identifies a trial strategy or states that he had no trial strategy, the district court is bound to accept counsel's testimony, and cannot invent, post hoc, a trial strategy that hypothetically would have been reasonable. During trial counsel's deposition in *Richter*, he "was unable to provide any reasoned explanation for failing to consult forensic experts or to seek expert testimony in order to corroborate his client's testimony or prepare to rebut the prosecution's case." *Richter*, 578 F.3d at 958–59.

---

was—not that he was a bad witness, and I did use him sometimes, but he was kind of a traditional mental state professional in that respect, and I thought Rex Beaber brought a different kind of perspective because of his own background and the fact that he was a lawyer—and I don't think a practicing lawyer, but he had gone to law school—and his personal qualities").

**246.** Stanley Depo. at 270:6–25, 271:1–5 ("Q. . . . In the course of the trial or prior to trial, did you engage a forensic analyst to calculate Mr. Lang's blood alcohol levels? A. I certainly don't recall that we did, and I have no reason to think that we did. Actually, I would have been able to pretty well do—done that myself. Q. Did you have any tactical or strategic reason not to hire an analyst to run these blood alcohol calculations? A. No. Q. Did you engage a forensic alcohol expert to discuss the impact of intoxication on a per-

son's judgment and perceptions? A. No. Q. If you had such forensic testimony that would offer support that Mr. Lang's blood alcohol was high enough to impair his judgment and cause him to misperceive events and circumstances, would that have been consistent with the presentation of an imperfect self-defense. . . . [A.] Yes").

**247.** *Id.* at 277:2–10 ("Q. . . . If you had engaged a forensic expert regarding intoxication who would have concluded that . . . Mr. Lang's level of intoxication [had] been sufficiently high to have affected his perceptions and judgments at the time of the incident with Mr. Anderson, would you have presented that information in support of your defense of imperfect self-defense and voluntary intoxication? . . . [A.] [E]ssentially the same answer [to the prior question to which Stanley answered 'I certainly would have considered presenting it']").

"When counsel offers no strategic reason for failing to perform what would otherwise constitute the duty of a reasonably competent counsel," the en banc court stated, the district court "may not invent such a strategy by engaging in 'a *post hoc* rationalization of counsel's conduct' in lieu of relying on 'an accurate description of [counsel's] deliberations prior to [trial].'" *Id.* at 959 (quoting *Wiggins*, 539 U.S. at 526–27, 123 S.Ct. 2527).[248] Consequently, it is the court's duty to evaluate "[c]ounsel's chosen trial strategy, as *he* explained it." *Id.* (emphasis original). See also *Pinholster*, 590 F.3d at 673 ("To give attorneys the benefit of the doubt is one thing, but to fabricate an excuse that the attorneys themselves could not conjure up is another"); *Caro*, 280 F.3d at 1255 ("Caro's trial counsel has filed a declaration conceding that he had no strategic reason for failing to investigate the effects that Caro's exposure to neurotoxicants and his personal background had on his brain. Accordingly, he has failed to adequately justify his reasons for not conducting a reasonable investigation and, therefore, rendered deficient performance").

Although Stanley did not investigate the effect petitioner's alcohol consumption may have had on his conduct, he did identify reasons why he did not present such evidence at trial:

"[T]his was all about when the intent to take the property came, which goes back to the issue of the homosexual pass which led to the belief that the gun was about to be fired, and for—for somebody to recall the events with that kind of specificity, the person could not have been too terribly impaired by alcohol it strikes me, for one thing. I would have

to say, though, that—that it would not— I mean to have placed more emphasis on it in the guilt phase would not have been inconsistent with the defense, but apparently I thought at the time that it wasn't really that strong in terms of support of the defense either." [249]

Accepting this statement as Stanley's explanation of his strategic choice not to present evidence of alcohol consumption— a fact that is not altogether clear, given that Stanley stated in the same breath that alcohol intoxication was not inconsistent with his chosen defense—such a "strategic choice[ ] made after less than complete investigation [is] reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052. See also *Jennings*, 290 F.3d at 1014 ("[A]ttorneys have considerable latitude to make strategic decisions about what investigations to conduct *once they have gathered sufficient evidence upon which to base their tactical choices*" (emphasis original)). The Ninth Circuit "follow[s] the Supreme Court's holding that 'the traditional deference owed to the strategic judgments of counsel is not justified where there was not an adequate investigation 'supporting those judgments.'" *Richter*, 578 F.3d at 955 (quoting *Correll*, 539 F.3d at 949).

In *Jennings*, a case that addressed the standard of care trial counsel were required to meet in California in 1984, the Ninth Circuit concluded that trial counsel's investigation of the defendant's mental

---

**248.** Unlike the present case, *Richter* is a case governed by AEDPA. Consequently, the court found it inappropriate to invent a post hoc rationale for trial counsel's behavior not only under *Strickland's* deferential standard, but

also "under deferential AEDPA review." *Richter*, 578 F.3d at 961.

**249.** Stanley Depo. at 95:16–21.

state at the guilt phase had been deficient. Counsel did not investigate certain potential mental-state defenses, including the possible effects of methamphetamine on the defendant at the time of the killing. *Jennings,* 290 F.3d at 1013–14. Trial counsel settled early on an alibi defense, which would have been inconsistent with a mental-state defense, including a defense that methamphetamine use impaired defendant's judgment at the time of the killing. *Id.* at 1014. Reversing the district court, the Ninth Circuit held that "[trial counsel] was obliged to thoroughly investigate [petitioner's] case in order to *determine* whether a mental state defense might have been better than the alibi defense he had 'settled on' early." *Id.* at 1015 (emphasis original). See also *id.* at 1016 ("We find that, even in 1983 [in California], the information [trial counsel] acknowledges he possessed would have put a reasonable attorney on notice that he needed to investigate … drug-related issues more thoroughly when defending a client against a charge—first degree, capital murder—for which raising a reasonable doubt as to intent could be crucial"); *Richter,* 578 F.3d at 955 ("*Strickland* obligates defense attorneys to make reasonable investigations *before* settling on a trial strategy or, at the least, to conduct sufficient inquiries to make an informed decision about whether further investigation is needed," citing *Jennings,* 290 F.3d at 1014).

In *Richter,* counsel made the strategic choice to attack evidentiary gaps in the police investigation of the crime scene, without consulting a forensic serology expert who could have advised and/or testified regarding the source of a pool of blood. The defense theory of the source of the blood—that it was derived from two different shooting victims—supported defendant's story that he had killed during a shootout and not in cold blood. The government's theory—that the blood came from one shooting victim only—suggested a cold-blooded killing. *Richter,* 578 F.3d at 953. Trial counsel selected his strategy without consulting a forensic expert in blood evidence despite the fact that the success of the defense turned on the source of the blood. *Id.* at 955–56. The Ninth Circuit identified three independent bases for finding counsel's assistance deficient, two of which are relevant here.[250] First, the failure to investigate before settling on a trial strategy was "in itself sufficient to require a holding of deficient performance." *Id.* at 956. Second, in pursuing the strategy for which he opted, trial counsel supported the theory that the multiple victims' blood was present at the scene only with his client's testimony. This constituted deficient performance, the court said, because a "reasonably competent attorney would have made inquiries of … an expert regarding what evidence might be available that would strengthen the chances that his 'he said-he said' strategy would succeed or might cause him to broaden that strategy were he to locate an expert whose testimony would support his client's statements." *Id.*[251]

---

250. Trial counsel's third failure was the fact that he did not conduct further investigation as the trial unfolded. After trial counsel revealed his strategy during opening argument, the state introduced the testimony of two serology experts. Trial counsel did not consult an expert to help him prepare to cross-examine these witnesses and made no effort to consult experts to present rebuttal testimony. *Id.* at 960–61.

251. See also *id.* at 958 ("Finally, we reject the district court's conclusion that counsel's failure to consult experts in preparation for trial was reasonable because counsel thought that the case was, at bottom, a credibility contest…. Precisely the opposite is true. Where the defense strategy is to win a credibility contest, the importance of corroborating the accused's testimony with physical evidence is paramount. Leaving the jurors to believe or disbelieve defendants solely on the basis of

In an observation that resonates here, the Ninth Circuit noted that if "counsel's decision not to consult experts in preparation for trial had been a 'strategic judgment,' it would have been an unreasonable one, as there was no adequate investigation to support it.... But, even more fundamental, counsel's performance in this respect was not 'strategic' at all. There was absolutely no reason not to consult a blood expert and counsel never suggested that there was. In his deposition, counsel was unable to provide any reasoned explanation for failing to consult forensic experts or to seek expert testimony in order to corroborate his client's testimony or prepare to rebut the prosecution's case." *Id.* at 958–59.

 Given that Stanley had no strategic reason for failing to investigate the effects of alcohol intoxication on petitioner, and that he was on notice as early as his first meeting with petitioner that alcohol intoxication was an issue, the court finds *Jennings* and the en banc decision in *Richter* controlling. It concludes that even in 1983, trial counsel did not make "an informed, strategic choice" because he settled on a defense "before conducting any investigation that might have led to a reasoned tactical choice." As a consequence, Stanley "was ineffective within the meaning of *Strickland's* first prong." *Jennings,* 290 F.3d at 1016.

### 4. Standard Governing Prejudice During the Guilt Phase

"To demonstrate actual prejudice under *Strickland,* a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Rhoades v. Henry,*

596 F.3d 1170, 1192–93 (9th Cir.2010) (quoting *Wiggins,* 539 U.S. at 534, 123 S.Ct. 2527). "Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial." *Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). See also *Hein v. Sullivan,* 601 F.3d 897, 918–19 (9th Cir.2010) ("Even if Miliotti satisfied the first prong, he must still establish prejudice by 'show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,'" quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

"It is clear ... that [petitioner] *need not* show that [counsel's] deficient conduct more likely than not altered the outcome in the case. This 'preponderance' standard was explicitly rejected in *Strickland.*" *Richter,* 578 F.3d at 952 (quoting *Sanders,* 21 F.3d at 1461 (emphasis original)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). "[W]ith respect to defective investigations, the test for prejudice is whether the noninvestigated evidence was powerful enough to establish a probability that a reasonable attorney would decide to present it and a probability that such presentation might undermine the jury verdict." *Mickey,* 606 F.3d at 1236–37.

 "The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant

---

their own testimony, without supporting evidence, where such evidence could be ob-

tained with diligent investigation, is objectively unreasonable").

challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. Petitioner contends that additional evidence not presented at the guilt phase would have allowed the jury to find that he had an honest but unreasonable belief that his life was in imminent danger. "Under California law, if a defendant kills with an honestly held but unreasonable belief that he needs to defend himself, he is not guilty of malice and can be convicted only of voluntary manslaughter." *Aguilar v. Alexander,* 125 F.3d 815, 820 (9th Cir.1997) (citing *Flannel,* 25 Cal.3d at 668, 160 Cal.Rptr. 84, 603 P.2d 1).

■ Imperfect self-defense is not an affirmative defense "and the prosecution ha[s] the burden of proving the absence of justification or excuse beyond reasonable doubt." *People v. Rios,* 23 Cal.4th 450, 458, 97 Cal.Rptr.2d 512, 2 P.3d 1066 (2000). See also *Townsend v. Knowles,* 562 F.3d 1200, 1209 (9th Cir.2009) ("To establish that a killing is murder and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder, and that the act which caused the death was not done in the heat of passion, or upon a sudden quarrel or in the actual, even though unreasonable belief, in the necessity to defend against imminent peril to life or great bodily injury," quoting CALJIC 8.50 (2009)). Because defendant argues that non-deficient performance by counsel would have permitted the introduction of evidence negating an element of the gov-

ernment's case that the government had the burden of proving beyond a reasonable doubt, "[p]rejudice is shown when 'there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Jones v. Wood,* 114 F.3d 1002, 1010 (9th Cir.1997) (quoting *Harris v. Wood,* 64 F.3d 1432, 1435 (9th Cir.1995) (alteration original)).

■ Neither proof of a mental defect or intoxication is necessary to prove imperfect self-defense. *In re Christian S.,* 7 Cal.4th 768, 777–78, 30 Cal.Rptr.2d 33, 872 P.2d 574 (1994) ("[I]mperfect self-defense is not rooted in any notion of mental capacity or awareness of the need to act lawfully. To the contrary, a person may be entirely free of any mental disease, defect, or intoxication and may be fully aware of the need to act lawfully—and thus not have a diminished capacity—but actually, although unreasonably, believe in the need for self-defense. Put simply, an awareness of the need to act lawfully does not—in fact or logic—depend on whether the putative victim's belief in the need for self-defense is correct. A person who actually believes in the need for self-defense necessarily believes he is acting lawfully. He is thus aware of the obligation to act lawfully").

Nonetheless, mental health evidence may corroborate a criminal defendant's actual belief. In *Daniels,* the Ninth Circuit noted that proof of petitioner's mental disorder—in that case paranoid delusion—together with evidence of his background, might "have demonstrated imperfect self-defense." *Daniels,* 428 F.3d at 1208–09.[252] In *Aguilar,* the Ninth Circuit held that

---

**252.** In addition to being diagnosed with paranoid delusion, Daniels "had previously been shot by the police nine times, arrested erroneously, betrayed by his own attorney, and subjected to insufficient and harmful medical treatment in jail that resulted in urine poison-

ing." The court concluded that in combination, these facts might have corroborated a finding that petitioner "feared for his life or safety when [ ] officers came to arrest him." *Daniels,* 428 F.3d at 1209.

"imperfect self-defense [was] available to an intoxicated defendant." *Aguilar,* 125 F.3d at 820. Here, the Ninth Circuit remanded to have the court determine "whether the mental health evidence [might] have sufficiently corroborated Dr. B[ea]ber's and Lang's testimony to raise reasonable doubt as to whether the killing was actually motivated by a desire to rob or whether, instead, the killing was motivated by Lang's honest belief that his life was in imminent danger." *Lang,* 2000 WL 1256886 at *1.

In reviewing deficient performance at the penalty phase, the Ninth Circuit has repeatedly found no prejudice where a petitioner merely speculates regarding the availability of a mental-state defense, but presents no evidence that he actually suffers or might suffer from a diagnosable disorder. See, e.g., *Bible v. Ryan,* 571 F.3d 860, 871 (9th Cir.2009) (in a case where petitioner asserted that had trial counsel adequately investigated his social and medical history, they might have developed information that they could have provided to mental health experts, who could then have conducted further tests to determine whether petitioner had brain damage, the court determined that petitioner "relie[d] on speculation that he may have some type of organic brain dysfunction or disorder" and held that "speculation is not sufficient to establish prejudice"); *King v. Schriro,* 537 F.3d 1062, 1074 (9th Cir.2008) (concluding that there was no prejudice where the petition did not contain information showing what the results of a more complete social and medical history would have been); *Gonzalez v. Knowles,* 515 F.3d 1006, 1015–16 (9th Cir. 2008) ("As to the failure to investigate mental health mitigation, Gonzalez does not contend that he actually suffered from a mental illness; he merely argues that *if* tests had been done, and if they had shown evidence of some brain damage or trauma, it *might have* resulted in a lower sentence. Such speculation is plainly insufficient to establish prejudice" (emphasis original)); *Raley v. Ylst,* 470 F.3d 792, 802 (9th Cir. 2006) (denying habeas relief where counsel's experts had not conclusively opined that the defendant had a mental defect and their testimony would have opened the door to other damaging evidence).[253]

The court has identified only one case in which the Ninth Circuit found prejudice based on something less than a firm diagnosis of a mental illness. In *Seidel v. Merkle,* 146 F.3d 750 (9th Cir.1998), the defendant had seen combat in the Vietnam War and reported experiencing nightmares about the combat. See *Seidel v. Merkle,* No. C–94–1621 SI, 1997 WL 168541, *2 (N.D.Cal. Mar. 27, 1997). Trial counsel, however, "conducted no investigation whatsoever" of his mental state. *Seidel,* 146 F.3d at 752. In preparation for an evidentiary hearing in his federal habeas case, Seidel was examined by a psychologist who concluded that he "manifest[ed] several clear symptoms" of PTSD and showed "some residual brain damage and

**253.** Although cognizant that these cases assess prejudice at the penalty phase, the court nonetheless finds them informative in evaluating prejudice arising from the failure to present a mental-state defense at the guilt phase. If anything, the standard these cases articulate should be applied more stringently in assessing prejudice at the guilt phase, since the Ninth Circuit has repeatedly stated that the "bar for establishing prejudice is set lower in death-penalty sentencing cases than in guilt-phase challenges and noncapital cases." See, e.g., *Cox,* 588 F.3d at 1050. This is consistent with the Ninth Circuit's statement that a different standard of care applies when investigating and presenting mental-state evidence at the guilt phase than at the penalty phase. Counsel is held to a higher standard of care during the penalty phase. See, e.g., *Wallace,* 184 F.3d at 1117 & n. 5; *Hendricks,* 70 F.3d at 1037–39.

long-term memory impairment." *Id.* From his first interview with police following the killing, Seidel had maintained that he was " 'scared for [his] life' at the time of the incident and only attacked the victim after receiving a punch to the head." The court noted that this statement could have been corroborated by evidence of PTSD, which "tends to leave victims excessively fearful and psychologically primed to over-react to perceived threats." *Id.* at 756. As a result, the Ninth Circuit concluded that a "defense of imperfect self-defense based on the facts of the case, coupled with petitioner's mental state at the time of the fight, the PTSD symptoms, and the organic brain damage would have eliminated the element of malice." *Id.* at 757.

### 5. Whether Trial Counsel's Deficient Performance Prejudiced Petitioner

#### a. Failure Adequately to Advise Mental Health Experts of the Nature of the Mental–State Defense under Consideration

█ As the testimony in this case of the mental health experts Stanley consulted reflects, Stanley's failure to advise them that he contemplated arguing that defendant had an honest but unreasonable belief he had to kill Anderson in self-defense did not prejudice petitioner.[254] Petitioner argues that had Stanley given the experts proper guidance, they would have requested further social history information and been able to produce a diagnosis that would have corroborated a defense that petitioner had an honest but unreasonable belief that his life was in imminent danger. In petitioner's words:

"The experts cannot, after all, be expected to know the legal issue to which their opinions should be directed unless the attorney tells them, and cannot, in turn, assess what information would be necessary to address the relevant question. An expert who is asked to provide a general, preliminary assessment of petitioner's mental health would not necessarily need a psychosocial history. Similarly, an expert retained to determine if a defendant met the very low threshold of capacity to commit the crime would not necessarily request further information once he or she determined that defendant had the requisite capacity. A practitioner retained for the limited purpose of administering standardized tests would be even less likely to ask for background information.

In contrast, a practitioner who is asked to uncover any mental condition or defect that could contribute to possible overreaction or hyper vigilance, in order to support [a] jury finding that petitioner had an honest, even if unreasonable belief that his life was in danger, would know that a much more in-depth analysis was required and would request such information." [255]

Petitioner adduces at least some evidentiary support for this argument, inasmuch as Dr. Schulte stated that had he "been asked to evaluate the defense of imperfect self-defense, and … asked to address the significance or Mr. Lang's mental state as it related to this defense, [he] would have conducted, or recommended that another expert conduct additional evaluation of Mr. Lang." [256] Schulte's statement is consistent

---

254. Had it determined that Stanley performed deficiently in providing social history information to the mental health experts at the guilt phase, the court would similarly have concluded that this aspect of Stanley's performance did not prejudice petitioner. The lack of prejudice, therefore, provides an alternate basis for denial of petitioner's

claims regarding the provision of social history information to the mental health experts during the guilt phase.

255. Pet.'s Trial Brief at 29–30.

256. Schulte Decl., ¶ 7.

with petitioner's argument that, given a proper referral question, the mental health experts would have conducted further evaluation, which might have included a request for additional social history information. In assessing prejudice, therefore, the proper inquiry is whether additional evaluation or social history information would have led to psychiatric or psychological testimony that could have helped petitioner's defense.[257] The court finds significant in this regard the fact that none of Drs. Jackman, Counter, Beaber, Ratner, or Schulte identifies a diagnosis, a set of clear symptoms suggestive of a possible diagnosis, or another cognizable psychological or psychiatric finding that he would have made or that could have been made based on a proper referral question and the current record, including Dr. Counter's psychosocial history.

Dr. Schulte, who was not deposed, and whose testimony consists of a brief nine-paragraph declaration, does not state that had he been given a more detailed referral question and received additional information, he would have formulated a different diagnosis. The closest he comes to suggesting this is the statement that, had he been presented with Dr. Counter's 249–page psychosocial history—which he reviewed in this proceeding "to some extent"—there would have been areas he "would have wanted to explore."[258] As noted earlier, this type of vague allusion to the possibility of a different diagnosis or identification of symptoms does not constitute prejudice. See, e.g., *Bible*, 571 F.3d at 871 (holding, in a case where petitioner asserted that, had trial counsel adequately investigated his social and medical history, they could have provided the information to mental health experts who could have conducted further tests to determine if he had brain damage, that petitioner "relie[d] on speculation that he [might] have some type of organic brain dysfunction or disorder" and that "speculation is not sufficient to establish prejudice"); *King*, 537 F.3d at 1074 (concluding that there was no prejudice where the petition did not contain information showing what the results of a more complete social and medical history would have been).

The court must therefore conclude that petitioner was not prejudiced by Stanley's failure to give Dr. Schulte a referral question that referenced a possible argument regarding imperfect self-defense. In reaching this conclusion, the court assumes that Dr. Schulte would have requested further social history information had he been

257. A psychological or psychiatric evaluation can encompass a number of activities, only one of which may be investigation of a patient's background. Dr. Schulte does not state that he would have requested social history information as part of any "additional evaluation." The court, moreover, has found that Stanley's performance was deficient because he failed to provide a proper referral question, not because he failed to provide petitioner's social history to the experts when they did not request it. That said, the link between the further "evaluation" Dr. Schulte references and a hypothetical request for social history information is vague and speculative at best. Because this is the only theory of prejudice petitioner advances, however, and because the court concludes that petitioner cannot show prejudice even if the evaluation contemplated by Dr. Schulte included an investigation of petitioner's social history, the court considers the theory as stated in petitioner's trial brief. Notably, none of the three experts retained in 1984 has testified that he would have reached a different diagnosis or conclusion based on the information he had in hand had Stanley posed a proper referral question. Similarly, Drs. Jackman and Counter, whom petitioner retained for this proceeding, offer no opinion regarding a diagnosis or other psychiatric or psychological findings that could have been made based on the information the experts possessed in 1984 had a proper referral question been posed.

258. Schulte Decl., ¶ 7.

given a proper referral question. Despite the fact that he had the benefit of Dr. Counter's comprehensive history as well as a referral question describing imperfect self-defense in this proceeding, however, Dr. Schulte did not offer a solid diagnosis or describe any symptoms or facts suggesting a particular mental condition that would have made a jury finding that the government had not proved absence of justification or excuse more likely. Rather, Dr. Schulte alludes vaguely to the fact that further exploration would have been appropriate. This does not suffice to meet petitioner's burden of showing prejudice.

Although he states that Stanley did not advise him that he intended to argue that petitioner had "an actual but unreasonable belief that [his] life was in danger" and that petitioner was "susceptibl[e] to panic because of post traumatic stress disorder," Dr. Ratner does not identify any additional steps he would have taken had a referral question with this information been posed.[259] Most specifically, Dr. Ratner does not state that he would have requested additional social history information had he been advised that Stanley intended to rely on imperfect self-defense. Dr. Ratner's testimony in this action, moreover, appears to be based both on his newfound knowledge that Stanley intended to argue petitioner had a honest, but unreasonable belief that his life was in danger, and on Dr. Counter's psychosocial history.[260] He does not address how he would have proceeded had he been given a proper referral question but *not* Dr. Counter's 249–page psychosocial history. As a consequence, Dr. Ratner's testimony does not establish prejudice flowing form the inadequate referral question. Even were the court to conclude that Dr. Ratner would have re-

quested additional psychosocial history had he been given an imperfect self-defense referral question, moreover, and additionally to assume that his request would have yielded the full corpus of Dr. Counter's psychosocial history, Dr. Ratner testified that Dr. Counter's psychosocial history "would not [have] change[d] [his] diagnosis of Mr. Lang as having antisocial personality disorder, [although it] would have raised the issue of Post–Traumatic Stress Disorder."[261] As a consequence, Stanley's reasons for not calling Dr. Ratner would have remained unchanged.

In *Raley*, the Ninth Circuit held there was no prejudice where "none of the three experts retained by defense counsel conclusively opined that Petitioner had a mental defect" based on information concerning petitioner's childhood abuse. *Raley*, 470 F.3d at 802. Here, Dr. Ratner does not state that his conclusions would have changed, nor that he would have reached a conclusion analogous to that of the expert in *Seidel* that petitioner had "clear symptoms" of PTSD or another disorder. The *Raley* court also noted that had mental health evidence been presented, "the experts' reports contained damaging content that would have come to light through cross-examination and, on balance, would have hurt more than helped." *Id.* at 802–03. Dr. Ratner's conclusion that petitioner suffered from antisocial personality disorder might have been significantly aggravating and would have been an independent basis to decline to call him as a witness; it seems highly likely that the specific and harmful diagnosis of antisocial personality disorder would have outweighed vague and nonspecific testimony that certain evidence "raise[d] the issue" of PTSD. Given the

---

**259.** Ratner 9/20/02 Decl., ¶ 3.

**260.** See, e.g., *id.*, ¶ 6 ("Similarly, the information in Dr. Counter's declaration ... raises the issue of post traumatic stress as a cause

for and definite exacerbating trigger in his conduct at the time of the murder").

**261.** Ratner 9/23/02 Decl., ¶ 14.

extensive and voluminous report authored by Dr. Counter and a proper referral question, Dr. Ratner does not conclusively opine that his diagnosis would have changed. Presumably the same would be true had Dr. Ratner received the more limited information contained in the reports prepared by Conry and Ballew and the information petitioner gave Stanley directly. The court cannot, therefore, find prejudice on these facts.

Significantly, Dr. Ratner's testimony focuses only on PTSD. The experts petitioner retained in this proceeding are equivocal at best on the viability of a PTSD diagnosis in 1984. Dr. Jay Jackman states that as described in the DSM–III in 1984, PTSD required "exposure to a single, circumscribed, albeit extraordinary, traumatic stressor ..., [although] researchers were [in those years] already defining and writing about" the effects of "multiple, repeated and extremely severe traumatic stressors," a fact pattern more consistent with petitioner's experience.[262] It is unclear whether Dr. Jackman contends that in 1984, an expert might have diagnosed PTSD or explained the effects of multiple stressors under a different rubric. Whether either of these things might have occurred, Dr. Jackman's testimony reveals that under the DSM–III, a diagnosis of PTSD was not possible absent a finding that the patient was "[re]experiencing" the trauma by either "(1) recurrent and intrusive recollections[;] (2) recurrent dreams of the event[;] [or] (3) sudden acting or feeling as if the traumatic event were reoccurring."[263] Nowhere in Dr. Jackman's analysis does he state that petitioner experienced recurrent and intrusive recollections of his childhood trauma,

dreams of that trauma, or a sudden acting or feeling as if that trauma was occurring. Thus, it cannot be said that Dr. Jackman opines either that petitioner suffered from PTSD or from "clear symptoms" of PTSD.

Similarly, it is not clear that Dr. Counter diagnoses PTSD based on 1984 criteria. In her psychosocial history, Counter emphasized that "[r]esearch and clinical practice" during the eighteen years from 1984 to 2002 contributed to a greater "professional understanding of repeated, chronic traumatic stressors," as well as an appreciation of the "complex, profound and lasting mental, emotional and neurological damage caused by chronic, ongoing traumatic experiences, especially those initiated in infancy and early childhood."[264] Dr. Counter acknowledged that, in 1984, the DSM–III did not recognize a PTSD diagnosis caused by chronic traumatic exposure; like Dr. Jackman, however, she stated that researchers were writing about the "complex nature and chronic consequences" of such exposure at that time. Dr. Counter did not state that researchers who were studying chronic traumatic exposure would have diagnosed petitioner as having PTSD in 1984.[265] As with Dr. Jackman, it is not clear that Dr. Counter opines that petitioner suffered from either PTSD or from "clear symptoms" of PTSD. There is no evidence, moreover, that Dr. Ratner was aware of the unidentified research literature cited by Drs. Counter and Jackman that might or might not have supported a diagnosis of PTSD in 1984. He states only that in 1984, "[PTSD] was ... a recent diagnosis that [had come] out at the end of the Vietnam War, and ...

**262.** Declaration of Jay M. Jackman, M.D. ("Jackman Decl."), Docket No. 301 (Sept. 27, 2002, ¶ 39).

**263.** *Id.,* ¶ 38.

**264.** Declaration of Barbara Cort Counter, Ph.D. ("Counter Decl."), Docket No. 306 (Sept. 27, 2002), Exh. A ("Psychosocial History"), at 225.

**265.** *Id.* at 230.

wasn't common currency in evaluation work until much later on."[266]

Petitioner does not argue that Stanley provided deficient performance by selecting Dr. Ratner, only that Stanley failed to provide sufficient guidance and background information to Ratner. Given this fact, the fact that the DSM–III did not recognize a PTSD diagnosis caused by chronic traumatic exposure in 1984, and the fact that there is no evidence that Dr. Ratner knew of the research literature cited by Drs. Jackman and Counter, it is speculative to conclude that he would have diagnosed PTSD or found that petitioner suffered "clear symptoms" of PTSD. Such "speculation is not sufficient to establish prejudice." *Bible,* 571 F.3d at 871.

Dr. Beaber does not address what, if any, effect a proper referral question, or for that matter, further social history information, would have had on his testimony or evaluation. As a consequence, his testimony does not show prejudice. Furthermore, Dr. Beaber presented detailed testimony that corroborated petitioner's panicked reaction to Anderson's alleged sexual advance. As described, *supra,* Dr. Beaber testified that petitioner's behavior was consistent with a "panic state of mind" and showed the effects of "an intense arousal, panic, passion."[267] Thus, to the extent petitioner's case could have been aided by testimony like that presented which the psychological expert provided in *Seidel* about symptoms short of a DSM–III diagnosis, Dr. Beaber gave such testimony and competently justified it, citing extensive experience meeting criminal defendants in the hours after they killed, and the then-extant psychological literature.[268] Indeed, an examination of Dr. Beaber's testimony indicates that he offered the type of opinions that the *Seidel* court held *should have been* presented in that case, not testimony that the *Seidel* court would have deemed to be inadequate or prejudicial.[269]

**266.** Ratner Depo. at 52:14–22.

**267.** Trial Transcript at 2086:6–28, 2087:1–14. In a hearing outside the presence of the jury, Dr. Beaber stated that although petitioner suffered "no panic disorder" as it was described in the DSM–III, he was "in a panic state which is not a mental disorder." (*Id.* at 2010:22–27.) It is thus clear that Dr. Beaber's testimony was similar to that discussed by the court in *Seidel.*

**268.** *Id.* at 2113:1–18 ("[This could] [p]robably [be found in] a number of places. All the literature—the old literature on situation adjustment reactions that discusses how people respond in various depressant or anxious ways to various unpleasant life circumstances. Certainly the concept of panic as a response to circumstances is discussed in detail[ ] [in the context of] post-traumatic stress disorders, and of course, there [is a] gigantic [amount of] literature on anxiety panic response that is a part of the literature on ... stress [reactions], in general. Both literature on the physiology of panic and ... literature on the phenomenon of panic and then there's a social psychology including anxiety for experiment purposes in laboratories. Any number of places and different kinds of places in psychological literature where panic is discussed. Ordinarily, everyday people don't need an expert to tell them that terrifying circumstances produce a terrified state of mind. Most people having lived a few years appreciate that as an evident fact"); *id.* at 2091:7–17 (noting that in meeting with many criminal defendants in the hours after their heat of passion crimes, he had heard " "the same words that [petitioner] said to [Dr. Beaber], that I kind of don't remember anything and then I heard the clicking of the gun in my hand, the click of the gun. So that parallel in the wording and construction of that moment is just remarkably consistent with these crimes of intense passion that I have become involved with" "); *id.* at 2092:5–13 ("It is commonly cited in the literature that crimes of passion involve remarkable overkill, and [there is] some data indicating that 50 percent—[in] 50 percent of homicides with elements of passion, there is amnesia for even more than the firing of the weapon").

**269.** Notably, none of the three mental health experts retained by counsel in 1984 asserts that, if he had reviewed Dr. Counter's psycho-

The Ninth Circuit's limited mandate in this case directed the court to consider whether "mental health evidence" would have corroborated petitioner's testimony that he was actually motivated by a fear for his own life. *Lang*, 2000 WL 1256886 at *1. Although it has found that the failure to provide guidance, including a proper referral question, to retained mental health experts constituted deficient performance, the court concludes that petitioner has not shown a reasonable probability that, absent that failure, the factfinder would have had a reasonable doubt as to whether petitioner was motivated to kill Anderson because he feared for his own life. Indeed, petitioner has not established that any expert would have altered his testimony in light of a referral question that included imperfect self-defense, or that any expert in 1984 could have presented a diagnosis or evidence of clear symptoms of PTSD or any other disorder that could have corroborated petitioner's testimony. Consequently, petitioner has not made an adequate showing that he was prejudiced by Stanley's failure to advise the mental health experts that he contemplated asserting an honest but unreasonable belief defense at the guilt phase.

### b. Failure to Investigate Alcohol Consumption and Intoxication

With respect to Stanley's failure to investigate petitioner's alcohol consumption and intoxication at the time of the killing,

"[the court] must determine whether, had [he] undertaken the necessary investigation, it is reasonably probable that the outcome of [petitioner's] trial would have been different." *Jennings*, 290 F.3d at 1016. Petitioner has presented the expert testimony of Darrell O. Clardy in support of his contention that testimony was available in 1984 that could have shown he was significantly impaired at the time of the shooting. Respondent has not presented an expert to rebut Clardy's testimony.

Clardy earned a Bachelor of Science degree in chemistry and biochemistry from California Polytechnic University in 1966 and a Masters of Science degree in biophysics from Iowa State University in 1970. From 1973 to 1983, Clardy was a criminalist with the Orange County Sheriff–Coroner's office; after 1978, he was a supervising criminalist. Between 1983 and the date of his testimony in 2002, Clardy was a forensic toxicologist at Analytical & Forensic Toxicology, Inc. in Brea, California.[270] Clardy has analyzed approximately 30,000 biological samples for alcohol and drugs and has, on more than 2,000 occasions, been qualified as an expert witness in federal, state, and military courts regarding the pharmacology and toxicology of alcohol and drugs, their effects on driving, on field sobriety tests, and their therapeutic and toxic levels.[271] Clardy offers the following testimony in his declaration:

"If I had been called to testify, I would have placed Mr. Lang's most probable blood alcohol level, at or about the time

---

social history or been given a proper referral question, he would have diagnosed petitioner with dysthymic disorder or identity disorder or conducted any further evaluation concerning such condition.

**270.** Declaration of Darrell O. Clardy ("Clardy Decl."), Docket No. 302 (Sept. 12, 2002), ¶¶ 1–3.

**271.** *Id.*, ¶¶ 4–5. See also *Huffman v. County of Los Angeles*, 147 F.3d 1054, 1056–57 (9th

Cir.1998) (citing Clardy as a toxicology expert who opined regarding an individual's blood alcohol content and mental capacity at the time of a shooting); *Dawson v. Marshall*, No. SA CV 07–00435 AHS (RZ), 2008 WL 4601031, *3 (C.D.Cal. Oct. 14, 2008) (qualifying Clardy as an expert regarding a petitioner's mental state due to alcohol intoxication at the time he committed a crime); *People v. Millard*, 175 Cal.App.4th 7, 19, 95 Cal.Rptr.3d 751 (2009) (citing Clardy's testimony regarding blood alcohol content).

of the shooting, between a 0.20 % and a 0.23%. This is based on the August 24, 1983 recorded interview in which Mr. Lang stated that he drank 7 or 8 beers from the store to the camp and 1 beer at the camp (a total of 8 to 9 beers between 3 and 5 p.m. with the shooting at 5:30 p.m.). Using Mr. Lang's October 5, 1983 handwritten statement, in which he stated that he drank 12.5 beers between 4 p.m. and shortly before the time of the shooting, around 7:00 p.m., Mr. Lang's blood alcohol level at the time of the shooting would have been between a 0.24% and a 0.30%.

It is my opinion that at those levels Mr. Lang would have been confused and disoriented. He would misinterpret what he saw and heard, have his interpersonal and critical judgment impaired, suffer from a misapprehension of danger, be unable to direct his thoughts along new lines appropriate to the problem at hand, and have a significant loss of inhibitions. He could become easily angered and impulsive. The mild buzz reported by Mr. Lang [ ] would most reasonably have been caused by the absorption of the last beers and has no relationship to mental impairment. The buzz is just an indicator that absorption was occurring at the time.

Had I been called to testify in 1984, my opinions would have been consistent with what I have stated above." [272]

Clardy was extensively cross-examined in his deposition. The cross-examination revealed a number of weaknesses in his testimony that could have been exploited had he testified at petitioner's trial. A central concern is the fact that Clardy's assumption regarding the amount petitioner had to drink is based exclusively on petitioner's testimony since no contemporaneous testing was done.[273] Additionally, there are a number of variables in an individual's level of intoxication that Clardy could not account for, including petitioner's tolerance for alcohol and his consumption of food.[274]

272. Clardy Decl., ¶¶ 7–9.

273. Excerpts from Deposition of Petitioner's Toxicology Expert, Darrell O. Clardy, for Evidentiary Hearing ("Clardy Depo."), Docket No. 398 (Jan. 28, 2003), at 18:14–22. ("[Y]ou are relying on the truthfulness of his statements, are you not, as far as the amount he had to drink and when? A. Yes. I am taking into account what he said he had to drink in coming [ ] to my conclusion as to what his level was. That is correct").

274. *Id.* at 22:2–12 ("I don't know what his tolerance was at the time he drank because you can have tolerance at one point in your life and then, for example, totally stop drinking, abstain, and lose that tolerance. So if you are in a situation where you completely lose the tolerance, you have to develop it again. You can develop it faster, but you still have to develop it. So the alcohol will have a huge impact until you develop the tolerance. But once you develop it, you can lose it, but you can develop it again more quickly than you did initially"); *id.* at 32:1–4 ("I do not know [whether Lang's stomach was full] other than what he wrote when he said he had something to eat here or there or I drank beer here and there. I have no knowledge what his stomach condition was"). Another issue is that Dr. Schulte's report stated that petitioner had consumed five to six beers at the time of the shooting. If this accurately reflected petitioner's alcohol consumption, Clardy's testimony would change dramatically. (*Id.* at 56:24–25, 57:1–5, 57:15–21 ("[Assuming the five to six beer figure is correct,] at the time of the shooting, he could have been in the area of a .10 to .13. Could be a .14. .10 to .14 could be happening at the time of the shooting assuming the drinking between 3:00 to 5:00 scenario type thing. [Assuming the five beer figure is correct,] [i]f we have roughly two and a half hours of metabolism, he is going to be around .10. If we have three hours of metabolism, he would be closer to maybe a .09. So in other words, he is a .09, .10 up to a peak of .13, .14.... [Q.] Typically, would you expect a person at a .09 to .10 to be confused and disoriented? A. No"). Respondent's reliance on this opinion of Clardy is speculative, since Dr. Schulte has not con-

More troubling for petitioner's case are a series of hypothetical questions asked by respondent:

"Q .... Here is the first series of facts: petitioner fired a fatal gunshot wound to the victim's head then fired three tightly clustered gunshots beneath the victim's ear all within about an inch and a half of each other. Petitioner fired a fifth gunshot in the middle of the victim's back. Petitioner's handgun held five rounds, and petitioner hit the victim with all five shots. In your opinion, assuming those facts to be true, would that be consistent or inconsistent with Mr. Lang's having been impaired by alcohol at the time of the shooting?
A. Could go either way." [275]

\* \* \*

"Q. Okay. Next series of facts to assume: immediately after the shooting, petitioner takes the keys to the victim's motor home from the pocket of the shirt the victim had been carrying and removed a knife and cartridge case of ammunition from the victim's belt. In your opinion, is Mr. Lang's ability to do those things consistent or inconsistent with him having been impaired by alcohol?
A. Again, the same argument. It could be both.... I have seen—I have worked on cases where that has happened, where people are intoxicated—similar type of thing, not exactly, but similar. So I couldn't rule it out." [276]

\* \* \*

"Q .... Now assume that petitioner was able to find his way back to the campground ... after the shooting. In your opinion, would Mr. Lang's ability to do that be consistent or inconsistent with his having been impaired by alcohol? A. Again, you could argue both. It is harder to do it when you are under the influence of alcohol.... [I]t's ... more reasonable to do it without alcohol than with alcohol.... It is not something you normally expect when a person is highly intoxicated." [277]

\* \* \*

"In your opinion, if you can do so without speculating, what would be the more reasonable interpretation of Mr. Lang's ability to negotiate an unfamiliar vehicle through the [narrow, unpaved] canyon roads [with steep embankments] as far as his impairment is concerned?
A. It would be more reasonable that he wasn't intoxicated or slightly intoxicated." [278]

\* \* \*

"Q. Mr. Clardy, next assume that at approximately 8:45 p.m. on the night of the shooting, a [California highway police] officer pulled petitioner over in the victim's motor home for not having taillights. Petitioner gives the officer a fictitious name, date of birth, and residence. Petitioner lies that the motor home belongs to his stepfather and petitioner was transporting it to his stepfather in Atascadero. The officer issues petitioner a ticket. Petitioner signs the ticket under the fictitious name that he gave. And during the time the officer questioned petitioner, petitioner did not seem at all evasive or nervous; he seemed calm, cool, and collected....

firmed that he heard this figure from petitioner and since, in any event, there is no reason to believe that the prosecutor would have had access to the Schulte report. In every other instance, including his confession to Detective Correll, petitioner reported drinking at least 7–8 beers before arriving at the camp.

275. Clardy Depo. at 62:11–23.

276. *Id.* at 63:16–25, 64:1–6.

277. *Id.* at 64:7–14. 65:3–14.

278. *Id.* at 66:16–22.

A. That's a hard question to answer, but it is more consistent with him not being significantly impaired at the time the [officer] pulled him over. He could be significantly impaired at the time of the shooting and not at this time due to adaptation of the alcohol, absorption of alcohol, and other factors."[279]

\* \* \*

"Q. Next, Mr. Clardy, assume that approximately one week after the shooting petitioner led the police in the wilderness to where the victim's body was located. Would that fact be reasonably consistent or inconsistent with Mr. Lang's having been impaired by alcohol at the time of the crime?

A. It is reasonably inconsistent.

Q. Because in fact alcohol ... impairs memory?

A. Yes."[280]

\* \* \*

"Q. Now, would you agree that petitioner recounts his version of the events in his October 1983 statement as well as during his earlier police interrogation— would you agree that he recounts the version of events in great detail.

A. Yes.

Q. In your opinion, would that reasonably be consistent or inconsistent with Mr. Lang's having been impaired at the time of the shooting?

A. Again, it addresses the issues of memory, so it causes concern. So it is more inconsistent than consistent with high degrees of intoxication."[281]

The court is cognizant that the standard for establishing prejudice is no more than "a probability sufficient to undermine confidence in the outcome.'" *Rhoades*, 596 F.3d at 1193 (quoting *Wig-*

*gins*, 539 U.S. at 534, 123 S.Ct. 2527). See also *Richter*, 578 F.3d at 952 (" '[i]t is clear ... that [petitioner] *need not* show that [counsel's] deficient conduct more likely than not altered the outcome in the case. This "preponderance" standard was explicitly rejected in *Strickland*,' " quoting *Sanders*, 21 F.3d at 1461 (emphasis original)).

In applying this standard, however, the court finds *Mayfield*, 270 F.3d 915, instructive. There, the Ninth Circuit considered a case in which petitioner alleged that trial counsel had been ineffective because he did not introduce, to rebut premeditation, evidence that petitioner chronically abused alcohol and PCP and expert testimony that as a result of petitioner's abuse and poorly regulated diabetes, he might have been experiencing a range of conditions the night of the crime, including reduced judgment, decreased impulse control, blurred vision, clumsiness, impaired thinking, nausea, and vomiting. *Id.* at 926. Without deciding whether counsel's performance was deficient, the Ninth Circuit held that the failure to introduce such evidence could not constitute prejudice given the wealth of inculpatory evidence, including evidence of motive, the murder weapon, a videotaped confession in which petitioner reenacted the crime, and two witnesses who told the police that petitioner stated that he was going to shoot the victim days before the crime. Trial counsel's task was complicated by the fact that petitioner had admitted to his attorney that he had gone to the victim's house on the night in question to kill her. *Id.* at 925–26. Balancing the weight of the inculpatory evidence and the excluded exculpatory evidence, the Ninth Circuit noted that

---

**279.** *Id.* at 66:23–25, 67:1–20. The time of the shooting is somewhat in dispute, but it is believed to have occurred between 5:30 and 7:00 p.m.

**280.** *Id.* at 69:13–19.

**281.** *Id.* at 71:1–12.

the case might "well have been one ... that was virtually indefensible." *Id.* at 926. The en banc panel also noted the brevity of the jury's deliberation—after a three-day trial, the jury took "scarcely more than two hours" to decide both guilt and the special circumstance of premeditation. It observed that this implied a "strength and unanimity of the jurors' belief in [the petitioner's] guilt" that would not have been broken by the presentation of mental-state evidence. *Id.* (citing *Murtishaw*, 255 F.3d at 974 (deeming the length of jury deliberations probative as to whether improper jury instructions prejudiced the defense)).

Here, while counsel was deficient in failing to investigate the effects of petitioner's alcohol consumption on the day of the killing, an investigation would have uncovered evidence that was mixed at best and that might, in certain ways, have impeached petitioner's character. Based on Clardy's cross-examination, it is clear there is only one piece of evidence supporting the conclusion that petitioner drank sufficient alcohol to impair his senses: petitioner's own recollection and reporting. Even had Stanley conducted an investigation in 1984, this fact would not have changed, since petitioner was not apprehended until days after the incident, and no contemporaneous alcohol testing was done. All objective factors—i.e., petitioner's ability to aim the gun, petitioner's deliberate removal of items from the victim's body, petitioner's ability to find the campground although he had been walking for more than an hour in the forest, petitioner's ability to drive a motor home out of the area via the narrow, steep canyon roads, the fact that an officer pulled petitioner over shortly thereafter and did not perceive him to be impaired, and the fact that petitioner was able to find the scene of the shooting a week later—all weigh against a finding that petitioner in fact consumed the amount of alcohol he asserts

he did, or acted with the level of impairment associated with imbibing eight or more beers. The presentation of testimony substantially similar to Clardy's—particularly his responses on cross-examination—combined with petitioner's testimony that he had consumed so many beers, might well have led the jury to conclude that petitioner was not being truthful about the amount of alcohol he had had to drink. Once impeached by his own expert petitioner might have been less believable with respect to the remainder of his testimony as well.

Because petitioner has not established a probability of prejudice sufficient to undermine confidence in the outcome of the guilt phase, he has not shown that he received ineffective assistance of counsel during that phase. Although petitioner need not demonstrate that Stanley's deficient investigation regarding alcohol consumption and intoxication evidence more than likely altered the outcome, petitioner must establish that because Stanley failed to conduct an adequate investigation, he did not receive a fair trial, i.e., a trial resulting in a verdict worthy of confidence. Given that expert testimony on the topic of alcohol intoxication might have harmed, rather than helped, petitioner's case, and at best would only resulted in the presentation of evidence both helpful and harmful to petitioner's case, petitioner has not met this burden. The court therefore denies petitioner's claim of ineffective assistance of counsel at the guilt phase of the trial.

### c. Cumulative Error

As noted, " 'prejudice may result from the cumulative impact of multiple deficiencies.' " *Boyde*, 404 F.3d at 1175 (quoting *Cooper*, 586 F.2d at 1333). Consequently, the court is required to consider each of petitioner's claims of ineffective assistance of counsel separately for purposes of determining whether trial coun-

sel's conduct fell below the appropriate standard of care, and then consider the areas of deficient performance both individually and cumulatively to determine whether they prejudiced petitioner. As noted, however, the court identified no appreciable prejudice resulting from Stanley's failure to provide adequate guidance and a proper referral question to the mental health experts given that voluminous additional information developed during this case has not led to evidence that an expert in 1984 would have provided a diagnosis or opinion concerning symptoms of a mental condition that would have helped petitioner's case. Similarly, the court found no appreciable prejudice resulting from Stanley's failure to investigate and present evidence of alcohol intoxication. Indeed, it concluded that such a presentation would more likely than not have been harmful inasmuch as it would have impeached petitioner's credibility as a witness. Consequently, the court concludes that, even cumulatively, the deficiencies in Stanley's performance at the guilt phase did not prejudice petitioner.

## C. Ineffective Assistance of Counsel During the Penalty Phase

### 1. Standard Governing Deficient Performance During the Penalty Phase [282]

█ *Strickland's* requirements apply to sentencing. See *Gardner v. Florida,*

430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). The Ninth Circuit has stated that "[t]here is no more important hearing in law or equity than the penalty phase of a capital trial." *Correll,* 539 F.3d at 946 (quoting *Gerlaugh v. Stewart,* 129 F.3d 1027, 1050 (9th Cir.1997) (Reinhardt, J., concurring and dissenting)). "As [the Ninth Circuit has] put it bluntly: 'Failure to present mitigating evidence at the penalty phase of a capital case constitutes ineffective assistance of counsel.'" *Summerlin v. Schriro,* 427 F.3d 623, 634 (9th Cir.2005) (en banc) (quoting *Bean v. Calderon,* 163 F.3d 1073, 1079 (9th Cir.1998)). "Preparing for the penalty phase of a capital trial is the equivalent of preparing for an entirely new trial, and trial counsel must treat it as such." *Sechrest v. Ignacio,* 549 F.3d 789, 816–817 (9th Cir.2008) (quoting *Turner v. Calderon,* 281 F.3d 851, 891 (9th Cir.2002)). See also *Correll,* 539 F.3d at 942 ("Because of the potential consequences of deficient performance during capital sentencing, we must be sure not to apply a more lenient standard of performance to the sentencing phase than we apply to the guilt phase of trial," citing *Mak v. Blodgett,* 970 F.2d 614, 619 (9th Cir. 1992)).[283]

The Ninth Circuit has "held that 'to perform effectively ... counsel must conduct sufficient preparation to be able to present[ ] and explain[ ] the significance of all the available [mitigating] evidence.'"

**282.** This discussion of the ineffective assistance standard that applies to the penalty phase is intended to supplement the general standard governing ineffective assistance of counsel claims outlined earlier in connection with the court's guilt phase analysis. Because federal courts, including the Ninth Circuit, have developed an extensive body of law specific to deficient performance at the penalty phase, the court sets forth those additional legal standards here.

**283.** The importance of mitigation evidence was discussed in *Allen v. Woodford,* 395 F.3d

979 (9th Cir.2005). There, the court stated that "[d]efense counsel's use of mitigation evidence to complete, deepen, or contextualize the picture of the defendant presented by the prosecution can be crucial to persuading jurors that the life of a capital defendant is worth saving." *Id.* at 1000 (citing Alex Kotlowitz, *In the Face of Death,* N.Y. TIMES, July 6, 2003, at 32–38, 46, 49 (attributing the decrease in the imposition of the death penalty in part to defense attorneys' increasing skill and resourcefulness in presenting mitigation evidence)).

*Belmontes v. Ayers,* 529 F.3d 834, 857 (9th Cir.2008) (quoting *Allen,* 395 F.3d at 1000 (quotation marks omitted) (alterations original)). See also *Hamilton,* 583 F.3d at 1113 ("Counsel [ ] has an obligation to present and explain to the jury all available mitigating evidence," citing *Correll,* 539 F.3d at 946); *Smith v. Stewart,* 189 F.3d 1004, 1008–09 (9th Cir.1999) ("The failure to present mitigating evidence during the penalty phase of a capital case, where there are no tactical considerations involved, constitutes deficient performance, since competent counsel would have made an effective case for mitigation").

As is true in evaluating ineffective assistance during the guilt phase, "we must avoid the temptation to second-guess [counsel's] performance or to indulge 'the distorting effects of hindsight.'" *Mayfield,* 270 F.3d at 927 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Nonetheless, it is not necessary to defer to counsel's choices at trial unless "those choices [were] made after counsel … conducted reasonable investigations or [made] a reasonable decision that makes particular investigations unnecessary." *Summerlin,* 427 F.3d at 630 (third alteration original) (internal quotation marks omitted).

 "When counsel have failed to fulfill their obligation to conduct a thorough investigation of the defendant's background, a failure to uncover and present voluminous mitigating evidence may be unreasonable." *Edwards,* 542 F.3d at 772 (citing *Wiggins,* 539 U.S. at 522–25, 123 S.Ct. 2527).[284] The "principal concern" is "not whether counsel should have presented a mitigation case." *Wiggins,* 539 U.S. at 522–23, 123 S.Ct. 2527. "Rather, [the] focus [must be] on whether the investigation supporting counsel's decision not to

introduce mitigating evidence of [defendant's] background *was itself reasonable.*" *Id.* at 523, 123 S.Ct. 2527 (emphasis original).

 The "[f]ailure to present mitigating evidence may be ineffective when counsel 'uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive.'" *Edwards,* 542 F.3d at 772 (quoting *Wiggins,* 539 U.S. at 525, 123 S.Ct. 2527). "However, when counsel's investigation discovers little that is helpful and much that is harmful, counsel may reasonably decide to forego presenting evidence of the defendant's background." *Id.* See also *Seidel v. Merkle,* 146 F.3d 750, 756 (9th Cir.1998) (holding that counsel had been ineffective because he "failed to conduct even a minimal investigation in order to make an informed decision" regarding his client's mental health defense).

Under certain circumstances, a defendant's history of mental problems and disturbed behavior is, on the whole, "highly aggravating in its own right and would open the door to even more damaging evidence." *Edwards,* 542 F.3d at 774. In *Edwards,* trial counsel decided not to present Edwards's troubled history to the jury during the penalty phase of a trial; instead, he presented an "aberrant act defense," calling twenty-five witnesses who testified that they were shocked Edwards could have committed such a crime. Evidence of Edwards's troubled history would have contradicted this defense. The court concluded that "[c]ounsel's decision not to present evidence of Edwards's troubled background to the penalty jury was a reasonable strategic decision." *Id.* See also *Wiggins,* 539 U.S. at 525, 123 S.Ct. 2527 (counsel may reasonably decide to forego

---

**284.** Conversely, "counsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence." *Babbitt v. Calderon,* 151 F.3d 1170, 1174 (9th Cir.1998) (quoting *Matthews v. Evatt,* 105 F.3d 907, 920 (4th Cir.1997)).

presentation of mitigating history that is double-edged).

By contrast in *Correll*, defendant was convicted under a law mandating the death penalty in the absence of mitigation evidence. Trial counsel believed that the trial judge would react unfavorably to double-edged evidence offered in mitigation, and so presented no mitigation case even though its absence made a death sentence inevitable. *Correll*, 539 F.3d at 981. The *Edwards* court later characterized trial counsel's error in *Correll* as follows: "Correll's counsel had everything to gain and nothing to lose by putting on a mitigation case, yet he did nothing." *Edwards*, 542 F.3d at 775. In *Belmontes*, 529 F.3d 834, the Ninth Circuit granted relief where trial counsel failed entirely to consult with mental health experts regarding the possibility of a mental defect defense at the penalty phase. It noted that although the record contained information about the defendant's background that might well have persuaded the jury against imposing the death penalty, counsel made no investigation and hence no informed decision re-

garding presentation of evidence concerning the issue. *Id.* at 859–61.

By contrast, in a decision reviewing a 1983 California trial, the Ninth Circuit held that counsel did not perform deficiently where he "thoroughly investigated" petitioner's history of disturbed behavior and mental problems, which did support a diagnosis of mental disorder, and determined not to present the information to the jury because it was "highly aggravating in its own right and would open the door to even more damaging evidence." *Edwards*, 542 F.3d at 775.[285]

■ Of course, the performance of counsel must be measured not only with respect to the investigation, but presentation of mitigation evidence at trial. "The failure to present mitigating evidence during the penalty phase of a capital case, where there are no tactical considerations involved, constitutes deficient performance, since competent counsel would have made an effective case for mitigation." *Correll*, 539 F.3d at 947 (quoting *Smith v. Stewart*, 189 F.3d 1004, 1008–09 (9th Cir. 1999)).[286] See also *Lambright v. Schriro*,

---

**285.** The Ninth Circuit recently reviewed scholarly articles regarding the double-edged nature of mental health evidence during the penalty phase. *Edwards*, 542 F.3d at 776 (citing John M. Fabian, *Death Penalty Mitigation and the Role of the Forensic Psychologist*, 27 LAW & PSYCHOL. REV. 73, 90 (2003) (evidence of mental illness may backfire because jurors may view it as aggravating; "in some cases, presenting evidence of ... mental disorders to create empathy in the jury might actually cause them worry and concern that the defendant is an 'irreparable monster' "); Ronald J. Tabak, *Executing People With Mental Disabilities: How We Can Mitigate An Aggravating Situation*, 25 ST. LOUIS U. PUB. L. REV. 283, 288–89 (2006) (juries often view severe mental illness as more aggravating than mitigating; "because of fear that juries will act in this manner, many defense attorneys decide not to present evidence of severe mental illness" at sentencing and counsel "who act in this manner are frequently held

not to have been ineffective")). On the other hand, the Ninth Circuit has "repeatedly held that counsel may render ineffective assistance if he is on notice that his client may be mentally impaired, yet fails to investigate his client's mental condition as a mitigating factor in a penalty phase hearing." *Correll*, 539 F.3d at 950 n. 3 (quoting *Caro*, 280 F.3d at 1254).

**286.** In *Correll*, the Ninth Circuit found deficient performance where trial counsel "put on no affirmative penalty phase defense whatsoever. He did not call a single witness to testify. He did not introduce any evidence.... Indeed, the only proactive effort that Correll's attorney made at sentencing was to write a short response to the presentence report. In that written submission, he included a list of mitigating arguments, but he did not support those arguments with any evidence, affidavits, or testimony." *Correll*, 539 F.3d at 946–47.

490 F.3d 1103, 1119 (9th Cir.2007) (holding that there was ineffective assistance where the mitigation evidence presented filled less than three pages of a double-spaced transcript and consisted of the testimony of a prison guard who testified only that petitioner had had no behavioral problems while incarcerated and been "respectful, courteous, and cooperative"); *Karis v. Calderon*, 283 F.3d 1117, 1135 (9th Cir.2002) (holding that counsel rendered ineffective assistance in a 1982 California trial by making a "meager presentation" for 48 minutes in which he elicited testimony that defendant had exhibited artistic and academic talent, that his mother had been divorced, and that defendant had saved his brother from drowning when he was a child); *Jackson v. Calderon*, 211 F.3d 1148, 1162 (9th Cir.2000) (holding that there had been ineffective assistance at a 1984 California trial where the defense presented the testimony of defendant's mother and wife that covered less than 30 pages of transcript and made no attempt to compile a social history and share with the jury the conditions in which he had been raised or lived, and crediting a *Strickland* expert's testimony that "a major part of competent counsel's duty at the penalty phase is to prepare and present such a history").

In *Lambright*, the Ninth Circuit noted that under "long-established Ninth Circuit law," trial counsel must "provide the sentencing court with a full presentation of the evidence that might lead the sentencer to spare his client's life [and this duty] is not discharged merely by conducting a limited investigation of these issues or by providing the sentencing court with a cursory or 'abbreviated' presentation of potentially mitigating factors." *Lambright*, 490 F.3d at 1120. See also *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir.2004) (reviewing a 1978 California trial, concluding that "counsel's duty ... is not discharged merely by presenting some limit-

ed evidence," and describing as "minimal" a mitigation case that consisted of the testimony of six witnesses covering "only approximately 50 pages in the transcript," including testimony regarding deprivations petitioner had suffered while growing up on a reservation and living in foster homes and a witness who provided a "chronology" of petitioner's life beginning with a severe beating at age six and continuing through various childhood placements in multiple state institutions).

 The presentation of a mitigation case also requires that counsel adequately argue that his client should be granted leniency. *Smith v. Stewart*, 140 F.3d 1263, 1269 (9th Cir.1998) (noting that "counsel presented no evidence at the penalty phase and virtually no argument" and concluding that even where little or no mitigation evidence is adduced because of defendant's reticence, "counsel could have at least presented some argument based upon the presentence report"); *Mayfield*, 270 F.3d at 928 (noting, as evidence of counsel's deficient performance, that he "waived his opening argument, his first opportunity to 'explain the significance' of the mitigating evidence to the jury"); *Ainsworth v. Woodford*, 268 F.3d 868, 872 (9th Cir.2001) (faulting counsel for waiving opening argument at sentencing and presenting a mitigation case that ran less than nine transcript pages).

 The decision not to present mitigation evidence is related to the duty to investigate as "[a] decision by counsel not to present mitigating evidence cannot be excused as a strategic decision unless it is supported by reasonable investigations." *Correll*, 539 F.3d at 948. See also *Wiggins*, 539 U.S. at 521, 123 S.Ct. 2527 (holding that a "tactical judgment not to present mitigating evidence and to pursue an alternative strategy instead" can only be reasonable if "the investigation supporting the[ ] decision not to introduce mitigating

evidence of [petitioner's] background was *itself reasonable*" (emphasis original)); *Lambright,* 490 F.3d at 1116 ("Similarly, a decision not to present a particular defense or not to offer particular mitigating evidence is unreasonable unless counsel has explored the issue sufficiently to discover the facts that might be relevant to his making an informed decision").

■ If counsel conducts a reasonable investigation into a mental state or other defense and uncovers no credible evidence, he is reasonable in not presenting the defense. *Williams,* 384 F.3d at 610. Counsel is also reasonable in not presenting evidence that is "largely cumulative" of testimony already presented. *Babbitt,* 151 F.3d at 1174 (trial counsel who presented expert testimony regarding posttraumatic stress disorder among Vietnam veterans was not unreasonable in failing to present the testimony of other Vietnam veterans to provide greater "emotional power" to the description of the Vietnam War).[287]

The Ninth Circuit recently explained the nature of ineffective assistance of counsel associated with the penalty phase:

"[A] common shorthand for [this] claim is 'ineffective assistance during the penalty phase.' If taken literally, this shorthand is misleading. The question is whether a defendant's counsel was ineffective with respect to the penalty imposed, irrespective of when during the proceedings the counsel was ineffective. It is often the case that a counsel's ineffectiveness is manifested during the penalty phase, as the common shorthand suggests. For example, defense counsel may have failed to discover a witness who would have testified favorably during the penalty phase. But ineffectiveness is often manifested earlier. For example, defense counsel may have failed to discover impeaching evidence that could have been used against an unfavorable witness who testified during the guilt phase, and which would have portrayed the defendant in a light that would have assisted him at the penalty phase." *Libberton v. Ryan,* 583 F.3d 1147, 1166 (9th Cir.2009).

See also *Daniels v. Woodford,* 428 F.3d 1181, 1210 (9th Cir.2005) ("The combination of counsel's guilt and penalty phase deficiencies ... den[ied] Daniels effective representation and prejudiced the outcome of his penalty phase trial"); *Moore v. Johnson,* 194 F.3d 586, 619 (5th Cir.1999) ("[C]ounsel's deficient performance, including counsel's performance during the guilt phase of Moore's trial, prejudiced the outcome of the punishment phase of Moore's trial").

Five recent Supreme Court opinions address an attorney's obligation to conduct an investigation in preparation for a sentencing hearing in a capital case. First, in *Terry Williams,* 529 U.S. at 396, 120 S.Ct. 1495, an attorney's "representation during the sentencing phase fell short of professional standards" where counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Id.* at 395, 120 S.Ct. 1495.[288]

---

**287.** In a similar vein, the Ninth Circuit concluded that trial counsel's "failure to consult with certain PTSD experts" identified by petitioner was not unreasonable because counsel had retained medical experts whom he thought were well qualified and who "did not state that they required the services of these additional experts." *Babbitt,* 151 F.3d at

1174. See also *Hendricks,* 70 F.3d at 1039 (holding that the Constitution does not "require an attorney, without interdisciplinary guidance, to provide a psychiatric expert with all information necessary to reach a mental health diagnosis").

**288.** The Supreme Court stated that had this investigation occurred "the jury would have

Second, in *Wiggins*, 539 U.S. 510, 123 S.Ct. 2527, defendant's claim "stem[med] from counsel's decision to limit the scope of the[ ] investigation into potential mitigating evidence." The state argued that the limited investigation "reflect[ed] a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternative strategy instead." *Id.* at 521, 123 S.Ct. 2527. The Court rejected this argument. The Court noted that Wiggins's counsel had investigated three sources of mitigation evidence: a psychologist's report, the presentence report, and social service records. *Id.* at 523, 123 S.Ct. 2527. Despite the fact that funds were available, the attorney did not order a report from a forensic social worker. *Id.* at 524, 123 S.Ct. 2527. The Court observed that in 1989, the ABA Guidelines required that investigations regarding mit-

igation evidence "comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* (quotation marks omitted). It concluded that "[t]he record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that the[ ] failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Id.* at 526, 123 S.Ct. 2527.[289] Given the fact that counsel did not conduct an investigation beyond the psychologist's report, presentence report, and social service records, the Court concluded that they "chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527–28, 123 S.Ct. 2527.[290]

learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody." *Id.* at 395, 120 S.Ct. 1495.

The Court noted, as regards prejudice, that "[o]f course, not all of the additional evidence was favorable to Williams." *Id.* at 396, 120 S.Ct. 1495. It concluded, however, that the state court's analysis of prejudice "was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation." *Id.* at 397–98, 120 S.Ct. 1495. It held that if all of the mitigation evidence had been presented to the jury, it "might well have influenced the jury's appraisal of [defendant's] moral culpability," and cautioned that "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Id.* at 398, 120 S.Ct. 1495.

289. The Court noted that on the eve of sentencing, counsel sought to bifurcate the proceeding into a retrial of guilt and a mitigation phase, and stated that they were prepared to come forward with mitigating evidence. *Id.* at 526, 123 S.Ct. 2527. Because this showed that they "never actually abandoned the possibility that they would present a mitigation defense," the Court stated, "they had every reason to develop the most powerful mitigation case possible." *Id.* The Court also faulted counsel's " 'shotgun' approach" in arguing the sentencing issue. *Id.*

290. Wiggins had been abused as a young child, including "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." *Id.* at 535. Wiggins was also homeless for a time, and had "diminished mental capacities." *Id.* The Court concluded that the "mitigating evidence counsel failed to discover and present in th[e] case [was] powerful," and the failure to discover it was prejudicial. *Id.* at 534, 123 S.Ct. 2527. "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at 537, 123 S.Ct. 2527.

Third, in *Rompilla*, 545 U.S. 374, 125 S.Ct. 2456, the Court described a defense attorney's pre-sentence investigation as one "in which defense counsel [did not] simply ignore[ ] their obligation to find mitigating evidence." *Id.* at 381, 125 S.Ct. 2456. Counsel interviewed some members of Rompilla's family and examined the reports of three mental health experts. They spoke with five members of Rompilla's family in a "detailed manner" in an attempt to unearth mitigating information. *Id.* Those family members, however, "didn't really feel as though they knew [the defendant] all that well." *Id.* at 382, 125 S.Ct. 2456. During post-conviction proceedings, new counsel pursued evidence that his trial attorneys had never investigated records of Rompilla's juvenile and adult incarcerations, including school records, or evidence of his history of alcohol abuse. *Id.* Rompilla's post-conviction attorneys also examined the court file on Rompilla's prior conviction, which his trial counsel had not done. *Id.* at 383, 125 S.Ct. 2456. This file contained sufficiently persuasive mitigating evidence that the Court held counsel's ineffective assistance had prejudiced Rompilla.[291]

Fourth, in *Van Hook*, 130 S.Ct. 13, a pre-AEDPA case like this one, the Court overturned the Sixth Circuit's grant of habeas relief to a murderer who had been sentenced to death. Defense counsel spoke with the defendant's mother, father, and aunt, and with a family friend; met with two expert witnesses; reviewed military and medical records; and considered enlisting a mitigation specialist.[292] *Id.* at 18. Defense counsel presented evidence of defendant's traumatic childhood experience and his impairment, including his consumption of drugs and alcohol, on the day of the crime. *Id.* The Court concluded that the scope of counsel's investigation was reasonable even though counsel did not interview all of defendant's relatives or the therapists who treated his parents. *Id.* at 19. It noted that "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties," and held that "given all the evidence they unearthed from those closest to Van Hook's upbringing and the experts who reviewed his history, it was not unreasonable for his

---

291. The file revealed that both Rompilla's parents were alcoholics who drank constantly, and that Rompilla's father "frequently beat Rompilla's mother." *Id.* at 391–92, 125 S.Ct. 2456. Rompilla's father abused him physically and verbally. *Id.* at 392, 125 S.Ct. 2456. Medical experts discovered that Rompilla had organic brain damage and had likely suffered from fetal alcohol syndrome. *Id.* The Court concluded that "[t]his evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test." *Id.* at 393, 125 S.Ct. 2456. Since the mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal of [Rompilla's] culpability," the Court remanded either for resentencing or for stipulation to a life sentence. *Id.* (quotation omitted and alteration in original).

292. Specifically, counsel "spoke nine times with [defendant's] mother (beginning within a week after the indictment), once with both parents together, twice with an aunt who lived with the family and often cared for Van Hook as a child, and three times with a family friend whom Van Hook visited immediately after the crime.... As for their expert witnesses, they were in touch with one more than a month before trial, and they met with the other for two hours a week before the trial court reached its verdict.... Moreover, after reviewing [defendant's] military history, they met with a representative of the Veterans Administration seven weeks before trial and attempted to obtain his medical records.... And they looked into enlisting a mitigation specialist when the trial was still five weeks away." *Van Hook*, 130 S.Ct. at 18.

counsel not to identify and interview every other living family member or every therapist who once treated his parents." *Id.*[293]

In *Porter v. McCollum,* — U.S. —, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (per curiam), another pre-AEDPA case, defendant represented himself during the guilt phase of his trial, but was represented by appointed counsel during the penalty phase. Penalty phase counsel was appointed[294] a little more than a month before the sentencing proceeding. It was the first time that lawyer had represented a defendant during a penalty-phase proceeding. The defendant and counsel had only one short meeting regarding the penalty phase. Counsel did not obtain any of the defendant's school, medical, or military service records or interview any members of his family. *Id.* at 453. He ignored these avenues for information despite the fact that court-ordered competency evaluations had revealed that the defendant had attended very few years of school, had served in the military and was injured in combat, and had reported his father's over-discipline. *Id.* As an explanation, counsel described the defendant as fatalistic and uncooperative following the guilty verdict and had instructed counsel not to speak with his ex-wife or son. *Id.* The Court found counsel failure to uncover and present any evidence of the defendant's "mental health or mental impairment, his family background, or his military service" to be deficient in that such decision "did not reflect reasonable professional judgment." *Id.* The defendant "may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation." *Id.* (emphasis original).[295] The Supreme Court reversed the decision of the

---

**293.** The Supreme Court concluded that the additional evidence would have "added nothing of value." *Id.* at 19. "Only two witnesses even arguably would have added new, relevant information: One of Van Hook's uncles noted that Van Hook's mother was temporarily committed to a psychiatric hospital, and Van Hook's stepsister mentioned that his father hit Van Hook frequently and tried to kill Van Hook's mother.... But the trial court had already heard-from Van Hook's mother herself-that she had been 'under psychiatric care' more than once.... And it was already aware that his father had a violent nature, had attacked Van Hook's mother, and had beaten Van Hook at least once." *Id.*

**294.** Penalty phase counsel had served as standby counsel during the guilt phase. *Id.* at 453.

**295.** The mitigation evidence uncovered in habeas proceedings revealed that the defendant routinely witness his father beat his mother, one time so severely that she had to go to the hospital and miscarried a pregnancy. By the defendant's siblings' account, the defendant was his father's favorite target for abuse, particularly when the defendant tried to protect his mother. On one occasion, defendant's father shot at him with a firearm for coming home late. Defendant attended classes for "slow learners" and left school at the age of 12 or 13. *Id.* at 449.

The defendant enlisted in the Army at age 17 and served in the Korean War. The defendant served in the 2d Division, which had advanced above the 38th parallel into China, when it was attacked by Chinese forces. The defendant sustained a gunshot wound to the leg during the advance, but remained with his unit. While the Eighth Army was withdrawing, the 2d Division was ordered to hold off the Chinese advance, enabling the bulk of the Eighth Army to live to fight another day. As one witness described, the unit " "went into position there in bitter cold night, terribly worn out, terribly weary, almost like zombies because we had been in constant-for five days we had been in constant contact with the enemy fighting our way to the rear, little or no sleep, little or no food, literally as I say zombies." On the last day, the unit engaged in "fierce hand-to-hand fight with the Chinese" and later that day received permission to withdraw, making Porter's regiment the last unit of the Eighth Army to withdraw. *Id.* at 449–50. Less than three months later, the defendant had fought in a second battle, whereupon his regiment was cut off from the rest of the Eighth Army and defended itself for two days and nights under constant fire. Defendant was again wounded and his com-

circuit court that had denied habeas relief, finding clearly deficient performance and prejudice.

Although not deciding on the question of deficient performance, *Wong v. Belmontes,* —— U.S. ——, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009) (per curiam), another pre-AEDPA case, is at least instructive on this question. In *Belmontes,* the Court considered the fact that the prosecution had substantial evidence that the defendant had committed a prior murder and was eager to introduce that evidence during the penalty phase. The Supreme Court described this evidence as "potentially devastating." *Id.* at 385.[296] Counsel for the defendant, therefore, "built his mitigation strategy around the overriding need to exclude" that evidence by ensuring that he introduced no evidence that would have allowed the prior murder to be introduced as rebuttal. *Id.*[297] The Court resolved the case by finding only that Belmontes could not establish prejudice because additional evidence, what the Court referred to as the "'more-evidence-is-better' approach" would have resulted in the introduction of "the strongest possible evidence in rebut-

tal"; evidence that not only had the defendant committed another murder in a "cold, calculated" manner, but has subsequently bragged about it. *Id.* at 389. Although the court is mindful that deficient performance and prejudice have been bifurcated in the present proceeding, and that *Belmontes* was decided on the prejudice prong, the court nonetheless finds the decision instructive, inasmuch as it reflects the sort of tactical decision an attorney must make when faced with the potentially devastating rebuttal evidence.

The Ninth Circuit sitting en banc recently emphasized the ABA standards in place at the time of petitioner's trial "recognized that counsel in capital cases had a duty to investigate thoroughly the client's background and the circumstances of the case in an effort to uncover mitigating evidence relevant to the penalty phase defense." *Pinholster,* 590 F.3d at 670. The same standards were quoted extensively in *Rompilla:*

> "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all

pany sustained greater than 50% casualties. *Id.*

On discharge from the Army, the defendant "suffered dreadful nightmares and would attempt to climb his bedroom walls with knives at night." *Id.* Defendant later developed a serious drinking problem and "began drinking so heavily that he would get into fights and not remember them at all." The defendant's expert noted this should have easily warranted a diagnosis of posttraumatic stress disorder. *Id.* at 453 & n. 4.

296. This evidence "was extensive, including eyewitness testimony, Belmontes' own admissions, and Belmontes' possession of the murder weapon and the same type of ammunition used to kill the victim." *Id.* at 385. In the prior murder, the police had found the victim in a secluded area, killed execution style, with a bullet to the back of the head. The authorities suspect Belmontes, but on the eve of trial the state's witnesses refused to cooperate.

The prosecution, concerned that it could not prove Belmontes guilty of murder beyond a reasonable doubt, although it could prove that the defendant possessed the gun used to murder the victim. The state, consequently, offered and Belmontes accepted a plea of nolo contendere to accessory after the fact to voluntary manslaughter. *Id.*

297. Counsel for the defendant had successfully brought a motion to exclude the evidence, but the trial court had indicated that the evidence would come in for rebuttal or impeachment if he opened the door. *Id.* at 386. At one point during trial, counsel for the defendant elicited testimony that the defendant "was not a violent person." *Id.* at 386. The trial court warned that it was going to have to allow the prosecution "to go into the whole background" if counsel for the defendant continued the line of questioning. He acquiesced and the trial court struck the testimony. *Id.*

avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." *Rompilla*, 545 U.S. at 387, 125 S.Ct. 2456 (quoting 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4–4.1 (2d ed.1982 Supp.)).

As the Ninth Circuit noted "[t]his duty has been unequivocally recognized by the Supreme Court," *Pinholster*, 590 F.3d at 670, which recently held that "[i]t is unquestioned that under the prevailing professional norms at the time of [petitioner's] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background,'" *Porter*, 130 S.Ct. at 453 (quoting *Terry Williams*, 529 U.S. at 396, 120 S.Ct. 1495, in turn citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4–4.1, commentary, 4–55 (2d ed.1980)). See also *Wiggins*, 539 U.S. at 524, 123 S.Ct. 2527 ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing.... Investigation is essential to fulfillment of these functions.") (quoting 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4–4.1, commentary, 4–55 (2d ed.1982)).

"At the time [petitioner] was sentenced, prevailing professional norms imposed a duty on counsel to adequately investigate, develop, and present mitigating evidence in capital sentencing proceedings." *Robinson v. Schriro*, 595 F.3d 1086, 1107 (9th Cir.2010) (citing *Summerlin*, 427 F.3d at 630; *Ainsworth v. Woodford*, 268 F.3d 868, 877 (9th Cir.2001) ("[Investigation] was as crucial in 1980 as it is today in order to assure individualized sentencing and the defendant's right to a fair and reliable capital penalty proceeding"); ABA STANDARDS FOR CRIMINAL JUSTICE 4–4.1 (2d ed.1980) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the penalty [phase]")). See also *Karis*, 283 F.3d at 1139 (reviewing a 1982 California trial, holding that counsel's performance was deficient where he was aware of evidence that the defendant was severely beaten as a child and yet failed to investigate the evidence further or to present it to the jury); *Silva*, 279 F.3d at 847 (reviewing a 1982 California trial, holding that counsel was deficient in failing to meet his "duty to determine what evidence was out there in mitigation in order to make an informed decision as to how to best represent his client");[298] *Ainsworth*, 268 F.3d at 877 ("[C]ounsel's deficient performance resulted from the failure to prepare and present mitigating evidence, interview witnesses, and investigate available documents and other available information. At the very least, counsel should have investigated and developed the background material and presented the information to the jurors so they could make an informed evaluation as to whether the death penalty should be imposed. This was as crucial in 1980 as it is today in order to assure individualized sentencing and the defendant's right to a fair and reliable capital penalty proceeding").[299]

---

**298.** In *Silva*, the Ninth Circuit in considering the standard of care for trial counsel in California in 1982, concluded that the ABA Guidelines applies and suggested that even in the fact of a client's objections, "a lawyer's duty to investigate is virtually absolute, regardless of the client's expressed wishes." *Silva*, 279 F.3d at 840.

**299.** Albeit a case arising in another jurisdiction, Arizona, at the same time as the present case, the court finds the Ninth Circuit's deci-

The duty to prepare for a penalty phase with evidence of social history and the defendant's mental state does "not arise from failure to employ novel or neoteric tactics." *Ainsworth*, 268 F.3d at 877 (quoting *Bean*, 163 F.3d at 1080). Rather, a failure to so prepare "result[s] from inadequacies in rudimentary trial preparation and presentation ... [for example,] conducting an adequate investigation, and preparing witnesses for trial testimony." *Id.* (quoting *Bean*, 163 F.3d at 1080). "These 'were not alien concepts in [1984], but were an integral thread in the fabric of constitutionally effective representation.'" *Id.* (quoting *Bean*, 163 F.3d at 1080). See also *Evans v. Lewis*, 855 F.2d 631, 636–37 (9th Cir.1988) (holding that defense counsel had duty to investigate and present evidence of mental health in 1979 capital sentencing proceeding); *Smith v. Stewart*, 189 F.3d 1004, 1009–1014 (9th Cir.1999) (holding that defense counsel had duty to present evidence of defendant's background and mental illness in 1979 capital resentencing hearing). The Ninth Circuit in *Ainsworth* emphasized that the duty to "prepare and present mitigating evidence, interview witnesses, ... investigate available documents and other available information, ... investigate[ ] and develop[ ] the background material and present[ ] the information to the jurors so they could make an informed evaluation as to whether the death penalty should be imposed ... was as crucial in 1980 as it is today in order to assure individualized sentencing and the defendant's right to a fair and reliable capital penalty proceeding." *Ainsworth*, 268 F.3d at 877.[300]

---

sion in *Correll* at least informative. In that case, trial counsel had met with some witnesses during the trial phase who could have been relevant for a mitigation investigation. The Ninth Circuit noted, however, that trial counsel had

> "met only one with Correll's father, sister, and brother, 'around the kitchen table at the same time,' and probably spent only '[a] couple hours' with them. Furthermore, Correll's counsel admitted that he interviewed witnesses only during the guilt phase, not during the sentencing phase. Although the attorney testified that he was looking for mitigation information as well as exculpatory information during those pre-trial interviews, he failed to ask any direct questions or to conduct any direct investigation related to the mitigating factors that are now at issue. When counsel was asked at the evidentiary hearing whether he had questioned the interviewees about Correll's drug abuse, head injury, psychiatric history, or family dysfunction, counsel testified that he asked no such specific questions but, rather, asked the interviewees simply to 'tell [him] anything [they could] tell [him] that would help.' As a result, counsel's interviews were substantively worthless. Thus, his failure to gather mitigating information did not result from its unavailability; it resulted from counsel's

complete failure to ask any relevant questions." *Correll*, 539 F.3d at 945.

The court rejected the argument that trial counsel had a reasonable mitigation strategy in that he could show that petitioner was a "good person" who had "done good deeds," finding it "unreasonably constricted" and "anemic" in light of the fact that "counsel's investigative efforts were unreasonably weak." *Id.* at 945–46. The court notes that although *Correll* is an Arizona case, it has recently been cited at great length in establishing the standard of care in contemporaneous California trials. *Edwards*, 542 F.3d at 775 (1983 California trial).

**300.** One unresolved issue in this circuit is whether trial counsel's "failure to associate co-counsel alone suffices to render counsel's performance deficient," an issue explicitly left open in *Hamilton*, 583 F.3d at 1114 n. 6. The court notes that Ninth Circuit has at least considered this as a factor in the mix of issues contributing to a finding of deficient performance in California cases following the California Supreme Court's decision in *Keenan v. Superior Court*, 31 Cal.3d 424, 431–32, 180 Cal.Rptr. 489, 640 P.2d 108 (1982). *Keenan* held that appointment of a second attorney may be necessary in capital cases involving complex issues. See *Mayfield*, 270 F.3d at 927 (noting that counsel was deficient in part for failure to associate co-counsel to assist in

Petitioner's "history of suffering violent physical abuse, as well as the family history of sexual abuse he had known about growing up, is the sort of evidence that could [have] persuade[d] a jury to be lenient." *Boyde,* 404 F.3d at 1176. "Because the defendant's background is so important in the sentencing process, '[i]t is imperative that all relevant mitigation information be unearthed for consideration'"; "failure to do so [falls] far short of professional standards." *Id.* at 1177 (quoting *Douglas,* 316 F.3d at 1088). See also *id.* at 1176 ("Because of the importance of background in convincing a jury to spare a defendant's life, the Supreme Court has recognized that it is ineffective for counsel to fail to present such evidence to the jury," citing *Terry Williams,* 529 U.S. at 390–99, 120 S.Ct. 1495).

## 2. Trial Counsel's Investigation and Presentation of Penalty–Phase Evidence

### a. Penalty Phase Strategy [301]

In his 1987 declaration submitted to the California Supreme Court, Stanley stated that he intended "to paint [a] biographical portrait" of petitioner during the penalty phase by calling family members and friends as witnesses.[302] The biographical portrait Stanley wished to present would have included some detail regarding petitioner's tumultuous upbringing, his separation from his mother, his emotional separation from Carol Dewey's family, his ambivalent relationship with his father, his distance from Hilda Lang's family, his eventual childhood homelessness, and his resulting petty criminality.[303]

> "Thus, Ken Lang during these years showed the classic pattern of rebellion from family and of relatively minor criminal ('delinquent' had his chronological age been a bit lower) behavior demonstrated by a young person who is the product of a broken home and generally unstable early environment, including rejection by parents and psychological abuse in various forms. Moreover, he was not rescued from these disadvantages, as are some young people, by exceptional skills in sports or schoolwork or by facility in the formation of friendships.

> * * *

> In short, substantial evidence was available to show that Ken Lang was not the 'little gangster' suggested by the prose-

the defense). In recommendations that took effect in 1985, the ABA urged use of a second counsel in defending capital cases. *Allen,* 395 F.3d at 998. Considering the standard applicable in 1982, the same year *Keenan* was decided, the Ninth Circuit held in *Allen* that use of second counsel was not the prevailing standard in 1982 unless the first lawyer "was or should have been aware at the outset that he could not try th[e] capital case on his own." *Id.* Moreover, the Ninth Circuit and the Supreme Court have recognized that "an ineffective assistance claim cannot be based solely on counsel's inexperience." *Ortiz v. Stewart,* 149 F.3d 923, 933 (9th Cir.1998) (citing *United States v. Cronic,* 466 U.S. 648, 665, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) ("Every experienced criminal defense attorney once tried his first criminal case.... The character of a particular lawyer's experience may shed light in an evaluation of his actual

performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation")). See also *LaGrand v. Stewart,* 133 F.3d 1253, 1275 (9th Cir.1998) ("In considering a claim of ineffective assistance of counsel, it is not the experience of the attorney that is evaluated, but rather, his performance").

**301.** The court notes that no investigation was conducted following the guilt verdict, and as a consequence the section describing the investigation included as part of the guilt-phase analysis also describes the penalty-phase investigation.

**302.** Declaration of David Y. Stanley ("1987 Stanley Decl."), Docket No. 338 (June 11, 1987).

**303.** *Id.* at 1–3.

cutor, but rather was a young man struggling to establish a secure sense of self and to find a positive position in society. He was not an inherently evil person; on the contrary, he could make friends under the right circumstances, and he had shown he was capable of earning wages for self-support." [304]

Stanley reported in his 1987 declaration, however, petitioner objected to the presentation of a mitigation case. He stated:

"This kind of evidence was withheld upon the explicit direction of Mr. Lang. Between the guilt and penalty phases I met with Mr. Lang on a daily basis, often accompanied by our defense investigator. The investigator and I both had, and still have, a close and mutually trusting relationship with Ken Lang. We implored him to permit the presentation of biographical evidence at the penalty phase, and explained the reasons the presentation of such evidence is extremely important. Indeed, I told him that with the presentation of this kind of evidence, the jury was not likely to return a death verdict, a belief I hold to this day. Ken Lang was steadfast, however, in his decision that this evidence should not be presented. In fact, he was so firm in his decision that I decided against seeking a continuance so as to continue trying to persuade him; I knew him well and I did not believe that within a few days or weeks of limbo he would feel differently. Hence, we proceeded upon virtually no evidence at penalty phase. The slight amount of evidence reflected the only compromise with which Mr. Lang agreed.... I ... tried to persuade him to share my view, but for the first time in our relationship I was unable to persuade him of the wisdom of a proposed course of action.

At that point in the case, I faced a most difficult dilemma. As Ken Lang's friend, with the mutual trust and respect we had developed through many hours spent together during a difficult time, I felt that he had a right to make a choice of the quality of whatever life he had remaining. I felt that to present this evidence over his objection likely would win him life in prison but to him as he felt at that time apparently it would have been a life bereft of his sense of human dignity. Out of respect for his right to make the choice of the nature and quality of his life, I deferred to his decision and the evidence therefore was not presented." [305]

In his 2002 deposition testimony, however, Stanley told a somewhat different story. He stated:

"I wouldn't use the term 'direct.' I mean we had the kind of relationship where we discussed things openly and honestly with each other, and I wouldn't say that he directed me. He—he told me clearly his preference was not to have family testify on his behalf or for him to testify on his behalf at penalty, so he expressed his preference, but I would not say that he directed me not to do it." [306]

\* \* \*

"I think we both understood that I made the decision [not to put on a mitigation case] as far as you know. I mean he's— I don't think he's ever characterized it to me as a decision that he dictated. I mean it was a position that he took, but I think he realized that ultimately it was my decision." [307]

\* \* \*

"Probably a poor choice of words if you read that to mean—to imply that it was

**304.** *Id.* at 3.

**305.** Stanley 6/11/87 Decl. at 3–4.

**306.** Stanley Depo. at 38:5–12.

**307.** *Id.* at 44:19–24.

his decision. I mean it was his input that he did not want that kind of evidence presented." [308]

\* \* \*

"I believe I used that term [decision], but I did not use it in the—the technical sense of the decision whether or not to call the witness, but rather I was referring to—to his decision that he did not want that evidence called, and—and I can see the ambiguity now. I did not intend that ambiguity as—as I wrote it. . . . I deferred to his decision in the moral sense but not in the legal sense." [309]

In this proceeding, Stanley, Ballew, and petitioner have presented different descriptions of what transpired in the days following the guilt-phase verdict. Stanley asserted that he met with petitioner on a daily basis between the guilt phase verdict, which was returned on October 15, 1984,[310] and the commencement of the penalty phase on October 18, 1984.[311] Stanley reported that he and petitioner had had some conversation regarding the penalty phase prior to start of the guilt phase, but could not recall when this discussion occurred or what was communicated.[312] When asked if petitioner understood prior to the guilt phase that a penalty phase was possible, Stanley could not answer yes or no.[313] He also could not say if, prior to the guilt phase, he and petitioner had spoken

---

**308.** *Id.* at 135:20–23.

**309.** Stanley Depo. at 325:21–25, 322:1–8.

**310.** Trial Transcript at 2553–60.

**311.** *Id.* at 2570–2636.

**312.** Stanley Depo. at 107:10–24 ("I don't know specifically [what I told Lang about the penalty phase prior to the guilt phase], but I know that I was aware from the very beginning that we faced a possible penalty phase and [that was] something that we talked about from time to time. I can't tell you specific times, but I'm certain we did that. I can also say that I believe he was much more focused on the guilt phase, you know, I think he heard what I was saying about penalty phase, but he was very focused on guilt phase and very desirous of having a verdict of something less than first degree murder with special circumstances, so it may be that, you know, his own internal emphasis was on [the] guilt phase, but I'm confident that we discussed [the] penalty phase as a potential and the basic process of a penalty phase before a guilt phase"); 122:4–8 ("[T]here was a fluid thought process about who might b[e] a better witness than who else and that sort of thing, because there were mixed messages from some of them, but certainly many of them saw some positive qualities in him"); Lang Decl., ¶ 114 ("Early on, Mr. Stanley told me that he did not think I would get first degree murder. I knew that there could be a second phase to decide the death penalty. I knew what I had done was manslaughter, not first degree mur- der. We never talked about evidence or witnesses to put on at the penalty [phase] during trial preparation, except Mr. Stanley told me during one of our first conversations that it was something that might happen. We never discussed possible witnesses before the guilt phase verdict. We never discussed what exactly we would be trying to prove at a penalty phase. We never discussed the instructions that would be given to the jury. He never explained how 'aggravating' and mitigating [circumstances] would be weighed. I had no idea, before the guilt phase, that my family could be called to testify on my behalf, or that they would want to. I had no idea that a professional in mental health issues could have been retained to present a life story"). Petitioner's recollection appears to be corroborated to some extent by the recording of August 30, 1983. During that meeting, Stanley advised petitioner, in the vaguest terms, that a penalty phase might occur, but did not describe the sort of investigation that would be required, the witnesses who might be called, or the consequences of failure to present a mitigation case. Respondent objects to the paragraph of petitioner's declaration cited in this note as irrelevant. Because the extent to which Stanley explained the consequences of foregoing a mitigation case is highly relevant, this objection is overruled.

**313.** Stanley Depo. at 111:11–22 ("Q. [] Did it appear to you that Lang understood prior to the guilt phase that the death penalty was a real possibility in this case? [][A.] I guess I

about specific witnesses who might testify at the penalty phase. Petitioner asserts that although he knew early on that a penalty phase was possible, he and Stanley did not discuss evidence or witnesses until after the conclusion of the guilt phase.

Only petitioner has provided anything approaching a detailed recollection of the two meetings he had with Stanley between the guilt phase and the penalty phase. Ballew could not recall whether she had been at one or both meetings.[314] Petitioner recalls that there was a one-to two-hour meeting following the guilt phase in which approximately thirty minutes to an hour was devoted to the presentation of mitigation evidence. He reports that Stanley and Ballew were both present at this first

meeting.[315] Petitioner also recalls specifically that Ballew was not present at the second meeting, during which Stanley proposed having a prison guard testify on petitioner's behalf.[316]

At his deposition, Stanley reported that preparation for the penalty phase "got more focused in the two meetings after the guilt verdict was returned ...—much more focused because by then he was as focused as I was on the fact that there was going to be a penalty phase, so we—we talked then." [317] Although Stanley asserts he has a "clearer recollection of the discussions during that time frame," he could not recall if during the two days between the guilt phase and the penalty phase, he proposed calling one or more witnesses.[318]

would have a two-level answer to that. I'm sure that he was told that. To what extent he really internalized it, I can't—I can't say. I mean it may be that he never really in his own mind faced up to that").

**314.** Ballew Depo. at 173:18–25, 174:1–9.

**315.** Lang Depo. at 21:22–25, 22:1–15.

**316.** Lang Depo. at 23:9–15 ("I remember when David was asking me about the testimony [of] the jailhouse guard ... [and] I remember that he was the only one there with me at that time. The conversations about my father and my grandmother testifying, I remember Dorothy always being there at that time"). Petitioner's recollection is consistent with the surprise Ballew expressed upon learning that the prison guard was going to testify. (2002 Ballew Decl., ¶ 21 ("I was surprised when Mr. Stanley brought in a guard from the Santa Barbara County Jail.... This guard had not had any real contact with Mr. Lang.... Mr. Stanley never discussed the possibility of this person testifying with me and I never interviewed this sheriff's deputy").) It is also consistent with billing records that show that Ballew recorded time for a meeting on October 16, 1984, but not October 17, 1984. (Ballew Depo. at 174:1–9.) That petitioner provided specific and accurate recollections of these meetings at his deposition supports the credibility of his testimony generally. This is particularly true given that

Ballew's testimony is generally more favorable than Stanley's; thus, petitioner might have had an incentive to recall that Ballew was present at all of the meetings.

**317.** Stanley Depo. at 122:4–8.

**318.** Stanley Depo. at 128:19–25, 129:1–4 ("Q.... [W]ere you proposing only one witness? A. You know, I really can't remember. I know when it got down to what I earlier called crunch time and I was thinking of a minimalist approach, the number one person on my list was [petitioner's] grandmother. The note that I made to the file said any—that he didn't want to testify and he didn't want any family members to testify, which suggests to me that we talked about more than one, but I honestly cannot say if, you know, we talked about person number 2, person 3, or whatever. I—I know that I emphasized [his] grandmother at that point"); *id.* at 344:12–22 ("Q.... When you just said that he didn't want anybody, is it clear in your mind that you were focused on the grandmother and that's the only person you can say with any certainty was discussed? A. There's a decreasing level of clarity, and that's right, I—I clearly remember talking about the grandmother. I don't specifically remember who else we did or might have talked about, so there's diminishing clarity down—down that line. My clear recollection is talking about the grandmother").

Ballew, for her part, reports that petitioner was devastated following the guilt verdict.[319] She maintains that she first heard Stanley propose having petitioner's grandmother testify during the penalty phase in the meetings following the guilt phase verdict.[320] She also reports that Stanley did not suggest having any other witness testify, "either family, friends or expert witnesses."[321] Petitioner offers specific reasons for not wanting his grandmother to testify:

"[I told Stanley] [t]hat I had received in the jail an investigative report from the District Attorney's office that they had gone up there to investigate her and asked her a series of questions and she was agitated and extremely upset and that she was elderly at the time, and I told David that I was, you know, concerned with the situation of my grandmother being put through th[is] type of questioning, upsetting [her] ... finding bad things in my life and questioning my grandmother about [them] [-] tell us what bad things Kenny has done in his life, and that was my understanding. Q. Did you expect that one question by Mr.

---

**319.** 2002 Ballew Decl., ¶ 14 ("When I saw him in the Santa Barbara County Jail after the verdict, he was disoriented"). Petitioner also reports that he was in "total shock" after the guilt phase verdict. (Lang Decl., ¶ 115 ("When the first degree verdict was entered, I went into total shock. Mr. Stanley and the investigator Dorothy Ballew talked to me then about the penalty phase, but I had no real understanding what they were talking about. I didn't understand that if we put on no witnesses, I would be conceding the death sentence. I definitely did not want to have the death penalty imposed on me and I said that to both Mr. Stanley and Ms. Ballew. I was (and am) just as terrified as anyone would be to be strapped to a board and injected with poison").

Respondent objects to Ballew's statements as lacking foundation. For lay opinion testimony to be admissible, the opinion must be (1) "rationally based on the perception of the witness" and (2) must be helpful in acquiring a "clear understanding of the witness' testimony or the determination of a fact in issue." FED.R.EVID. 701. Given that Ballew personally observed petitioner at the jail, her observation that he was disoriented is rationally based on her perceptions. Petitioner's disorientation, moreover, is related to a fact in issue, i.e., whether petitioner made an informed choice to forego the presentation of mitigation evidence.

Respondent also objects to petitioner's statement that he did not understand the risk of a death penalty verdict if mitigation evidence were not presented as irrelevant. Because the extent to which petitioner understood or was made to understand the consequences of foregoing a meaningful mit-

igation case is highly relevant in assessing whether petitioner made a voluntary, knowing, and intelligent decision to forego the presentation of mitigation evidence, this objection is overruled.

**320.** Ballew Depo. at 169:18–25 ("[T]his was the first time I heard [Stanley talk about bringing the grandmother to testify.... I don't remember Mr. Lang ever talking to me about David suggesting that").

**321.** 2002 Ballew Decl., ¶ 15 ("It was during this period of Mr. Lang's disorientation that Mr. Stanley suggested for the first time to Mr. Lang that Mr. Lang's grandmother testify at the penalty phase. No other witnesses were suggested, either family, friends or expert witnesses. Mr. Stanley left the decision about calling Mr. Lang's grandmother to Mr. Lang. Mr. Lang decided not to have his grandmother testify. Mr. Lang was not capable at this time of making a rational decision about who should testify and whether or not there should be a penalty phase"). Respondent objects to this paragraph as lacking foundation. As respects Ballew's comment that petitioner was disoriented, the court overrules the objection for the reason stated in note 306. As respects Ballew's assertion that this was the "first time" the subject of the grandmother's testimony had been raised, the court views her statement in the context of Stanley's assertion that he discussed all relevant decisions and conversations with Ballew. The fact that Stanley might have discussed family member testimony with petitioner prior to this time and failed to advise Ballew goes to the weight of this testimony rather than its admissibility.

Stanley of your grandmother would describe the good things you had done in your life? A. That wasn't really explained to me, no." [322]

Petitioner is the only witness that recalls with specificity Stanley suggesting a second witness.

"Mr. Stanley then suggested that, instead, we could call my father, who had been down for a few days of the trial. I said I didn't want Mr. Stanley to call my father, because I thought my father was angry at me. I had a lot of different emotions when it came to my father. I felt like if he hadn't abandoned me, maybe none of this would have happened, maybe I would have had a chance at a real life.... Also, I knew that it cost a lot of money to come down from Portland, and that he had already driven down once. I didn't think he could get back again. I didn't know the state of

California would pay for him to fly down. Mostly, though, I didn't understand what it was he would be testifying about." [323]

\* .\* \*

"He had asked me why I had reservations about my father being down there. I explained to him basically my feelings that, you know, I didn't want to see my father—I was embarrassed to be in this situation and that I had previously had some unresolved issues with my father that we had not settled yet." [324]

Stanley's best recollection is that petitioner objected to calling any witness to testify to his background, not just his grandmother.[325] Petitioner disputes this:

"At that point, I was just waiting for Mr. Stanley to suggest something or someone else. Then, the next day, at the last meeting between Mr. Stanley and me, Mr. Stanley suggested a prison guard.

---

**322.** Lang Depo. at 31:18–25, 32:1–20.

**323.** Lang Decl., ¶ 118. Respondent objects to this paragraph as irrelevant. Petitioner's reasons for rejecting certain witnesses and his statements to Stanley regarding those decisions and that reasoning are probative in assessing whether Stanley was justified in acceding to petitioner's request that the witnesses not be called and in not suggesting additional witnesses. See also Lang Depo. at 24:11–25, 25:1–23 ("Q. How about in the meeting ... that followed the guilt phase? A. We concentrated on the importance of a couple of those witnesses, my father and my grandmother testifying. Q. Did you understand that your father would be considered a mitigating witness? A. No. Not at all. Q. What was your understanding of what your father's testimony would constitute? A. Just background. What kind of a guy Ken is and that's it. Q. Well, what's your understanding of the word 'mitigating'? A. At the time I didn't really have a very clear concept of mitigating and aggravating circumstances. I tired to look it up in the dictionary. I didn't understand it in the context of the courtroom. Q. Because Mr. Stanley never explained it to you—A. No. Q.—correct? A. Not at all. Q.

What did you understand the purpose of your father testifying to be? A. I really didn't know. David explained that 'we just want to show the jury that you do have a past.' He talked to me mostly about that").

**324.** Lang Depo. at 35:14–19. Petitioner is the only witness who asserts that Stanley in fact proposed a second mitigation witness. Given that Stanley's suggestion of two witnesses, rather than one, is somewhat detrimental to petitioner's position, petitioner's recollection in this regard supports a finding that his testimony is generally credible.

**325.** Stanley Depo. at 139:20–25, 140:1–2 ("Q. Did he object only to [evidence about his background] coming from his grandmother or did he object to anyone providing the jury with this type of evidence. A. My best recollection is that he did not want anybody providing that kind of evidence. The—the reason that I tend to emphasize the grandmother in talking about it is that that was my number one choice for a witness. But, no, he didn't—did not simply say, 'I don't want my grandmother.' My best recollection is that he said, 'I do not want this kind of evidence presented' ").

I agreed because if this was the best we could do, I felt, then that was the way it was. I was too upset to think clearly at the time. . . . But, Mr. Stanley did not suggest any witnesses besides me, my father, my grandmother and the prison guard." [326]

Petitioner, Stanley and Ballew also present starkly divergent testimony as to whether Stanley and Ballew "implored" petitioner to allow the presentation of mitigation evidence. In his 1987 declaration, Stanley stated that "[w]e [Stanley and Ballew] implored him to permit the presentation of biographical evidence at the penalty phase, and explained the reasons the presentation of such evidence [was] extremely important [and] told him that with the presentation of this kind of evidence, the jury was not likely to return a death verdict." Stanley reported, however, that petitioner was "steadfast" in his decision that background evidence not be presented. [327]

At his deposition, by contrast, Stanley testified:

"Q. Would you say that you implored him to present the evidence?

\* \* \*

A. Well, yeah. I mean adjectives and adverbs are all over the chart. What I—what I told him was that if we did not present some of this available evidence that there was a very real risk there would be a death verdict, and if we did present it,

I thought there was a pretty good chance for a more favorable outcome, and—and I said that forcefully. . . .

Q. And what do you mean by 'forcefully'?

A. Very directly and without hesitation." [328]

Asked about the 1987 declaration, Stanley stated that "although [the 1987 declaration] was close in time to my recollection, [ ] I think I was more of the implorer than Dorothy Ballew was. . . . My recollection is

---

**326.** Lang Decl., ¶¶ 119, 124. See also *id.*, ¶ 120 ("I did not know we could have called Suzi Rosenthal and Mr. Stanley did not suggest that we call Suzi Rosenthal. If he had, I would have agreed to have her testify. I feel very close to Suzi and I know she has suffered a lot from the way we were brought up"); *id.*, ¶ 121 ("I did not know we could call my half-siblings, Tami, Tony or Tracy Lang or Bobby Cavitt. If he had [told me this], I would have agreed because I knew that my half brothers and sister did not hate me and would not want me to die. And again, I knew we had suffered together growing up"); *id.*, ¶ 122 ("I did not know we could call my mother. Mr. Stanley did not suggest that we call my mother. I would have agreed for my mother to come. I always believed that she loved me in her way and I knew that she would have wanted to come and help me if she could"); *id.*, ¶ 123 ("I did not know we could call my aunt, Dyanne Van Zandt. Mr. Stanley never suggested her as a possible witness. I would have agreed to have her come down, if she would do it. I had no reason not to have her come"); *id.*, ¶ 124 ("In fact, as to any other family member, I would have agreed for them

to testify. But, Mr. Stanley did not suggest any witnesses besides me, my father, my grandmother and the prison guard"); *id.*, ¶ 125 ("I did not know we could have called a mental health professional or a social historian or other qualified expert witness to talk to my family and to testify about my life. I wish I had known that. This would have been a good way to get the information from my grandmother without having to distress her by making her come all the way to California to testify in front of people at the trial. I would have agreed to that but Mr. Stanley did not suggest it"). Respondent objects to the relevance of these paragraphs. Petitioner's statements that he would have allowed certain witnesses to testify is relevant to prejudice rather than deficient performance. In this phase of the proceedings, therefore, the court considers only petitioner's statements that Stanley did not suggest calling these additional witnesses.

**327.** Stanley 6/11/87 Decl. at 3–4.

**328.** Stanley Depo. at 136:5–14.

that, for reasons I cannot explain today or then, she seemed less concerned." [329] At her deposition, Ballew confirmed that she did not implore petitioner and contradicted Stanley's statement that he explained to petitioner the importance of presenting mitigation evidence:

"Q. Did you personally implore Mr. Lang to permit the presentation of biographical evidence at the penalty phase?

A. No.

Q. Why not?

A. There was no plan for a penalty phase. He wasn't told anything about—it wasn't—I was never present when anything was ever explained to Ken Lang about the importance of information being presented one way or another." [330]

Ballew was questioned regarding Stanley's statement that she and Stanley had implored petitioner to permit the introduction of mitigation evidence:

"Q. .... Is he not being truthful here?

A. He's not being truthful here.

Q. Have you ever known Mr. Stanley to lie?

A. If this is what he says, I do now know him to lie." [331]

Petitioner's account also differs from Stanley's. At his deposition, petitioner stated that Stanley focused on the importance of two potential witnesses—his father and grandmother— [332] and that Stanley questioned him regarding the nature of petitioner's concerns about having these witnesses testify.[333]

---

329. Stanley Depo. at 136:23–25., 137:4–5 173

330. Ballew Depo. at 141:2–11.

331. Ballew Depo. at 140:17–21.

332. Lang Depo. at 24:11–25, 25:1–23 ("Q. Prior to the start of the penalty phase did Mr. Stanley tell you it was important to present mitigating evidence in the penalty phase? A. Prior to the penalty phase? Q. Yes. A. No. Q. How about in the meeting that you've been referring to, the meeting that followed the guilt phase? A. We concentrated on the importance of a couple of those witnesses, my father and my grandmother testifying. Q. Did you understand that your father would be considered a mitigating witness? A. No. Not at all. Q. What was your understanding of what your father's testimony would constitute? A. Just background. What kind of a guy Ken is and that's it. Q. Well, what's your understanding of the word 'mitigating'? A. At the time I didn't really have a very clear concept of mitigating and aggravating circumstances. I tried to look it up in the dictionary. I didn't understand it in the context of the courtroom. Q. Because Mr. Stanley never explained it to you—A. No. Q.—correct? A. Not at all. Q. What did you understand the purpose of your father testifying to be? A. I really didn't know. David explained that 'we just want to show the jury that you do have a past.' He talked to me mostly about that").

333. Lang Depo. at 34:3–18 ("He basically wanted to hear why I had these concerns. He listened. He didn't voice any other thing besides repeatedly asking me why I felt so strongly about this and—Q. Who made the decision as to whether she would testify? A. Well, that was Mr. Stanley. Q. Were you under the impression at that time—I take it was Mr. Stanley's decision to make and not yours? A. Oh, most definitely"); id. at 35:14–19 ("He had asked me why I had reservations about my father being down there. I explained to him basically my feelings that, you know, I didn't want to see my father—I was embarrassed to be in this situation and that I had previously had some unresolved issues with my father that we had not settled yet"); id. at 38:13–17 ("Q. Did he attempt to persuade you to have her testify? A. No. He was just—he was interested in how I felt, why I felt and just asked me those questions"); id. at 55:11–15 ("Q. Did Mr. Stanley ask you to allow him to present evidence of your background in the penalty phase? A. He just never asked my permission for anything"); id. at 55:23–25, 56:1–5 ("Q. Did Mr. Stanley tell you that if the jury heard evidence of your background that they would be more sympathetic to you? A. I don't recall Mr. Stanley telling me that. The only time I really remember that is—is the scales in the courtroom [during Scott's closing penalty phase closing argument] and that being written up

Stanley, Ballew and petitioner agree that petitioner was never given a clear understanding of the nature of a penalty proceeding. Petitioner asserts that he did not understand that if witnesses were not called to present mitigation evidence, that evidence would not be before the jury. He contends that he believed mitigation evidence could be presented to the jury through Stanley's closing argument.[334] It is also clear that petitioner did not have an understanding of the balancing process the jury was required to undertake. Petitioner's jury received the following instruction at the penalty phase:

"If you agree unanimously and beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, you *shall impose* a sentence of death."[335]

The parties stipulated that the prosecutor would introduce evidence of petitioner's prior convictions; these constituted aggravating circumstances. Under the instruction given to the jury, therefore, unless petitioner presented evidence of mitigating circumstances that outweighed the convictions, a verdict of death was certain. This reality was never explained to petitioner.[336] Rather, Stanley's recollection is that:

on a board and that's the only real memory I have of sympathy"); *id.* at 58:7–10 ("He appeared very co[n]templative. He had asked me questions and then he was thinking things. He appeared to be thinking things over in his head. He never shared or stressed upon me the importance"); *id.* at 63:21–25, 64:1 ("Mr. Stanley didn't say too much. He would just often look up, ask me a question and then regard—he would internalize everything I sad. He didn't elaborate on anything. He just asked a question, I would answer it. He would just look at me and that was it"); *id.* at 74:11–18 ("Mostly he was trying to console me and that was most of the gist of it. He would ask me questions and I would explain to him why and he would listen and we would talk about something else for a while and then he would revisit and ask me, you know, 'is this still how you feel?' and I says, 'Yes' and then we'd go over a little bit longer and then we'd talk about something else").

**334.** Lang Decl., ¶ 126 ("I also did not understand that the good information had to be presented by witnesses or the jury wouldn't know about it. I thought Mr. Stanley could just tell the jury about it during his argument. In fact, that is the way I pictured it happening, like 'Perry Mason,' when the lawyer gives a great speech and it changes everything"); Lang Depo. at 16:17–25 ("Q.... What did he explain to you in terms of background evidence and how that could be used in the penalty phase? A. That was not explained at all. So was it your testimony that prior to the penalty phase Mr. Stanley never explained to you the use of background evidence in a penalty phase; correct? A. Prior to the penalty phase, yes, correct"); *id.* at 19:11–16 ("Q. So

prior to the presentation of evidence in the penalty phase it's your testimony that Mr. Stanley never explained to you that the defense can present background evidence in the penalty phase; correct? A. No. No. I wasn't aware of that"); *id.* at 37:10–14 ("I thought that [Scott] would present mostly a speech. Both of the attorneys would get up there and argue back and forth. I wasn't really understanding evidence would be presented in that part of the phase").

**335.** Pet.'s Exh. 1, Vol. 5, Tab 50 (emphasis supplied). The instruction given was the applicable model instruction in 1984. CALJIC 8.84.1 (1984 revision). The model instructions also set forth a list of specifically delineated factors to be weighed by the jury; the jury in petitioner's trial was instructed on the factors that were relevant in his case. *Id.* The jury found the instruction confusing and requested clarification of the judge. (Trial Transcript at 2635:25–28, 2636:1–6 ("The Court: The jury has asked this question: 'Please define the following words: one, aggravating; two, mitigating.' And I have written out this answer: 'Webster's New Collegiate Dictionary 1976 edition contains the following definitions of aggravating: to make worse or serious or more severe. Mitigate: to make less severe or painful; to cause to become less harsh or hostile.' Anything else? Mr. Scott: That's satisfactory with the People. Mr. Stanley: That's fine, your Honor").

**336.** Stanley 9/11/98 Decl., ¶ 2 ("I never told Mr. Lang that under the instructions given to

"What I told him was that if we did not present some of this available evidence that there was a very real risk there would be a death verdict, and if we did present it, I thought there was a pretty good chance for a more favorable outcome." [337]

Stanley's recollection that he told petitioner there was a "very real risk" of a death verdict was not adequate to inform petitioner that, absent a mitigation case, a

death verdict was a virtual certainty. Both petitioner and Ballew confirm that petitioner was never advised of the mandatory language of the instruction, as does petitioner.[338] It is also undisputed that petitioner did not want to die and communicated that to Stanley and Ballew.[339]

With the exception of meeting petitioner's father at the trial, Stanley at no time spoke with any family member or friend of petitioner.[340] Because Ballew had been

the jury ... a death sentence was conceded if no mitigating evidence was presented, because the aggravating evidence of the prior convictions automatically outweigh the non-existent mitigating factors").

337. Stanley Depo. at 136:5–14

338. Undated Ballew Decl., ¶ 5 ("I have no recollection of Mr. Stanley ever advising Mr. Lang that the failure to present a penalty phase would necessarily result in a sentence of death, in light of the aggravating circumstances of Mr. Lang's prior convictions"); Lang Decl., ¶ 131 ("Mr. Stanley did not explain that by not having witnesses, I was virtually conceding the death penalty. He did not tell me about the jury instructions, about how aggravation is weighed against mitigation and that because I had prior arrests and convictions, there would be at least some aggravating evidence. He did not explain that, because there was certainly going to be some aggravating evidence, then we would either have to 'outweigh' that evidence with mitigation evidence, or I would automatically get the death sentence. I was not sure what 'aggravating' and 'mitigating' meant. Neither was the jury, because I remember they had to ask the judge. And the first time I really understood the 'weighing' aspect was when the prosecutor, Mr. Scott, drew a picture of a scale for the jury during his closing penalty phase argument. The first time I heard the jury instruction was when it was read to the jury. Mr. Stanley did not give it to me, or read it to me, at any time before the penalty phase started. If I had understood these things, I would have told Mr. Stanley to put on as much mitigation evidence as he could, except not my grandmother. I believed that Mr. Stanley was going to put on all the mitigation evidence he thought was appropriate or sufficient. I was surprised to learn, in this

case, that Mr. Stanley knew there was more mitigating evidence and did not present this evidence under the mistaken impression that I did not want any evidence presented"). Although respondent objects to this paragraph as expert legal opinion offered by a layperson, the court considers the paragraph only to the extent that it reflects the information provided to petitioner. It does not consider any implicit legal opinions contained therein.

339. Stanley Depo. at 319:3–1 ("Q. But Mr. Lang never told you that he wanted to die. Correct? A. That's absolutely correct. Q. And at no point did he say he wanted you to concede a death verdict? A. That is absolutely correct. Q. And at no point did he—did he say he wanted to concede a death verdict? A. That is correct. Q. And in fact you argued for life? A. Yes. Q. And he did not object to your arguing for life? A. That is correct. Q. And Mr. Lang never told you that he did not want any witnesses to be called in mitigation? A. That is correct"); Ballew Depo. at 146:11–13 ("All I remember is that he did not want to die"); Lang Decl., ¶ 115 ("I didn't understand that if we put on no witnesses, I would be conceding the death sentence. I definitely did not want to have the death penalty imposed on me and I said that to both Mr. Stanley and Ms. Ballew. I was (and am) just as terrified as anyone would be to be strapped to a board and injected with poison"). Respondent objects to this paragraph as irrelevant. The court finds, however, that the fact that petitioner did not understand the consequences of foregoing a meaningful mitigation case reflects whether Stanley gave petitioner sufficient information to make such a decision.

340. Stanley Depo. at 146:14–20 ("I did not go to Oregon and meet with any of [petitioner's

the one to interview them, it is clear that she would have had primary responsibility for contacting and arranging transportation for family members and friends called to testify at the penalty phase of the trial.[341] It was, therefore, not possible for Stanley to plan a penalty phase without Ballew. Ballew, states, however that

> "[t]here were no formal discussions between myself and Mr. Stanley as to whether or not we should put on a penalty phase. I was never advised by Mr. Stanley of any specific plan for the investigation or presentation of a penalty phase. To the best of my recollection, Mr. Stanley did no preparation at all for a penalty phase. I strongly believe that Mr. Stanley never had any specific plan regarding presentation of mitigating evidence at the penalty phase, since any such plan would necessarily have involved my participation as the only investigator on the case." [342]

> \* \* \*

> "There were never any plans made to bring any family member or other person from Oregon and at no time was there any discussion of money that would be needed for such transportation.

> To the best of my recollection, there was no preparation done for a penalty phase, nor even a discussion as to the type of penalty phase that should be put on. Although I generally discussed with Mr. Stanley Mr. Lang's background, as uncovered during my trip to Oregon, it was never discussed with him in regard to a penalty phase." [343]

> \* \* \*

> "Furthermore, even if it had been decided to put on a penalty phase, there were no witnesses available because we had not contacted any." [344]

As Ballew's testimony is not disputed by Stanley, it appears that, when the guilt-phase verdict was rendered on October 12, 1984, Stanley had made no arrangements for any witness to testify in the penalty phase, which was set to begin three days later on October 15, 1984. Nor had either

family] prior to trial. I did meet Ken Lang, Sr., because he came to Santa Maria for part of the trial. Q. Did you speak with any of them on the phone? A. Not that I recall").

341. Ballew Depo. at 148:18–25, 149:1–4 ("Q. The way that it worked in the Santa Barbara Public Defender's office at the time, if a defendant needed a witness to appear for trial was it possible to obtain funding for that witness to travel and have lodging? A. Yes. Q. Would that request have to have been— have to be made at some point prior to the witness appearing at trial? A. Yes.... Q. Would that be a task that you would have expected to perform in the Lang case if a witness had been required? A. Yes").

342. Undated Ballew Decl., ¶ 3. Respondent objects to portions of this paragraph on the ground that Ballew's statements regarding the level of Stanley's preparation are speculative. Stanley has testified regarding Ballew's close involvement in trial preparation, however, and the court therefore finds that respon-

dent's objection goes to the weight of Ballew's statements rather than their admissibility. The statements, moreover, are couched as opinions concerning subjects about which Ballew has sufficient information to offer a lay opinion under Rule 701 of the Federal Rules of Evidence.

343. 2002 Ballew Decl., ¶ 19–20. Respondent objects to these paragraphs as speculative. The paragraphs concern trial preparation that, of necessity, would have involved Ballew since she was the investigator who would have had to make arrangements for the witnesses to testify. The paragraphs are based on personal knowledge, therefore, and the objection is overruled.

344. 2002 Ballew Decl., ¶ 16. Respondent objects to this paragraph on the basis that it is speculative. Given that Ballew would be responsible for contacting witnesses and making travel arrangements, this paragraph is based on her personal knowledge that no such contact had been made.

he or Ballew made potential witnesses aware that they would be asked to testify.

Stanley states that his failure to present mitigation evidence through a family member or an expert witness was a clear error and was not based on any tactical or strategic consideration.[345] At his deposition, Stanley emphasized that how to proceed during the penalty phase was his decision and was not dictated by petitioner. He stated:

"Q. With respect to issues concerning Mr. Lang's background, did he ever mention to you any specific areas of his background that he didn't want discussed?

A. Not that I recall.

Q. Did Mr. Lang ever tell you that he didn't want his grandmother to come to court because he was afraid she would say negative things about him?

A. I don't recall that he ever said that, no.

Q. Ultimately, whose decision was it not to call the grandmother? . . .

[A.] My decision as to which witnesses to call or not to call, so that was my decision. [ ]

Q. . . . [T]hroughout the guilt trial, did you make the decisions about what witnesses to call?

A. Yes.

Q. And did you believe that it was your responsibility to make those decisions for the penalty phase as well?

A. Yes.

Q. Did Mr. Lang ever tell that if you called his grandmother over his desire that she not be called he would act out in any way? [ ]

[A.] He did not tell me that, and I had no concern that he would act out. He was very reasonable in all of his behavior. I would have been shocked if he had acted out in court. [ ]

Q. . . . When I'm using that term, I mean do you believe that he would have disrupted or interfered with the proceedings in any way if you had called his grandmother over his desires?

A. That's exactly how I took your question, and I do not believe he would have done any of those things. I feel very confident that he would not have.

Q. Did you have any tactical or strategic reason not to call the grandmother?

A. No, not in terms of potential outcome. I mean my—my reasons are laid out in the declarations, but in terms of a lawyer's strategic or tactical decision not to call her, there was none.

Q. . . . [C]ould you state for us again the reason you did not call the grandmother.

[A.] In a nutshell, I would say it was kind of a dichotomy of roles; that with the relationship that Mr. Lang and I had, I—I really developed a respect for him as a very principled person within, you know, his own spectrum, and I had a—although it's the lawyer's decision whether to call or not to call certain witnesses, to me this particular decision was qualitatively different in terms of the—the quality of life for Mr. Lang, with what he was going to have to live with[,] with what we did or did not do in the—in the penalty phase. So on the moral side of the ledger, respecting him as I did and respecting his choices about quality of life, I acted from a sense of

---

**345.** Stanley Depo. at 288:10–15 ("I believe it was an error not to present that kind of evidence through some mechanism and, frankly, what I had been considering was family members rather than some sort of expert witness, but I clearly think it was an error not to have presented that kind of evi-dence through some methodology"); *id.* at 288:23–25, 289:1 ("Q. Did you have a tactical or strategic reason for not calling an expert during the penalty phase to testify about Mr. Lang's social history and background? A. No").

morality in that context rather than acting as his lawyer, which I should have, and as his lawyer, I should have said, well, that's all well and good, Mr. Lang, but I'm your lawyer and I want to win this penalty phase; therefore, I am going to call the witness. [ ]" [346]

Like Stanley, petitioner recalls that decisions regarding the witnesses to be called were Stanley's, not his.[347] Stanley had no concern in 1984 that petitioner would act out in any way, attempt to disrupt the proceedings, or object in open court if he attempted to put on a mitigation case.

Although counsel sometimes determine to limit testimony at the penalty phase for strategic reasons so as not to open the door to rebuttal testimony, this concern did not drive Stanley's decision because the prosecutor, Michael Scott, had told Stanley he would not put on a rebuttal case.[348] Scott also informed Stanley while

**346.** Stanley Depo. at 302:2–25, 303:1–25, 304:1–25, 305:1–25, 306:1–9. Although Stanley conceded a number of errors, he made several comments during his deposition that indicated he was concerned with protecting his reputation; he noted, however, that he was "a prideful person" and that he was concerned that his work at a 1984 trial, which took place when the death penalty was still somewhat new, was being judged by 2002 standards. (Stanley Depo. at 42:16–25, 43:1–6 ("Yes, it bothers me from that standpoint, and it also strikes me as kind of the contextual situation with the trial that has happened this many years ago, given that the methodology and practice involved in defending capital cases has evolved tremendously in the 18 years since this case was tried. So, you know, in terms of a fundamental sense of justice, I guess it rubs me a little bit that I probably am being gauged by 2002 standards for a trial that occurred in 1984 when the death penalty was still—you know, after the reenactment, was still relatively new in California, and lots of other people as I were doing their first capital trial. So yeah, there's—you know, I am a prideful person so that stings a bit"); *id.* at 321:13–25 ("Q. Is it fair to say that you have concerns regarding your professional reputation if the court were to find that you were—had provided ineffective assistance of counsel? A. That's fair to say. Q. Is it also fair to say that you're concerned that should the court find that you had provided ineffective assistance of counsel that it may have an impact on your license or your practice? A. That's certainly possible that it could. Q. Is it fair to say that you have an interest in the integrity of your reputation and your practice? A. Yes").

**347.** Lang Decl., ¶ 127 ("I did not believe, and Mr. Stanley did not tell me, that the decision about what witnesses to call was mine. I always believed that the decision was Mr. Stanley's. All of the decisions in the trial had been made by Mr. Stanley, even when I did not agree with the decision ..."); Lang Depo. at 30:12–13 ("I suppose Mr. Stanley made the decision not to call them"); *id.* at 39:4–6 ("I was not part of the decision-making process. I just explained my concerns. I mean, I left everything up to David Stanley"); *id.* at 46:19–25 ("Q. Did you consider yourself an equal with him in terms of the decision-making process? A. No. Not at all. Q. Why not? A. Well, I basically looked at him as the authority figure. I mean, I was fairly ignorant of the process"); *id.* at 55:11–15 ("Q. Did Mr. Stanley ask you to allow him to present evidence of your background in the penalty phase? A. He just never asked my permission for anything"). Respondent objects to paragraph 127 of petitioner's declaration as irrelevant. The court overrules this objection because the division of labor between petitioner and counsel is relevant in assessing whether counsel could reasonably have concluded that petitioner had ordered him not to present mitigation testimony.

**348.** Stanley Depo. at 308:3–25, 309:1 ("Q. You had testified earlier that you believed Mr. Scott was not going to offer a rebuttal case. Is that correct? A. Yes. Q. And at some point before the penalty phase began, did you know that there was not going to be a prosecution rebuttal case. A. He told me before the penalty phase began, and I just cannot remember specifically what he told me. I don't think it would have been before the guilt verdict, although it's not inconceivable, and it may have been as—as late as the afternoon before. I think there was a jury instruction conference. It might have been as late as the afternoon before or conceivably even the—the morning

the jury was deliberating that if there was a hung jury at the penalty phase, he would not retry the death penalty question.[349]

### b. Penalty Phase Presentation

The penalty phase of the trial took place on October 18, 1984. Stanley had informed Judge Lewellen the day before that he intended to waive opening argument.[350] Stanley and Scott stipulated that the jury would be informed of petitioner's five prior felony convictions.[351] Stanley and Scott also presented a stipulation that petitioner's escape conviction resulted from petitioner walking off a work detail.[352] The only witness called by either party was John Roberts, a corrections officer with the Santa Barbara Sheriff's Department.[353] The following is the entirety of the relevant testimony:

"Q. In connection with your official duties, Officer Roberts, have you become acquainted with Kenneth Lang, my client, who is seated here at counsel table this morning?

A. Yes, sir, I know him.

Q. And is that because on your rotating shift basis, he's been here in custody at your institution from time to time when you've been on duty?

A. Yes, sir.

Q. Officer Roberts, in your experience in having Mr. Lang in your facility, has he presented any serious disciplinary problems?

A. Not to my knowledge.

Q. Is the nature of your agency such that if he presented serious disciplinary problems to other officers in your jail or to any officers in the main jail in Santa Barbara, that there would be a report of that to you so that you would be on the alert?

A. Yes, sir, I would know about it if there were any problems.

Q. Have you received any reports of any serious disciplinary problems regarding Mr. Lang?

A. Not to my knowledge.

Q. And is this true for the approximately 14 months or thereabouts that he's been in custody?

A. I can't recall any disciplinary problems with this man.

---

that we went in to start penalty, but I—I definitely remember he told me that before the penalty phase started, but I can't say on the time line exactly when it was. Q. But it's fair to say that the reason you did not put on any mitigation witnesses, other than the guard, was unrelated and had nothing to do with your concern that the prosecution was going to put on a rebuttal case? A. That's correct").

**349.** Stanley Depo. at 37:9–15 ("And I would note that Michael Scott told me, while this jury was out, if there had been a hung jury, he did not intend to retry penalty. So I believe there would have been a more favorable outcome for Mr. Lang if, as his lawyer, I had decided to go ahead and put on more mitigating evidence even though he did not want me to").

**350.** Trial Transcript at 2568:8–10 ("As a practical matter, I would not feel a need to give an opening statement").

**351.** *Id.* at 2581:12–25 ("That on May 15, 1979 in Clackmamas County ..., Oregon, defendant pled guilty to robbery in the second degree, a felony. That on May the 15th, 1979 in the same county, defendant pled guilty to burglary in the second degree, a felony. That on October 30th, 1980, same county, the defendant pled guilty to forgery in the first degree, felony. That on January 24th, 1980, in Marion County, Oregon, ... defendant pled guilty to escape in the second degree, a felony. And on October 23rd, 1981, defendant pled guilty to unauthorized use of a vehicle, a felony. That occurring in Multnomah County, Oregon").

**352.** *Id.* at 2583:26–28, 2584:1.

**353.** *Id.* at 2585:18–19.

Q. Thank you, sir. No further questions, Your Honor." [354]

Officer Roberts being the only witness, the evidentiary portion of the penalty phase hearing consumed less than one and one-half pages of trial transcript.

During Scott's closing argument, he drew a scale for the jury, visually depicting aggravating factors on one side and mitigating factors on the other. Scott emphasized that "if the factors in aggravation outweigh, that means the death penalty must be imposed as a matter of law. If you find beyond a reasonable doubt the factors in aggravation outweigh, the death penalty must be imposed as a matter of law." [355] Scott argued that the first factor—the circumstances of the crime— [356] weighed heavily in favor of death, given the special circumstance of robbery found by the jury and the fact that the guilty

verdict showed that the jury had determined alcohol played little role in the crime. [357] Scott also emphasized petitioner's five felony convictions as an aggravating factor. [358] Scott's closing argument occupies ten pages of trial transcript.

In his closing argument, Stanley emphasized the catch-all provision of the statute. [359] He noted that the citizens of Santa Barbara County lived "in a very sheltered environment," as Los Angeles County had significantly more robbery-homicides, but prosecutors did not seek the death penalty in each such case. [360] Although he had presented virtually no evidence regarding alcohol intoxication, Stanley emphasized the point in his closing argument, citing testimony by the victim's wife that Thurman Anderson kept beer in the R.V. refrigerator and petitioner's testimony during the guilt phase that he had been drinking beer. [361] Much of the remainder

354. *Id.* at 2585:28, 2586:1–27.

355. *Id.* at 2583:22–26.

356. The jury instruction describes this factor as "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true." CALJIC 8.84.1(a) (1984 revision). Also related to Scott's argument on this point is CALJIC 8.84.1(b) (1984 revision) ("The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence").

357. Trial Transcript at 2589:27–28, 2590:1–19 ("What are the factors you can consider? First, on the aggravation side. The circumstances of this crime and of the special circumstances of the crime. By 'circumstances of the crime,' it's the same sort of things you considered during the guilt phase of this trial—the condition and circumstances of the body, the manner in which the person was killed, the conduct of the defendant following the execution of the victim, the defendant's conduct up until his arrest, and even the defendant's demeanor while on the stand. Those are factors you consider in aggravation,

circumstances of the crime. Contained in that is another circumstance that may—you may feel works as a factor in mitigation, the effects of alcohol. But it's inherent in your verdict of guilt that the alcohol played very little role in this crime, that defendant knew what he was doing. He was able to handle that weapon and to rob the victim of his property, negotiate a difficult road on Barrel Springs. But that's a factor you may consider. Circumstances of the crime—cold, calculated fashion in which this defendant carried out his design to kill and rob").

358. *Id.* at 2590:20–24; CALJIC 8.41.1(c) (1984 revision) ("The presence or absence of any prior felony convictions").

359. Trial Transcript at 2602:7–14; CALJIC 8.84.1(k) ("Any other circumstance which extenuates the gravity of the crimes even though it is not a legal excuse for the crimes and any other aspect of defendant's character or record that the defendant offers as a basis for a sentence less than death").

360. Trial Transcript at 2604:17–28, 2605:1–24.

361. *Id.* at 2607:25–28. 2608:1–28, 2609:1–15 ("Similarly, the evidence of alcohol use—and

of Stanley's closing emphasized that a life without parole sentence was a harsh punishment, possibly harsher than the death penalty, that petitioner would never be released on a work detail where he could escape, and that the death penalty should be reserved for rare cases. Stanley's closing argument occupies thirty pages of trial transcript.

### 3. Whether Trial Counsel's Performance Was Deficient at the Penalty Phase

Petitioner argues that Stanley rendered deficient performance inasmuch as he failed adequately to investigate petitioner's personal background and potential mental health defects, failed to prepare for the penalty phase, and improperly relied on petitioner's statements in not presenting a mitigation case. The court addresses these arguments separately below.

there's lots of circumstantial evidence that backs up the fact that what Ken Lang told you about drinking beer that afternoon was true. Mrs. Anderson testified that they always kept that motor home well stocked. They used it a lot. And when they travel—I mean, they had stuff they left in it all the time. And when they travel[ ]ed, they loaded it up with fresh provisions. And she also [said] that Thurmon Anderson, when he was out hunting, enjoyed sitting down in the evening and having some Budweiser beer. You just can't avoid the conclusion that there was some beer in that motor home when Thurmon Anderson picked up Ken Lang. And doesn't it follow that he would offer him one, a guy that's been out hitchhiking for a few days, picked up in the rain. 'Want a beer?' 'Sure.' That doesn't defy human nature; that rings true with human nature. We did not stress the alcohol consumption at the guilt phase of the this trial because, quite honestly, it may have some effect on his judgment. But that was not what this case was all about as far as guilt is

### a. Whether Trial Counsel Was Reasonable in Deferring to Petitioner's Alleged Desire to Forego Mitigation Evidence

The Ninth Circuit's remand order directed that the court resolve factual issues concerning what evidence petitioner demanded Stanley not present at the penalty phase, whether Stanley fully advised petitioner of the importance of presenting mitigation evidence and of the various types of mitigation evidence available, and whether trial counsel adequately investigated and was adequately prepared to present a case in mitigation.

The court credits petitioner's testimony that Stanley discussed only two potential penalty phase witnesses with him—his father and his grandmother. Although Stanley testified that petitioner objected broadly to the presentation of family member testimony, petitioner could, at most, reject the witnesses identified by his lawyer. Had Stanley focused on the probation officer's report that indicated petitioner's grandmother had become visibly upset

concerned. . . . [E]ven if you assume that Ken Lang's plan was established at some point along the way with Thurmon Anderson, that he eventually was going to kill Thurmon Anderson . . . , do you find that a person who has consumed seven or eight cans of 12-ounce beer and feels the effect of it, as a 145 [pound] person who hasn't had much sleep the night before certainly would feel it. Why[ ] don't you take that into consideration? Don't you give that some significant weight in making this evaluation? Yes, you do. It's acknowledged by statute, and it's acknowledged by human nature. It's not an excuse for what he did, but it certainly operates properly in the decision of whether or not his life has to be taken"). The jury was also advised of CALJIC 8.84.1(h) (1984 revision) ("Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of . . . the [e]ffects of intoxication").

when questioned and considered the fact that petitioner had a tenuous relationship with his father, given that petitioner told Stanley during trial he was not comfortable with his father being present, he would likely have proposed other or additional penalty phase witnesses to petitioner. The court cannot discern, for example, why Stanley did not propose that petitioner's mother testify, as both Conry and Ballew, who, unlike Stanley, had spoken with petitioner's family, identified her as a favorable witness.

■ The parties debate at length whether Stanley "implored" petitioner to allow him to present background evidence. Stanley insists that he did, while Ballew and petitioner state this is not the case. The court does not find the issue relevant. "A defendant's lack of cooperation does not eliminate counsel's duty to investigate." *Hamilton*, 583 F.3d at 1118 (citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4–4.1 (2d ed.1980) ("The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty")). See also *Douglas*, 316 F.3d at 1089 ("[A]lthough the client's desires are not to be ignored altogether, it may be inappropriate for counsel to acquiesce to the client's demands"); *Karis*, 283 F.3d at 1136 (determining that defendant's lack of cooperation did not excuse counsel from further investigating mitigation evidence, especially given that "counsel was aware [that the defendant suffered] childhood abuse and there was essentially no other significant mitigating evidence to present to the jury"). Thus, a client's "opposition to calling family members or experts as witnesses does not excuse an attorney from interviewing experts and family members or from investigating documents containing mitigating evidence." *Stankewitz*, 365 F.3d at 721–22 (1978 California trial).

■ Additionally, "if a client forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial." *Silva*, 279 F.3d at 847. Even crediting Stanley's testimony that he implored petitioner, it appears his importuning focused exclusively on a request that he be allowed to call petitioner's father and grandmother; there is no evidence that Stanley explored the possibility of calling other family members that might have elicited less of or no objection from petitioner. There is, indeed, no evidence Stanley proposed other family members' names to petitioner. Nor is there any evidence that Stanley explored calling an expert who could have testified to petitioner's social history and its effects.

■ Counsel also has a "concomitant duty to try to educate or dissuade [the defendant] about the consequences of his actions." *Silva*, 279 F.3d at 847 (reviewing a 1982 California trial). Stanley did not satisfy this standard, as he did not advise petitioner of the most basic fact—that absent the presentation of mitigation evidence, the jury would be compelled to sentence him to death. Stanley, Ballew and petitioner agree that Stanley did not inform petitioner of the mandatory language of the penalty phase jury instruction, and what it meant given that Scott intended to introduce petitioner's prior convictions and they would constitute aggravating circumstances.

■ "Adequate consultation between attorney and client is an essential element of competent representation of a criminal defendant." *Correll*, 539 F.3d at 943 (quoting *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir.1983)). See also *Summerlin*, 427 F.3d at 633 ("We have held that limited consultations may constitute

deficient performance by a criminal defense attorney"); *Silva,* 279 F.3d at 847 (counsel has a duty to try to persuade defendant to allow the presentation of mitigating evidence and counsel cannot make a reasoned tactical decision if he does not even know what evidence is available); *Turner v. Duncan,* 158 F.3d 449, 457 (9th Cir.1998) ("Counsel's admission that he spent at most forty-five minutes with Turner prior to trial demonstrates deficient performance ... [and] is especially shocking in light of the seriousness of the charges").

■ Here, the circumstances surrounding Stanley's consultation with petitioner are remarkably similar to the facts of two Ninth Circuit cases. In *Silva,* the defendant had expressly instructed his attorney not to call his parents as witnesses. The Ninth Circuit held that this could not reasonably be construed as a direction that counsel not contact the parents for informational purposes or that he not contact family members other than the parents to investigate his background and history. *Silva,* 279 F.3d at 839. See also *id.* at 838 ("[C]ounsel's duty to *investigate* mitigating evidence is neither entirely removed nor substantially alleviated by his client's direction not to *call* particular witnesses to the stand" (emphasis original)). Additionally, the court noted, Silva's attorney did not "ma[ke] a serious attempt to educate [his client] about the consequences of his decision." *Id.* at 841. For both reasons, it held that the lawyer's "conduct was objectively unreasonable under the circumstances and ... amounted to deficient performance...." *Id.* See also *id.* at 838 ("[A] lawyer who abandons investigation into mitigating evidence in a capital case at the direction of his client must at least have adequately informed his client of the potential consequences of that decision and must be assured that his client has made 'informed and knowing' judgment"). The Ninth Circuit also held that, faced with a client directive limiting the scope of defense, an attorney "must conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client." *Id.* at 846 (quoting *Sanders v. Ratelle,* 21 F.3d 1446, 1456–57 (9th Cir.1994)). See also *Summerlin,* 427 F.3d at 638–39 (relying on *Silva* and concluding that counsel's performance was deficient on analogous facts).

In *Correll,* petitioner claimed that he and trial counsel had one five-minute meeting between the guilt phase and the penalty phase. Trial counsel asserted that they had met two or three times, a fact that was corroborated by handwritten notes documenting at least two meetings *Correll,* 539 F.3d at 943. The court observed that "the attorney's notes [made] clear that Correll failed to grasp the significance of the sentencing hearing and that his attorney made, at best, minimal efforts to explain it to him.... At no point did Correll's counsel explain to Correll the possibility of a mitigation defense arising from Correll's drug use, brain damage, family history, or psychiatric record, and at no point did counsel ask Correll for information or contacts specifically related to those issues. We therefore conclude that the district court's factual finding on this issue was clearly erroneous and that the district court's legal conclusion was in error. Correll's attorney did not maintain constitutionally adequate contact or engage in constitutionally adequate consultation with Correll in between conviction and sentencing." *Id.*

Like the lawyers in *Silva* and *Correll,* Stanley failed adequately to advise petitioner of the consequences of presenting no mitigation case. Stanley's attempts to explain the risk of foregoing a mitigation case were not only incomplete and minimal, but in some senses misleading. Stanley told petitioner there was a "very real

risk" of a death verdict if no mitigation case were presented. However the phrase "very real risk" is interpreted, it is clearly not equivalent to advising petitioner that a death verdict was all but certain in the absence of mitigation evidence. That was the advisal required to provide effective assistance. By downplaying the risk of a death verdict, and telling petitioner that he would argue in favor of life imprisonment, Stanley may have given advice that was more harmful than helpful; Stanley's statements may have caused petitioner to underestimate the risk of a death verdict to a greater extent than he would have absent any advice.

Sitting en banc, the Ninth Circuit has also noted the "additional due process concerns" that are present in "the capital case context." *Summerlin,* 427 F.3d at 639. Specifically, it has stated that a capital defendant has a constitutional right to present a mitigation defense, and a "defendant's waiver [of that right] must be knowing, voluntary, and intelligent." *Id.* (citing *Whitmore v. Arkansas,* 495 U.S. 149, 165, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). The *Summerlin* court continued:

> "This standard does not only mean that the defendant's waiver must be an informed decision, but also that it must be a competent one. If a client has elected to forego legal proceedings that could

avert the imposition of the death penalty, then a court must make the determination 'whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.' " *Id.* (quoting *Rees v. Peyton,* 384 U.S. 312, 314, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966)).

If there is a finding that the decision was voluntary, informed and competent, the Ninth Circuit will "sustain a criminal defendant's decision to limit a mitigation defense." *Id.*[362] To be knowing, voluntary, and intelligent, the *Summerlin* court held that the waiver must occur after counsel has "conduct[ed] an adequate investigation," and "provide[d] the advice necessary for the client to provide informed consent to forego a mitigation defense." It must be "an unequivocal direction," and the court must ensure "that [it] was a competent, voluntary, intelligent, informed, and knowing decision." *Id.* at 639–40.[363]

Applying *Summerlin,* the court concludes that Stanley failed not only to educate petitioner regarding the consequences of foregoing a mitigation case, but failed to ascertain whether petitioner's decision to forego having his grandmother and father

---

**362.** The Ninth Circuit declined to address "whether presentation of some mitigation evidence is constitutionally required in a capital case, regardless of the client's informed decision to forego a defense." *Summerlin,* 427 F.3d at 639 n. 1.

**363.** *Summerlin's* holding that a defendant's waiver of mitigation evidence must be voluntary, knowing, and intelligent, has not been cited since that case was decided in 2005. The decision could be interpreted as addressing a right arising under the due process clause or a right associated with ineffective assistance of counsel. Given that no other court has identified a due process right of this

type, however, it is unlikely that *Summerlin* would have raised such a claim in state court. Consequently, the claim would not have been exhausted at the time he filed his federal habeas petition. Additionally, the reference to knowing, voluntary and intelligent waiver is found in a section of the opinion addressing ineffective assistance of counsel. The court therefore concludes that the *Summerlin* court did not intend to create a hitherto unarticulated due process right, but meant merely to caution that "due process concerns" mandate heightened scrutiny of an attorney's obligation to educate his client regarding the consequences of his actions and ensure that his client comprehends those consequences.

testify was knowingly and intelligently made. Indeed, Stanley in some ways acted to ensure that it was not, as he did not accurately describe the consequence of presenting no mitigation evidence to petitioner.

Furthermore, the court finds factually that petitioner never demanded that Stanley present no mitigation evidence and that the decision as to which witnesses to call was at all times Stanley's. See *Summerlin*, 427 F.3d at 638 ("the allocation of control between attorney and client typically dictates that 'the client decides the "ends" of the lawsuit while the attorney controls the "means," ' " quoting Marcy Strauss, *Toward a Revised Model of Attorney–Client Relationship: The Argument for Autonomy*, 65 N.C. L. REV. 315, 318 (1987)).

There is no doubt that both the Supreme Court and the Ninth Circuit have held that a defendant's refusal to cooperate in the penalty phase may render counsel's limited investigation and presentation of mitigating evidence reasonable. In *Schriro v. Landrigan*, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007), the defendant actively obstructed counsel's investigation and flatly refused to allow counsel to present mitigation evidence. *Id.* at 468–70, 127 S.Ct. 1933. For example, he explicitly instructed his mother and ex-wife not to testify. *Id.* at 469, 127 S.Ct. 1933. Counsel tried to make a proffer of the witnesses' testimony, but defendant repeatedly interrupted the presentation and reiterated that he did not want mitigating evidence presented. *Id.* at 470, 127 S.Ct. 1933. When the judge asked defendant if he wanted to make a statement at the conclusion of the penalty phase, he responded: "I think if you want to give me the death penalty, just bring it right on. I'm ready for it." *Id.*

The Supreme Court emphasized the blanket nature of petitioner's prohibition on and obstruction of the presentation of mitigation evidence. Reviewing the record, it held that the lower court's conclusion that the prohibition concerned specific testimony only was erroneous. Rather, the Court stated, trial counsel had attempted to introduce varied types of evidence, and petitioner continuously objected. It noted that "[h]e [had] even refused to allow his attorney to proffer that he had worked a regular job at some point." *Id.* at 476–77, 127 S.Ct. 1933. The Court commented: "In the constellation of refusals to have mitigating evidence presented ... this case is surely a bright star. No other case could illuminate the state of the client's mind and the nature of counsel's dilemma quite as brightly as this one. No flashes of insight could be more fulgurous than those which this record supplies." *Id.* at 477, 127 S.Ct. 1933 (quoting *Landrigan v. Stewart*, 272 F.3d 1221, 1226 (9th Cir.2001) (original panel opinion subsequently reversed en banc)).[364] See also *Jeffries v. Blodgett*, 5 F.3d 1180, 1197 (9th Cir.1993) (holding that there was no deficient performance in a case where defendant refused to allow his counsel to present any mitigation evidence other than brief testimony by his brother regarding his artistic abilities, a decision he made "after a weekend of discussions with his brother and with counsel," and one his counsel told the court that defendant had "made knowingly, voluntarily and intelligently" and "after a weekend of soul searching").

---

364. In *Hamilton*, the Ninth Circuit emphasized that *Landrigan* was a post-AEDPA case. *Hamilton*, 583 F.3d at 1119. As a result, the Supreme Court "defer[red] to th[e] finding" of the state court that the defendant instructed his attorney not to bring any mitigation evidence to the attention of the sentencing court. *Landrigan*, 550 U.S. at 492, 127 S.Ct. 1933.

Short of a case as clear-cut as *Landrigan*, however, the fact that a defendant is "fatalistic or uncooperative[ ] . . . does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation." *Porter*, 130 S.Ct. at 453. See also *Rompilla*, 545 U.S. at 381–82, 125 S.Ct. 2456 (even where defendant was "uninterested in helping" and said he was "bored . . . listening" when trial counsel attempted to develop a mitigation strategy, counsel performed deficiently by failing to investigate available mitigating evidence).

In *Hamilton*, for example, the Ninth Circuit held that even resolving serious evidentiary doubts in favor of trial counsel, the defendant had, at most, refused to answer questions or provide relevant sources of information. *Hamilton*, 583 F.3d at 1117–18. Hamilton had insisted on receiving the death penalty if found guilty and felt that presenting mitigating evidence would be tantamount to admitting guilt. *Id.* at 1118. The Ninth Circuit noted that he had not impeded any avenues of investigation available to counsel, had not attempted to obstruct the presentation of the mitigation evidence counsel found, and had not made a knowing and informed decision not to present mitigating evidence. *Id.* at 1119. Consequently, reviewing Hamilton's 1982 California trial, the court found deficient performance.

Here, while petitioner was nominally uncooperative in that he objected to calling the two witnesses Stanley discussed with him, there is no evidence that petitioner impeded the presentation of mitigation evidence or attempted to obstruct such a presentation.[365] Stanley and petitioner both testified that the decision as to which witnesses should be called was Stanley's. Stanley made that decision without reference to strategic or tactical concerns. Rather, he acquiesced in the perceived request of a fatalistic defendant who had just received a devastating verdict and who had not been informed of the consequences of foregoing a mitigation case. Based on the line of cases, including *Hamilton*, *Silva*, *Correll*, and *Summerlin*, that have found deficient performance on similar facts, the court concludes that Stanley's deference to petitioner's perceived request constitutes deficient performance independently and without regard to the other bases for finding deficient performance in the penalty phase.

**b. Whether Trial Counsel Was Deficient in Failing to Investigate Mental Health Evidence at the Penalty Phase**

 One facet of both effective investigation and presentation is the proper preparation of experts. At the penalty phase, "trial counsel has an affirmative duty to provide mental health experts with all information relevant to the formulation of their conclusions." *Stanley*, 598 F.3d at 624. See also *Wallace*, 184 F.3d at 1117 ("[C]ounsel have an obligation to conduct an investigation which will allow a determination of what sort of experts to consult. Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert. . . . A lawyer who knows of but does not inform his expert witnesses about . . . essential pieces of information going to the heart of the case for mitigation does not function as 'counsel' under the Sixth Amendment," quoting *Caro v. Calderon*, 165 F.3d at 1226–28 (omissions original)). In *Stanley*, a day after he was arrested, petitioner had been seen by a jail psychia-

---

**365.** Even were the court to resolve the conflict in the testimony in trial counsel's favor, and find that petitioner objected more broadly to the presentation of mitigation evidence, it would reach the same conclusion with respect to the fact that petitioner did not impede or obstruct the presentation of such evidence.

trist and had said, among other things, that at the time of the killing, "he experienced the sensation that he was watching like he wasn't even there" and "that he flew off the wall and shot them." *Stanley*, 598 F.3d at 617. These statements, which were recorded in notes taken by the jail psychiatrist, were never provided to petitioner's mental health experts. Upon learning of the statements after trial, both mental health experts concluded that petitioner most likely suffered from a "dissociative reaction" at the time of the killings, making it "unlikely that he acted with premeditation." *Id.* The Ninth Circuit concluded that such evidence would have been inadmissible under Arizona law to rebut premeditation, but concluded that any evidence that might have persuaded the sentencer that petitioner was something other than a "cold-blooded killer" could have resulted in a sentence short of death. *Id.* at 625.

Similarly, in *Wallace*, the Ninth Circuit concluded that trial counsel's performance was deficient. The court faulted counsel because (1) he had failed to discover information about petitioner's dysfunctional family environment, which involved "an almost unimaginable level of chaos, neglect, bizarre and insane behavior, and ... extreme violence between the parents," *Wallace*, 184 F.3d at 1116 (describing the conclusion of Dr. David Lisak); and (2) had failed to provide such information to mental health experts who stated that it would have had an impact on their testimony, *id.* ("Which brings us to the heart of the issue here: Does an attorney have a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request? The answer, at least at the sentencing phase of a capital case, is yes"). See also *Caro v. Calderon*, 165 F.3d at 1226–27 (reviewing a 1981 California trial and concluding that trial counsel performed deficiently by failing to communicate to experts the fact that defendant had been abused as a child and exposed to neurotoxic chemicals throughout his life, as the experts would have testified at a sentencing hearing that defendant had diminished capacity); *Hendricks*, 70 F.3d at 1037–39 (reviewing a 1981 California trial, the court concluded that "where counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance"); *Clabourne*, 64 F.3d at 1377, 1384, 1386–87 (holding that trial counsel had performed deficiently where he retained a psychologist only a few days before the psychologist testified during the guilt phase, provided the expert with scant information about the defendant, and relied on the psychologist's guilt-phase testimony at the penalty phase).[366]

*Hendricks* addresses the fact that trial counsel's burden to investigate and present mental health evidence is higher at the penalty phase than it is at the guilt phase:

"The prosecution takes an all or nothing approach, contending that if the investigation into mental defenses in the guilt phase was sufficient to foreclose further investigation in the guilt phase, it must be sufficient to foreclose investigation into mitigation based on mental condition in the penalty phase as well. The

---

366. The "failure of a psychologist retained on [petitioner's] behalf to make a proper inquiry as to [petitioner's] background may also constitute a failure to provide competent psychiatric advice in violation of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)." *Wallace*, 184 F.3d at 1118 n. 7. While such a claim was presented to and rejected by Judge Ideman, it was not preserved on appeal to the Ninth Circuit and is not before the court.

differing legal standards in the guilt and penalty phases render this argument a non-sequitur. Evidence of mental problems may be offered to show mitigating factors in the penalty phase, even though it is insufficient to establish a legal defense to conviction in the guilt phase.... So, it does not follow that an investigation sufficient to foreclose the possibility of a mental defense necessarily forecloses the possibility of presenting evidence of mental impairment as mitigation in the penalty phase.

Moreover, the broad latitude given defendants to present mitigating evidence encompasses more than evidence relating to mental health. CAL.PENAL CODE § 190.3(k) (Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime [is a relevant mitigating factor] )." *Hendricks*, 70 F.3d at 1043–44.

See *Wallace*, 184 F.3d at 1117 n. 5 ("Mental state is relevant at the guilt phase for issues such as competence to stand trial and legal insanity—technical questions where a defendant must show a specific and very substantial level of mental impairment. Most defendants won't have problems this severe, and counsel can't be expected to know that further investigation is necessary to develop these issues. By contrast, all potentially mitigating evidence is relevant at the sentencing phase of a death case, so a troubled childhood and mental problems may help even if they don't rise to a specific, technically-defined level"). See also *Pizzuto v. Arave*, 385 F.3d 1247, 1256 n. 8 (9th Cir.2004) (noting that defense counsel "is not ineffective for failing to provide a mental health expert with unrequested background information about the defendant for the guilt phase of trial" but that "to be effective *in the penalty phase* of a capital case, defense counsel must provide background information to mental health experts who are examining the client, even if the experts do not request those facts").

■ The court finds, therefore, that Stanley had a duty to provide the mental health experts that he had retained all background information potentially in his possession regarding petitioner so that they could determine if they could provide helpful testimony at the penalty phase. As noted in *Hendricks* and *Wallace*, the range of mental health information that might be relevant at a penalty phase is so broad and varied that it is unreasonable for trial counsel to limit the information provided to his mental health experts. None of the information contained in the Conry and Ballew reports, or in petitioner's October 1983 letter to Stanley, was given to Drs. Ratner, Schulte or Beaber. This leads to one of two conclusions: either these doctors were retained for the guilt phase only and Stanley did not conduct any mental health investigation for the penalty phase, or they were retained to investigate issues related to the penalty phase and were not properly prepared.[367]

---

367. This holding is not affected by respondent's argument that petitioner objected to the presentation of background evidence. Petitioner raised this alleged objection, at the earliest, after the guilt-phase verdict on October 15, 1984. Given that the penalty phase was set to begin almost immediately thereafter, Stanley was in no position to prepare and present expert testimony within a few days' time. Stanley in fact testified that while he "may have thought about" introducing expert testimony at some earlier time, he did not consider it at "crunch time." (Stanley Depo. at 62:25, 63:1–3. See also *id.* at 288:10–15 ("I believe it was an error not to present that kind of evidence through some mechanism and, frankly, what I had been considering was family members rather than some sort of expert witness").) Stanley also testified that in his estimation, Judge Lewellen would not have "granted a continuance to [allow him to] hire an expert to work up a case at that late stage" because the judge would not have considered the request "reasonable." (*Id.* at 314:22–25, 315:1–9.)

In either event, Stanley's performance was deficient. See *Summerlin*, 427 F.3d at 630 ("We have long recognized an attorney's duty to investigate and present mitigating evidence of mental impairment. This includes examination of mental health records" (citation and internal quotation marks omitted)); see also *Hendricks*, 70 F.3d at 1043 ("Evidence of mental problems may be offered to show mitigating factors in the penalty phase, even though it is insufficient to establish a legal defense to conviction in the guilt phase") (citing CAL.PENAL CODE § 190.3(d), (h)).

### c. Whether Trial Counsel Was Deficient in Failing Properly to Investigate and Present Family Member Witnesses

Petitioner next argues that as of October 15, 1984, when the guilt-phase verdict was returned, Stanley had not adequately investigated his background and had not adequately prepared any family member witnesses to testify at the penalty phase beginning on October 18, 1984.

 "[P]enalty phase investigations in capital cases should include inquiries into social background, including investigation of any family abuse, mental impairment, physical health history, and substance abuse history.... That investigation should include examination of mental and physical health records, school records, and criminal records.... 'Defense counsel should also personally review all evidence that the prosecution plans to introduce in the penalty phase proceedings, including the records pertaining to criminal history and prior convictions.'" *Correll*, 539 F.3d at 943 (quoting *Summerlin*, 427 F.3d at 630). Where counsel is aware that potential mitigating evidence exists, he must "explore any avenues that might lead to development of that evidence." *Id.*

As noted, evidence concerning a defendant's background and character is relevant to the jury's penalty phase determination because of "'the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, *may be less culpable than defendants who have no such excuse.*'" *Boyde v. California*, 494 U.S. at 382, 110 S.Ct. 1190 (emphasis original) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)). In a capital case, such evidence can be the difference between a life sentence and a sentence of death. See *Mak*, 970 F.2d at 619 ("[T]he issue for the jury is whether the defendant will live or die.... To fail to present important mitigating evidence in the penalty phase—if there is no risk in doing so—can be as devastating as a failure to present proof of innocence in the guilt phase").

 Because "[t]he Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy," *Hendricks*, 70 F.3d at 1044 (citing *Deutscher v. Whitley*, 884 F.2d 1152, 1161 (9th Cir.1989) (internal quotation marks omitted)), "[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase," *Caro v. Calderon*, 165 F.3d at 1227. At the time of petitioner's trial, "his counsel had a duty to conduct 'a thorough investigation of the defendant's background.'" *Hamilton*, 583 F.3d at 1113 (quoting *Terry Williams*, 529 U.S. at 396, 120 S.Ct. 1495). To that end, counsel was required to inquire regarding his "social background, ... family abuse, mental impairment, physical health history, and substance abuse history," *Correll*, 539 F.3d at 943; obtain and examine "mental and physical health records, school records, and criminal records," *id.*; *Summerlin*, 427 F.3d at 630; consult with appropriate medical experts, *Mayfield*, 270

F.3d at 927–28; and pursue relevant leads, *Lambright*, 490 F.3d at 1117. As the Ninth Circuit noted in an en banc decision examining the standard of care for trial counsel engaged in a penalty phase trial in California in 1984, "[i]t is prima facie ineffective assistance for counsel to 'abandon [ ] ... investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.'" *Pinholster*, 590 F.3d at 673 (quoting *Wiggins*, 539 U.S. at 524–25, 123 S.Ct. 2527).[368]

"[W]hen 'tantalizing indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued." *Lambright*, 490 F.3d at 1117 (quoting *Stankewitz*, 365 F.3d at 719–20). See also *Wiggins*, 539 U.S. at 525, 123 S.Ct. 2527 ("[A]ny reasonably competent attorney would have realized that pursuing ... leads [regarding the petitioner's trau-

matic childhood] was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background"). Counsel's failure "to contact persons who might have had more detailed information about [petitioner's] past," when initial investigation put counsel on notice that petitioner "had a particularly difficult childhood," rendered his performance deficient. *Douglas*, 316 F.3d at 1088.

 Conry's and Ballew's investigations, together with petitioner's October 1983 letter, clearly put Stanley on notice that petitioner had had a particularly difficult childhood. From the earliest interviews conducted by Conry in October 1983, a year before the penalty phase began, Stanley was on notice that petitioner had been abandoned by his mother;[369] that he had been harmed emotionally by a series

---

**368.** As with the standard governing preparation of mental health experts, the standard of care governing the investigation and presentation of background evidence is higher at the penalty phase than at the guilt phase. Although the Ninth Circuit has not explicitly addressed this difference, it follows from and is directly analogous to the reasoning that gives rise to the differing standards applicable to preparation of mental health experts in the guilt and penalty phases. As noted, at the guilt phase, mental health experts are called to prove narrow and technically defined defenses; at the penalty phase, by contrast, any mental health testimony that explains or lessens the culpability of defendant's conduct is relevant. The differences are even more stark when the testimony in question is that of lay witnesses who can provide information regarding the defendant's background. At the guilt phase, such witnesses will be relevant, if at all, as background evidence supporting a narrow and technically defined mental state defense. At the penalty phase, by contrast, the "Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy." *Hendricks*, 70 F.3d at 1044. As the Supreme Court has held:

"[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality) (emphasis original).

See also *Abdul–Kabir v. Quarterman*, 550 U.S. 233, 248, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007) (noting that Chief Justice Burger's plurality opinion in *Lockett* had been "endorsed and broadened" in subsequent decisions, and that given "the severity of imposing a death sentence ... 'the sentencer in capital cases must be permitted to consider *any* relevant mitigating factor,'" quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (emphasis original)).

**369.** Conry/Lang Sr. Notes I at 2 ("The witness said that the defendant's real mother wanted to have 'nothing to do with him' i.e., with the defendant. The witness said that in regard to the last six years, that a lot of these people would not have had much contact with Kenny

of broken marriages;[370] that he may have suffered emotional problems as a teenager;[371] that his first stepmother described her own rearing of petitioner as "very strict," "terrible" and potentially physically abusive;[372] that petitioner's mother confirmed that his first stepmother had physically and emotionally abused petitioner;[373] that as a preteen petitioner was a pawn in fights between his father and first stepmother;[374] that petitioner had spent at least some of his childhood homeless, sleeping in the bed of a semi-trailer;[375] and that at one time petitioner may have had a drug problem.[376] Despite these indications that much fruitful evidence could have been developed through followup investigation, the court does not second-guess Stanley's decision to forego further

investigation by Conry, given the gaps in his investigation he exhibited. Nonetheless, it was then incumbent upon Stanley to follow up on the leads Conry's investigation had produced, as he had ample time to do so. Conry's last investigative reports were submitted at the end of October 1983. Stanley, therefore, had almost a year to conduct additional investigation. It appears, however, that the bulk of Ballew's investigation was not completed until August and September 1984. The testimony and records in this case, moreover, lead to the conclusion that Ballew's substantive investigation regarding family members did not commence until July 1984, and that Stanley received reports from her no earlier than August 31, 1984, and possibly as late as September 16, 1984.[377] Jury selection commenced on August 22, 1984.

Lang because he had spent a lot of time in prison in those years").

370. *Id.* at 3 ("I asked the witness if he felt his son had any emotional or mental problems and the witness said 'I believe he does.' The witness said that he was 'always blaming myself' and he cited 'the broken marriages' and he said that he felt these broken marriages 'has something to do with it.'... The witness said that his son 'never had the real mother chance.' The witness said that the defendant's real mother never had any time for him").

371. Conry/Hilda Lang Notes I at DB0904 ("She said that he did good at [high school] his freshman year ... and then 'all of a sudden [went] bananas[.]' [S]he said 'he wouldn't go to school—he would stay in the halls' ").

372. Conry/Rosenthal Notes I at DB0892 ("Regarding the way that the defendant was raised, the witness said 'I was very strict with him ... terrible.'... She said that when they got married, she obtained no legal right to custody of the defendant because she never adopted the defendant. She said th[at] she felt that the defendant was 'not very smart' and unintelligent.... She said that she would pick him up and spank him on the bottom.... Of the defendant she said that 'God, he was a brat.'... I asked the witness if the

defendant had an attention problem and she said yes that he did, but that he likes school and didn't do very poorly because he wasn't interested but because he wasn't bright").

373. Conry/Atwell Notes I at DB0907 ("The witness said that she had heard that Carol Rosenthal was 'terribly mean to Ken Lang, Jr.'. She said that Carol Rosenthal used to knock Kenny around,' and 'be really [cruel].' ... She said that Carol Rosenthal told her that this was true").

374. *Id.* at DB0893 ("She said that the defendants' father would go out and get drunk and then come back and take the kid out of his bed in the middle of the night").

375. Conry/Tracy Lang Notes I at DB0895 ("He said that he also knew of the defendant living in a 'Freight Liner' trailer at one time").

376. Conry/Atwell Notes I at DB0910 ("The witness said that she felt that at one time the defendant did have a drug problem, although she didn't really know what the extent of it would be, and she said that at one time the defendant admitted the drug problem").

377. Reconstruction of a chronology is hampered by the fact that Ballew's reports are

Stanley obviously believed that the case warranted early investigation; he retained Conry almost a year before the start of trial. Upon receiving reports that Stanley concedes were below his expectations, but that contained clear indications that further investigation was required, the defense team apparently conducted no further investigation until slightly more than a month before the start of the trial. Stanley did not receive Ballew's reports until he was already in the midst of his first capital trial—a trial in which he was representing petitioner without benefit of co-counsel. Notably, Ballew's reports were not completed until after each of the experts had examined petitioner; even had Stanley wanted to provide the experts with background information, therefore, he would have had only Conry's incomplete reports available.

Evaluating the standard of care in a 1982 California trial, the Ninth Circuit concluded that "preparation for the sentencing phase of a capital case should begin early and even inform preparation for a trial's guilt phase." *Allen*, 395 F.3d 979, 1001 (9th Cir.2005). The *Allen* court quoted at length the following passage from an article published in 1983 and authored by a noted California litigator and law professor:

> "Counsel's obligation to discover and appropriately present all potentially beneficial mitigating evidence at the penalty phase should influence everything the attorney does before and during trial. . . .
>
> \* \* \*
>
> The timing of this investigation is critical. If the life investigation awaits the guilt verdict, it will be too late. Although a continuance should be requested and may be granted between the guilt and penalty phases of a trial, it is likely to be too brief to afford defense counsel the opportunity to conduct a substantial investigation." *Allen*, 395 F.3d at 1001 (quoting Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58

---

undated and Ballew offered no testimony regarding the timing of her reports. The court intimates, however, that the bulk of Ballew's investigation was conducted in and after July 1984 and that Stanley did not receive her reports until August and September 1984. Ballew testified that she had conducted little investigation prior to November 21, 1983. (Ballew Depo. at 68:14–17 ("I mean, this [letter] is [dated] November 21st, 1983. I don't think really much was done on that case by me at that point").) Ballew's interviews with petitioner's family members were conducted in-person in Oregon, and her billing records indicate that she did not travel to Oregon until the summer of 1984. This is confirmed by the fact that the only airline tickets Ballew obtained were purchased on July 26, 1984. (Pet.'s Exh. 99 ("Investigative Expenses (Detailed)")). The same billing report indicates that Ballew billed for a motel room at the Rancho Tee Motel on October 16, 1983, but did not charge another motel room until July 11, 1984, when she stayed at Keefer's Inn.

(*Id.*) The Rancho Tee Motel is not in Oregon, but in Atascadero, California. (Ballew Depo. at 150:23–24 ("I think that [the] Rancho Tee Motel is [a] [m]otel in Atascadero").) Moreover, Ballew gave Stanley a typewritten transcription of her interview notes, prepared at least in part by an outside transcription service. (Ballew 2002 Decl., handwritten amendment). Billing records from the transcription service establish that transcription did not begin until August 31, 1984 and that it was completed on September 16, 1984. (*Id.*, Exh. C.) Ballew testified that "Stanley could not have received [her] investigative reports prior to this time frame." (*Id.*, handwritten amendment.) While it appears that Ballew did some sporadic investigative work in late 1983, she billed no hours on the case from December 28, 1983 until June 30, 1984. Although secretaries in the public defender's office could have prepared some of the transcriptions, it is clear that at least some of the reports were not prepared prior to the August 31–September 16, 1984 time frame.

N.Y.U. L.Rᴇᴠ. 299, 320, 324 (1983) (omissions original)).[378]

Stanley does not attempt to explain his lengthy delay in continuing and completing the investigation begun by Conry. Respondent does not attempt to justify the delay. Given the fact that Conry undertook his work more than a year before trial began, there appears to be no justification for the fact that Stanley commenced trial with only Conry's "preliminary work" in hand.[379]

Because trial counsel was dilatory in preparing for the penalty phase, on October 15, 1984 when the guilt verdict was rendered, Stanley and Ballew had not asked a single witness to testify in the penalty phase. In *Allen*, the Ninth Circuit credited the testimony of petitioner's *Strickland* expert, who stated that:

"Another time-consuming aspect of penalty phase preparation is obtaining the cooperation of mitigation witnesses. For many reasons, mitigation witnesses are frequently reluctant to come to court. With time and multiple contacts, their reluctance can be overcome as they understand the role that they would play in the penalty phase of the trial and the significance of their testimony." *Allen*, 395 F.3d at 1001–02.

Applying this rationale, the Ninth Circuit concluded that counsel's performance at a 1982 California trial had been deficient because counsel had had only "one week in which to prepare the witnesses and evidence necessary to persuade the jury to spare [petitioner's] life," and therefore "fail[ed] to thoroughly investigation and present Allen's mitigation case." *Id.* at 1002. Here, Stanley had only three days to prepare a mitigation case; in that time, it was also necessary for him to explain to petitioner, for the first time, his strategy for the penalty phase. Based on the Ninth Circuit's holding in *Allen*, this is deficient performance. As the court there concluded, "[c]ounsel's untimely, hasty, and incomplete investigation of potential mitigation evidence for the penalty phase fell outside the "range of reasonable professional assistance." *Allen*, 395 F.3d at 1001 (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).[380]

378. See *Karis*, 283 F.3d at 1135 (citing Goodpaster, 58 N.Y.U. L.Rᴇᴠ. at 321, for the proposition that "a substantial mitigating case may be impossible to construct without a life-history investigation"). See also *Strickland*, 466 U.S. at 689–90, 104 S.Ct. 2052 (citing Goodpaster, 58 N.Y.U. L.Rᴇᴠ. at 299); *People v. Deere*, 41 Cal.3d 353, 364–65, 222 Cal.Rptr. 13, 710 P.2d 925 (1985) (relying on Goodpaster, 58 N.Y.U. L.Rᴇᴠ. at 317–18, for the proposition that "at the penalty phase defense counsel has a critical obligation to present a case in mitigation, first, 'to assure reliability in capital sentencing,' and second, 'to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die,'" and further that "'[w]here potentially beneficial mitigating evidence exists and counsel has not presented it, counsel has precluded the sentencer from considering mitigating factors. Through failure to discover or present such evidence, counsel has "create[d] the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty"'"); *People v. Frierson*, 39 Cal.3d 803, 816 n. 5, 218 Cal.Rptr. 73, 705 P.2d 396 (1985) (evaluating the standard of care for a trial conducted in 1980, and relying on Goodpaster, 58 N.Y.U. L.Rᴇᴠ. at 333 & n. 137, for the proposition that "'counsel has an obligation to thoroughly investigate and assess both guilt and penalty phase evidence, to inform his client fully of the trial implications, and to obtain the client's assent to the respective guilt and penalty phase cases to be presented'").

379. Stanley Depo. at 213:2–6 ("My idea of hiring Mr. Conry was to get a preliminary kind of investigation of Mr. Lang's background and family with the idea that ultimately we would have a full-time investigator who would do follow-up work").

380. Similarly, in a case considering the standard of care for trial counsel in California in 1984, the Ninth Circuit held that counsel's performance was deficient where counsel pre-

Even had Ballew begun her work earlier, however, the investigation she conducted was incomplete. Ballew interviewed only four of petitioner's family members: his father, mother, second stepmother, Hilda Lang, and step-aunt, Susie Rosenthal. Given that Stanley apparently considered petitioner's grandmother a key witness, it is curious that Ballew did not interview her separately. Petitioner's grandmother appears to have been present during Ballew's interview of petitioner's father, and to have interjected certain comments, but there is no indication that Ballew raised the possibility that she might be asked to testify at any penalty phase. Conry's interview notes similarly do not indicate that he raised the concept of testifying with petitioner's grandmother. Additionally, although petitioner's father was present in court for part of the trial, neither Stanley nor Ballew asked him to testify or to provide information regarding other potential witnesses.[381]

Nor does it appear that Ballew asked the witnesses she interviewed to elaborate on the information they or others had earlier provided to Conry. Based on her notes, Ballew never asked any family member about the emotional and physical abuse petitioner suffered at the hands of Carol Dewey.[382] She similarly made no attempt to develop further evidence of the emotional problems petitioner suffered as a teenager; the emotional trauma he experienced as a preteen when he was a pawn in fights between his intoxicated father and Carol Dewey; the fact that he was

---

sented a mitigation case, but "spent virtually no time preparing [ ] witnesses for their testimony" and at least one witness asserted that "she did not even know she would be testifying until the night before the penalty phase began." *Douglas*, 316 F.3d at 1087. In another case considering the standard of care applicable to a 1982 California trial, trial counsel believed that the defendant's mother would be hesitant to testify about family abuse and did not know what she would say. Despite this, the court held that counsel committed an error "of constitutional magnitude" by failing to elicit information regarding the abuse from other witnesses or "explain[ing] to [defendant's mother] the gravity to her son in not testifying about the abuse." *Karis*, 283 F.3d at 1136.

**381.** Declaration of Kenneth Burton Lang Sr. ("Lang Sr. 2002 Decl."), Docket No. 343 (Apr. 19, 2002), ¶ 2 ("I was not told that I could testify for my son. Even though I was there in court, the defense lawyer himself never interviewed me or asked me about Kenny's life, what it was like for Kenny growing up, what kind of person he was, what experiences Kenny went through, how the family treated him, what the family thought of him. Nothing. I was not asked to speak with any mental health professionals about Kenny. Nor did the defense lawyer ask me to meet with Kenny to discuss testifying at the trial or

what it might mean to him and the jury if I did testify. The defense lawyer never asked me who else might offer helpful information about Kenny and his life or who else might be willing to come to court and testify on Kenny's behalf. The defense lawyer did not ask me for names of other people that could have been interviewed about Kenny and his life").

**382.** The only entry in Ballew's interview notes that even hints at the sustained abuse petitioner suffered is the following summary of Ballew's conversation with petitioner's mother:

"She said that when Ken Sr. and Carol were hav[ing] a bad time arguing about their marriage she stayed away from the scene[,] i.e., Kenny too. She said that she would ask Kenny Jr. if he loved her and he would. say yes. She said that when Carol and Ken Sr. were fighting she went to an attorney to try to get custody of Kenny. The attorney told her she would have to pay him $400[ ] down before he would work on the case. Phyllis said she did not have the money to do this so she did not go through with her plan to retain custody of Ken. Phyllis said that one time Kenny said 'my Dad[']s to[o] busy for me[.]' She said that only bitterness was ever expressed to him by Carol and Hilda." (Ballew/Atwell Notes at DB0971–72.)

homeless during his teenage years; and the fact that he may have had a drug problem. Indeed, Ballew's reports, although more professional and detailed in certain areas, largely covered the same ground as Conry's. They do not reflect that Ballew had identified important leads and was seeking to develop them. In fact, they show that Ballew interviewed fewer family members than Conry, and thus may well have had a narrower understanding of petitioner's background than he did.

"To be sure, in some cases counsel may have 'sound reason to think it would have been pointless to spend time and money on . . . additional investigation,' thereby rendering counsel's failure to discover additional mitigating evidence reasonable." *Pinholster*, 590 F.3d at 671 (quoting *Rompilla*, 545 U.S. at 383, 125 S.Ct. 2456). See also *Burger v. Kemp*, 483 U.S. 776, 792–95, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (concluding that "counsel's decision not to mount an all-out investigation into petitioner's background in search of mitigating circumstances" was reasonable given that all potential witnesses brought to his attention provided information that was predominantly harmful to the defense, to wit, although petitioner's mother, who was seated in the courtroom during trial, could have testified that defendant had an exceptionally unhappy and physically abusive childhood, she would have been subjected to cross-examination regarding defendant's criminal history). "But such decisions are reasonable only because counsel made them after an investigation adequate enough to make an informed choice." *Pinholster*, 590 F.3d at 671.

In *Pinholster*, the court considered a case in which trial counsel had conducted no background investigation beyond an interview of the defendant's mother and had failed to follow up leads gleaned from that source. The court held there was "no basis for concluding that [counsel] could

have had any 'sound reason' to believe that *'additional* investigation' . . . would not have, as [Pinholster's counsel] termed it, 'ma[d]e a great deal of difference' " *Id.* at 672 (quoting *Rompilla*, 545 U.S. at 383, 125 S.Ct. 2456 (emphasis in *Pinholster* )). Similarly, in this case, the failure to conduct further investigation does not appear to have been the result of any strategic or tactical choice. Rather, having failed to investigate for most of 1983, Stanley and Ballew conducted an investigation that was hurried and inadequate to its purpose. In the course of that investigation, they failed to prepare any witness to testify or even to suggest to any witness that his or her testimony might be helpful to petitioner. Under *Pinholster*—and numerous other cases—this constitutes deficient performance.

Counsel may, of course, decline to investigate and present evidence concerning a capital defendant's character and emotional state when such evidence would conflict with another reasonable mitigation strategy. In *Cox*, 588 F.3d 1038, for example, the court found reasonable a decision not to seek additional mitigation evidence where such "decision reflected counsel's strategic choice to emphasize their primary argument at the penalty phase: that Petitioner was not the shooter [even though he was otherwise involved in the murders]." *Id.* at 1050. Conversely, where counsel indicates that "he did not make a conscious decision to omit humanizing evidence, and did not feel that such evidence would have opened the door to detrimental rebuttal evidence" such that there would have been "no risk . . . [in] presenting [it]," the Ninth Circuit has held that tactical considerations do not justify the failure to present mitigation evidence. *Mak*, 970 F.2d at 619. Here, Stanley did not have an alternative strategy for the penalty phase; indeed, he appears to have been so wedded to calling petitioner's grandmother and father as witnesses that

when petitioner objected, he was unable to develop another strategy for presenting family background and social history evidence. Nor did Stanley believe that introducing mitigation evidence would result in damaging rebuttal testimony, since the prosecutor had informed Stanley that rebuttal evidence would not be presented. For all of these reasons, there is no basis in the record to conclude that Stanley's inadequate investigation was the result of a strategic or tactical decision.

### d. Conclusion Regarding Deficient Performance

Trial counsel performed deficiently at the penalty phase. He failed to ensure that his investigators thoroughly explored petitioner's background in a timely fashion. He failed, despite tantalizing indications that petitioner had a troubled background, to follow up those leads. He failed to ask members of petitioner's family to testify—or to have his investigator do so—sufficiently in advance of the penalty phase that he knew whether they were willing to travel to California for that purpose and what arrangements would be necessary for them to come. He failed adequately to investigate and prepare mental health experts to testify at the penalty phase. He failed to select a reasonable trial strategy when he deferred to petitioner's prefer-

ence that certain witnesses not testify and decided to present no mitigation evidence other than the testimony of Officer Roberts. Finally, he failed to ensure that petitioner understood that the consequence of presenting no mitigation evidence to rebut the aggravating circumstance of his prior convictions would almost certainly be death.

### D. Petitioner's *Brady* and *Mooney–Napue* Violations

#### 1. Procedural History

Petitioner argues that the prosecution's failure to disclose the false and coerced testimony of Donnie Marshall constitutes a violation of due process under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Petitioner argues alternatively that the prosecution violated *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), in which the Court held that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," and that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* at 269, 79 S.Ct. 1173.[383]

---

**383.** In remanding this claim for an evidentiary hearing, the Ninth Circuit did not refer to *Napue,* but cited *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), a case the court characterized as "holding that use by the prosecutor of perjured testimony to obtain a conviction and the deliberate suppression of evidence that would have impeached and refuted the testimony constitutes a denial of due process." *Lang,* 2000 WL 1256886 at *2 n. 7 (citing *Mooney,* 294 U.S. at 112–13, 55 S.Ct. 340). The court is uncertain whether the Ninth Circuit believed that the standard set forth in *Mooney* differed in some way from that announced in *Napue.* The *Napue* Court cited and relied on *Mooney* in articulating the standard quoted in the text. *Napue,* 360 U.S. at 269, 79 S.Ct. 1173 (citing

*Mooney,* 294 U.S. 103, 55 S.Ct. 340). Since the remand, the Ninth Circuit has cited the cases in tandem when describing the rights recognized in *Napue.* See, e.g., *Cooper v. Brown,* 565 F.3d 581, 595 (9th Cir.2009) ("[I]f state actors planted this evidence, its presentation at trial violated Cooper's due process rights under *Mooney* and *Napue*"); *Jackson v. Brown,* 513 F.3d 1057, 1071 (9th Cir.2008) ("The Supreme Court has long held that a conviction obtained using knowingly perjured testimony violates due process. *Mooney,* 294 U.S. [at] 112 [55 S.Ct. 340]. In *Napue[ ],* the Court made clear that this prohibition against the use of false testimony applies even when the testimony in question was relevant only to the witness's credibility. [*Napue,* 360 U.S.] at 269[, 79 S.Ct. 1173]"); *Morris v. Ylst,* 447

■ Three requirements must be satisfied to prove a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Rhoades v. Henry*, 596 F.3d 1170, 1180 n. 10 (9th Cir.2010). "Under the *Mooney–Napue* line of cases, a conviction will be reversed if two conditions are met: first, the prosecution knowingly presented false evidence or testimony at trial; and, second, it was material, that is, there is a reasonable likelihood that the false evidence or testimony could have affected the judgment of the jury." *Morris*, 447 F.3d at 743. Certain facts that are relevant to application of the *Brady* and *Mooney–Napue* tests have already been decided by the Ninth Circuit:

> "The fact that the testimony may have been false and coerced was material because it is likely that the testimony— which undercut Lang's testimony and therefore Lang's theory of defense— would have been viewed with even more scepticism by the jury. Furthermore, the fact that the prosecution had presented coerced and false testimony likely would have raised questions in the minds of the jurors as to 'the thoroughness and even the good faith of the investigation.'" *Lang*, 2000 WL 1256886 at *2 (quoting *Kyles*, 514 U.S. at 445, 115 S.Ct. 1555).

See also *id.* ("Donnie Marshall's declaration raises the question of whether the prosecution knowingly used coerced and false testimony. This question, if resolved in favor of Lang, could show that the prosecution violated Lang's due process rights. Moreover, if Marshall's testimony was indeed coerced and false, the State violated *Brady* [ ], by failing to disclose this information to the defense"). Given these statements, it appears the Ninth Circuit has already determined for purposes of *Brady* that if Marshall's testimony was false and coerced, that was a fact that both material and favorable to the accused. It appears that the court has likewise found that the fact would have been material for purposes of *Mooney–Napue* as well. The issue the court is tasked with deciding is identified in the following paragraph reversing Judge Ideman's denial of an evidentiary hearing:

> "Because Lang would be entitled to relief if he proved that the prosecutor knowingly used coerced and false testimony and/or failed, despite any lack of personal knowledge, to disclose the use of such testimony, we hold that the district court abused its discretion when it denied Lang's request for an evidentiary hearing on this claim."

As a consequence, the remaining inquiry is factual, not legal, and requires that the court determine (1) whether prosecutor Scott knowingly used coerced and/or false testimony; and (2) whether Scott failed, knowingly or otherwise, to disclose the use of coerced and/or false testimony.

## 2. Evidence from Law Enforcement and from Ballew

On January 10, 1984, Charles "Chuck" Watkins, an investigator in the Santa Barbara District Attorney's office who handled

---

F.3d 735, 744 (9th Cir.2006) ("Under the *Mooney–Napue* line of cases, a conviction will be reversed if two conditions are met: first, the prosecution knowingly presented false evidence or testimony at trial; and, second, it was material, that is, there is a reasonable likelihood that the false evidence or testimony could have affected the judgment of the jury"). The court therefore construes the mandate as directing that it determine whether a violation of the rule articulated collectively in *Mooney* and *Napue* occurred.

pretrial investigations, contacted Millie Daniels, who served as petitioner's parole officer in Portland, Oregon.[384] Daniels told Watkins that she had spoken with petitioner when he resided in Portland, and that at one time he had given her an address that was later determined to be Donnie Marshall's. Apparently, petitioner told Watkins that Marshall's name was "John Wurls." Watkins reported that Daniels had visited the address, identified herself, and asked the resident to identify himself. Daniels described the encounter to Watkins as follows:

> "Millie said that Wurls told her that Lang had stayed there and that Lang seemed to always have three or four hundred dollars on him even after having spent money. Millie said that Wurls informed her that he kick[ed] Lang out of the apartment because Lang was carrying a loaded gun with him and at that time Wurls admitted to Millie that he had been on parole and that he didn't want any trouble with Lang having a gun at his place." [385]

The same day he talked with Daniels, Watkins contacted Detective David Kell of the Portland Police Department, advised him of the circumstances of petitioner's case, and gave him petitioner's name and Wurls's name and address. Watkins asked that Kell contact Wurls.[386]

Kell, accompanied by Detective James Bellah, contacted Daniels. According to Kell's investigative report, Kell had assembled a six-photograph photo array based on the information Watkins provided. The array included Marshall. When Kell showed the photo array to Daniels, she identified Marshall.[387]

Kell and Bellah next went to Marshall's residence. According to a report authored

384. Declaration of Charles Watkins ("Watkins Decl."), Docket No. 356 (Oct. 15, 2002), Exh. A ("Watkins Investigation Report") at 1

385. Watkins Investigation Report at 1. Ballew also interviewed Daniels, and made the following notation: "Went out to Donnie Marshall's apartment once. She doesn't know if [she met] Wurls or Marshall." (Petitioner's Exh. 103 ("Ballew/Daniels Notes"), at DB0046.)

386. Watkins Investigation Report at 1 ("After speaking with Millie Daniels, I telephoned the Portland Police Department and was put in contact with Detective David Kell who works the sex crimes unit. I advised Detective Kell of the circumstances of the case that I was working and I gave him the name of both Kenneth Lang and John Wurls and the address that I had been given by Millie Daniels for Wurls. I requested that Detective Kell contact this individual to see what he knew about Lang"); Amended Declaration of David Kell ("Kell Decl."), Docket No. 355 (Oct. 11, 2002), ¶ 2 ("In 1984, our department received a request from the District Attorney of Santa Barbara, California to contact Donnie Marshall, a Portland resident, who was a potential witness in a Santa Barbara murder case"); Kell Decl., Exh. A ("Kell Report"), at

1 ("[Kell] received a telephone call from [Watkins], an investigator for the Santa Barbara District Attorney's Office ..."); Direct Testimony of James Bellah for Evidentiary Hearing ("Bellah Decl."), Docket No. 330 (Oct. 9, 2002), ¶ 2 ("In 1984, our department received a request from the District Attorney of Santa Barbara, California to contact Donnie Marshall. Marshall, a Portland resident, was a potential witness in a Santa Barbara murder case").

387. Kell Report at 2 ("Last Thursday, 01/12/84, [Kell] accompanied by Detective BELLAH, after receiving a request for assistance ..., contacted in Clackamas County MILLIE DANIELS, an employee of the Office of Parole and Probation in Clackamas County. Because of information furnished by Investigator CHUCK WATKINS of Santa Barbara, [Kell] requested Miss DANIELS view six police photographs, in an attempt to identify a man who she believed had the name of JOHN WURLS, and was an acquaintance of the homicide suspect.... Miss DANIELS upon viewing the six police photographs pointed directly to [a photograph] of Mr. DONNIE MARSHALL ...").

by Kell,[388] as well as Bellah's recollection, Kell explained the facts of petitioner's case, and showed Marshall a five-photograph array. Marshall identified petitioner as "Ken"; he said Ken had spent a few days with him in either June or July 1983. Kell stated that Marshall placed his initials on the back of petitioner's photograph.[389] The report then contains the following description:

"Mr. MARSHALL further related to writer that he and KEN[ ] had slept together while KEN was staying at his residence, and had engaged in homosexual love making. Mr. MARSHALL also stated that at that time, KEN was in possession of and carrying a handgun.

Mr. MARSHALL also said he recalled KEN telling him that he was from the Washington area, but was going to be going south in California. Mr. MARSHALL stated that KEN only spent a couple of days with him and because he had the gun, Mr. MARSHALL had asked him to leave." [390]

Bellah recalls that Marshall stated he had "had sex" with petitioner and that he had asked petitioner to leave because he carried a handgun.[391] Bellah also notes: "The interview was cordial. Marshall was relaxed throughout. His statements appeared spontaneous rather than rehearsed." [392] Both Bellah and Kell state that they did not threaten, bribe, or coerce Marshall in any way, or attempt to rehearse his version of events.[393]

---

388. Kell's declaration states that he has no independent recollection of the interview. He reaffirmed the content of the report based on his usual custom and practice, however. (Kell Decl., ¶¶ 3–4.) Bellah reviewed the report and affirmed that it conforms with his independent recollection. (Bellah Decl., ¶ 6.)

389. Kell Report at 2 ("Writer again accompanied by Detective BELLAH on Tuesday 1/17/84 went to [the residence of Donnie Marshall]. Writer explained to Mr. MARSHALL the basic facts of this investigation, and requested Mr. MARSHALL look at five police photographs, in an attempt to identify a white male subject, he stated had stayed with him sometime during June or July or 1983. Mr. MARSHALL upon viewing the photographs, picked out [a photograph of petitioner], stating positively that this was in fact the white boy, who he knew by the name of KEN, who had spent a few days with him in either June or July of 1983. Mr. MARSHALL was asked if he was indeed positive this was a picture of this fellow and he stated that he was, at which time he was requested to place his initials on the back of the photograph, which was also done by Detective BELLAH and Detective KELL"); Bellah Decl., ¶ 3 ("Pursuant to the request from the Santa Barbara District Attorney, I contacted Mr. Marshall at his apartment in Portland. I was accompanied by Detective David Kell. Marshall was shown a group of photographs, from which he identified a photograph of a person he identified as

'Ken' "). The photograph bearing Marshall's initials is not included in the record before the court.

390. Kell Report at 2–3.

391. Bellah Decl., ¶ 4 ("Marshall stated he had previously had sex with 'Ken.' Marshall also stated he asked 'Ken' to leave the apartment because 'Ken' carried a handgun"). Petitioner objects to this paragraph on hearsay grounds. The court notes that the truth of Marshall's statement is not relevant to the court's factual findings. The court's inquiry is limited to whether any of the investigators knew that Marshall's testimony was false or coerced. Accordingly, the statements of Marshall are relevant not for their truth but as evidence of whether Bellah or Kell knew that Marshall's later testimony was false.

392. Bellah Decl., ¶ 5.

393. Bellah Decl., ¶ 7 ("I did not threaten, bribe, or coerce Marshall in any way, nor did I engage him in any type of rehearsal of his version of events. Nor did any other law enforcement officer or any other person engage in any of the foregoing alleged misconduct in my presence.... Neither Detective Kell nor I had any investment in this case other than a request to interview Mr. Marshall"); Kell Decl., ¶ 4 ("Although I have no specific recollection of this interview, I am certain I did not threaten, bribe or coerce

Watkins's report states that he later received a call from Detective Kell, who said that Wurls had been identified as Marshall; that Kell had spoken with Marshall; that Marshall said Kell that he and petitioner had engaged in same-sex sexual relations; and that petitioner was carrying a gun at the time Marshall knew him.[394]

On February 12, 1984, Watkins traveled to Portland and interviewed Marshall at Marshall's apartment with Detective Kell. The interview took place on the morning of February 13, 1984.[395] Watkins tape-recorded the interview and so advised Marshall.[396] Watkins noted that "Marshall appeared to be fairly relaxed during the interview. He did not appear to be nervous or agitated. He did not appear to be intimidated by me or Detective Kell. At that time I was experienced in recognizing the visible signs of intoxication; Mr. Marshall did not appear to be intoxicated."[397]

During the tape-recorded conversation, Marshall told Watkins and Kell that he had met petitioner through petitioner's cousin, Jim Lord. He stated that Lord and petitioner had an argument and petitioner needed a place to live. Marshall said that petitioner could stay with him if petitioner could pay rent.[398] Either Watkins or Kell

Marshall in any way, nor did I engage him in any type of rehearsal of his version of events. Nor to my knowledge did any other law enforcement officer or any other person engage in any of the foregoing alleged misconduct").

394. Watkins Investigation Report 1–2 ("On January 11, 1984, I received a returned call from Detective Kell and he advised me that he had contacted John Wurls and that at this time Wurls had been identified as being Donnie Marshall. Detective Kell went on to advise[] me that Donnie Marshall was known to homosexuals in the Portland area. Detective Kell stated that he talked with Marshall in regards to Lang and that Marshal[l] told him that they had a homosexual affair together and that Lang was carrying a gun around at that time. Detective Kell also advised me that he took a photo line-up to Donnie Marshall's apartment with him to assist in the identification of Lang and that he allowed Marshall to look through the photographs and that Marshall selected the photograph of Kenneth Lang as the person that he had the affair with"). The January 11, 1984 date recorded in the report is inconsistent with Kell's report and appears to be an error. January 11, 1984 would have been the day after Watkins first spoke with Daniels. The precise dates are not relevant, however; only the sequence of events is material.

395. Respondent's Exh. 201 ("Marshall 2/13/1984 Interview") ("Okay today's date is 2/13/1984. The time 1048 hours. I'm Investigator Watkins, Santa Maria District Attorney's Office. Present with me is Detective Kell from Portland P.D. and Donnie Marshall, uh, resident who resides at 2065 Northwest Flanders, Apartment number 102. This, uh, interview will be in regards to Kenneth Burton Lang and his conduct while in the Portland area").

396. Watkins Decl., ¶ 2 ("On February 12, 1984, I traveled to Portland, Oregon, and interviewed Donnie Marshall at his residence there. Marshall was a potential witness in the case. I was accompanied at the interview by Portland Police Detective David Kell. I tape-recorded the interview with Mr. Marshall, and I advised Mr. Marshall that the interview would be recorded. Mr. Marshall stated th[at] he had no objection to a tape recording of the interview. Following the interview I prepared a written report"). Kell has no independent recollection of this second interview. (Kell Decl., ¶ 7.)

397. Watkins Decl., ¶ 3.

398. Marshall 2/13/1984 Interview ("And, uh, so, uh, I seen Kenneth another day by hisself downtown and he told me that, uh, him and his cousin just got in a argument, something to do with, uh, I don't know the rent or something, you know, but his cousin put him out. So I told Kenneth that he can, uh, stay, you know, at my place, you know, I would charge him rent and, uh, so Kenneth moved over to my apartment ... and gave me $50, uh, down on the rent. And at that time that, uh, we were sitting there talking I found out he was on parole and he just recently got out

asked Marshall during the interview whether Marshall was on parole, and Marshall said he was.[399] Marshall also confirmed that petitioner knew that Marshall was bisexual before he moved in.[400] He said petitioner indicated that "he didn't care" about Marshall's bisexuality.[401]

Marshall also related the following exchange regarding petitioner's handgun:

"He just paid the rent and then at the time, uh, he showed me a gun and, uh, I asked him you know what he's doing with it, why he carried that and he told me that you know he be robbing faggots that pick him up on the street out here on, on 4th and Yamhill.... So at the time I was on parole and I just told him that, um, I couldn't let him live here with me because I can be violated and so he came back later with some older guy, white guy with him and, uh, told me that, uh, well he was gonna move out anyway...." [402]

With respect to the purported sexual encounter, the following exchange occurred:

"Q. Let me ask you this, um, did he ever spend the night with you?

A: No. Un-uh. He just came back later on with some other white dude, with blond hair and got his clothes.

Q: Uh-huh. Did he ever sleep with you?

A: No, he didn't sleep with me.

Q: Did you guys ever have an affair together?

A: Uh, we started but that was it. But he didn't sleep with me.

Q: Okay, explain that to me. What went down?

A: Well, uh, when I told him I was bi at the time I think he was loaded on something anyway, I don't know for sure, and, uh, he started letting me give him head but he stopped.

Q: Uh-huh. Okay. Um, what's your recollection of the, uh, conversation you had?

Q: Well, Donnie, when Jim [Bellah] and I were in here talking and we, ah, told you about, kind of about this case and when we asked if you had ever had a relationship with Ken, well you told me and what I put in the report here is that, uh, that he had stayed with you, that you had slept together while he was staying at your residence and engaged in homosexual lovemaking. Now, maybe, maybe you meant that, uh, you just gave him [ ] head once or something but this is what you told us. [ ] We're not so concerned that you had an affair with him or anything like that, it is just that we want to know for certain whether he's that kind of person, or, or, or not, you know. Um, if it happened tell us you know. We just, I'm just after the

of the Oregon State Penitentiary, that's what he told me").

**399.** Marshall 2/13/1984 Interview ("Q: Okay. Were you on parole at the time you met him? A: Yes sir I was").

**400.** Marshall 2/13/1984 Interview ("A: Well, I'm bisexual and, and you know, I like young guys. Q: Uh huh. [ ] Did, um, Kenneth Lang know this, did you let him know that? A: I let him knows it before, you know, he moved in").

**401.** Marshall 2/13/1984 Interview ("I just told him that I was bisexual but, uh, you know he told me he didn't care, you know he'd been in

the penitentiary, you know, but, uh, he don't go that route you know").

**402.** Marshall 2/13/1984 Interview. See also *id.* ("[Y]ou know guys pick him up on the, you know be passing by on the street downtown, you know, where they hustle at, they pick him up and instead of him, you know, let[ting] them do it [ ] he'll rob 'em, that's what he told me.... [H]e told me so far since the time I know him he said he did it probably eight times, nine times here in Portland.... But I know everywhere he went he had that gun with him, he had it tucked down in his, his bellybutton, you know, in a paper bag").

truth, you know, that's all I want to know.

A: Well, um, I mean I told this gentleman that, but I just didn't want to get involved in this, but, um, I don't consider, I don't, him being, uh I don't consider him being gay. I think the reason why he let me did it because he gave me $50 rent and made the difference up that way.

\* \* \*

Q: The night that, um, you were giving him head okay, um, he was aware of what was going on?

A: Oh yeah, you, you know . . .

Q: I mean was it your idea or his idea or . . .

A: Well, you know when he gave me $50 you know down on the rent and, um, he told me that he was going out and make some more money just like that and I said well, I said, if you can just make the difference up with me that way.

Q: Uh-huh.

A: And uh, so he did, he took his clothes off and . . . and, uh . . .

Q: Did he ejaculate?

A: Uh-huh.

Q: So he went all the way with it?

A: Yeah, I just don't like some stuff like that on the—"[403]

At the end of the interview, either Kell or Watkins said: "You're not in any trouble at all, you know, listen, we're just asking, trying to find out, ah, to help these people out down south." [404]

On July 24, 1984, deputy district attorney Michael Scott and Detective Bruce Correll traveled to Portland. Correll independently recalls that "Marshall portrayed Lang as a person who went to the 'camp' area in Portland to rob males who had stopped there to pick up young men for sexual activities. I recall that Marshall expressed amusement that Lang would later claim he was repulsed by a homosexual advance." [405] Correll's contemporaneous report states that Marshall told Correll and Scott "that in exchange for $50.00 rent due on Lang's portion of the rent, Lang had allowed him to orally copulate him." [406] At his 2002 deposition, Correll recalled the following conversation with Scott:

"I certainly remember discussion with Mike [Scott], after we had met with Donnie Marshall, and we were both very convinced that Mr. Marshall was being truthful with us in the totality of explaining to us what type of person Mr. Lang was, how he operated, the areas that he operated. And Mike and I visited those areas in Portland [described by Marshall]. Mike was convinced that Mr. Lang's claim of homosexual outrage was untruthful." [407]

\* \* \*

"Certainly we told him who we were and what we were investigating. And I clearly recall sitting there in his living room, Michael and I, and he was, I think, on a sofa. He was very relaxed. And he—I have this clear recollection how amused he was that Mr. Lang would claim that he was repulsed by someone—by a homosexual male making an advance on him. I have this recollection that he was amused by that, that it was like he was amused, that this was a very ridiculous thing for Lang to say,

---

**403.** Marshall 2/13/1984 Interview.

**404.** Marshall 2/13/1984 Interview.

**405.** Declaration of Bruce Correll ("Correll Decl."), Docket No. 317 (Oct. 8, 2002), ¶ 4.

**406.** Correll Decl., Exh. A ("Correll Report") at 4. Correll quotes this language in his declaration and states that the report "accurately described Marshall's statements during the interview." (*Id.*, ¶¶ 2–3.)

**407.** Correll Depo. at 22:18–25.

and him telling us about Lang living there. I believe he mentioned that he'd had some homosexual relations with Mr. Lang; and that he portrayed Mr. Lang as a person who went down to this areas that I mentioned earlier in Portland to rob males who stopped there to pick up young men for sexual activities." [408]

Scott's 2002 declaration offers much the same account of the interview:

"Prior to the trial, I interviewed Marshall at his residence in Portland, Oregon. I was accompanied by then-detective Bruce Correll of the Santa Barbara Sheriff's Department. Prior to the interview I identified myself to Marshall, as did Detective Correll. In terms of demeanor, Marshall appeared very cooperative and forthcoming during the interview. Marshall made jokes during the interview and spoke very freely and somewhat comically about Lang. It did not appear that Marshall had rehearsed his statements, or that he had been intimidated by anyone to say what he had to say. He did not appear to be parroting any script." [409]

Scott knew that Marshall had prior convictions, but could not detail the precise nature of his knowledge during his 2001 deposition.[410] Scott said that the notion of offering Marshall a deal never came up because Marshall was not a suspect in the investigation and Scott therefore had no leverage and nothing to offer him.[411] Scott indicated that Marshall appeared coherent, lucid and not under the influence of alcohol or drugs.[412] Scott offered the following opinion of Marshall:

"My impression is he was so outgoing, he was so affable, unlike a lot of witnesses one runs into when you become prosecutor trying a case, they don't want to say anything. He was just very

---

408. Correll Depo. at 32:6–22.

409. Declaration of Michael Scott ("Scott Decl."), Docket No. 331 (Oct. 9, 2002), ¶ 2. See also id., ¶ 4 ("At no time during my dealings with Marshall did I threaten, bribe or coerce him in any way. I did not knowingly obtain false testimony from Marshall, nor—to my knowledge—did anyone else. I never told Marshall that if he did not testify in a manner that favored the prosecution, his parole would be revoked. To my knowledge, no other person made such a threat to Marshall either. Nor did I engage in any rehearsal with Marshall of his rendition of any statements or testimony. Nor did I witness any other law enforcement representative or any other person engaging in any such alleged misconduct").

410. Deposition of Michael John Scott ("Scott Depo."), Docket No. 350 (Nov. 29, 2001) at 24:20–25, 25:1 ("I believe that before the interview I was informed that he had priors for something. At the time I don't recall what I was told, but I don't know whether Chuck Watkins had run him, or Detective Correll had run him, but I do recall going into the interview knowing that he was not pure, Mr. Marshall").

411. Scott Depo. at 27;12–25 ("We had nothing on Mr. Marshall, so there was no—we had no leverage, in other words, that—he wasn't a suspect in this case. We just—he was going to be a witness. So, I don't recall him asking for any sort of promises, or making any promises, or his asking for any kind of assurances. I don't remember him even talking about any difficulties he might have been having at the time. But we would not have been in a position to offer him anything because he wasn't a suspect. We didn't have anything on him. There may have been discussions about his, if the case went to trial would we put him up and fly him down and things like that, but that's about it").

412. Scott Depo. at 28:6–15 ("I don't recollect him being loaded when he spoke with us. I mean he didn't—I don't remember him being—he seemed alert, responsive, coherent. He didn't, as I recall, manifest any symptoms that would suggest he was presently under the influence of anything. But, if, you know, would I be surprised if he used drugs and drank? No. I mean, but he didn't seem to indicate or suggest to me that he was under the influence when we talked with him").

garrulous. He was talking and joking, and he did not seem to be under any stress or strain. He talked very freely and somewhat comically about his relationship with Mr. Lang. He didn't seem concerned about any repercussions that he might suffer as a result of speaking so freely about Mr. Lang. So to suggest that he had somehow been given a script, I never told him what to say. I was very pleased with what he had to say when I first spoke with him in Portland. And the things that he had to say many of them I was able to use at trial, some I was not able to, the judge excluded them. But, he did not give me any sense that he was going off a script or that he had been intimidated by anybody to say what he had to say. He was not nervous, he was very relaxed. And to suggest that he was told what to say, that certainly—I didn't tell him what to say. And based on what he presented when I first met him, he was talking very freely. He wasn't parroting any kind of script." [413]

Correll and Scott spoke with Marshall in Santa Maria again before he testified.[414] Correll recalls that Marshall was "much like he was in Portland. He was very friendly. He was very relaxed. And my recollection is Mr. Marshall had a good sense of humor, so he was making jokes and things when I talked to him." [415]

Defense investigator Ballew also interviewed Marshall. Her interview was tape recorded. Although the audiotape has been lost, a tape was transcribed and the transcript is available. Given that Ballew did not travel to Portland until July 26, 1984, it appears that her interview of Marshall followed the Kell–Bellah, Watkins–Kell and Scott–Correll interviews in Portland.[416] Marshall told Ballew that petitioner knew he was bisexual before petitioner moved in. He also told her about his sexual encounter with petitioner.[417] Marshall also recounted that petitioner robbed gay men who picked him up.[418]

**413.** Scott Depo. at 41:4–25.

**414.** Scott Decl., ¶ 3 ("Subsequently, and just prior to his trial testimony, I briefly spoke with Marshall in Santa Barbara").

**415.** Correll Depo. at 33:23–25, 34:1–2.

**416.** Petitioner's Exh. 104 ("Ballew/Marshall Notes"), at DB0538 ("[Q:] Who have you spoken to about Mr. Lang? [A:] Well, all I know is the D.A. from Santa Barbara and a detective from Santa Barbara. [Q:] Do you remember how long ago it was that you spoke to them? [A:] The first one came out about, I think it was two months ago. It was a detective from Santa Barbara and a detective from Portland. Then two weeks ago it was the detective from Santa Barbara and a District Attorney from Santa Barbara"). Marshall suggests that only two interviews with law enforcement occurred in Portland, a misapprehension he reiterated during his 2001 deposition.

**417.** Ballew/Marshall Notes at DB0541 ("[Q:] It was $50 down, what was the agreement about the total amount? [A: ] Well, the total amount would have been $125, but I told him

before he moved in that I was bi-sexual and he said well that didn't make no difference. [Q:] Did he say he was bi-sexual or homosexual? [A:] No, he never did say that to me. [Q:] Did he say he was heterosexual? ... [A:] Yeah, he liked women"); *id.* ("[A:] Well, I mean, I asked him, you know, could I give him head.... [Q:] How about, did it go beyond that? Your asking what.... [A:] Well, he told me it was okay"); *id.* at DB0542–43 ("[Q:] Okay, when you made the pass at him, how did he respond? [A:] He didn't care. He got naked, laid on the floor and I did it. [Q:] There was no conversation? [A:] No, he said he enjoyed it").

**418.** Ballew/Marshall Notes at DB0542–43 ("[H]e didn't [live with me and] he went out and before he went out, he showed me a pistol and I told him he was going to get in a lot of trouble with that but he told me he was a little gangster and that's how he made his living, rolling faggots, you know, older mans"); *id.* at DB0546 ("[H]e told me that he go out and roll faggots. And [I] asked him do you do anything with them, he said no, and I asked him how come he did it with me he

Marshall opined, however, that he did not believe petitioner had committed the crime with which he was charged:

"Because he just didn't seem like a violent man to me. He, every time I saw him, he had a kind word to say to anybody. And I know a lot of people to carry weapons and don't use it. Only think I can say, I don't know for sure, maybe the person that he supposed to shot might have tried to cause him some harm and he [was] probably protecting himself. I don't know but he just didn't, because I look at it this way, he didn't put up a fight with me and I figure that if, you know, that if I had tried to do something to[ ] him against his will he would have to protect himself. Something, maybe, that he was in this, he was in a position that he didn't have no choice but [to] protect himself. I mean, that's the way I look at it, I don't care how the police look at it, that's the way I look at it. He just don't give the impression he's that type of person who would go around hurting people. You know, sure he'd do drugs and stuff but that's nothing, everybody do that as far as I'm concerned." [419]

\* \* \*

"Well, I didn't feel scared or nervous because Lang just didn't give me the impression that he was the type of person who's go around hurting people because I'm talked to[ ] him more than one time before I ever brought him to my

house, downtown, and he just didn't give me that impression." [420]

Marshall said that although there had been a sexual encounter, he was certain petitioner was heterosexual.[421]

At trial, Marshall gave largely the same testimony:

"Q. Prior to his moving in with you, did you let him know what your sexual preference was?

A. Yes.

Q. The defendant didn't stay with you very long, did he?

A. No, he didn't spend the night, or nothing like that.[[422]]

Q. Approximately how many times, if you recall, did you see the defendant in the camp area of Portland?

A. Well, I mostly seen him on Fifth Street; the same thing like the camp area, everybody hangs out there because if they selling drugs or hustling or ripping somebody off or whatever, they're looking to pick up on somebody.

\* \* \*

Q. Did you ever see the defendant with any type of weapon?

A. Yes.

Q. What kind of weapon was that?

A. Pistol.

\* \* \*

Q. During your acquaintanceship with the defendant Lang, did you ever make

said well you seem like you're a nice guy and you know my cousin. That's what he told me. But he didn't tell me he'd go out, you know, shooting them and hurting them or nothing. He told me he'd just scare them, you know").

**419.** Ballew/Marshall Notes at DB0547.

**420.** Ballew/Marshall Notes at DB0555.

**421.** Ballew/Marshall Notes at DB0556 ("I know for a fact that Lang is not homosexual. . . . That's right, I've seen him with too

many women. No, I know for a fact that he wasn't a homosexual").

**422.** At both the Kell–Bellah and the Watkins–Kell interviews in Portland, Marshall alluded to the fact that petitioner had lived with him for some period of time and that Marshall had asked petitioner to leave when he learned that petitioner possessed a handgun. At trial, however, Marshall abandoned this narrative and told a story similar to petitioner's, i.e., that petitioner never spent a night in Marshall's apartment.

any homosexual proposition to the defendant Lang?

A. Yes, sir.

Q. What did you say to him?

A. Well, I asked him could I give him some head.

Q. Give him some head?

A. Yes.

Q. What do you mean by head, sir?

A. Well, going down on him.

Q. I guess the—by law that would be oral copulation?

A. Yes. . . .

Q. When you made that proposition to the defendant did he become angry?

A. No, sir.

Q. Did he push you or use any physical violence on you?

A. No, sir.

Q. Did he attempt to discourage you in any way?

A. No, sir.

Q. Did he use his gun on you?

A. No, sir.

Q. Did he seem disturbed in any way by your tendering that proposition to him?

A. No, sir." [423]

Marshall's direct examination consumed approximately six pages of trial transcript. He was not cross-examined.

**423.** Trial Transcript at 2311:1–24, 2312:21–28, 2313:1–28, 2314:1–2.

**424.** Declaration of Donnie Marshall ("Marshall 8/17/98 Decl.") Docket No. 351 (Aug. 17, 1998), ¶ 2 ("I was first contacted about Ken Lang's case by a Portland Detective. He specifically told me that if I did not cooperate, the police would violate my parole and they would return me to the State Penitentiary. This scared me and I cooperated with the detective. However, when I started answering questions and telling the police about my knowledge of[ ] and experience with Ken, they told me that what I had to say was not what they wanted to hear. I told them that I had been the aggressor and lied to Ken to get him into my apartment because I did not believe Ken would have willingly come into

### 3. Marshall's Recantation

In post-conviction proceedings, Marshall offered testimony that contradicted his trial testimony and the accounts of Scott, Watkins, Kell, Bellah, Correll, and Ballew. Marshall signed a declaration in 1993, and a second, substantially identical one in 1998. Although he could not identify the individuals involved by name, he recalled a first meeting during which a Portland detective told him that if he did not cooperate, the detective would report him for a parole violation and return Marshall to the state penitentiary. During this interview, Marshall told the detective that he, not petitioner, had been the aggressor in the sexual encounter; that Marshall had lied about his sexual orientation to get petitioner into his apartment; and that petitioner had been "heavily drugged and not aware" at the time the sexual act occurred. After petitioner became aware of what was occurring, Marshall stated, he became "frightened[,] . . . confused" and "very upset" and left Marshall's apartment immediately. Marshall asserted that the Portland detective and a Santa Barbara investigator had forbidden him from revealing these facts.[424] Instead, he said,

"[t]hey specifically instructed me to testify that sex with a guy did not bother Ken. This was a lie. Ken was obviously

my apartment if he knew I was a homosexual. I told them Ken would not have willingly consented to a sexual act. I told them that Ken had been heavily drugged and was not aware that I was pulling his pants down and orally copulating him until I was already orally copulating him. I told them Ken was not a homosexual. I told them I did not see Ken in the homosexual neighborhood of Portland. I told them that Ken seemed frightened and confused. I told them that Ken was very upset when he left my apartment. The Portland Detective and the Santa Barbara Investigator forbade me to reveal any of the above facts"). In his 1993 declaration, Marshall stated that he made a pass at petitioner, and petitioner rebuffed his advances. Marshall said that he then gave petitioner whiskey,

upset with the act I performed on him when he was drugged. They specifically told me to testify that Ken told me he robbed faggots. This was a lie. Ken never told me that or anything like that. They told me that I had to say that Ken willingly participated in a sexual act with me. This was a lie. Ken was too heavily drugged to willingly participate and would not have let me do it if he had not been drugged. They also told me to say that Ken carried a gun all the time. This was a lie because I had no idea whether Ken carried a gun or not. They told me to testify that Ken said he used a gun to threaten men he robbed. This was a lie. Ken never told me that or anything like that." [425]

In his 1998 declaration, Marshall recalled a second meeting, in which the Portland detective was accompanied by a Santa Bar-

followed by marijuana, and possibly other drugs, such as acid or speed. (Marshall 9/16/93 Decl. at 3–4 ("I knew about Ken and who he was before I actually met him. I saw him with Jim Lord on the streets of Portland in the summer of 1983. It was in the area of Fifth Street, where everything was going on. Drugs, prostitution, all kinds of hustling went on on Fifth Street. I asked Lord about Ken because I liked the way Ken looked. Lord told me that Ken was definitely not into men and was 'straight.' When I met Ken, I made it a point not to let on that I liked men. At one point, Ken needed a place to live and I told him that he could share my apartment. I didn't want him to know I was into guys, because I wanted him to move in. We spoke on the street and went to my house. When we got to my apartment, I made a pass at Ken and he refused. I had whiskey and gave Ken whiskey to drink and I also drank the whiskey. I also knew that Ken had smoked some weed. At the time, I was really into drugs, mostly acid and speed. I always drank Old Crow or Old Grand Dad. I know that I gave Ken some drugs and whiskey, thinking that if he was high enough, we could get together. It was after he was drunk and stoned that I told him that I would let him slide for part of the rent if I could perform oral sex on him. Ken was broke and agreed, but only because I tricked him. I got him really messed up on drugs and really drunk. I really took advantage of him. I was also feeling good. During the act, Ken did not enjoy it and did not get off. Afterwards, he collected his things and split right away. He never lived with me. He never even stayed the night. I think he left when he realized what had happened with me").)

**425.** Marshall 8/17/98 Decl., ¶ 3. In addition, Marshall contended that he did not see petitioner carrying a gun around Portland, but only saw petitioner's handgun on the one night that petitioner came to Marshall's apartment when it fell out of a bag he was carrying. Marshall 9/16/93 Decl. at 1 ("After that, the same detective and another detective or D.A. from California came to my house with pictures and I recognized the gun Ken had at my apartment. I only saw the gun because when Ken was at my apartment it fell out of his bag. At the time the detectives came to my house the second time, I had just gotten off parole and they told me if I didn't cooperate, and say just what they wanted me to say, I would be arrested for withholding evidence. All they really wanted to know was did I have anything to do with Ken sexually and did he try to kill me for it. They explained that Ken was charged with murdering a man Ken said molested him or tried to molest him"); Marshall 8/17/98 Decl., ¶ 9 ("In my statement where I said Ken told me he had robbed people about eight or nine times in Portland, that was not true and was a complete fabrication. Where I stated that Ken carried his gun tucked in his pants, that too, is a lie. I never even once saw Ken with a gun on his person. The only time I ever saw a gun was the night Ken came to my house and had it in a brown paper bag. I was lying when I said that he carried the gun everywhere. The police instructed me to say that Ken carried a gun all the time and that he carried the gun I had identified in the photographs they brought and showed to me"); Marshall 9/16/93 Decl. at 4 ("When Ken was at my apartment, he had a pistol. I knew about it because it fell out of his bag. I asked Ken about it. He said he carried it for protection. That made sense to me since the area in Portland was rough, even though Ken did not seem to me to be at all violent or to be a hood. In fact, I remember thinking that the man he shot must have really done something like molest him, like Ken said he did, for Ken to shoot him. I know he was really opposed to gay stuff").

bara investigator. Marshall asserted that during this meeting, the detective and investigator instructed him to "make Ken seem as bad as possible" and gave him largely the same instructions he received during the first meeting.[426] Marshall said in 1998 that he was "certain that the police [had] ... contacted [his] parole officer" and that the officers would have charged him with a parole violation if he had not cooperated.[427] He also said that they instructed him not to speak with anybody about the case except law enforcement.[428]

As respects the tape-recorded statement that Watkins and Kell took, Marshall reported in his 1998 declaration that he had "practiced [his statement] at length before it was recorded. The police really wanted to make sure I knew what I was supposed to say. They coached me so well that I was able to make some things up as I went

**426.** Marshall 8/17/98 Decl., ¶ 4 ("When the Portland Detective came with the Investigator from Santa Barbara, they told me that I had to make Ken seem as bad as possible. They specifically instructed me to say that sex with a guy did not bother Ken and that Ken told me he robbed faggots. They told me to never say that Ken was under the influence of drugs or alcohol at the time I orally copulated him. I was told not to say that Ken did not know I engaged in homosexual acts before coming over to my house. They told me not to reveal the fact that I lured Ken to my house, that I thought Ken was not a homosexual and would never have agreed to sex with me or any man and that in fact he did not agree to have sex with me. They also told me to make it seem like homosexual activity [ ]dominated the camp area of downtown Portland. The police wanted it to seem like it was all one big area—the area where drugs were used, bought and sold, the area where the women walked the streets, the area where young runaway boys and girls hung out and the area where men cruised for other men. In fact, they really wanted me to portray the area as predominately men cruising for other men with whom to engage in sexual conduct. The truth is that the area where the homosexual cruising [took] place [was] a few blocks removed from the camp area where everything else [went] on. I never saw Ken in the homosexual area. I always saw him in the main camp area. The homosexual cruising area was a specific stretch where gay cruising took place and I always saw Ken talking to women, not to the men"); id., ¶ 5 ("The police coached me to say what they needed me to say. They told me not to reveal that Ken was high or in any way under the influence of drugs and alcohol when I orally copulated him. They told me that I had to say that Ken willingly participated in a sexual act with me.

They also told me to say that Ken carried a gun all the time and that Ken told me he robbed men he picked up downtown and used the gun to threaten them"). In his 1993 declaration, Marshall stated that the two people who came to his apartment for the second meeting were "the same detective [who had come once before] and another detective or D.A. from California...." Marshall 9/16/93 Decl. at 1. This statement, and the statement that "a Portland detective came to my house and showed me about four pictures and asked if I recognized any of the people in the photos" (id.), appear to indicate that Marshall did not recall a second officer being at the first meeting.

**427.** Marshall 8/17/98 Decl., ¶ 6 ("I am certain that the police even contacted my parole officer. I truly believe that the police would have charged me with a violation that would have revoked my parole. They would not have to make anything up to have done it either. Back then, I was still engaged in illicit drug use and sexual activity that could easily have landed me in prison").

**428.** Marshall 8/17/98 Decl., ¶ 7 ("During the process of speaking with the detectives, they also told me not to speak with anybody but the police or the DA's office. They instructed me that if anybody tried to speak with me, I should refer them to the DA because I was a key witness. They told me this while I was in Portland and again when I was flown down to California. The encounter with the police and the District Attorney's office over Ken's case was very disturbing for me and upset me quite a bit. I felt I had no choice but to conceal what the police and DA wanted me to conceal and to provide the information they supplied me with that I did not personally know to be true or false").

along." [429] Marshall stated that, in the course of rehearsing the statement, he began to concoct lies on his own, believing that he understood the tenor of the story the officers wanted to hear. He cited the statement that petitioner had a lot of money, once over $1,000, as something that he fabricated independently and not in response to a specific request by a law enforcement officer.[430]

Marshall was deposed in 2001. At the deposition, respondent's counsel examined him at length. One topic discussed repeatedly during the deposition is Marshall's belief that his parole officer had been contacted. Marshall said that his former parole officer, whose name he could not recall, had telephoned after he had been fired. Marshall stated the parole officer said that he had been asked by a detective to threaten Marshall into cooperating, but had refused.[431] Marshall testified that he had this contact with his former parole officer after all of the law enforcement interviews had taken place, but before he met with Ballew.[432] He said he

---

429. Marshall 8/17/98 Decl., ¶ 8 ("The statement I gave when the police turned on the tape recorder was practiced at length before it was recorded. The police really wanted to make sure I knew what I was supposed to say. They coached me so well that I was able to make some things up as I went along. There are many things in that recorded statement that are not true. For example, where I state that I told Ken that I was a bisexual prior to him coming to my apartment is false. I never revealed my sexual interest in the same gender prior to Ken's arrival at my apartment. In fact, I was in the process of luring Ken to my apartment to try and have a sexual encounter with him.... I intentionally withheld my sexual interest because I did not want to scare Ken away because I was hoping to score with him sexually. By the time he came to my apartment the first time, I had already seen him on the street a few times. I totally orchestrated my meeting with him through his cousin").

430. Marshall 8/17/98 Decl., ¶ 10 ("In my statement where I reported that I once saw Ken with a lot of money, over $1,000, that too was a lie. That part I made up on my own. The way the statement came out was that there were certain specific things I was told to say and other things I was told to conceal. We had practiced quite a bit before the recorder was turned on so that by the time the 'official' statement was recorded, I felt pretty confident that I knew what the police wanted from me"). See also Marshall 9/16/93 Decl. at 2–3 ("Before the detectives recorded my statement, they discussed with me what it is they wanted me to testify about. They asked me a lot of questions, in ways that would give them the[ ] information they wanted, and re-

hearsed what I was supposed to say before it was recorded. Also, they told me that they heard stories about Ken taking men's money and being a gangster, which they wanted me to confirm. As far as I know, this was not true, and I told them that. During the time this all went on, I was drinking at least a fifth of whiskey a day. I also dropped acid, and did other drugs. I was constantly high, especially one time that I talked to the detectives").

431. Deposition of Donnie Marshall ("Marshall Depo."), Docket No. 351 (Sept. 21, 2001) at 16:19–25, 17:1–5 ("Q. With respect to the sentence that you are certain the police contacted your parole officer, how do you know that? A. My parole officer told me. Q. Would you please explain that? A. My parole officer told me—he told one day he got fired for some reason. He said because he didn't like a woman being his boss. And he told me the detective called him to try to force me into line, to threaten me—you know—to threaten me to send me back to the penitentiary, and he refused to do it"). In addition to the transcript of Marshall's deposition, to which neither party objected, petitioner lodged a videotape of the deposition. (Docket No. 415 (Feb. 10, 2003).) The court has reviewed the videotape in order to assess Marshall's credibility. Because, however, neither party objected to introduction of the deposition transcript, which was created by a certified court reporter, the court cites page and line references from that transcript.

432. Marshall Depo. at 77:8–18 ("My parole officer, when he got fired he contacted me, let me know he wasn't my probation officer any-

knew that the investigators could not violate him and thus pressured his former probation officer to threaten to do so unless he cooperated. He said the former probation officer simply told him to tell the truth.[433]

Marshall's testimony is implausible and inconsistent. He says he knew the investigators could not violate his parole, and portrays his parole officer as someone who did not threaten him and told him to tell the truth. Yet he contends that he testified falsely in part because of a fear that his parole would be violated if he did not. The events he describes are also factually impossible. Respondent has proffered evidence that Marshall's parole term ended on June 9, 1983, before any of the interviews occurred and, indeed, before the murder of Thurman Anderson. Specifical-

ly, respondent has submitted a Notice of Discharge dated June 9, 1983. The notice appears to be a copy retained in parole office files; it indicates that an original should have been sent to Marshall.[434] While there is no evidence that the notice was in fact sent, respondent has adduced an original certificate of parole, which states that Marshall's term of parole would end June 9, 1983. This certificate is signed by Marshall.[435] The court finds it implausible that, six months to a year after being released from parole, Marshall believed he was still on parole and parole officers maintained contact with him more than a year after the conclusion of his parole term.

Marshall recalled only two visits from investigators. He said he spoke with two Caucasian "old guys in suits" at the first meeting.[436] Marshall acknowledged that

more. He told me the[re] was a detective called him about something to do with the Lang murder case, that they wanted him to put pressure on me to say this and say that or else he would revoke me, and he refused to do it. That's what my probation officer told me. Q. When did he tell you that? A. He told me that after the officers didn't come to my house anymore"); *id.* at 78:20–24 ("Q. Did your probation officer advise you of what you've just described him telling you before or after you talked to that woman? A. Before I talked to the woman").

433. Marshall Depo. at 78:4–8 ("The investigator wasn't going to violate my parole. They wanted my probation officer to force me to go along with them and if I didn't violate my parole, not them. The probation officer. And he refused to do it"); *id.* at 78:23–24 ("And my probation officer told me to tell the truth").

434. Direct Testimony of Lisa A. Chase for Evidentiary Hearing ("Chase Decl."), Docket No. 335 (Oct. 8, 2002), Exh. B ("Notice of Discharge").

435. *Id.*, Exh. A ("Certificate of Parole"); Errata to Direct Testimony Declaration of Lisa A. Chase for Evidentiary Hearing ("Chase Errata"), Docket No. 335 (Oct. 25, 2002) ("Signature Page").

436. Marshall Depo. at 29:7–11. See also Marshall Depo. at 29:17–25, 30:1–7 ("They came in, and we proceeded to sit down at the kitchen table, and they asked me did I know a Ken. And at the time I didn't remember Ken's name. I said no. So they had some pictures with them. First they showed me three pictures of three different white guys and told me to pick out—do I see anyone there I know to pick it out. And I picked out Ken. Then they put four pictures of a gun—four different guns—pictures on the table and told me to pick out if I seen one of these guys before, and I did. And so they wrote something on both pictures—on the back of the pictures, which I don't know what they wrote back there, but that's what they did"); *id.* at 58:9–13 ("Q. Do you recall [the first time investigators visited your home] that they both represented the Portland Police Department? A. That's what I thought they—I know one of them's from Portland. I don't know if both of them were from Portland or not. I don't know"); *id.* at 59:11–21 ("They was older gentlemans. They wasn't no young people. They was older gentlemen. One of them looked like he had some gray and the hair was short. And the other one—you know—he had some hair on his head.... To me they might have been about maybe—I'm going to say about 50. Could have been a little older").

these officers did not threaten him.[437] At the second meeting, he stated, one of the officers who had visited him originally was accompanied by a different Caucasian man.[438]

At the second meeting, the officers informed Marshall that petitioner had killed someone, and asked about Marshall's and petitioner's sexual encounter.[439] Marshall asserted that when he told the officers that he had used alcohol and drugs to lower petitioner's defenses, they threatened him, saying that they knew he was on parole at that time. After threatening Marshall and explaining what they wanted him to say, the officers turned on the tape recorder.[440] Marshall testified that after rehearsing what he was to say, the officers told him that they intended to record the statement.[441] Marshall testified that he first met

437. Marshall Depo. at 61:5–25 ("The first one, the bald head one started talking. They didn't threaten me the first day they came. Like I said, sir, when they first came to my house they knocked on the door, they presented themselves who they was. I let them in my home. We sat at the kitchen table. They asked did I know a Lang. I did not know Lang at the time because I don't remember names. When they put the three pictures on the kitchen table, asked me to point on the table do I know this person—do I see anyone there I know, point it out. I point out Lang. Then, sir, they put four pictures of four different guns on the kitchen table, sir, and asked me if I see a gun that I've seen, point it out to them. I did. And they picked up the pictures, wrote something on the back of the pictures and everything, and I asked them how—why they're here asking me questions, and all they told me at that time they found my name, address and phone number in Lang's possession").

438. Marshall Depo. at 31:20–24 ("[The second visit] I think it was a different man, one of them. I know one of the—one of the ones that came the first time came back, but it was a different person came with him. And he was white also").

439. Marshall Depo. at 32:11–25: 33:1–7 ("That's when they told me that Ken had killed somebody—what you call those—RV things that you drive or something. I don't know. Guy was camping or something and he shot him, and they picked him up at the airport or something using the man's credit card and all of that. And then they went into asking me then—you know—was Ken gay, did I have sex and stuff with him. And when I was telling them the truth they told me they didn't want to hear that. They told me what to say. Q. When you say you told them the truth what do you mean by that? A. I told them that Ken is not gay. I told them Ken

likes women. That's all I have seen him with. I told them that I did have sex with Ken, but I got Ken high and drunk and took advantage, that he really didn't have knowledge that I was doing it. When he realized what I was doing he got up and fled out of my home. And they told me they didn't want to hear it that way").

440. Marshall Depo. at 33:8–25 ("Q. Did they threaten you in any way? A. Yes, they did. Q. Please tell us what they said? ... [A.] Told me that they would know that I've been in trouble with the law a lot, that I'm on parole now for mail fraud, and if I don't say what they wanted me to say, that Ken gave me permission—you know—to have sex with him and also that I know Ken carried a gun around with him to rob homosexuals and stuff like that, they told me that they would see me being violated, and they told me they personally would see to that. Q. By violated you mean violated on your parole? A. On my parole"); id. at 34:7–14 ("So I did what they asked. They scared me. I did not want to go back to the penitentiary. So they coached me and coached me, that I was really tired of seeing them and calling me on the phone, so I lied to what they wanted me to do. And then—I mean, they had me lying so good so I throwed a little bit in myself just to get them out of my hair"). It appears that Marshall does not recall any other threatening behavior. (Marshall Depo. at 87:22–25 ("Q. Did either one of them raise his voice? A. No, but they made it clear to me—they made it clear to me that with my record they can put me in prison any time").)

441. Marshall Depo. at 82:14–22 ("Q. Were you aware during these rehearsals that you were rehearsing for a subsequent tape recorded statement to be made? A. When these officers was talking to me for me to lie they did not have a recorder on. Q. Did they tell

an African American investigator, later identified as Watkins, when Watkins picked Marshall up from the airport in Santa Barbara. He said that he first met the district attorney in Scott's office in Santa Maria.[442] Marshall did not recall that Watkins was at the second meeting, as he believed that he had spoken with two Caucasian officers at that time. He also apparently did not recall the meeting with Scott and Correll in Portland.[443]

Respondent's counsel played the tape recording of the Watkins–Kell interview for Marshall during his deposition. After hearing the tape, Marshall's testimony changed fundamentally. He said he now realized that the African American investigator who had picked him up at the airport in Santa Barbara had in fact interviewed him in Portland and that his first meeting with that individual had not been in Santa Barbara.[444] Marshall then stated that neither officer told him what to say on the day the tape was made; rather, he asserted, he had been told what to say during the first interview.[445] This contradicted Marshall's earlier testimony that he had not been told what to say at the first interview. In subsequent testimony, Marshall could not recall which officer had coached him to lie, and when the coaching had occurred.[446] Later, he stated adamantly that all coercion occurred at the first interview, not at the second.[447] He also testified that he did not remember seeing

---

you they were going to record your statements? A. Yes, sir. After they told me what to say they told they was going to record").

**442.** Marshall Depo. at 36:9–25, 37:1 ("When I got here in California and when I got to the airport it was a black gentleman, heavy set, dark-skinned man, met me at the airport. Well, I thought he was the district attorney. I didn't know what he was. But the way he was talking and coaching me, you know, I figured that—you know—he was the district attorney. But at the time I was in California as I got—he got me to the office in Santa Barbara I think it was—I think it was Santa Barbara where they took me for that trial— then I talked to a white man. And he weared glasses. He was—I found out later he was the DA. And how I found out he was the DA— he coached me in his office. And then I didn't know he was the DA till I went in the court and got on the stand and seen him questioning me").

**443.** Marshall Depo. at 74:1–10 ("Q.... Can you describe the two Caucasian men in the second meeting? A. Well, it was one of the same men that came out the first time and then there was another man that came out. If I remember right he had a full hair—a lot of hair on his head, if I remember right, and he was kind of heavyset, I think he was. Not fat, but kind of heavyset").

**444.** Marshall Depo. at 90:17–22 ("Q. So earlier when you described the two investigators that came to your home that day as Caucasian were you mistaken? A. Yes, I was mistaken. I thought both of them was white, but I for-

got. You know, it's been a while"); id. at 98:3–8 ("And to be honest with you, he must have been in Portland, but I don't even remember seeing this black man in Portland").

**445.** Marshall Depo. at 97:5–9 ("Q. So nobody told you to say on that day—the day the tape was made you had not been told to say that, correct? A. No. Nobody told me to say it because I was told a day before"); id., 97:17–21 ("Q. And the first time they came to your home you were told by—you were told to say that you had told Lang you were bisexual before he moved in, right? A. Yes").

**446.** Marshall Depo. at 102:18–25, 103:1–14 ("You recall that you said that when you asked Lang why he carried a gun he told you he robbed homosexuals who picked him up on the street in the area of Fourth and Yamhill? A. Yes, sir. Q. When were you told to fabricate that information? A. I was told to say that by the Portland detectives—told me that's what I had to say. Q. Do you recall whether you were told to say that just prior to this tape being made or at a prior meeting? A. I can't say when. All I know—when they came they told me what to say. That's what I did. Q. Can you recall—Can you describe which detective told you to say that Lang told you he picked up homosexuals in the area of Fourth and Yamhill? A. The older bald head officer. White officer").

**447.** Marshall Depo. at 150:7–1 ("When they came to my house the second time, that's when they put the threat on me what to say

the tape recorder, implying that he was unaware the interview was being recording.[448] This contradicted his earlier testimony that he was told that he was being coached in preparation for a subsequent recording. Toward the end of the deposition, respondent's counsel asked whether there was a third meeting that involved Scott. Marshall could not discount the possibility that he met Scott in Portland, but did not recall that he recognized Scott when he met him in Santa Maria.[449]

### 4. Conclusion regarding Marshall's Recantation

"Recantation testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction. For these reasons, a witness' recantation of trial testimony typically will justify a new trial only where the reviewing judge after analyzing the recantation is satisfied that it is true and that it will 'render probable a different verdict.'" *Dobbert v. Wainwright*, 468 U.S. 1231, 1233–34 [105 S.Ct. 34, 82 L.Ed.2d 925]

(1984) (Brennan, J., dissenting from denial of certiorari) (quoting *Brown v. State*, 381 So.2d 690, 692–693 (Fla.1980)). As Justice O'Connor cautioned in her concurrence in *Herrera v. Collins*, 506 U.S. 390, 423, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), affidavits made many years after trial, purporting to exculpate a convicted prisoner by offering a new version of events, are "not uncommon" and "are to be treated with a fair degree of skepticism." For these reasons, courts generally have viewed, and properly may view, recantations with some skepticism, if not outright suspicion. See, e.g., *Christian v. Frank*, 595 F.3d 1076, 1084 n. 11 (9th Cir.2010) (emphasizing that a "later recantation of his trial testimony does not render his earlier testimony false," quoting *Allen*, 395 F.3d at 994, and citing *Carriger v. Stewart*, 132 F.3d 463, 483 (9th Cir.1997) (Kozinski, J., dissenting) ("Recanting testimony has long been disfavored as a basis for a claim of innocence" and is viewed, on review, "with extreme suspicion"); *Haouari v. United States*, 510 F.3d 350, 353 (2d Cir. 2007) ("It is axiomatic that witness recantations 'must be looked upon with the utmost suspicion,'") quoting *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir.2003));

and you and nobody else is going to change my mind because that's what they did. They forced me to lie on that man"); *id.* at 150:15–16 ("Sir, I told you that from the beginning. I wasn't threatened at the first time").

**448.** Marshall Depo. at 102:5–17 ("I don't even remember—as a matter of fact, I don't even remember seeing the recorder. See? So as far as I'm concerned that could have had the recorder somewhere in my house and I didn't see it. I know they didn't have it on the table").

**449.** Marshall Depo. at 141:2–11 ("Q. Do you recall that following—that there was a subsequent meeting or a third meeting in Oregon, in Portland, at your apartment involving a sheriff's deputy from Santa Barbara, a prosecutor from Santa Barbara and yourself? A. I

don't remember if it is a sheriff come to my house. I don't know—I don't remember all the peoples come to my house, and I definitely didn't know where they came from. All I know, they were polices"); *id.*, 142:16–19 ("[Scott] might have [met me in Portland]. I don't know. All I heard later down the road—somewhere down the toad—he's not a DA no more for some reason"); *id.* at 142:20–25, 143:1–4 ("Q. We'll get to that. I guess I need to know about your memory. In other words, if you met him in Portland and then you saw him again in California, don't you think you'd remember that? A. In a way, not really, because I have talked to too many different peoples. And like I say—you know—I remember some faces and some faces—you know—you all look all alike to me sometimes, so I don't know. No. I don't remember").

*United States v. Leibowitz*, 919 F.2d 482, 483 (7th Cir.1990) ("Judges view recantation dimly"); *United States v. Nixon*, 881 F.2d 1305, 1311 (5th Cir.1989) ("The recanting of prior testimony by a witness is ordinarily met with extreme skepticism"); *United States v. Kearney*, 682 F.2d 214, 219 (D.C.Cir.1982) ("Recanting affidavits and witnesses are looked upon with 'the utmost suspicion' by the courts," quoting *United States v. Vincent*, 491 F.2d 1326, 1332 (2d Cir.1974)); *United States v. Ahern*, 612 F.2d 507, 509 (10th Cir.1980) ("Recantation of testimony given under oath at trial is not looked upon with favor. Indeed, such is generally looked upon with downright suspicion"); *Majoy v. Roe*, 651 F.Supp.2d 1065, 1069 (C.D.Cal.2009) ("Because recanted testimony is often the result of self-interested motivations, '[r]ecantation testimony is properly viewed with great suspicion,'" quoting *Dobbert*, 468 U.S. at 1233–34, 105 S.Ct. 34 (alteration original)).

Here, more than skepticism causes the court to discount Marshall's recantation. Marshall's deposition is replete with contradictory statements, implausible or impossible factual allegations, and statements that reveal his poor memory of events. Ultimately damning is the fact that Marshall's declarations and deposition repeatedly makes reference to threats revoke or violate his parole despite the fact that his parole term had ended eight months before his first meeting with the Portland investigators and more than a year before he met Scott and Correll. Moreover, Marshall's inconsistent reporting as to who coerced him to give false testimony renders this aspect of his story unreliable. Marshall most frequently asserts that two Portland detectives coerced him during the first interview. This ap-

pears implausible, given that the Portland detectives had little motivation to risk their careers by coercing a witness to assist an investigation in another state. To the extent Marshall contends he was first coerced during the second interview, this undercuts the suggestion of coercion altogether since Kell's report of the first interview, prepared contemporaneously and prior to the second interview, stated that Marshall and petitioner engaged in "homosexual lovemaking," that petitioner carried a handgun, and that petitioner lived with Marshall for several days.

Prior to testifying at petitioner's trial, Marshall was interviewed by the district attorney, a defense investigator, two Portland, Oregon detectives, a Santa Barbara County detective, and an investigator in the Santa Barbara District Attorney's office. Marshall told each the same story. Kell, Watkins, and Correll authored contemporaneous reports reciting essentially the same facts. Watkins and Ballew made tape recordings that also reflected those facts. Despite the extensive evidentiary record created in 1984, there was no evidence or suggestion that Marshall had been coerced or that he was giving false testimony. An individual's "recantation testimony is even more unreliable because his trial testimony implicating [petitioner] is consistent with the other evidence, while his recantation is not." *Allen*, 395 F.3d at 994.

Moreover, the court has reviewed the audiotape of the February 13, 1984 interview. It is not indicative of an individual who is being coerced or told to lie. Marshall speaks freely and the questions the officers put to him were neither suggestive nor intimidating. Marshall laughs throughout the interview and makes off-color jokes.[450] It is simply not plausible

---

450. See, e.g., Marshall 2/13/1984 Interview ("Q. Did he ejaculate? A. Uh-huh. [Marshall chuckles.] Q. So he went all the way with it? A. Yeah, I just don't like stuff like that on the.... Q. Well if this is something I'm gonna write anyway, you know. A. Oh, you know I

that Marshall had been threatened with returning to prison for a parole violation and yet was cracking jokes and offering suggestive commentary.

For these reasons, the court concludes that petitioner has presented no credible evidence that any government actor coerced Marshall or that any government actor knew that Marshall had given any false testimony. As a consequence, petitioner's claim under *Brady* and *Mooney–Napue* fails.

### III. CONCLUSION

For the foregoing reasons, the claim of ineffective assistance of counsel at the guilt phase alleged in petitioner's amended petition for writ of habeas corpus is denied, as is the claim under *Brady* and *Mooney–Napue* regarding the false and/or coerced testimony of Donnie Marshall. As respects the bifurcated claim of ineffective assistance of counsel at the penalty phase, the court finds that trial counsel provided deficient performance at the penalty phase.

The court has conducted an extensive and complete review of the evidence that has thus far been presented in this matter. Although, in reaching its decision, the court has considered only evidence that is relevant to the issues addressed in this order, it has nonetheless taken note of the entire evidentiary record. Based on its knowledge of the record, the court is of the view that, at most, limited additional discovery should be required to address whether petitioner suffered prejudice at the penalty phase as a result of counsel's

deficient performance. The court directs all parties to evaluate critically whether additional discovery is necessary, to discuss how this matter can be resolved in an expeditious fashion and to file a joint report addressing these issue no later than **August 9, 2010.** The status report must detail all discovery any party wishes to take, and indicate the purpose for which that discovery is sought. In addition, the status report should provide each party's opinion as to whether the court can assess prejudice on the basis of the extensive record that has already been compiled. Finally, the joint report should propose a schedule for resolution of the prejudice prong of the penalty phase ineffective assistance of counsel claim.

---

have my pride. [Marshall laughs.]"); *id.* ("Q. Did he ever orally copulate you? A. No. Q. No? A. Uh-uh. I wish he would have but he didn't. [Marshall laughs.]"). At one point Marshall states that "it took him forever to get off," but then says "he liked it." He notes that petitioner "must be one of them long-winded persons" and extends the word "long" so as to emphasize the joke or innuen-

do. (*Id.*) At another point, Marshall laughed for an extended period after noting that petitioner "must have liked it he didn't shoot me." (*Id.*) Marshall described how petitioner dressed and noted that he wore tight blue jeans. Watkins asked if that was to get men to look at him. Marshall said: that "They got me to looked at him," and laughed. (*Id.*)